1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   - - - - - - - - - - - - - - - - - -x

4   In the Matters of:

5   HELLAS TELECOMMUNICATIONS

6   (LUXEMBOURG) II SCA AND                    Main Case

7   TPG CAPITAL MANAGEMENT, L.P., et al.,      No. 12-10631-mg

8            Debtors.

9   - - - - - - - - - - - - - - - - - -x

10  ANDREW LAWRENCE HOSKING and

11  SIMON JAMES BONNEY, INC.,

12            Plaintiffs,                      Adv. Proc.

13     -against-                               No. 14-01848-mg

14  TPG CAPITAL MANAGEMENT, L.P., et al.,

15            Defendants.

16  - - - - - - - - - - - - - - - - - -x

17            United States Bankruptcy Court

18            One Bowling Green

19            New York, New York

20            December 16, 2014

21            2:03 PM

22

23  B E F O R E:

24  HON. MARTIN GLENN

25  U.S. BANKRUPTCY JUDGE

1

2   Adv. Proc. No. 14-01848-mg:

3   (CC: Doc# 36, 37, 113, 114, 115) Certain Apax and TPG

4   Defendants' motion to dismiss the complaint, for lack of

5   personal jurisdiction

6

7   (CC: Doc# 43, 45 46) Motion to dismiss adversary proceeding,

8   filed by Charles Alan Gilman on behalf of Deutsche Bank AG

9

10   (CC: Doc# 47, 49, 50, 51, 52) Motion of The TCW Group Inc., TCW

11   Asset Management Company, TCW/Crescent Mezzanine III, LLC,

12   TCW/Crescent Mezzanine Trust III, TCW/Crescent Mezzanine

13   Partners III Netherlands, L.P., and TCW/Crescent Mezzanine

14   Partners III, L.P. to dismiss the complaint and joinder in

15   motion to dismiss of TPG defendants and Apax defendants

16

17

18

19   Transcribed by:  Esther Accardi

20   eScribers, LLC

21   700 West 192nd Street, Suite #607

22   New York, NY 10040

23   (973)406-2250

24   operations@escribers.net

25

1

2    A P P E A R A N C E S :

3    CHADBOURNE & PARKE LLP

4         Attorneys for Joint Liquidators

5         1301 Avenue of the Americas

6         New York, NY 10019

7

8    BY:   HOWARD SEIFE, ESQ.

9         MARC D. ASHLEY, ESQ.

10        ANDREW ROSENBLATT, ESQ.

11        ERIC DAUCHER, ESQ.

12        ROBERT KIRBY, ESQ.

13

14

15   WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

16        Attorneys for Plaintiffs as Against Deutsche Bank AG and

17         Nikesh Arora

18        270 Madison Avenue

19        New York, NY 10016

20

21   BY:   ALAN A.B. MCDOWELL, ESQ.

22

23

24

25

1  CAHILL GORDON & REINDEL LLP

2        Attorneys for Defendant Deutsche Bank AG

3        80 Pine Street

4        New York, NY 10005

5

6  BY:   KEVIN J. BURKE, ESQ.

7

8

9  KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

10        Attorneys for TPG Defendants

11        1633 Broadway

12        New York, NY 10019

13

14  BY:   ANDREW K. GLENN, ESQ.

15        PAUL M. O'CONNOR III, ESQ.

16        MICHELE L. ANGELL, ESQ.

17

18

19  LATHAM & WATKINS LLP

20        Attorneys for TCW Defendants

21        355 South Grand Avenue

22        Los Angeles, CA 90071

23

24  BY:   WAYNE S. FLICK, ESQ. (TELEPHONICALLY)

25        MICHAEL J. REISS, ESQ. (TELEPHONICALLY)

1

2   ROPES & GRAY LLP

3          Attorneys for Apax Defendants

4          1211 Avenue of the Americas

5          New York, NY 10036

6

7   BY:   ROBERT S. FISCHLER, ESQ.

8          STEPHEN MOELLER-SALLY, ESQ.

9          EVAN P. LESTELLE, ESQ.

10

11

12  TORYS LLP

13          Attorneys for Defendant Nikesh Arora

14          1114 Avenue of the Americas

15          23rd Floor

16          New York, NY 10036

17

18  BY:   JACLYN J. LEADER, ESQ.

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2            THE COURT:  Please be seated.  Okay, we're here in

3    Hosking v. TPG Capital Management, L.P., et al.; it's adversary

4    proceeding number 14-01848.

5            Mr. Seife?

6            MR. SEIFE:  Good afternoon, Your Honor.  Howard Seife

7    from Chadbourne & Parke, for the liquidators.

8            I have a preliminary matter I'd like to bring --

9            THE COURT:  Sure.

10            MR. SEIFE:  -- to the attention of the Court.  The

11    liquidators have settled this litigation as to one of the

12    defendants:  Nikesh Arora.  So I wanted the Court to be aware

13    of that, subject to documentation.  The question which I have,

14    which frankly we haven't been able to see any precedent on it,

15    is whether we can do that simply through a stipulation to

16    dismiss with prejudice or whether Your Honor would prefer a

17    9019 motion.  I know in some Chapter 15s the practice has been

18    not to do 9019 motions, but I don't know if this Court has a

19    preference or predilection, which we would follow of course.

20            THE COURT:  I'm not sure this issue has come up before

21    me, Mr. Seife.

22            MR. SEIFE:  Right.

23            THE COURT:  So you haven't found authority one way or

24    the other?

25            MR. SEIFE:  No cases on point.  We've inquired and

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al.   7

1   it's a practice, but I don't think that means anything

2   particularly.  I don't know if the other defendants care one

3   way or the other, but I wanted to raise it.

4          THE COURT:  My suggestion is confer afterward with the

5   other defendants' counsel.  And I don't -- quite honestly, this

6   issue hasn't arisen before me before.  So --

7          MR. SEIFE:  I could see arguments on both sides,

8   frankly, so --

9          THE COURT:  I take it you don't need approval in the

10  main proceeding?

11         MR. SEIFE:  No.  The liquidator has authority to

12  settle claims without court approval, so it would be on that

13  basis that we would settle.

14         THE COURT:  Yeah, I look in cases in the post-

15  confirmation phase that that's typically what happens.

16         MR. SEIFE:  Right.

17         THE COURT:  A liquidating trust settles -- has

18  authority under a plan to settle without court authority, and

19  that's what's done.  If the foreign representative has the

20  authority in the main proceeding, let's proceed that way.

21         MR. SEIFE:  Okay.  Thank you, Your Honor.

22         THE COURT:  Okay.

23         MR. SEIFE:  We'll do that.

24         THE COURT:  Put it on presentment.  Well, you're --

25         MR. SEIFE:  Stipulation to dismiss?

1    THE COURT:  Because you want me to sign off on -- or

2  not.  Well, I guess not.

3    MR. SEIFE:  No.

4    THE COURT:  No.

5    MR. SEIFE:  No, we just file a --

6    THE COURT:  No, you just file it.

7    MR. SEIFE:  And dismiss.

8    THE COURT:  Let's file it.

9    MR. SEIFE:  Okay.  Thank you, Your Honor.

10    THE COURT:  Okay.

11    MR. SEIFE:  We'll --

12    THE COURT:  All right.

13    MR. SEIFE:  We'll proceed in that way.

14    THE COURT:  Okay.  So we're here to continue with

15  the --

16    MR. SEIFE:  Yes.

17    THE COURT:  -- arguments on the motion to dismiss.

18    MR. SEIFE:  And I think where we left off is we were

19  responding to the arguments regarding the standing of the

20  liquidators; if I could pick up --

21    THE COURT:  Sure.  Go ahead, Mr. Seife.

22    MR. SEIFE:  -- from that point.  And then Your Honor

23  noted a variety of different items we would cover today.

24    Turning to --

25    THE COURT:  Just give me one second, okay?  Let me

1   find my --

2           MR. SEIFE:  Yeah.

3           THE COURT:  -- notes on standing.

4           Go ahead.

5           MR. SEIFE:  And I know Your Honor has multiple

6   binders, so we've put in one small binder some of the relevant

7   cases and statutes.

8           THE COURT:  Sure.

9           MR. SEIFE:  If I could hand that up.

10           THE COURT:  Absolutely.  Thank you.

11           MR. SEIFE:  So -- oh, I'm sorry.

12           THE COURT:  Go ahead.

13           MR. SEIFE:  You ready?

14           THE COURT:  Yeah.

15           MR. SEIFE:  In order to analyze whether the

16   liquidators have standing to bring these claims under the New

17   York Debtor-Creditor Law, I think we need to look both at the

18   DCL and see who's entitled to bring the claims, and then look

19   at English insolvency law to see if the liquidators have in

20   fact the power to bring the claims for the benefit of

21   creditors.

22           So with that, I would turn first to the DCL to see who

23   can sue under the DCL.  And these are the provisions:  270 to

24   281.  And the question is, is it only creditors who can avail

25   themselves of this statute, or those who have a direct

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 10

1   assignment to the claims, or whether it's a broader universe

2   that would include people like receivers, assignees for the

3   benefit of creditors, or in our case a liquidator equivalent to

4   a trustee.

5           The operative sections, 273 and 276, talk about claims

6   which are transfers which are fraudulent as to creditors;

7   doesn't say necessarily who can bring those claims.  But if we

8   look at other sections of the DCL -- and the analysis, of

9   course, has to start with the language of the statute.  If we

10  look at 276-a, which the Court can find at tab 11 in the binder

11  I handed up, it's a section that deals with entitlement to

12  attorney's fees in an action to set aside a conveyance; and

13  what it says is, "In an action or special proceeding brought by

14  a creditor, receiver, trustee in bankruptcy, or assignee for

15  the benefit of creditors," and it continues, to be entitled to

16  legal fees.  So I think, right there in the face of the

17  statute, it answers the question.  It's not just creditors that

18  can bring these claims, but the drafters in legislature

19  specifically provided and intended that other parties can bring

20  the claims.

21          Furthermore, if we look at Section 280, which is at

22  tab 15, it provides cases not provided for in the article.  And

23  what that section says -- and it's a little obtuse but, in

24  parsing through it, it says, "In any case not provided for in

25  this article, the rules of law and equity" -- skipping some

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 11

1  language -- "and the effect of ... bankruptcy or other

2  invalidating cause shall govern." So, clearly again, the

3  drafters envisioned that this provision, the DCL, and the use

4  of the avoidance powers would be tied into bankruptcy, with a

5  small B.

6       So I think these are provisions which, frankly, many

7  of the cases have overlooked. But the answer to the standing

8  issue is right there in the language of the statute.

9       The leading cases on this issue of who can bring

10  fraudulent-conveyance claims under New York law and state law,

11  the analysis starts with the Second Circuit case in Eberhard.

12  And in Eberhard -- the citation is 530 F.3d 122, 122 -- there

13  the Second Circuit was dealing with an SEC-appointed receiver,

14  a very different creature than a liquidator or a trustee in

15  bankruptcy. And the court discussed the role of the federal

16  securities receiver and said it was to preserve the status quo,

17  marshal the assets, prevent dissipation, but not to liquidate

18  an estate. And the court specifically held it was not an

19  alternative to bankruptcy.

20       So the receiver's a very different animal, at least as

21  perceived by the Second Circuit, than, as I'll explain under

22  English law, the liquidator, the role of the liquidator. And

23  the reason for this rule and the distinction of the receiver

24  and the fact that the receiver in this case would not have

25  standing under the DCL, in the language of the Second Circuit,

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 12

1    it would be perverse for the wrongdoer to profit from his own

2    misdeeds.  And that's why a receiver solely standing in the

3    shoes of the company can't bring these claims.  Again, very

4    different from a trustee in bankruptcy; very different than our

5    liquidator.

6          Eberhard was based and relied on -- really is the

7    seminal case in this area from the Seventh Circuit, the Scholes

8    case, which was Judge Posner, and that's at tab 1; I'm not sure

9    it was in the prior materials.  And there we also had an SEC

10   receiver, but Judge Posner thought the receiver in that case

11   had a somewhat broader role, and he allowed the receiver to

12   bring suit under the Illinois statute, which is the exact same

13   statutes; it was the former Illinois fraudulent-conveyance

14   statute, which is very similar to the statute under the DCL,

15   under the UFCA.

16         And the rationale of Judge Posner was that if the

17   wrongdoer no longer exists, there's no legal or practical

18   objection for the receiver to bring these fraudulent-conveyance

19   claims.  And I draw the Court's attention, in tab 1, to the

20   exact language, which is page 3 -- I've highlighted it -- of

21   the inserts.  It's actually -- I believe the citation is page

22   755.  And the rationale is, now that the corporations that made

23   the transfer are controlled by a receiver, whose only object is

24   to maximize the value of the corporations for the benefit of

25   their investors and creditors, we cannot see any objection to

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 13

1    the receivers bringing suit to recover corporate assets

2    unlawfully dissipated.

3            So again, Seventh Circuit even went so far in a

4    receiver case to permit the receiver to proceed, because the

5    receiver, like our liquidator, in England is acting for the

6    benefit of all creditors.

7            THE COURT:  So how does that work if claims belong to

8    creditors?  Because then the risk is the recovery -- or two

9    plaintiffs chasing exactly the same recovery.  For example, I

10   guess the judge, again, just changed his own view in Hellas and

11   is permitting the claims against TPG and Apax on behalf of, I

12   guess, the securities purchasers to proceed, at least at this

13   stage.

14           MR. SEIFE:  Right.

15           THE COURT:  So doesn't that risk the question of who's

16   the proper plaintiff?

17           MR. SEIFE:  Well, we've seen in a variety of

18   circumstances there are overlapping plaintiffs that bring the

19   same claims.  Clearly, the defendants can't be subject to two

20   recoveries for the same fraudulent conveyance.  But there are

21   tools at the ready of the liquidators if there is a situation

22   where individual creditors appear to be gaining the ability to

23   recover assets.  And there are, under English law, injunctions

24   available to recover those recoveries for the benefit of the

25   estate.  Hopefully we won't get to that stage.  This case is

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 14

1  proceeding much more rapidly than the state-court action,

2  which, frankly, has barely begun, so I don't think we'll be

3  faced with that.  But there could be overlapping plaintiffs,

4  yes.

5          THE COURT:  I mean, the Second Circuit's Wagoner rule,

6  in part, is aimed at precisely this issue:  who does the claim

7  belong to, that a trustee or receiver standing in the shoes of

8  the company can't proceed with a claim, the injured party is

9  the creditor, that's who has the right to proceed with it,

10 that's part of the justification behind the in pari delicto

11 rule, the Wagoner -- let me say, the Wagoner rule --

12         MR. SEIFE:  Right.

13         THE COURT:  -- of the Second Circuit, different than

14 the state law in pari delicto doctrine.

15         MR. SEIFE:  Yeah, I think Judge Posner discussed that

16 and, in his view, once -- in that case, Scholes, a receiver,

17 was appointed; in our case, a liquidator -- the taint -- the

18 bad guy -- reason for not permitting that party to sue goes

19 away, because it's not the bad guy trying to recover from a

20 transaction; he was defrauding a third party.

21         THE COURT:  That argument hasn't worked so well in the

22 Second Circuit.

23         MR. SEIFE:  Well, I think the Wagoner rule -- are you

24 talking about Eberhard or --

25         THE COURT:  No, I'm talking about the Wagoner rule.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 15

1        MR. SEIFE:  Well, I think the Wagoner rule is a little

2 different situation, but I've -- on this issue I think you have

3 to look at Eberhard, and Eberhard cites Scholes very favorably

4 and relies on it.

5        THE COURT:  All right, go ahead.

6        MR. SEIFE:  The Barnet case, which was handed up to

7 you at the last hearing, I don't think is particularly good

8 precedent for our situation.  That was a claim brought by

9 Australian liquidators.  And what Judge Castel said in denying

10 the Australian liquidators' standing to bring suit under the

11 DCL, he said, "The liquidators failed to explain standing under

12 Australian law;" and that was an exact quote.  And I think

13 that's why the case failed.  And we will turn and explain how

14 under English law we do have standing.  And of course, the

15 court in that case failed to even examine or look at, because

16 the parties didn't raise it to his attention, the fact that

17 276-a contemplates trustees and assignees for the benefit of

18 creditors, and the like, bringing these claims.  So I don't

19 think that case is particularly problematic for the liquidator

20 here.

21        So with that I'll turn to English law.  And the

22 question Your Honor posed at the end of the day was how the

23 foreign representatives were given standing to pursue these

24 initially creditor claims.  Before I get there, Your Honor,

25 also as to whether this was a question of law or fact -- and I

1    think the answer is it's a question of law, if you look at

2    Federal Rule of Civil Procedure 44.1, which says, "In

3    determining foreign law, ... the court's determination must be

4    treated as a ruling on a question of law," just to clarify the

5    record --

6              THE COURT:  Thank you.

7              MR. SEIFE:  -- on that.

8              So let's turn to English law.  In the Moss

9    declaration, he discusses the role of the liquidator; it's to

10   act on behalf of the estate, to augment the estate for

11   creditors generally, not unlike our trustees here, and then

12   it's a collective remedy so that no individual creditor gets a

13   leg up, as Your Honor pointed out, in a collective proceeding;

14   all similarly situated creditors get treated alike.

15             So where does this authorization come from for the

16   liquidator to bring these claims?  I'd suggest there are four

17   legs to a stool, a four-legged stool if it were; the first,

18   which appears at tab 20 in the binder, was the initial decision

19   and order of Justice Sales; it was the High Court decision

20   which converted the administration to a liquidation.  And I've

21   highlighted the language there on paragraph -- starting

22   paragraph 86.  I don't see page numbers.

23             THE COURT:  It's all right, I'll find it.  Just bear

24   with me a second.

25             MR. SEIFE:  Um --

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 17

1          THE COURT:  Just bear with me a second.

2          MR. SEIFE:  Sure.

3          And this --

4          THE COURT:  Okay, go ahead.

5          MR. SEIFE:  -- case was attached to our petition at

6    the outset.  And the background was the creditors of the case

7    were very unhappy with the role the administrators played and

8    the extent of their investigation.  And Judge Sales -- Justice

9    Sales noted in paragraph 87, "I address the question of putting

10   it into a compulsory liquidation, on the basis that a

11   significant portion of the unsecured creditors wish that to

12   occur" -- put into liquidation -- "and they are unopposed by

13   any other creditor."

14          So it was unanimous that the creditors wanted a

15   liquidation; they want liquidators appointed and they wanted

16   the CPEC redemption transaction to be investigated.  And as

17   Judge Sales -- Justice Sales continues in paragraph 91, "The

18   role of the liquidators is to conduct the investigation and

19   bring claims, to the extent they found there are valid claims."

20          So, number one, it was clearly contemplated by the

21   very appointment of the liquidators that they were to focus on

22   this transaction, investigate it and bring appropriate claims.

23          THE COURT:  But the issue is what claims belong to

24   them.

25          MR. SEIFE:  Yes.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 18

1           THE COURT:  I mean, it's no question that the
2   liquidators should bring any claims that belong to the estate
3   that they --
4           MR. SEIFE:  Right.
5           THE COURT:  -- conclude that they can recover on.
6           MR. SEIFE:  Right.  That's why I'm building --
7           THE COURT:  Okay.
8           MR. SEIFE:  -- building up that crescendo, Your Honor.
9           THE COURT:  The second point:  The liquidators did
10  their investigation, they decided there were appropriate
11  claims, that those claims should be brought in the United
12  States, where many of the defendants were to be found.  They
13  had a complaint drafted up and they brought it to the
14  creditors' committee; the creditors' committee, which acts as
15  fiduciaries for all creditors.  And at tab 21 is a copy of the
16  liquidation committee resolution which sanctioned the bringing
17  of the lawsuit.
18          So the creditors' committee, acting as fiduciaries for
19  all creditors, sanctioned the liquidators going forward with
20  the lawsuit, which was filed some three weeks later.
21          THE COURT:  Sanctioned the liquidators to do what?  I
22  mean, to pursue claims that belong to the estate.
23          MR. SEIFE:  Well, to bring the lawsuit which was
24  presented to them, which is under the DCL.  Okay, that's the
25  second leg of our stool.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 19

1          THE COURT:  Okay.

2          MR. SEIFE:  The third leg is what are the statutory

3   predicates to bringing this.  And tab 17 -- we have a copy of

4   the Cross-Border Insolvency Regulations, the CBIR, Schedule 1,

5   Article 5, and that authorizes, "The British insolvency

6   officeholder" -- and the liquidator is a British insolvency

7   officeholder -- "is authorised to act in a foreign State" --

8   so, clearly, can leave the borders of England and cross the

9   channel and bring suits -- "on behalf of a proceeding under

10  British insolvency law, as permitted by the applicable foreign

11  law," a very broad mandate.  And what's worth noting is the

12  language that it's on behalf of a proceeding.  Doesn't say on

13  behalf of the debtor or the company.  It's the liquidation

14  proceeding.  So a very broad mandate.  And it's as permitted by

15  the applicable foreign law.  So one looks to the DCL and has to

16  see if in fact someone, like a liquidator, like a trustee, like

17  an assignee for creditors, has standing under that statute.

18  And clearly the answer is yes.

19          Finally, the fourth leg of the stool is the insolvency

20  act itself; and that's Schedule 4, Part 3, paragraph 13, and

21  that's tab number 19.  In this schedule are the powers of the

22  liquidator, and some are very specific.  And the last power,

23  paragraph 13, is general; it's the power to do all such other

24  things as may be necessary for winding up the company's affairs

25  and distributing the assets.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 20

1          THE COURT:  Is there substantive English law that

2     construes paragraph 13 to expand or enlarge the range of claims

3     that a liquidator is entitled to do?  I guess what I'm --

4          MR. SEIFE:  I do have a case.

5          THE COURT:  Go ahead.  Go ahead.

6          MR. SEIFE:  I asked Mr. Moss that question and he was

7     kind enough to have a very recent decision, which is at tab

8     number 2, which analyzes paragraph 13, because Defendants have

9     suggested, oh, it's just a throwaway kind of catchall, which

10    can't be relied on.  But that's not the case.  And if you turn

11    to paragraph 55 of this case -- it's the Connaught Income Fund

12    case, which just came out in October -- the facts are

13    different; it's whether a liquidator there had power to take

14    property claims and bring them --

15         THE COURT:  Stop for a second.

16         Mr. --

17         UNIDENTIFIED SPEAKER:  Your Honor, apologies for the

18    interruption, but I object to the introduction, without notice

19    to us, of this foreign law.  Obviously, U.S. law is different,

20    and we can interpret that law as U.S. practitioners.  But to

21    come into court ten days after the last hearing, with new

22    foreign law, without giving us the benefit of our QC's ability

23    to rebut it, I think is unfair.  So I object to the

24    introduction of this.  If Your Honor believes it's some --

25         THE COURT:  I don't know that's being introduced.

1  Mr. Seife is arguing on foreign law.  If what you're saying is

2  you haven't had a chance to respond to it, raise it again when

3  we get to the end of the hearing and I'll decide whether I'll

4  permit you to address the issue.  For now I'm going to hear

5  Mr. Seife, but I'd like you both --

6         UNIDENTIFIED SPEAKER:  Thank you.

7         THE COURT:  -- to stop until I read paragraph 55,

8  okay?

9     (Pause)

10        THE COURT:  Go ahead, Mr. Seife.

11        MR. SEIFE:  So as Your Honor can see, the High Court

12 has viewed paragraph 13 a standalone provision which gives

13 unquestionably broad powers --

14        THE COURT:  I --

15        MR. SEIFE:  -- to liquidators.

16        THE COURT:  I see what it says.  I see where it says

17 it's standalone, but I still don't see how it authorizes a

18 liquidator to pursue claims that belong to somebody else.

19 Maybe I'm making -- I'm building an assumption in that the

20 claims belong to somebody else.  But I don't see where it says

21 that the liquidator has the right to pursue claims that belong

22 to creditors.  So, for example, 544 of the Bankruptcy Code,

23 which you can't use, would give a trustee the right to stand in

24 the shoes of a judgment creditor and pursue creditor claims.

25 You don't have that ability to do that, at least under the

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 22

1   Bankruptcy Code.

2           MR. SEIFE:  Definitely not.

3           THE COURT:  Okay.

4           MR. SEIFE:  What we do have --

5           THE COURT:  So I don't -- but I don't --

6           MR. SEIFE:  Sorry.

7           THE COURT:  -- see how -- reading paragraph 55 of this

8   opinion, without more, I don't see how -- and I see it says

9   it's standalone, but what does "standalone" in this context

10  mean?  It may mean nothing more than that the liquidator can

11  pursue all rights that belong to the estate, whether there's

12  some other provision of positive law that says you can pursue

13  it.  In that sense, and whether all of the courts in England

14  agree with this I don't know, but I see this as saying this is

15  standalone, it is authority for a liquidator to pursue whatever

16  rights the estate may have --

17          MR. SEIFE:  Right.

18          THE COURT:  -- even if there isn't some other section

19  of the insolvency statute that says you can do it.

20          MR. SEIFE:  Well, you have to look at these powers in

21  conjunction with the New York Debtor-Creditor Law, which says

22  trustees, assignees --

23          THE COURT:  The section on attorney's fees says that,

24  right?

25          MR. SEIFE:  Absolutely.  And if you look at Judge --

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al.   23

1   the Seventh Circuit, there was no -- in the Scholes case, there

2   was no 544.  Judge Posner said this makes sense, we have a

3   receiver who can act on behalf of all creditors.  And he

4   permitted standing for the receiver.  It's exactly the same

5   situation.  So you have to read the two in conjunction.

6        And what I think is particularly relevant is the CBIR

7   gives the liquidators the authority to bring claims in foreign

8   countries, which is exactly our case.

9        THE COURT:  I have no doubt that the liquidators have

10  standing to pursue claims in foreign countries, but it doesn't

11  say what claims; it says --

12        MR. SEIFE:  Correct.

13        THE COURT:  -- claims that -- certainly claims that

14  belong to the estate that the liquidator, under U.K. law, has

15  standing to bring.  1509 would say -- grant comity to the

16  foreign representative --

17        MR. SEIFE:  And that's why you need --

18        THE COURT:  -- and give them access to the court.  And

19  maybe he doesn't need 544?  I think I asked -- really at the

20  outset of the case, we made clear at that first-day hearing --

21  obviously you weren't relying on 544, you couldn't do that,

22  because this is a Chapter 15, not a plenary action.

23        MR. SEIFE:  Right.  Well, that's why you really need

24  to look at English law in conjunction --

25        THE COURT:  Um-hum.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 24

1          MR. SEIFE:  -- with New York Debtor- --

2          THE COURT:  Okay.

3          MR. SEIFE:  -- Creditor Law --

4          THE COURT:  All right.

5          MR. SEIFE:  -- and with the overlay of Scholes, which

6  says this is the right thing to do, it's right under law, and

7  it's right as a practical matter, to allow a receiver to have

8  standing under the state fraudulent-conveyance law.  And that's

9  exactly what they're doing.  And when you bring the pieces

10 together, it works.

11         So, hopefully I've created the stool for Your Honor

12 to --

13         THE COURT:  To think some more about.

14         MR. SEIFE:  -- to stand on.  Sorry?

15         THE COURT:  To think some more about.

16         MR. SEIFE:  Well, the critical language is that the

17 liquidators can do whatever is necessary.  And what is

18 necessary --

19         THE COURT:  That's where I go full stop, because the

20 liquidators can't do whatever is necessary; they can do

21 whatever is necessary that's authorized by law.

22         MR. SEIFE:  Right.

23         THE COURT:  And that's where I'm having problems,

24 okay --

25         MR. SEIFE:  Right.

1        THE COURT:  -- both under the New York Debtor and

2   Creditor Law -- and I'll go back -- and I'm certainly aware of

3   the attorney's-fee provision in 273-a.  But I've got --

4        MR. SEIFE:  Right.  So let me --

5        THE COURT:  It doesn't go as far as you're suggesting,

6   okay?

7        MR. SEIFE:  I'm sorry?

8        THE COURT:  Maybe far enough, maybe not.

9        MR. SEIFE:  Great.  But I think Scholes is really

10   the --

11        THE COURT:  Okay.

12        MR. SEIFE:  -- the landmark case that provides us with

13   support.

14        The final point -- Mr. Rosenblatt took my Bankruptcy

15   Code.

16        If we look at the final point, is interpreting Chapter

17   14.  If we look at 1508 -- and hopefully this, to the extent

18   Your Honor is --

19        THE COURT:  You know what, I left my Code on my desk.

20        MR. SEIFE:  Ah.

21        THE COURT:  I usually bring it out.  Just -- no, I'll

22   get mine.

23        MR. SEIFE:  Okay.

24        THE COURT:  Just, everybody sit tight.  Nobody get up.

25        Okay, go ahead, Mr. Seife.

1           MR. SEIFE:  Section 1508 provides that "[i]n

2    interpreting this chapter, the court shall" -- it's required --

3    "consider its international origin" -- and here's the important

4    part -- "and the need to promote an application of this chapter

5    that is consistent with the application of similar statutes

6    adopted by foreign jurisdictions."  So what we're asking to be

7    interpreted is really under 1509(b)(1), whether the foreign

8    representative in our case has the capacity to sue, and, number

9    two, whether the foreign rep may apply directly to a court in

10   the United States for appropriate relief.

11          THE COURT:  Unquestionably, yes.

12          MR. SEIFE:  Okay.  So let --

13          THE COURT:  But the problem is, for what relief --

14          MR. SEIFE:  Well --

15          THE COURT:  -- and what right does he have to assert

16   it.

17          MR. SEIFE:  Right.  So what 1508 says, we should try

18   to be consistent -- Your Honor should try to be consistent with

19   the laws of other jurisdictions that have adopted the model

20   law, because we want consistent application.  And what is in

21   the Moss affidavit, in paragraph 17, is a U.S. trustee who goes

22   over to England has standing to bring fraudulent-conveyance

23   actions under 238 and 423 of the Insolvency Code.

24          So there is --

25          THE COURT:  And Congress decided that 544, 548, 547

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 27

1  can't be applied in the Chapter 15 case; only in a plenary

2  bankruptcy.  So I got to follow what Congress said.

3          MR. SEIFE:  Correct, but Your Honor has the ability to

4  permit the liquidators to bring state-law fraudulent-conveyance

5  claims, which would bring a consistency to what a trustee here

6  could do over in England, which is to bring fraudulent-

7  conveyance claims.  They roll out of the same Statue of

8  Elizabeth, going back to 1570.  This is what trustees have been

9  doing in England since time immemorial, and we would suggest

10 it's appropriate that they do it here in the United States.

11         THE COURT:  So why didn't you bring these actions in

12 England, then?

13         MR. SEIFE:  Well, there's a good reason:  the

14 defendants are here.  We're suing --

15         THE COURT:  No, a lot of them are not here.  I mean, I

16 got all these motions to dismiss for lack of personal

17 jurisdiction.  You didn't sue them in --

18         MR. SEIFE:  The bulk of the defendants we are seeking

19 to --

20         THE COURT:  I'm --

21         MR. SEIFE:  -- get judgments against are here.  We

22 have brought a -- as you know, this is a defendant class

23 action.  There are plenty of other defendants out there that

24 are not susceptible to service and jurisdiction in England.

25         So it was a decision made to go follow the money.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al.  28

1    This is where the bulk of the money went.  This is where the

2    defendants are.  We had to make a choice and this is our

3    choice.

4             THE COURT:  Well, it wasn't the only choice you could

5    make.  You could have sued here over those -- for those

6    defendants against whom you could obtain jurisdiction, based on

7    U.K. -- or Luxembourg, if it was applicable -- avoidance

8    statute.  You didn't do that.  You sued solely under the New

9    York DCL.  I'm not going to revisit the arguments we had the

10   last time, I mean, as to whether there's extraterritorial

11   effect or whether comity would dictate the New York DCL not

12   apply in the circumstances.

13            But it is not correct to say -- I'm assuming that, as

14   to U.S.-based -- U.S.-domiciled defendants -- I'll assume, for

15   purposes of this discussion, you couldn't get jurisdiction over

16   them in the U.K.

17            MR. SEIFE:  Right.

18            THE COURT:  And let's assume that you can here.  Okay?

19   But that doesn't mean you sue under the New York DCL.

20            MR. SEIFE:  No, that was the law which was selected.

21   If Your Honor --

22            THE COURT:  You didn't even allege in the alternative.

23   I mean, the only --

24            MR. SEIFE:  Right.

25            THE COURT:  -- the avoidance claim you've alleged is

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 29

1   New York DCL; I think we talked about last time why that is.

2   I'm not going to --

3          MR. SEIFE:  Well, there's --

4          THE COURT:  -- explore it further.

5          MR. SEIFE:  -- clearly one reason which we were quite

6   frank with, and that is, constructive fraud claims no longer

7   were -- were never available in the U.K.  So that was not a

8   parallel situation.

9          But as the court said in Condor, the plaintiffs in

10  that case could choose to sue in the United States because

11  that's the jurisdiction where they found the defendants.

12         THE COURT:  Under Nevis law --

13         MR. SEIFE:  Under Nevis law, right.

14         THE COURT:  Under Nevis law, not under Texas law in --

15  or I don't remember if it was Condor --

16         MR. SEIFE:  Right.

17         THE COURT:  -- or Louisiana, I don't remember --

18         MR. SEIFE:  Right.

19         THE COURT:  -- if it was Louisiana or Texas, but it

20  was just --

21         MR. SEIFE:  You know, our pleadings are sufficient to

22  maintain causes of action under English law.  I think, you know

23  that --

24         THE COURT:  I don't think so.  You very specifically

25  allege, and the only thing you allege, putting aside the unjust

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 30

1　enrichment claim -- the unjust enrichment claim doesn't say

2　what law governs.

3　　　　　　MR. SEIFE:  Right.

4　　　　　　THE COURT:  But your avoidance claim is solely pled

5　under the New York DCL.

6　　　　　　MR. SEIFE:  I think the --

7　　　　　　THE COURT:  I was surprised.

8　　　　　　MR. SEIFE:  -- the parties have acknowledged that

9　Section 238 and New York State fraudulent-conveyance law -- I'm

10　sorry, Section 423 and actual fraud under the DCL, are similar

11　statutes.  And we have pled --

12　　　　　　THE COURT:  The only thing you alleged in the

13　complaint are New York DCL fraudulent-conveyance claims, actual

14　and constructive fraudulent- --

15　　　　　　MR. SEIFE:  Right.

16　　　　　　THE COURT:  -- conveyance claims.  I was surprised

17　when I saw that, but that's what you did.

18　　　　　　MR. SEIFE:  Right.  I mean, parties do plead in the

19　alternative.  And we can also amend to include English law

20　claims.

21　　　　　　THE COURT:  Maybe you can and maybe you can't.

22　　　　　　MR. SEIFE:  Right.  The facts -- the facts are

23　identical and the statutes, the parties concede, are the same.

24　So I don't -- I mean, that is true --

25　　　　　　THE COURT:  I didn't particularly feel like I wanted

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al.  31

1  to go through this giant exercise -- putting aside the personal
2  jurisdiction issues -- if you think you're going to turn around
3  and say we didn't really mean it, we'll pursue it under English
4  law.  I mean, how far into this case are we now, and how much
5  briefing has taken place?

6          MR. SEIFE:  Well, we --

7          THE COURT:  We'll see where we -- let's see where we
8  get to with the present complaint.

9          MR. SEIFE:  Right.  We do mean it, and we do believe
10 we have standing under --

11         THE COURT:  So why didn't you sue the defendants over
12 whom you could obtain jurisdiction in England?

13         MR. SEIFE:  The liquidators made a decision, and part
14 of it was based on limited resources.  They had to make a
15 decision whether they wanted to fight a three-front war,
16 because you know they brought claims in Luxembourg.  The
17 decision was made --

18         THE COURT:  Not fraudulent-conveyance claims?

19         MR. SEIFE:  No.  No, but litigation which is
20 expensive.  They can't chase every defendant in every
21 jurisdiction around the world.  And they made the decision,
22 this is the most favorable jurisdiction in terms of getting
23 recovery.  And that was -- and this is where the bulk of the
24 money came.  So it was a reasoned and measured decision to
25 bring the claims here.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 32

1        THE COURT:  Go ahead.

2        MR. SEIFE:  That's up to the discretion of the

3   liquidators.  I don't think it should be held against them.

4        THE COURT:  It isn't going to be the discretion of the

5   liquidators that decides the pending motions.

6        MR. SEIFE:  Thank you for reminding me, Your Honor.

7        Okay, well, that's all I have to say on standing.

8        THE COURT:  Okay, thank you.

9        Who's going to pick up for the defendants?

10       UNIDENTIFIED SPEAKER:  I'll try to be brief, Your

11  Honor, because we covered many of the same points from the last

12  time here.

13       The starting point of the analysis is the statutory

14  language of the New York Debtor and Creditor Law.  We're not

15  relying on the Bankruptcy Code to change the meaning and terms

16  of the New York Debtor and Creditor Law.  And I think the point

17  that Mr. Seife raises actually works in our favor about 276-A.

18       Had the New York legislature wanted to include all

19  those different entities as the parties with specific standing

20  to avoid intentional fraudulent conveyances, constructive law

21  conveyances, they very well could have done so.  But the

22  statutory language for avoidance is limited to only creditors,

23  number one.

24       Obviously, the legislature could have decided that

25  because those other parties serve in representative capacities,

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 33

1  that cleaning up the attorneys' fees provision would clarify

2  that they too were entitled to --

3       THE COURT:  And let me just say --

4       UNIDENTIFIED SPEAKER:  -- attorneys' fees.

5       THE COURT:  -- I obviously misspoke earlier when I

6  referred to 273-A.  What I mean, was 276-A.  But go ahead.

7       UNIDENTIFIED SPEAKER:  Right.  But going back to the

8  legal analysis of the case law interpreting this, Mr. Seife

9  cited the Seventh Circuit opinion and Judge Posner's decision.

10 But that case is not binding on this court.

11      THE COURT:  Well, whether it's binding --

12      UNIDENTIFIED SPEAKER:  Eberhard is.

13      THE COURT:  -- I usually find Judge Posner quite

14 persuasive.  So --

15      UNIDENTIFIED SPEAKER:  However, in this case, the

16 Second Circuit has held just the opposite.  In Eberhard, the

17 court said you can't just be a receiver; you can't have the

18 aspirational goals of wanting to distribute value in a way that

19 might be beneficial to creditors.  You have to have legal

20 standing.  And to have legal standing, you have to own the

21 rights as a matter of law to those of a creditor.

22      And the Barnet case follows that principle as it

23 relates to foreign representatives.

24      THE COURT:  I'm not sure I agree that you have to own

25 it.  I -- so I asked the question at the last hearing whether

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 34

1   there was anything in -- I guess you don't call -- what do you

2   call -- it's not a plan in England it's the --

3        UNIDENTIFIED SPEAKER:  Scheme of arrangement?

4        THE COURT:  -- the scheme of arrangement that purports

5   to give -- expressly purports to give the liquidator authority

6   to bring creditor claims.  I mean, I was told, no there isn't.

7        UNIDENTIFIED SPEAKER:  I would argue that would be

8   ownership, if it existed, but --

9        THE COURT:  Well, I --

10        UNIDENTIFIED SPEAKER:  -- it doesn't exist in this

11   case, so it's academic.

12        So going back to the U.K. branch of this, all Mr.

13   Seife did in his exposition was to cite further sweep-up-type

14   language, general language that, much like the court and the

15   other parties in the Seventh Circuit, in Judge Posner's

16   decision tried to say well, this might make sense, it might be

17   something that would benefit creditors; but it doesn't pass

18   muster under New York law.

19        And I think the best proof of that is in tab number

20   17.  And this is something that Mr. Moss cited in his

21   affidavit.  And that is, "A British insolvency officer is

22   authorized to act in a foreign state on behalf of a proceeding

23   under British Insolvency Law, as permitted by the applicable

24   foreign law."

25        So if the New York DCL said foreign law -- foreign

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 35

1  representatives or something analogous to that, can bring

2  claims under the DCL, an enabling statute like this would allow

3  them to do that.  It does not say -- it does not say anything

4  analogous to Section 544(b).  And Mr. Seife didn't cite

5  anything else that's analogous to 544(b) that would provide

6  legal vesting or the authorization to bring claims on behalf of

7  or in the shoes of creditors.

8          So I don't think there's much new that was added in

9  that argument.  And unless, Your Honor has any questions, I

10  would rest on that.

11          THE COURT:  So my focus has been under U.K. law on the

12  enumerated powers in Schedule 4, the power to bring legal

13  proceedings under Sections 213, 214, 239 -- 238, 239, et

14  cetera; paragraph 3A, power to bring or defend any action or

15  other proceeding in the name and on behalf of the company;

16  paragraph -- I guess that's paragraph 4; power to bring legal

17  proceedings as under 213 is under 3A; power to bring or defend

18  any action or other legal proceeding in the name and on behalf

19  of the company is paragraph 4.  And then the issue about the

20  paragraph 13, power to do all such other things as may be

21  necessary.  You want to address that?

22          UNIDENTIFIED SPEAKER:  Sure.  It says --

23          THE COURT:  Is this the winding-up?

24          UNIDENTIFIED SPEAKER:  It's in English.  It says, "The

25  company's affairs and distributing its assets."  So if

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 36

1   anything, that further supports us, because under New York law,

2   these are creditor claims and creditor assets, not the

3   company's assets.  That's why you need Section 544(b).

4           THE COURT:  So why isn't Mr. Seife correct that we

5   have to read 276-A with 276 or the rest of the provision --

6   276-A which is broader in terms of who can recover legal fees?

7   276 itself, perhaps isn't crystal clear about who can assert

8   the claim.  Why don't I read those together?

9           UNIDENTIFIED SPEAKER:  The way I interpret that is the

10  way I opened up.  If the legislature wanted all of these other

11  actors to be able to prosecute these avoidance claims without

12  application of the supremacy clause and 544(b), it could have

13  done so.  I interpret Section 276 as a clarifying statute that

14  allows other parties -- and again, there are special

15  proceedings here, other actions --

16          THE COURT:  276 doesn't say who the plaintiff is.  276

17  just says every conveyance made and every obligation incurred

18  with actual intent is fraudulent as to both present and future

19  creditors.  It doesn't say who the plaintiff is.

20          UNIDENTIFIED SPEAKER:  Well, Eberhard has decided

21  that.  And Eberhard says that only a creditor can bring those

22  claims.  And again, Eberhard involved an SEC receiver, the very

23  predicate of the Scholls (ph.) case and the logic that Mr.

24  Seife has articulated.  So if Your Honor holds that a receiver

25  is enough -- status as receiver without being a creditor is

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 37

1   enough to prosecute these avoidance claims, Your Honor is

2   disregarding the holding of Eberhard.

3             THE COURT:  Okay, go ahead with your argument.

4             UNIDENTIFIED SPEAKER:  So my view is, 276-A is a more

5   general statute that could encompass significantly more than

6   the preceding sections.  It refers to special proceedings,

7   actions, other types of recovery, and then the other sections,

8   as interpreted by Eberhard, relate specifically to creditors

9   qua creditors.

10            And I think Your Honor's point at the outset also

11   backs that up.  This is not a case where there are dueling

12   proceedings like the Luxembourg case.  The Luxembourg case

13   deals with different legal theories that might accomplish the

14   same type of relief that Your Honor might grant, had this case

15   proceeded.  And we deal all the time with claims against

16   officers and directors that approve avoidable transfers.  And

17   they're potentially independently liable under the operation of

18   state law.

19            But in this case, we have a clear conflict between

20   what Mr. Seife believes -- who Mr. Seife believes is the owner

21   of these claims, and the other parties down the street, who

22   also believe that they clearly own the claims.  And I don't

23   think -- I don't think there's any law that backs Mr. Seife up

24   that two parties can bring the exact same claim and both assert

25   their ownership in it.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 38

1          So I think either they own it or he owns it, and I
2    think for all the reasons we've argued, the creditors still own
3    it, because there's no vesting provision that they've cited
4    that gives them ownership or even the representation by
5    creditors to bring these claims.  Thank you.
6          THE COURT:  Who's next?
7          MR. FISCHLER:  Your Honor, you had given us a list of
8    a few items.  Do you have a preference as to what you'd like to
9    hear --
10          THE COURT:  No.
11          MR. FISCHLER:  -- about next?
12          THE COURT:  No.
13          MR. FISCHLER:  In that case, I will address the unjust
14    enrichment --
15          THE COURT:  Okay, you need to make your appearance.
16          MR. FISCHLER:  -- issues -- Your Honor, Robert
17    Fischler from Ropes & Gray, representing the Apax defendants.
18          Your Honor raised a few questions with respect to the
19    unjust enrichment claim.  We can take them in a particular
20    order, if Your Honor would like.
21          THE COURT:  Go ahead.
22          MR. FISCHLER:  Why don't we start, then, with the
23    question you raised as to whether the arguments we have made
24    concerning the extraterritorial application of the statutory
25    law also applies to the common-law claim.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 39

1          The short answer, Your Honor, is that we have been

2     unable to locate a case that has directly addressed this

3     question.  Having said that, we think that the better reading

4     of the cases is that our argument on extraterritoriality does

5     not apply to the common-law claim.

6          THE COURT:  There's an interesting law review article

7     by Jeffrey Meyer, M-E-Y-E-R, "Extraterritorial Common Law:

8     Does the Common Law Apply Abroad?" 102 Geo.L.J. 301, January

9     2014.

10         MR. FISCHLER:  Hmm.

11         THE COURT:  The focus of the article primarily deals

12    with human rights cases, but it's broader, and argues quite

13    strongly that the issue -- the issues about extraterritorial

14    application of common law are very different than

15    extraterritorial effect of statutes.  And that extraterritorial

16    effect of common law traditionally has been given.  You deal

17    with a choice of law analysis and comity, rather than the way

18    statutes are treated.  So it's a lengthy, interesting article.

19         MR. FISCHLER:  Yes.  Well thank you, Your Honor, for

20    that.  We had not seen it, at least I hadn't.  But the case law

21    we have seen talks about the presumption against the

22    extraterritorial application of U.S. law as one of statutory

23    construction primarily.

24         THE COURT:  Yeah, that's, essentially, what the

25    analysis historically has been.  You're dealing with statutory

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 40

1   construction; there's presumption against extraterritorial

2   effect, which can be overcome.

3         The article actually cites one Fourth Circuit case by

4   Judge Wilkinson, where he concluded that extraterritorial

5   effect should not be given to common law.  But there are very

6   few cases on this issue.

7         MR. FISCHLER:  Right.  So that, Your Honor, is our

8   answer to that question.

9         THE COURT:  Well, give me the rationale of why -- I

10  mean, don't -- look, if the plaintiff hadn't so clearly pled

11  New York DCL for the avoidance claims, I would be faced --

12  wouldn't I be faced with issues regarding not only

13  extraterritorial effect, but comity, choice of law rules?  I

14  mean, that's what Maxwell really dealt with.  Judge Brozman,

15  both determined no extraterritorial effect of the preference

16  statute, 276, but -- 547, excuse me, and then also decided it

17  on comity, on the basis of comity.  And she goes through a

18  choice of law analysis, uses the center of gravity as the

19  applicable test.  The District Court affirmed her on both

20  grounds; the Second Circuit affirmed only on the basis of

21  comity.

22        MR. FISCHLER:  Well, Your Honor, we think you can get

23  to the same place by saying that the extraterritorial analysis

24  does not apply to the unjust enrichment claim.  We, by no

25  means, are saying that Your Honor should be deciding that claim

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 41

1  here under New York law.

2          THE COURT:  Well, here -- look, there are defendants

3  in this case who I assume are not amenable to process in

4  London, but who are, we'll see, amenable -- there would be

5  personal jurisdiction here.  There was at least -- I think one

6  of your clients is in New York, right?

7          MR. FISCHLER:  Yes.

8          THE COURT:  Okay.  So just deal with that.

9          And there is an unjust enrichment claim against your

10  clients?

11          MR. FISCHLER:  Yes.

12          THE COURT:  So it's probably premature, because no one

13  has squarely, other than me, has raised the issue about choice

14  of law, and extraterritorial effect, state law.  I don't have

15  to decide at this stage.

16          I mean, my limited poking at UK law is that they have

17  unjust enrichment claims; it may be denominated differently, an

18  action and a subset and I saw something about the historical

19  origins of it, but they do recognize -- do you agree with that,

20  the UK recognizes unjust enrichment?

21          MR. FISCHLER:  Yes.

22          THE COURT:  Okay.  So that's what Chapter -- to me,

23  that's part of a Chapter 15 is about, that the foreign

24  representatives are granted comity, the right to appear and

25  sue, assuming they have personal jurisdiction over your client.

1   And maybe they can't get personal jurisdiction over some of

2   your clients in the UK.  You can't escape an unjust enrichment

3   claim because the foreign representative happened to find you

4   here.  It may be, and I'm not -- I don't know that I have to

5   decide it now, whose law would apply to it.  So because, at

6   least when I look back at that claim, it didn't say -- it said

7   unjust enrichment, it didn't say whose law applies to that

8   claim.

9        So would you agree that if there's jurisdiction over

10  your client here, and an unjust enrichment claim is pled, that

11  the Court's role would be to determine whose law is applicable

12  in the circumstances?  And if it's UK law I would proceed to

13  decide the claim against your client based on UK law.  You

14  agree with that?

15       MR. FISCHLER:  No, I don't, Your Honor.

16       THE COURT:  Tell me why not.

17       MR. FISCHLER:  Well, a couple of things.

18       First, as we talked about last time, in a choice of

19  law context, the first step is to identify whether there's an

20  actual --

21       THE COURT:  Where there's an actual conflict.

22       MR. FISCHLER:  -- conflict.

23       THE COURT:  Absolutely.

24       MR. FISCHLER:  Right.  So if we -- we are not able to

25  identify --

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 43

1          THE COURT:  Nobody's briefed that yet.

2          MR. FISCHLER:  And we have, as we said in our brief

3    before the last hearing, we had not identified any actual

4    conflict.  In light of the inquiries Your Honor made at the

5    last hearing, we went back and revisited the issue with our

6    experts.  We still have not identified a material difference.

7          THE COURT:  So if there's no difference between UK law

8    and New York law regarding unjust enrichment, then what New

9    York choice of law principles would say is court, apply New

10   York law, right?

11         MR. FISCHLER:  Right.  If you kept the case alive

12   and --

13         THE COURT:  Correct.

14         MR. FISCHLER:  -- rejected our other arguments, yes.

15         THE COURT:  So, look, I mean, if the foreign

16   representative comes here and sues one of your clients that can

17   get jurisdiction over here, but can't get jurisdiction under UK

18   law, and there's no actual conflict between UK and New York

19   law, the teaching is I apply New York law, and I would

20   adjudicate -- I grant comity to the foreign representative.

21   He's -- you haven't argued -- you haven't argued he doesn't

22   have standing to assert an unjust enrichment claim.

23         MR. FISCHLER:  Well, we have in terms of in pari

24   delicto.

25         THE COURT:  And I do have a question about that, and

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 44

1  you can address it now.  Has in pari delicto been applied to

2  unjust enrichment claims?

3          MR. FISCHLER:  Yes.

4          THE COURT:  Can you give me a case regarding that?

5          MR. FISCHLER:  I believe I can, Your Honor.

6          THE COURT:  Because most of the cases I'm familiar

7  with involve fraud, breach of fiduciary duty claims.  That's

8  where in pari delicto has generally arisen.  I'm not saying it

9  hasn't arisen in the context of an unjust enrichment claim, but

10 the policies that underlie the state-law doctrine of in pari

11 delicto, or the Second Circuit's standing rule, the Wagoner

12 rule, I'm not sure that those same policies would apply in the

13 case of an unjust enrichment claim.  Maybe they do.  If you

14 have some case authority that says that?

15         MR. FISCHLER:  They do, Your Honor.  I don't know that

16 I have a case right in front of me, but I am quite sure, based

17 on what we've seen that -- and it may be the Madoff case, Judge

18 Lifland, which is cited in our brief, as well as the AlphaStar

19 case, which is also cited in our brief, a case decided by Judge

20 Bernstein.  But I will need to confirm those to you, unless one

21 of my co-counsel's able to say for sure whether they involve

22 unjust enrichment or not.  But I am quite sure that we have

23 seen in pari delicto applied in the unjust enrichment context.

24         THE COURT:  And of course, the foreign representatives

25 argue that your clients should be deemed to be insiders, and,

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 45

1  therefore, the role in pari delicto --

2          MR. FISCHLER:  Right.

3          THE COURT:  -- is not a defense on claims against

4  insiders, at least at this pleading stage.

5          MR. FISCHLER:  That's the issue.  I want to address

6  that, Your Honor.  If I could just briefly comment on the one

7  other thing that we were talking about --

8          THE COURT:  Yes.

9          MR. FISCHLER:  -- before we get off it?  You,

10 yourself -- you had raised at the last hearing a -- posited a

11 scenario whereby a conditional dismissal might be what makes

12 sense here, meaning dismissal --

13         THE COURT:  I don't know -- I'm not sure whether I was

14 positing that or -- I certainly raised the question about that.

15         MR. FISCHLER:  Whether you were using, or what -- you

16 raised the question.  I'm not trying to attribute anymore than

17 that to it.

18         And as we thought about it after the hearing, it

19 occurred to us that we think it's clear for the reasons we

20 talked about last time, that certainly the constructive

21 fraudulent-conveyance claim cannot be heard in New York,

22 because foreign law applies.  Under either foreign law that's

23 plausible.  There is no constructive claim; therefore, at a

24 minimum, that has to be dismissed.

25         If Your Honor then were to look at the other two

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 46

1   claims, the actual fraudulent-conveyance claim, and the unjust

2   enrichment claim, both of those claims can be brought in the

3   UK.  You start with the basic proposition, as Your Honor

4   certainly knows better than I, that as a Chapter 15 Court, you

5   are here to support, not to supplant the foreign main

6   proceeding.

7         There is no reason that those two claims, both of

8   which are available to the liquidators under UK law, which they

9   say would apply either in Luxembourg or the UK, couldn't be

10  brought, let's say, in the UK, so long as you had a consent to

11  personal jurisdiction by all of the other defendants.

12        Under those circumstances, we would submit to Your

13  Honor, that consistent with your role as a Chapter 15 Court,

14  your assistance to the foreign main court would no longer be

15  required.  You would have given the liquidators the ability to

16  bring their claims in the UK against all of the defendants

17  here.  And that would be consistent, not only with the support

18  role of a Chapter 15 court, but also, with the teaching of some

19  of the cases, including the recent decision by Judge Peck in

20  the -- bear with me one second, in the JSC BTA Bank case, at

21  434 B.R. 334.  That's a 2012 decision where he held that the

22  automatic stay in Chapter 15 did not apply to a foreign

23  arbitration.

24        But what he talks about there, is the notion that a

25  Chapter 15 court should refrain from needlessly intervening in

1   a dispute that doesn't have any significant contacts with the

2   U.S.  And we would submit to Your Honor that this is precisely

3   a case where that sort of refrain should be exercised.  And so

4   doing what you had at least thrown out as a possibility, if you

5   were to get consent from the U.S.-based defendants to be sued

6   in the UK, would be consistent with both Chapter 15, consistent

7   with the principles of comity that are discussed in Maxwell,

8   and applied by numerous other courts to defer to a foreign

9   tribunal where that other foreign jurisdiction has significant

10  contacts, and a genuine interest in a dispute.

11          THE COURT:  I think what you have to look at, Mr.

12  Fischler, is Section 305(a)(2), and apply the analysis and the

13  argument under that section.  It's the section that deals with

14  abstention; (a)(2) specifically applies in Chapter 15 cases.

15  There's a body of law that's developed about when abstention

16  under 305 is appropriate, and when it's not.

17          What you're suggesting is all hypothetical in the

18  sense that whether all of the defendants -- so, look, the

19  unjust -- the New York DCL claims were asserted against all

20  defendants, actual and constructed.  The unjust enrichment

21  claim was only asserted against the Apax and TPG defendants.

22  But 305 is the section that -- and I'm not -- that would be the

23  section and the case law that's developed under it.

24          In the Monitor case some years ago, I refused to

25  abstain in a Chapter 11 case where there were foreign

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 48

1  proceedings, and -- I think it was the UK, in fact, where there

2  was proceeding, but I denied it.  I analyzed the abstention

3  doctrine, and that was that case, it's different from this.

4       But I understa -- I raised the issue last time for a

5  reason, obviously.  But all I can suggest is is that you and

6  your colleagues talk to Mr. Seife and his colleagues.  And it

7  would seem to me, at a minimum, the following -- before you got

8  serious consideration from me, at least the following would be

9  required:  that all defendants in this case consent to

10  jurisdiction in the UK, they all agree that they -- all

11  defendants agree they will not assert statute of limitations

12  defense for the period in which this case has been pending.

13  Those are the first two obvious points that came to my mind,

14  there may be additional ones.

15       Go ahead with your argument.

16       MR. FISCHLER:   Thank you, Your Honor.

17       So turning to in pari delicto, and particularly the

18  plaintiff's argument that the Apax and TPG defendants were

19  insiders by virtue of controlling the company, that theory is

20  unsustainable in our view because the complaint is devoid of

21  factual allegations that support it.  There simply is no basis

22  in the complaint for a plausible inference that any Apax

23  defendant or any TPG defendant exercised any meaningful degree

24  of control -- in fact, any degree of control over Hellas II.

25       But, first, no Apax or TPG defendant is alleged to

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 49

1   have had any managerial role with respect to the company or to

2   have directed Hellas II to redeem CPECs.  To the contrary, the

3   complaint specifically alleges that Hellas II was managed by

4   what is referred to as its "manager" which is Hellas, its

5   ultimate parent and particularly Hellas' board of managers.

6          As we talked about last time, each of the individual

7   members of the board of managers is now a defendant in

8   Luxembourg.  If plaintiffs were to argue to Your Honor that

9   those defendants have insider status and could not assert an in

10  pari delicto defense because of it, they might have a plausible

11  position.  But that's not what we're talking about here.  Those

12  are not the defendants in this case.

13         None of the Apax defendants or TPG defendants here

14  were members of the Hellas board of managers, and as I said,

15  there is simply not a single factual allegation that any of

16  them had any managerial control over Hellas II.

17         In addition, there are no allegations of ownership

18  with respect to Hellas II, and particularly with regard to any

19  Apax or TPG defendant.  No allegation that any of them had an

20  ownership interest, let alone a controlling interest.

21         At page 25 of their brief, the plaintiffs assert

22  without citation that, "TPG and Apax," who again they refer to

23  collectively, as if all twenty of those defendants can simply

24  be lumped together, which of course they can't be.  But even

25  putting that aside, there are simply no factual allegations

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 50

1  that any of those defendants had an ownership interest and as I

2  say, much less one that would constitute control over the

3  voting stock, so that they could be considered insiders.

4        Indeed, if you look at paragraphs 88 and 119 of the

5  complaint, it alleges specifically that the company was owned

6  by Hellas I, which in turn was owned by Hellas, which in turn

7  was owned by eight investment funds that are referred to in the

8  complaint as the sponsors.  Even the sponsors are not

9  defendants in this case, with one limited exception, and that

10 is the defendant Apax WW Nominees, which had a one-half of one

11 percent ownership interest in Hellas.  So an indirect one-half

12 of one percent ownership interest in Hellas II.

13        THE COURT:  Can I ask you this?

14        MR. FISCHLER:  Sure.

15        THE COURT:  Is in pari delicto a defense to a UK

16 unjust enrichment claim?

17        MR. FISCHLER:  I do not know.

18        THE COURT:  I don't either.  But if I am not

19 determining whose law applies, so if -- if in pari delicto was

20 a defense to a New York unjust enrichment claim but was not a

21 defense to a UK unjust enrichment claim, there would be an

22 actual conflict, and then I'd have to decide which law would

23 apply in the circumstances, do you agree with that?

24        MR. FISCHLER:  Your Honor raises a good question as to

25 whether differences in the available defenses constitutes a

1   true conflict.  I think the answer is yes.

2           THE COURT:  Okay.  So your argument is premature about

3   in pari delicto because there's been no determination made

4   about what law would apply to an unjust enrichment claim.  You

5   haven't argued what UK law is.  I'm still up in the air about

6   whether in pari delicto would apply to New York law unjust

7   enrichment claim and we don't really -- the parties haven't

8   addressed whether there's an actual conflict between the UK and

9   New York law.

10          MR. FISCHLER:  Well, I think we've addressed it in a

11  sense, Your Honor, that they have said that there is an unjust

12  enrichment claim under UK law.

13          THE COURT:  Yeah, but they didn't -- the complaint

14  didn't say whose law that was under.

15          MR. FISCHLER:  Oh, the complaint does not --

16          THE COURT:  It doesn't say whose law.

17          MR. FISCHLER:  -- specify.

18          THE COURT:  It doesn't specify whose law.

19          MR. FISCHLER:  Right.  We don't --

20          THE COURT:  I think --

21          MR. FISCHLER:  -- they ought to get the --

22          THE COURT:  -- I just --

23          MR. FISCHLER:  -- well --

24          THE COURT:  While it's fresh in my mind, I did

25  remember -- I knew I had a third point with respect to if the

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al.  52

1  parties discuss whether the defendants would consent ,and my

2  three points were:  all defendants consent; two, no statute of

3  limitations; three, defendants agree that all discovery taken

4  in this action would be used in any action in the UK.  That was

5  third point that I had thought about.

6        Go ahead, Mr. Fischler.

7        MR. FISCHLER:  Your Honor, I only have a couple -- a

8  very short remaining point on in pari delicto.

9        THE COURT:  Sure.

10       MR. FISCHLER:  Should you decide that you want to

11  default to New York law, let me just get it out there.  The

12  only paragraphs of the complaint that the plaintiffs cite with

13  respect to their allegation that there was sufficient control

14  to constitute insiders for the purposes of this issue are

15  paragraphs 95 and 125 to 127.  Those paragraphs do not begin to

16  support an inference of insider control.  Paragraph 95 contains

17  mostly conclusory allegations about TIM Hellas, which is the

18  Greek operating company.  Not a single Apax or TPG defendant is

19  specifically mentioned by name, much less does that paragraph

20  describe any conduct by any of those defendants.

21       Similarly, the other paragraphs they cite, 125 to 127,

22  simply discuss the fact that each of the Hellas entities that

23  was involved in the redemption transaction signed a redemption

24  agreement.  Again, no Apax or TPG defendant over whom they want

25  to -- who they assert controlled Hellas II is even mentioned in

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 53

1  those paragraphs.

2        And then finally on this issue, just to hearken back

3  for a brief second to the group pleading point that we talked

4  about before.  Even if they had alleged facts, which they

5  haven't, but even if they had, as to this so-called TPG and so-

6  called Apax, at least as referred to in the complaint, we would

7  argue that given that the case law is very clear that you have

8  to make control allegations on a very specific, defendant-

9  specific and fact-specific basis, that even if they had pled

10 facts as to these defined terms, TPG and Apax, that that would

11 be insufficient.

12       Briefly, the Bigio case which is cited in our brief

13 stands for that proposition.  Your Honor talked about -- excuse

14 me, the DeJesus case in the Second Circuit talks about the need

15 for specificity.  That's at 87 F.3d at 65.  And AlphaStar,

16 Judge Bernstein's opinion similarly talks about.

17       So even if everything I just said, if they were to

18 suddenly be able to point to a bunch of allegations that we may

19 have missed, they still would not have adequately pled control.

20       THE COURT:  Thank you, Mr. Fischler.

21       MR. ASHLEY:  Good afternoon, Your Honor.  Marc Ashley

22 from Chadbourne & Parke for the plaintiff joint liquidators.

23       Let me just briefly state some pertinent facts with

24 respect to the issues, generally, that I think will inform the

25 analysis and those facts will add some detail to Mr. Seife's

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 54

1   earlier point regarding the liquidators' pursuit of the

2   fraudulent-transferred monies in this court.

3           The point is, as Mr. Seife said generally, the

4   majority of the December 2006 CPEC redemption proceeds entered

5   the United States.  Almost sixty percent of those proceeds came

6   through this country.  This was not a foreign transfer.  400

7   million euro went to TPG.  115 million euro went to Apax.  28

8   million euro went to TCW.

9           Two-thirds of the money that went to Apax and TPG went

10  through the United States.  Defendants, in their transfer of

11  funds tables that they produced to us, admit that at least 543

12  million euro in proceeds were transferred to this country.  So

13  the money was transferred to and from the United States.  As I

14  said last time, coming and going, coming from U.S.-based

15  noteholders from whom the money was raised and then going out

16  to U.S. transferees.  Much, in fact the majority of the money

17  was transferred here in the United States.  So that's just

18  background.

19          I will now address, Your Honor, the choice of law

20  issue with respect to the unjust enrichment claim.  We continue

21  to believe and perhaps we should have made more clear in our

22  complaint, but we believe that New York law should apply to all

23  of our claims including the unjust enrichment claim.

24          As you noted, Your Honor, as a threshold matter, the

25  defendants effectively consent to the application of New York

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 55

1   law.  They didn't purport to identify any conflict of laws as

2   to that claim, and for that reason alone, the Court should

3   apply New York law to the unjust enrichment claim.

4          I just will quote their -- defendants' supplemental

5   brief at page 1 states, "Defendants are not at this time aware

6   of an actual conflict between New York law and either

7   Luxembourg law or United Kingdom law that would require the

8   Court to engage in a choice of law analysis regarding the third

9   cause of action in the complaint."  And the third cause of

10  action is the unjust enrichment claim.  We think that should

11  end the analysis.  The forum law should apply.

12         THE COURT:  Would you still feel that way if in pari

13  delicto applied to a New York unjust enrichment claim but not

14  to a UK unjust enrichment claim?

15         MR. ASHLEY:  I don't know the answer to whether in

16  pari delicto applies to a UK claim or not, Your Honor.

17         THE COURT:  Do you know whether it applies a New York

18  unjust enrichment claim?

19         MR. ASHLEY:  I've been told that there are cases

20  applying the doctrine in unjust enrichment settings.  As I'll

21  note in a moment, we certainly believe that the doctrine is not

22  applicable here because we have more than adequately alleged

23  that Apax and TPG are insiders.

24         Getting back to the elements of the claim, they're

25  straightforward under New York law.  Our expert declarations

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 56

1  confirm that there's no conflict between the unjust enrichment

2  claim under New York law and its analogs under foreign law.

3         To the extent Your Honor were inclined to engage in a

4  choice of law analysis, we believe that --

5         THE COURT:  I'm not inclined to engage in it when the

6  parties haven't briefed -- you've recited what the state of the

7  briefing is, I agree.

8         MR. ASHLEY:  Okay.  Well, in light of that, Your

9  Honor, I'll skip some material that I was going to cover.  Let

10 me get to the sufficiency of our allegations concerning the

11 unjust enrichment claim.

12        As I mentioned, the elements are very straightforward.

13 We think we have adequately alleged that.  We have pleaded

14 unjust enrichment by TPG and Apax arising from the December

15 2006 CPEC redemption and the consulting fees transfer.

16        The defendants have asserted a defective Wagoner or in

17 pari delicto defense.  They argue that they're insulated by

18 virtue of those doctrines; they're wrong.  TPG and Apax were

19 not the sorts of third parties, such as financial advisors,

20 accountants and lawyers, that the Wagoner rule was designed to

21 protect from suit by a debtors' estate.

22        THE COURT:  Says who?  Where do you see that?

23        MR. ASHLEY:  Where do I -- I'm sorry?

24        THE COURT:  Yeah, where do you find that?  I heard

25 what you said, but where in the case law do you find support

1  for your argument?

2         MR. ASHLEY:  That was a general statement about --

3         THE COURT:  Okay.

4         MR. ASHLEY:  -- the general gist of the case law.

5         THE COURT:  Do you have any cases that support your

6  general statement?

7         MR. ASHLEY:  Yeah, let me get to the -- well, let me

8  get to the cases that I think support our argument that these

9  were insiders.  I'll get to where I think we allege it

10 adequately in the complaint.

11        There are two cases that stand for the proposition

12 that the term insider must be flexibly applied on a case-by-

13 case basis.  In re KDI Holdings, Inc., 277 B.R. 493 at page

14 511, that's -- this court, in 1999, Judge Gonzalez agreed with

15 our argument that the term insider has to be flexibly applied

16 and held when deciding a motion to dismiss, that even a third-

17 party lender could be considered an insider.

18        Indeed in Picard v. Madoff, 458 B.R. 87 at page 123 --

19        THE COURT:  Give me the page again.

20        MR. ASHLEY:  87 and at page 123.

21        THE COURT:  Okay.

22        MR. ASHLEY:  Again, this court in 2011 -- and that's a

23 case cited by the defendant, that case emphasizes that an

24 entity or individual may be an insider for purposes of this

25 exception if, "they either are on the board or in management or

1   in some other way control the corporation," and "or in some

2   other way control the corporation," is actually the emphasis in

3   the original case.

4           I will get in a moment to the factual allegations that

5   we do make that I think clearly make clear that TPG and Apax

6   were insiders, but let me note before --

7           THE COURT:  Just give me a second --

8           MR. ASHLEY:  Sure.

9           THE COURT:  -- Mr. Ashley, okay?  Let me catch up with

10  you in my notes.

11      (Pause)

12          THE COURT:  All right.  Go ahead.

13          MR. ASHLEY:  Thank you, Your Honor.  Let me just note

14  before I recite the factual allegations of the complaint that

15  if the defendants' view were correct, it really would be -- it

16  could reach an absurd result.  Every controlling shareholder

17  could set up special purpose vehicles between it and the

18  debtors' estate and thereby try to invoke the in pari delicto

19  or the Wagoner Doctrine.  And that sort of contrived outcome

20  can't be right.

21          THE COURT:  I don't follow that.

22          MR. ASHLEY:  The defendants are arguing that they

23  can't be deemed insiders because the sponsors or other entities

24  were between them and the debtor.  They created those entities

25  for their own purposes, for tax purposes or for obscurity, for

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 59

1   whatever reason, but it can't be the result that if a

2   controlling shareholder sets up those sorts of special purpose

3   vehicles between it and the debtor company, they're therefore

4   insulated from recovery under this claim by virtue of the in

5   pari delicto doctrine.  That sort of contrived corporate

6   structure finagling can't be the motivating factor in this

7   analysis.

8           THE COURT:  But wouldn't you need to specifically

9   allege the facts about the defendant that set up that corporate

10  structure and why you believe you collapse it or, I'm not sure

11  what term to apply to it.  You wouldn't -- Mr. Ashley, it can't

12  simply be that you don't have to allege anything about it or

13  simply allege in conclusory fashion, on information and belief

14  this corporate structure was established for whatever nefarious

15  purpose.

16          MR. ASHLEY:  I agree with you, Your Honor.  In fact,

17  we did much more than that, and let me describe it.  I will

18  again note before I recite the factual allegations that we're

19  at the pleading stage.  The nuances of the morass of defendant

20  entities that are at issue here were beyond our reach when

21  drafting the complaint.  We did the best we could, and I think

22  we did quite well.  So let me turn to those factual

23  allegations.

24          The complaint sufficiently alleges that the Luxembourg

25  Hellas entities and the sponsors through which Hellas II was

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 60

1   owned and controlled were themselves each formed and all

2   relevant times owned and controlled by the TPG and Apax

3   entities.  Specifically, paragraph 40 of the complaint alleges

4   that the eight so-called sponsors collectively held all of the

5   CPECs and common stock issued by Hellas and that through those

6   sponsors the TPG and Apax defendants, "owned and controlled the

7   company and its affiliates and obtained proceeds from the

8   December 2006 CPEC redemption."  That statement is absolutely

9   true, in fact.

10        Paragraphs 40 through 47 further allege that each of

11   those eight sponsors were managed by specified TPG and Apax

12   executives.

13        Paragraphs 86 through 88 allege that TPG and Apax

14   created a series of Luxembourg companies, that is the Hellas

15   entities, to facilitate the acquisition of the operating

16   company TIM Hellas; "Hellas II and Hellas Finance were wholly

17   owned by Hellas I, which in turn was wholly owned by Hellas,

18   which was wholly owned by the sponsors."  And again, this

19   corporate structure was a creation of the Apax and TPG

20   defendants.

21        Paragraph 95 alleges that, "TPG and Apax directed and

22   controlled the actions of the sponsors, the Hellas entities,

23   the company," that is Hellas II, "and the company's

24   subsidiaries."  It further alleges that this control was

25   exercised through TPG and Apax Personnel Holding, "overlapping

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 61

 1  positions of authority on the board of managers of Hellas, the

 2  sole manager of Hellas II, and in the management of the

 3  sponsors and the TPG and Apax defendants."

 4          Mr. Fischler tried to sort of hide behind this

 5  corporate structure by saying well, there were -- the manager

 6  was not the Apax and TPG defendants, but the manager was

 7  comprised of people appointed by TPG and Apax.

 8          Paragraphs 125 to 129 allege specific details about

 9  how TPG and Apax exercised their control of the company to

10  accomplish the December 2006 CPEC redemption including, for

11  example, that the same TPG and Apax executives -- so the very

12  same people -- executed the board resolutions and CPEC

13  redemption agreements that memorialized that transaction and

14  that those executives, the very same people who were affiliated

15  with TPG and Apax, engineered the redemption price of thirty-

16  five times par without any arm's-length valuation required by

17  the terms of the CPECs.

18          Finally, Your Honor, the eight sponsors that have been

19  referred to are described in paragraphs 40 through 47 and in

20  124, and we note that seven of the eight sponsors were

21  dissolved by TPG and Apax after the proceeds from the December

22  2006 --

23          THE COURT:  Do you say -- I think one of Mr.

24  Fischler's complaints is the group pleading, that you just

25  defined TPG without breaking it down into which TPG entity.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 62

1          MR. ASHLEY:  Your Honor, they're all --

2          THE COURT:  No, that's the group pleading doctrine.

3          MR. ASHLEY:  Right.

4          THE COURT:  I have applied it, is a fact that you may

5  have a good claim against one defendant by simply merging them

6  all and defining them as a single entity, you run afoul of --

7  why don't you run afoul of the group pleading doctrine?

8          MR. ASHLEY:  Because, Your Honor, all of these

9  entities were interrelated.  They were controlled by the same

10 people.

11         THE COURT:  Where is that in the complaint?

12         MR. ASHLEY:  I think --

13         THE COURT:  Don't shake your head --

14         MR. ASHLEY:  No, I'm not --

15         THE COURT:  -- and roll your eyes at me.

16         MR. ASHLEY:  -- shaking at you.  I think --

17         THE COURT:  Okay?  There is a group pleading doctrine.

18 It does say that you have to allege facts specifically as to

19 individual defendants.  You can't simply define all TPG

20 entities as TPG and then think you get away with -- that you

21 satisfied your pleading requirements.  So don't roll your eyes

22 when I ask you the question.

23         MR. ASHLEY:  I'm sorry, Your Honor.  I didn't mean to

24 roll your (sic) eyes at you.

25         I think we have done enough at this pleading stage,

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 63

1   Your Honor.  We didn't have access to all of the nuances of the

2   corporate structure when we drafted our complaint.  Some of

3   those details have emerged through discovery, but we simply had

4   no ability to make very intricate and ornate allegations at the

5   pleading stage.

6        We think, in sum, Your Honor, that those allegations

7   more than suffice at the pleading stage to plausibly plead that

8   the TPG and Apax defendants were insiders of the company and

9   cannot escape liability by asserting the Wagoner or in pari

10  delicto doctrine.

11       THE COURT:  All right.

12       MR. ASHLEY:  Your Honor, if I may, can I just very

13  briefly reference the notion of transferring the case to

14  England based on some theoretical consent of the defendants on

15  various bases.

16       We would argue, Your Honor, that even if Your Honor

17  concludes that English law should apply here, and we believe

18  that New York law should apply to our claims, that does not

19  mean that the case should be dismissed in favor of the UK.  I

20  note that there's been no motion to dismiss on the basis of

21  forum non conveniens.  That analysis implicates various

22  factors, including the degree of deference due to the

23  plaintiff.  And despite the fact that the plaintiffs here are

24  foreign liquidators, I think they still are owed substantial

25  deference because there really was genuine convenience in

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 64

1  bringing our claims here.  Eighteen out of the twenty-eight
2  defendants were U.S.-based entities.

3          As Mr. Seife alluded to, many -- and this has been
4  clarified through discovery -- many of the transferees were
5  U.S. entities.  In fact, more than 350 were U.S. transferees
6  and are members of our defendant class.  There's no evidence
7  that we could secure their consent to any of this.

8          In addition, Your Honor, there's really no real
9  inconvenience at all to the remaining defendants, the non-U.S.
10  entities.  Our choice of this forum was not in any way designed
11  to harass or unduly inconvenience that minority of defendants
12  that are not U.S. entities or residents because each of those
13  foreign defendants has a substantial connection to the United
14  States and indeed to New York through affiliate offices.

15          THE COURT:  So what are you going to do if I dismiss
16  as to the foreign entities?  What are you going to do then?  So
17  let's assume that the result here is I conclude that I can
18  assert jurisdiction over U.S. -- I conclude that U.S. context,
19  this minimum context is sufficient, any of the defendants
20  domiciled in the U.S., personal jurisdiction can be asserted
21  against them.  But I can't -- if I were to conclude, but I
22  can't hold the TPG foreign entities or any of the other foreign
23  entities in here.  So what happens then?  What do you do then?
24  Do you just give up on the TPG entities that are based in
25  Europe?

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 65

1          MR. ASHLEY:  I assume you mean the Apax entities?

2          THE COURT:  Apax, excuse me.

3          MR. ASHLEY:  The honest answer is, Your Honor, I don't

4    know.  We'd have to -- we've discussed that scenario.  We've

5    come to no strategic or tactical conclusions about what we

6    would do in the event that happens.  We're hoping it --

7    certainly hoping it does not, but I don't have any ready

8    answer, Your Honor, at this moment.

9          I would note based on --

10         THE COURT:  I mean the law doesn't just say, you know,

11   it's more convenient to have everybody in one forum, so I'm

12   going to haul everybody in here.

13         MR. ASHLEY:  Right, but generally, Your Honor, in a

14   forum non conveniens setting, the moving party -- and again,

15   there has been no moving party here -- but the moving party has

16   to show that there is some strong, compelling reason to move

17   the forum.  It's not a sort of just minimal balancing of the

18   convenience factors.  They have to show that this forum is not

19   convenient for them and all of these large institutions are

20   represented by able counsel.  We've engaged in substantial

21   discovery already.  We should not be put to the task, I think,

22   Your Honor, of moving the forum where everyone, I think, would

23   have to hire UK counsel, as well, which would add to the

24   expense of the case generally.

25         And just getting back to the issue of the defendant

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 66

1    class members over whom we have no control, the alternative

2    forum really has to be an adequate forum for all defendants,

3    and I can cite a couple of cases:  U.S. Fidelity and Guaranty

4    Company, 1999 WL 307666 in the Southern District from 1999.

5    The requirement that it be an adequate forum refers to all

6    defendants, not just the primary one.

7            THE COURT:  But it's already -- yeah, but the reality

8    is you may not be able to keep all defendants in here.  So the

9    fact that it may be more convenient for you doesn't mean they

10   stay here.

11           MR. ASHLEY:  Understood, Your Honor.

12           THE COURT:  It's as simple as that.

13           MR. ASHLEY:  Right.  But again, the majority of the

14   defendants are U.S.-based entities.  Only six of the twenty-

15   eight named defendants is an English entity or resident.  It's

16   not as if the majority of entities or defendants are based in

17   England.  Most of them are, in fact, based in the United

18   States.  So that defect of an adequate -- having no adequate

19   alternative forum in light of the defendant class can't simply

20   be cured by these defendants waiving certain rights or

21   interests here.

22           Finally, Your Honor, this is not a localized English

23   controversy.  As I've described, the nexus to the United States

24   and to New York is very strong.  Most of the money, in fact,

25   was transferred to this country.  Thank you, Your Honor.

HELLAS TELECOMM., et al.; HOSKING & BONNEY V. TPG, et al. 67

1            THE COURT:  Thank you.

2            MR. FISCHLER:  May I briefly respond, Your Honor?

3            THE COURT:  Very brief.

4            MR. FISCHLER:  Very briefly.  Just to give Your Honor

5     two citations for application of in pari delicto to unjust

6     enrichment.  The first one is a Madoff case, 987 F.Supp. 2d 311

7     and the second one is Second Circuit, 119 F.App'x 300.

8            I just want to comment for a second on the two cases

9     that Mr. Ashley relied on and would very much invite Your Honor

10    to look at those cases.  KDI involved a controlling shareholder

11    who was deemed to be an insider on very specific fact

12    allegations which bear no resemblance to the conclusory and

13    generalized allegations in this case.

14           And similarly, the Madoff case that Mr. Ashley

15    referenced involved defendants who were, "senior officers,

16    directors, and compliance managers of BLMIS," nothing like the

17    remote defendants in this case.

18           Finally, Mr. Ashley kept talking the sponsors and how

19    the sponsors were dissolved; the sponsors had an ownership

20    interest.  The sponsors are not the defendants in this case

21    with one irrelevant exception.  If you look at paragraphs 88

22    and I believe it was -- if you give me one second -- in 119 of

23    the complaint, where the plaintiffs themselves depict in a

24    diagram the corporate structure of ownership.  The defendants

25    in this case don't even make the chart.  They are so remote to

1   Hellas II, they're not even in the picture.  You've got a whole

2   diagram that takes up almost half a page.  Not a single

3   defendant in this case with the one exception of the one-half

4   of one percent owner of an interest in Hellas, which in turned

5   owned Hellas I, which in turn owned Hellas II, is even in the

6   picture.

7          The other point I wanted to make, Your Honor, is that

8   you've heard from Mr. Ashley many, many times about how the

9   Apax and TPG defendants created the Luxembourg entities to make

10  this as difficult as possible to sort of pierce through to

11  them.  I would just point you to the offering memorandum, which

12  is Exhibit 13 to Mr. Ashley's declaration before you, which

13  talks about the fact that Hellas II, the most important of

14  these entities, was incorporated in 2003 which is two years

15  before Apax and TPG even acquired their initial interest in

16  Hellas.

17         And finally, on the group pleading point, not to beat

18  a dead horse, but Your Honor, I think the question very simply

19  is this.  Where in the complaint is there a fact allegation or

20  are there fact allegations that would support a reasonable

21  inference under Iqbal and Twombly that, let's say, Martin

22  Halusa controlled Hellas II?  Where is there a single

23  allegation that supports the inference that Apax Europe VI GP

24  Co., Ltd. exercised control over Hellas II?  You can go right

25  down the line.  There is simply nothing that is specific to any

1  of these defendants, and that simply is not a sufficient way to

2  plead this type of allegation.  Thank you.

3          THE COURT:  Thank you.  All right.  The matter is

4  under submission.  We're adjourned.

5          The schedule?

6          MR. SEIFE:  For January, Your Honor.

7          THE COURT:  Okay.

8          MR. SEIFE:  The next deposition is set for the first

9  week of January.  I think it's January 7th.

10          THE COURT:  All right.  We're adjourned.

11      (Whereupon these proceedings were concluded at 3:44 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

70

1

2

3                         C E R T I F I C A T I O N

4

5      I, Esther Accardi, certify that the foregoing transcript is a

6      true and accurate record of the proceedings.

7

8

9

10

11

12      _____

13      ESTHER ACCARDI

14      AAERT Certified Electronic Transcriber CET**D 485

15

16

17      eScribers

18      700 West 192nd Street, Suite #607

19      New York, NY 10040

20

21      Date:  December 17, 2014

22

23

24

25