**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA, | Chapter 15 |
| | Case No. 12-10631 (MG) |
| Debtor in a Foreign Proceeding. | |
| ANDREW LAWRENCE HOSKING and SIMON JAMES BONNEY, in their capacity as joint compulsory liquidators and duly authorized foreign representatives of HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA, | |
| Plaintiffs, | Adv. Proc. No. 14-01848 (MG) |
| -against- | |
| TPG CAPITAL MANAGEMENT, L.P., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

*A P P E A R A N C E S:*

CHADBOURNE & PARKE LLP
*Attorneys for Plaintiffs as against*
*all Defendants except Deutsche Bank AG*
1301 Avenue of the Americas
New York, New York 10019
By:    Howard Seife, Esq.
         Andrew Rosenblatt, Esq.
         Marc D. Ashley, Esq.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
*Attorneys for Plaintiffs as against*
*Deutsche Bank AG*
270 Madison Avenue
New York, New York 10016
By:    Alexander H. Schmidt, Esq.
         Alan McDowell, Esq.
         Jeremy Cohen, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for the TPG Defendants*
1633 Broadway
New York, New York 10019
By:     Paul M. O'Connor III, Esq.
        Andrew K. Glenn, Esq.

ROPES & GRAY LLP
*Attorneys for the Apax Defendants*
1211 Avenue of the Americas
New York, New York 10036
By:     Robert S. Fischler, Esq.
        Stephen C. Moeller-Sally, Esq.

CAHILL GORDON & REINDEL LLP
*Attorneys for Defendant Deutsche Bank AG*
80 Pine Street
New York, New York 10005
By:     Charles A. Gilman, Esq.
        Kevin J. Burke, Esq.
        Philip V. Tisne, Esq.

LATHAM & WATKINS LLP
*Attorneys for the TCW Defendants*
355 South Grand Avenue
Los Angeles, California 90071
By:     Wayne S. Flick, Esq. (*pro hac vice*)
        Amy C. Quartarolo, Esq. (*pro hac vice*)
        Thomas Rickeman, Esq. (*pro hac vice*)

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

        Pending before the Court are four motions to dismiss (the "Motions to Dismiss") the

adversary proceeding complaint (the "Complaint," ECF Doc. # 1)[1] filed by Andrew Lawrence

Hosking and Bruce Mackay[2] (the "Plaintiffs"), in their capacity as Joint Compulsory Liquidators

of Hellas Telecommunications (Luxembourg) II SCA ("Hellas II" or the "Debtor").

---

[1]     Unless otherwise indicated, all citations to the docket are to Adv. Proc. No. 14-01848.

[2]     The Court recognized Mr. Mackay's predecessor, Carl Jackson, as one of the foreign representatives in the chapter 15 case.  (*See* Case No. 12-10631, ECF Doc. # 17.)  Mr. Jackson was succeeded by Mr. Bonney, who was then succeeded by Mr. Mackay.

The Plaintiffs seek to avoid and recover initial transfers of approximately €1.57 billion

made by Hellas II from bank accounts outside the United States (the "U.S.") to parent entities,

and to avoid and recover subsequent transfers of approximately €973.7 million made to the

defendants in this case.  The defendants allegedly played various roles in an orchestrated

restructuring, whereby Hellas II and its related entities issued over €1 billion in debt securities to

fund the redemption of convertible equity securities issued by Hellas II's parent and held by

special purpose vehicles controlled by many of the defendants.  The Plaintiffs also seek to

recover certain amounts paid by Hellas II as consulting fees to two groups of defendants based

on an unjust enrichment claim.

The foreign main proceeding underlying the Debtor's chapter 15 case, in which Hosking

and Mackay were appointed as liquidators, is pending in the United Kingdom (the "U.K.");

however, Hellas II and several of its related companies were previously based in Luxembourg,

and Hellas II's underlying business was a Greek telecommunications company.  Some, but not

all, of the money transferred from accounts outside the U.S. found its way to transferees in the

U.S.; some, but not all, of that money found its way to transferees in New York.

The 27 named defendants in this case include 16 entities and individuals that are

organized and have their principal places of business or residences in the U.S., but not in New

York.[3]  One Defendant—who allegedly marketed the Hellas II debt issued to fund the challenged

---

[3]      The moving defendants (the "Defendants") consist of four groups of related entities and individuals:  (i)
Apax Partners Europe Managers Ltd., Apax Europe VI GP Co. Ltd., Apax Europe VI GP, L.P., Apax Europe VI-A,
L.P., Apax Europe VI-1, L.P. (collectively, "Apax Europe VI"), Apax Partners LLP ("Apax Partners"), Apax
Partners, L.P. ("Apax NY"), Apax WW Nominees Ltd. ("Apax Nominees"), and Martin Halusa ("Halusa" and,
together with Apax Europe VI, Apax Partners, Apax NY, and Apax Nominees, "Apax"); (ii) TPG Capital
Management, L.P. ("TPG Capital"), David Bonderman ("Bonderman"), James Coulter ("Coulter"), TPG Capital,
LLP ("TPG London"), TPG Advisors IV, Inc., TPG GenPar IV, L.P., TPG Partners IV, L.P. ("TPG IV"), T[3]
Advisors II, Inc., T[3] GenPar II, L.P., T[3] Partners II, L.P., and T[3] Parallel II, L.P. ("TPG T[3] II" and, together with
TPG Capital, Bonderman, Coulter, TPG London, and TPG IV, "TPG"); (iii) Deutsche Bank Aktiengesellschaft
("DB"); and (iv) The TCW Group, Inc., TCW Asset Management Company, TCW/Crescent Mezzanine III, LLC,
TCW/Crescent Mezzanine Partners III L.P., TCW/Crescent Mezzanine Trust III, and TCW/Crescent Mezzanine
Partners III Netherlands, L.P. (collectively, "TCW").

transfers—is a bank organized and headquartered in Germany, but with a large office and numerous employees in New York. Nine Defendants are organized and have their principal places of business outside the U.S., with no offices in New York or the U.S., although some of their affiliates are organized and have their principal places of business in the U.S. All but one Defendant—the only one organized and with its principal place of business in New York—move to dismiss the complaint for lack of personal jurisdiction. A separate Motion to Dismiss the Complaint on other grounds was also filed by the Defendants.[4]

The Plaintiffs allege actual and constructive fraudulent transfer claims against all of the named Defendants and an unnamed class of transferees (the "Transferee Class") based *only* on the application of the New York Debtor and Creditor Law ("NYDCL").[5] The avoidance claims asserted under the NYDCL, where all of the initial transfers were made from outside the U.S., raise a host of issues: whether the Plaintiffs can obtain personal jurisdiction over each Defendant and hale domestic or foreign-based Defendants, that are not organized under New York law and are not "at home" in New York, into the bankruptcy court in New York; whether under applicable choice of law principles, New York law or foreign law should apply to the transfers if the NYDCL could be given extraterritorial effect; whether the avoidance claims can be brought in an adversary proceeding related to a chapter 15 case in light of section 1521(a)(7) of the Bankruptcy Code; whether the Plaintiffs, as Joint Compulsory Liquidators of the Debtor, have standing to bring the avoidance claims (which are "creditor" claims); and whether the NYDCL has extraterritorial effect to reach the transfers. With respect to the unjust enrichment claim, the Defendants assert that the Plaintiffs do not have standing to bring this claim because the so-

---

[4]     The Motion to Dismiss filed by TCW also seeks dismissal on the basis of grounds other than lack of personal jurisdiction.

[5]     N.Y. DEBT. & CRED. LAW § 270 *et seq.* (McKinney 2010).

called *Wagoner* rule and *in pari delicto* doctrine deny standing to a trustee to assert claims against third-parties on behalf of a debtor if the debtor was complicit in the alleged wrongdoing. Several other issues are presented as well.

Resolution of these issues requires considerable analysis and results in this lengthy opinion. As explained below, not all of the issues need to be resolved to dispose of the pending Motions to Dismiss. The Court concludes that the Plaintiffs have established a sufficient basis to assert personal jurisdiction against some, but not all, of the Defendants; choice of law principles require dismissal of the NYDCL constructive fraudulent conveyance claim, because an actual conflict exists between the laws of New York, on the one hand, and of U.K. and Luxembourg (which do not recognize a constructive fraudulent conveyance cause of action), on the other hand, and those two foreign jurisdictions have a more significant interest in applying their laws in this case; the Plaintiffs lack standing under New York law and U.K. law to bring the NYDCL actual fraudulent conveyance claim; and it is unnecessary to decide whether the NYDCL may be given extraterritorial effect to the transfers, or whether the Plaintiffs may bring the avoidance claims in light of Bankruptcy Code section 1521(a)(7), because the NYDCL avoidance claims must be dismissed on other grounds. The Court also concludes that the Complaint sufficiently alleges that the Defendants named in the unjust enrichment claim should be treated as "insiders" that controlled Hellas II and directed or authorized the transfers, such that at this stage the Complaint overcomes the asserted prudential standing challenges.

For the reasons detailed below, the Motions to Dismiss for lack of personal jurisdiction are granted in part and denied in part. The Motions to Dismiss on all other grounds are granted in part and denied in part.

5

# I.    BACKGROUND

## A.    Factual Background

In June 2005, eight investment funds (the "Sponsors"), allegedly created by TPG Capital and Apax Partners, acquired approximately 80% of the equity in TIM Hellas Communications S.A. ("TIM Hellas"), a Greek telecommunications services provider, through a special purpose vehicle ("Troy GAC") in a leveraged transaction. (*See* Compl. ¶¶ 84–89.) In preparation for the acquisition of TIM Hellas, in March 2005 TPG and Apax allegedly organized a group of entities under Luxembourg law, including Hellas Telecommunications, S.àr.l. ("Hellas"), Hellas Telecommunications I, S.à.r.l. ("Hellas I"), Hellas II, Hellas Telecommunications Finance SCA ("Hellas Finance"), and other related entities. (*See* Compl. ¶ 86.) Hellas II and Hellas Finance were wholly owned by Hellas I, which in turn was wholly owned by Hellas. (*Id.* ¶ 87.) Hellas, the ultimate parent of the Hellas entities, was wholly owned by the Sponsors. (*Id.*) The Sponsors acquired the remaining shares of TIM Hellas in November 2005 through Troy GAC, and the acquisition was principally funded by debt issued by the Hellas entities. (*See id.* ¶ 91.) Subsequently, the Sponsors' equity interests in TIM Hellas were cancelled and TIM Hellas merged into Troy GAC; the surviving entity became a wholly owned subsidiary of Hellas II. (*See id.* ¶ 92.)

Also in mid-June 2005, Hellas issued 490,000 convertible preferred equity certificates ("CPECs") to the Sponsors with a par value of €49 million. (*Id.* ¶ 97.) At the same time, Hellas I—the direct subsidiary of Hellas and direct parent of Hellas II—issued 490,000 CPECs to Hellas, and Hellas II issued an equivalent number of CPECs to Hellas I. (*Id.*)

TPG and Apax allegedly used Hellas and its related entities to acquire Q-Telecom, a business unit of a large mobile network operator in Greece, in a stock purchase deal that closed on January 31, 2006. (*See id.* ¶ 104.) The acquisition was principally financed with debt issued

by a subsidiary of Hellas II and cash contributed by certain other Hellas II subsidiaries.  (*See id.*
¶ 105.)  In exchange for the transfer of €28.3 million from the Sponsors to Hellas, Hellas issued
an additional 282,681 CPECs to the Sponsors.[6]  (*Id.* ¶ 106.)

The Plaintiffs allege that TPG and Apax "put in motion plans to dispose of [Hellas II]'s
subsidiaries in a sale to a third party" in June 2006.  (*Id.* ¶ 112.)  However, the sale process
purportedly did not generate interest at the prices sought by TPG and Apax, and subsequently
"they instead took steps to extract those returns from [Hellas II] under the guise of a purported
'refinancing' of its debt."  (*Id.* ¶ 116.)

In December 2006, through a multi-step transaction (the "December 2006 Transaction"),
(i) Hellas II issued €960 million and $275 million of Floating Rate Subordinated Notes due 2015
(the "Sub Notes"); (ii) Hellas Finance and certain subsidiaries of Hellas issued additional series
of notes, the proceeds of which were transferred or loaned to Hellas II; and (iii) Hellas II
transferred a total of approximately €1.57 billion to its parent, Hellas I, of which approximately
€978.7 million was paid to redeem CPECs issued by Hellas II.  (*Id.* ¶¶ 117–118.)  Subsequently,
Hellas I paid approximately €973.7 million to Hellas to redeem CPECs issued by Hellas I, and
Hellas then paid the Sponsors approximately €973.7 million to redeem CPECs issued by Hellas
(the "December 2006 CPEC Redemption").  (*Id.* at 118.)  The remaining portion of the €1.57
billion transferred from Hellas II to Hellas I was allegedly used to retire other outstanding debt
issued by the Hellas entities and to pay costs associated with the December 2006 Transaction.
(*See id.*)

In February 2007, TPG and Apax sold Hellas and its subsidiaries to Weather Investments
S.p.A., later renamed WIND Telecom S.p.A. ("Weather Investments"), a stock corporation

---

[6]     Cash was allegedly transferred from Hellas to Hellas I, and then to Hellas II; in exchange, corresponding
CPECs were then issued up the corporate structure from Hellas II to Hellas I, and then to Hellas.  (*See id.* ¶ 106.)

organized under the laws of Italy. (*Id.* ¶ 143.) Weather Investments purchased 100% of the equity of Hellas for €500 million, €6,435,736 of which was allocated toward the purchase of the remaining CPECs previously issued by Hellas to the Sponsors at the par value of €1 per CPEC. (*Id.* ¶ 145.) Hellas II's financial statements for the year ending December 31, 2007 indicated that its debt-service obligations grew and resulted in a net financial loss of more than €259.5 million; its "leverage remained high at 12.4x EBIT, while its cash interest coverage declined to 1.2x EBIT." (*Id.* ¶ 148.) On or about June 5, 2008, Apax Partners paid €500 million to Weather Investments for a 5% equity stake in the company. (*Id.* ¶ 149.) Additionally, Hellas II "paid a minimum of €1.22 million in additional 'consulting fees' to Hellas I and, directly or indirectly, Hellas I then paid approximately those same amounts to TPG and Apax (the "Consulting Fees Transfer")." (*Id.* ¶ 142.)

In 2009, Hellas II began considering a potential restructuring of its capital structure. (*See id.* ¶ 151.) Accordingly, in August 2009 Hellas II "moved its center of main interests from Luxembourg to the United Kingdom, including among other steps by moving its head office and operating office to London, England." (*Id.*) On November 26, 2009, the High Court of Justice of England and Wales (the "High Court") approved placing Hellas II into administration in England and appointed joint administrators (the "Administrators"). (*Id.*) On December 1, 2011, the High Court discharged the Administrators and ruled that Hellas II should be instead wound-up through a compulsory liquidation. (*Id.* ¶ 152.) The Plaintiffs were thereafter appointed as Joint Compulsory Liquidators. (*See id.* ¶ 18.)

The Plaintiffs allege that Hellas II was insolvent at the time of the December 2006 CPEC Redemption and that the Defendants received portions of the proceeds of such transaction from one or more Sponsors. (*See id.* ¶¶ 23–74, 118.) The Plaintiffs seek to avoid the initial transfer of

€1.57 billion from Hellas II to Hellas I as an actual or constructive fraudulent transfer under the

NYDCL, and to recover the alleged subsequent transfers to the Defendants. (*See id.* ¶¶ 155–

168.) The initial transfers were made from accounts maintained in London, England. (*See*

Lestelle Decl. Ex. A at 10, ECF Doc. # 93-1.) Also pursuant to the NYDCL, the Plaintiffs seek

to avoid and recover the Consulting Fees Transfer allegedly paid to TPG and Apax.[7] (*See id.*)

Finally, the Plaintiffs assert an unjust enrichment claim against TPG and Apax for their receipt of

payments they received in connection with the December 2006 Transaction, the December 2006

CPEC Redemption, and the Consulting Fees Transfer. (*See id.* ¶¶ 169–173.)

### B.    Procedural History

On February 16, 2012, the Debtor filed a chapter 15 petition for recognition of its foreign

proceeding in this Court. (*See* ECF Doc. # 1, Case No. 12-10631.) The Court entered an order

granting recognition of the Debtor's foreign main proceeding on March 14, 2012. (*See* ECF

Doc. # 17, Case No. 12-10631.) This adversary proceeding was commenced nearly two years

later, on March 13, 2014. (*See* ECF Doc. # 1.)

The Motions to Dismiss include: (1) the motion to dismiss for lack of personal

jurisdiction filed by Apax[8] and TPG (the "Apax/TPG Motion," ECF Doc. # 37);[9] (2) the motion

to dismiss on all other grounds filed by Apax and TPG (the "Defendants' Motion," ECF Doc.

---

[7]    The parties do not provide information regarding where this transfer originated from; however, in light of the fact that Hellas I's offices and bank accounts were located in Europe, this transfer likely originated from accounts maintained outside the United States.

[8]    Notably, Apax NY is not a moving Defendant under the Apax/TPG Motion and does not move for dismissal for lack of personal jurisdiction. (*See* Apax/TPG Mot. at 1 n.1, ECF Doc. # 37; Dec. 3, 2014 Hr'g. Tr. 36:14–17, ECF Doc. # 127.)

[9]    TCW joins in part the Apax/TPG Motion, including the factual background section, the legal standards section, and "those portions [of the argument section] that address the constitutionality of exercising jurisdiction over a defendant based on its contacts with the United States (as opposed to its contacts with the State of New York)." (TCW Mot. at 2 n.2, ECF Doc. # 50.)

# 41),[10] which is joined in part by DB and TCW;[11] (3) DB's motion to dismiss for lack of personal jurisdiction (the "DB Motion," ECF Doc. # 46);[12] and (4) TCW's motion to dismiss (the "TCW Motion," ECF Doc. # 50).

The Plaintiffs filed two memoranda of law in opposition to the Motions to Dismiss for lack of personal jurisdiction:  an opposition to both the Apax/TPG Motion and the TCW Motion (the "PJ Opposition," ECF Doc. # 83), and a separate opposition to the DB Motion (the "DB Opposition," ECF Doc. # 79).[13]  The Plaintiffs also filed a memorandum of law in opposition to the Defendants' Motion (the "Opposition," ECF Doc. # 84).[14]

In response, (1) Apax and TPG filed a reply in support of the Apax/TPG Motion (the "Apax/TPG Reply," ECF Doc. # 91)[15] and a reply in support of the Defendants' Motion (the "Defendants' Reply," ECF Doc. # 94);[16] (2) DB filed a reply in support of the DB Motion (the "DB Reply," ECF Doc. # 98);[17] and (3) TCW filed a reply in support of the TCW Motion (the

---

[10]     The Apax/TPG Motion and the Defendants' Motion are supported by the declarations of Andrew K. Glenn (the "Glenn Declaration," ECF Doc. # 42) and Barry Isaacs QC (the "Isaacs Declaration," ECF Doc. # 44), a purported expert on English law.

[11]     Specifically, (1) DB joins in the arguments made in the Defendants' Motion, with the exception of the arguments related to the Plaintiffs' unjust enrichment claim against Apax and TPG (*see* DB Reply at 1, ECF Doc. # 98); and (2) TCW joins in the arguments made in the Defendants' Motion, with the exception of the sections regarding subsequent transferee liability and unjust enrichment (*see* TCW Mot. at 1, ECF Doc. # 50).

[12]     The DB Motion is supported by the declaration of Philip V. Tisne (the "Tisne Declaration," ECF Doc. # 45).

[13]     The Plaintiffs submitted the declaration of Marc D. Ashley (the "Ashley Declaration," ECF Doc. # 81) in support of the PJ Opposition and the DB Opposition.

[14]     The Opposition is supported by the declaration of Gabriel Moss QC (the "Moss Declaration," ECF Doc. # 82), a purported expert on English law and European Insolvency law.

[15]     The Apax/TPG Reply is supported by the declaration of Evan P. Lestelle (the "Lestelle Reply Declaration," ECF Doc. # 93).

[16]     The Defendants' Reply is supported by the declaration of Barry Isaacs QC (the "Isaacs Reply Declaration," ECF Doc. # 95), an expert on English law.

[17]     The DB Reply is supported by the declaration of Philip V. Tisne (the "Tisne Reply Declaration," ECF Doc. # 99).

"TCW Reply," ECF Doc. # 90, and together with the Apax/TPG Reply, the Defendants' Reply,

and the DB Reply, the "Reply Briefs").

The Plaintiffs filed a supplemental memorandum of law in opposition to the DB Motion

(the "DB Supplemental Opposition," ECF Doc. # 104),[18] and DB filed a surreply (the "DB

Surreply," ECF Doc. # 106).[19]

Pursuant to the Court's *Order Scheduling Oral Argument and Directing Supplemental

Briefing* (the "Supplemental Briefing Order," ECF Doc. # 115), the Court scheduled a hearing on

the Motions to Dismiss and directed the parties to submit supplemental briefs on choice of law

issues.  In response to the Supplemental Briefing Order, the Defendants filed a supplemental

memorandum of law (the "Defendants' Supplemental Brief," ECF Doc. # 122),[20] and the

Plaintiffs likewise filed a supplemental memorandum of law (the "Plaintiffs' Supplemental

Opposition," ECF Doc. 121).[21]

On December 3 and 16, 2014 (together, the "Hearing") the Court heard oral argument on

the Motions to Dismiss and took the matter under submission.  This Opinion follows.

---

[18]    The DB Supplemental Opposition is supported by the supplemental declaration of Alan A.B. McDowell (the "McDowell Supplemental Declaration," ECF Doc. # 105).

[19]    The DB Surreply is supported by the Supplemental Declaration of Philip V. Tisne (the "Tisne Supplemental Declaration," ECF Doc. # 107).

[20]    The Defendants' Supplemental Brief is supported by the declarations of Professor André Prüm (the "Prüm Declaration," ECF Doc. # 120), a purported expert on Luxembourg law, and Barry Isaacs QC (the "Supplemental Isaacs Declaration," ECF Doc. # 118).

[21]    The Plaintiffs' Supplemental Opposition is supported by the declarations of Marc D. Ashley (the "Supplemental Ashley Declaration," ECF Doc. # 119), Gabriel Moss QC (the "Supplemental Moss Declaration," ECF Doc. # 117), and Marc Thewes (the "Thewes Declaration," ECF Doc. # 116).

### C.    The Parties' Positions

#### 1.    *Personal Jurisdiction*

All of the Defendants except for Apax NY argue that the Complaint should be dismissed

for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(2),

arguing that the Plaintiffs have failed to adequately allege that either general (i.e. all-purpose) or

specific jurisdiction exists over these Defendants.  Apax, TPG, and TCW all contend that the

applicable forum by which their minimum jurisdictional contacts are to be assessed is New York,

rather than the U.S.  (*See* Apax/TPG Mot. at 2; TCW Mot. at 8.)  They argue that, following the

Supreme Court's recent decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), a defendant

is generally only subject to general jurisdiction in its place of incorporation, principal place of

business, or domicile; general jurisdiction exists over a foreign defendant only when its contacts

with the forum state "are so 'continuous and systematic as to render [it] essentially at home' in

the forum state." (Apax/TPG Mot. at 5 (citing *Daimler*, 134 S. Ct. at 761 (alteration in original)

(citation omitted)); *see* TCW Mot. at 7.)  Since New York is not the state of incorporation,

principal place of business, or domicile of any of the Defendants moving to dismiss for lack of

personal jurisdiction, and the Plaintiffs have not otherwise sufficiently alleged that such

Defendants are "at home" in New York, the Defendants argue that they are not subject to general

jurisdiction.  (*See* Apax/TPG Mot. at 7–17; TCW Mot. at 9–14.)  DB also argues that it is not

subject to general jurisdiction even if the relevant forum for assessing its minimum contacts is

the U.S., because it was neither incorporated in the U.S. nor is the U.S. where its principal place

of business is located.  (*See* DB Mot. at 3 n.1.)  According to all of the Defendants, the Plaintiffs

have also failed to adequately allege that the Court has specific jurisdiction over the Defendants,

because none of the Defendants' suit-related conduct bears a sufficient nexus to New York or the

U.S.  (*See* Apax/TPG Mot. at 2; TCW Mot. at 14; DB Mot. at 6–7.)

In response, the Plaintiffs argue that the U.S.—not New York—is the pertinent forum with respect to which a defendant's minimum jurisdictional contacts are to be assessed where, as here, nationwide service of process is authorized by a federal statute. (*See* Apax/TPG Mot. at 11–12.) According to the Plaintiffs, all of the Defendants' contacts with the U.S. are sufficient to subject them to personal jurisdiction. (*Id.* at 17; DB Supp. Opp. at 1.) The Apax, TPG, and TCW Defendants with their residence, principal place of business, or place of incorporation in the U.S. are subject to general jurisdiction; the remaining foreign Apax and TPG Defendants are subject to specific jurisdiction based on their suit-related conduct purposefully directed at the U.S. (*See* Apax/TPG Mot. at 17–18.) DB is subject to general jurisdiction because its New York operations are so substantial and of such a nature as to render it at home in New York. (*See* DB Supp. Opp. at 1.) The Plaintiffs contend that DB is also subject to specific jurisdiction because, through its wholly-owned and controlled subsidiary, Deutsche Bank Securities Inc. ("DBSI"), DB marketed and sold Sub Notes to U.S. investors, and proceeds from the Sub Notes were used to fund the December 2006 CPEC Redemption. (*Id.* at 2–12.)

> ## 2.    *Other Grounds*

The Defendants also collectively move to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to FRCP 12(b)(1) and (6), respectively. (*See* Defs.' Mot. at 1.) First, the Defendants argue that the Complaint should be dismissed on the basis that "the Court lacks core subject matter jurisdiction over this dispute." (*Id.* at 35.) Specifically, the Defendants contend that this adversary proceeding is not a core proceeding within the meaning of 28 U.S.C. § 157, and therefore the Court cannot finally adjudicate the Plaintiffs' claims. (*See id.* at  35–39.) Second, the Defendants argue that Count II of the Complaint, which asserts a constructive fraudulent conveyance claim under the NYDCL, must

13

be dismissed because, under New York choice of law rules, Luxembourg or U.K. law has the

greatest interest in regulating the December 2006 CPEC Redemption, and the law of either

jurisdiction does not recognize a claim for constructive fraudulent conveyance. (*See* Defs.'

Supp. Br. at 1.) The Defendants do not argue that any actual conflict between New York law

and either Luxembourg or U.K. law exists with respect to the Plaintiffs' actual fraudulent

conveyance claim (Count I of the Complaint) or unjust enrichment claim (Count III of the

Complaint). (*See id.*) However, the Defendants contend that the Plaintiffs lack standing to assert

these claims. (*See* Defs.' Mot. at 9–10, 18.) With respect to the Plaintiffs' actual fraudulent

conveyance claim, the Defendants argue that the Plaintiffs "lack standing because (i) Section

1521(a)(7) of the Bankruptcy Code prohibits them from obtaining relief under Section 544—the

only mechanism by which a debtor or trustee may assert state law fraudulent conveyance claims

belonging to creditors, . . . (ii) the [Plaintiffs] represent Hellas II, not its creditors, and (iii)

Section 1521(a)(7)'s bar preempts state law." (*Id.* at 10.) Defendants also argue that the

Plaintiffs lack standing to assert their unjust enrichment claim under the *Wagoner* rule, which

"bars a trustee from suing to recover for a wrong that he himself essentially took part in." (*Id.*

at 18 (citing *O'Connell v. Arthur Anderson, LLP (In re Alphastar Ins. Grp. Ltd.)*, 383 B.R. 231,

272 (Bankr. S.D.N.Y. 2008) (citations and internal quotations omitted)).)

      Finally, the Defendants argue that the Complaint fails to state a claim for five separate

reasons.[22] First, the Defendants argue that the Plaintiffs' claims are barred by the applicable

statutes of limitations. (*Id.* at 19.) Second, the Defendants contend that there is a well-settled

presumption against the extraterritorial application of the NYDCL to avoid a foreign transaction

---

[22]     The Defendants also assert as an affirmative defense that the Plaintiffs' NYDCL claims must be dismissed
because the holders of the Sub Notes consented to the December 2006 CPEC Redemption, and therefore the
Plaintiffs cannot now seek to avoid the December 2006 CPEC Redemption on their behalf. (*Id.* at 24.)

lacking a close nexus to New York because the drafters of the NYDCL did not clearly indicate

that it should apply extraterritorially.  (*See id.* at 21–24.)  Third, the Plaintiffs fail to adequately

allege subsequent transferee liability against TPG or Apax because they assert no facts "to

plausibly show that any portion of the [December 2006 CPEC Redemption] was actually

received by any TPG or Apax Defendant."  (*Id.* at 30.)  Fourth, the Defendants argue that the

Plaintiffs' NYDCL claims are barred by section 546(e) of the Bankruptcy Code because the

December 2006 CPEC Redemption constitutes a settlement payment made by, to, or for the

benefit of a financial institution.  (*See id.* at 39–41.)  Alternatively, Bankruptcy Code section

546(e) preempts the Plaintiffs' state law claims.[23]  (*See id.* at 42–44.)  Lastly, Apax and TPG

argue that the Complaint fails to allege an unjust enrichment claim against them, because the

Plaintiffs do not plead that a sufficiently close relationship existed between Apax and TPG and

the holders of the Sub Notes.  (*Id.* at 33.)

The Plaintiffs contend that the Court has subject matter jurisdiction over their claims

under section 1334 of title 28 of the U.S. Code.  (Opp. at 48.)  According to the Plaintiffs,

"whether this action falls within this Court's 'core' or 'non-core' jurisdiction is irrelevant to

whether this Court possesses subject matter jurisdiction, which it plainly does."  (*Id.* at 48–49.)

The Plaintiffs also argue that New York law, rather than Luxembourg or U.K. law, governs their

claims.  (*See* Pls.' Supp. Opp. at 1.)  However, even if the Court were to apply Luxembourg or

U.K. law to their claims, the Plaintiffs contend that they would still have standing to pursue their

---

[23]      Because the NYDCL claims are dismissed on other grounds, the Court does not reach the merits of the
Defendants' remaining arguments regarding these claims, including that the NYDCL does not apply
extraterritorially, the Complaint fails to allege subsequent transferee liability, the holders of the Sub Notes consented
to the December 2006 CPEC Redemption, and section 546(e) bars or preempts the NYDCL claims.

claims.[24]  (*See id.* at 15–16.)  According to the Plaintiffs, they have standing to bring their claims

by virtue of their status as liquidators of the Debtor, and "English law—which defines the scope

of the [Debtor's] foreign insolvency estate—vests [them] with authority to bring actions on

behalf of the [Debtor's] creditors."  (Opp. at 26–27.)

The Plaintiffs also maintain that they have adequately alleged their claims at this pleading

stage and therefore the Motions to Dismiss should be denied.[25]  (*Id.* at 1.)  First, the Plaintiffs

argue that their claims are timely because section 108(a) of the Bankruptcy Code extends the

time within which a foreign representative may commence adversary proceedings in a chapter 15

case, and the Plaintiffs' claims vested with the Plaintiffs prior to the commencement of the

Debtor's chapter 15 case.  (*See id.* at 42–44.)  Second, the Plaintiffs argue that the NYDCL may

be applied extraterritorially to reach the transfers at issue, regardless of whether they have a close

nexus to New York.  (*See id.* at 13–15 (citing cases).)  Third, the Plaintiffs contend that they

satisfied their pleading requirements under FRCP 8(a) in alleging that the Defendants received

proceeds from the December 2006 CPEC Redemption.  (*See id.* at 9.)  Fourth, the Plaintiffs

argue that Bankruptcy Code section 546(e)'s safe harbor with respect to settlement payments is

not applicable in a chapter 15 case.  (*Id.* at 44–45.)  Nor does Bankruptcy Code section 546(e)

implicitly preempt the Plaintiffs' state law claims.  (*Id.* at 45–48.)  Finally, the Plaintiffs contend

that the Complaint adequately alleges that Apax and TPG had a sufficiently close relationship

with Hellas II for purposes of stating an unjust enrichment claim, noting that the Complaint sets

forth that the December 2006 CPEC Redemption was planned, approved, and executed by Apax

and TPG executives.  (*See id.* at 26.)

---

[24]     Alternatively, the Plaintiffs argue that the Court should decline to make a choice of law determination at this stage in the adversary proceeding, because such a determination is fact intensive and discovery is ongoing. (Pls.' Supp. Opp. at 17–18.)

[25]     In the event any claims are dismissed, however, the Plaintiffs contend that they should be granted leave to amend their Complaint.  (*See* Opp. at 49.)

## II.      DISCUSSION

### A.    Personal Jurisdiction

On a motion to dismiss under FRCP 12(b)(2), a plaintiff bears the burden of making "a *prima facie* showing 'through its own affidavits and supporting materials' that personal jurisdiction exists." *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 418 B.R. 75, 79 (Bankr. S.D.N.Y. 2009) (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) ("On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." (citation omitted)).  The plaintiff must make "legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (alteration in original) (citations and internal quotation marks omitted).  When personal jurisdiction is averred on affidavits or declarations, "all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) (citations omitted).

Rule 7004(f) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides:

> [i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule . . . is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

FED. R. BANKR. P. 7004(f).  Pursuant to Bankruptcy Rule 7004(d), "[t]he summons and

complaint and all other process except a subpoena may be served anywhere in the United

States."  *Id.* 7004(d).  The Defendants were served pursuant to Bankruptcy Rule 7004 (PJ Opp. at

17), and they do not object to service (*see* "Response Extension Stipulation," ECF Doc. 7, ¶ 1

("The Defendants waive any objection to the manner or validity of service of process in the

above-captioned action.")).  Accordingly, the Defendants are subject to personal jurisdiction so

long as constitutional due process requirements are met.  *See Bickerton v. Bozel S.A. (In re Bozel*

*S.A.)*, 434 B.R. 86, 97 (Bankr. S.D.N.Y. 2010) ("Since [the defendant] does not contend that

service of process was improper [under Bankruptcy Rule 7004], he is subject to personal

jurisdiction in this Court so long as the Due Process requirements are satisfied.").

        "To establish personal jurisdiction over a defendant, due process requires a plaintiff to

allege (1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that

the exercise of jurisdiction is reasonable in the circumstances."  *In re Terrorist Attacks on Sept.*

*11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310,

316 (1945); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

        In assessing the sufficiency of a defendant's "minimum" contacts, courts distinguish

between "general" and "specific" personal jurisdiction.  *Id.*  General, or "all-purpose,"

jurisdiction over a foreign defendant allows a court to hear any and all claims against such

defendant.  *Daimler*, 134 S. Ct. at 754 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*,

564 U.S. ___, ___, 131 S. Ct. 2846, 2851 (2011)).  Specific jurisdiction over a foreign defendant

allows a court to hear claims that "aris[e] out of or relate[] to the defendant's contacts with the

forum . . . ."  *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)

(citation omitted).  A determination of the reasonableness of exercising personal jurisdiction over

a defendant entails inquiring whether the exercise of jurisdiction "would offend 'traditional notions of fair play and substantial justice.'" *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987) (quoting *Int'l Shoe*, 326 U.S. at 216).

       *1.     General Jurisdiction*

Only a narrow set of affiliations with a forum will subject a defendant to general jurisdiction in that forum. *Daimler*, 134 S. Ct. at 760. An individual's paradigm basis for general jurisdiction is his or her domicile. *Id.* "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction.'" *Id.* (citing Lea Brilmayer et al., *A General Look at General Jurisdiction*, 66 TEX. L. REV. 721, 735 (1988)). These paradigms are sufficient, but not exclusive, bases for general jurisdiction. *See id.* ("*Goodyear* did not hold that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums."). At the same time, however, "engag[ing] in a substantial, continuous, and systematic course of business" in a forum is not alone sufficient to render a defendant subject to general jurisdiction in such forum. *Id.* at 761. Rather, beyond the paradigm bases for general jurisdiction over a corporation, general jurisdiction exists where such corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* (quoting *Goodyear*, 564 U.S. at ___, 131 S. Ct. at 2851)).

Central to the determination of whether the Defendants are subject to general jurisdiction is the issue whether their minimum contacts are to be assessed with respect to New York or the U.S. If the pertinent forum for assessing minimum jurisdictional contacts is the U.S., then each Defendant who is "at home" in the U.S. is subject to general jurisdiction; however, if minimum

contacts must be assessed with respect to New York, then each Defendant's contacts with New York must be evaluated in order to determine whether it is "essentially at home" in New York. *See id.* at 761.

The Plaintiffs contend that a nationwide minimum contacts test is all that is required where a federal statute provides for nationwide service of process, and here, Bankruptcy Rule 7004(d)—a federal rule implicitly authorized by Congress and thus tantamount to a statute— authorizes nationwide service of process.  (PJ Opp. at 12–13.)  In support for their position, the Plaintiffs cite to several cases holding that a national minimum contacts standard applies to cases implicating Bankruptcy Rule 7004, adversary proceedings asserting purely state law claims, and even to an adversary proceeding related to a chapter 15 case.  (*Id.* at 13–15 (collecting cases).)

The Defendants argue that the "Plaintiffs ignore Bankruptcy Rule 7004(f) which expressly requires that personal jurisdiction under this rule be 'consistent with the Constitution and laws of the United States.'"  (Apax/TPG Mot. at 12 (quoting FED. R. BANKR. P. 7004(f)).) The Defendants contend that nationwide service of process does not subject a defendant to personal jurisdiction in any bankruptcy court in the country in light of *Daimler*, particularly where, as here, the suit is based solely on state law claims arising out of foreign transactions and therefore has no connection to the U.S.  (*See id.* at 12–14.)

"[I]n federal question cases . . . no inquiry into a defendant's 'minimum contacts' with the forum state is needed to exercise jurisdiction pursuant to Bankruptcy Rule 7004; rather, only a federal 'minimum contacts' test is required, whereby the Fifth Amendment's Due Process Clause limits a bankruptcy court's exercise of personal jurisdiction over a defendant."  *Enron Corp. v. Arora (In re Enron Corp.)*, 316 B.R. 434, 444 (Bankr. S.D.N.Y. 2004) (citing cases); *see also Bozel*, 434 B.R. at 99 (finding that, in the context of an adversary proceeding

commenced in a bankruptcy proceeding, "the minimum contacts analysis should evaluate the defendant's contacts with the United States as a whole, not merely contacts with the forum state" (citation omitted)); *British Am. Ins. Co. Ltd. v. Fullerton (In re British Am. Ins. Co. Ltd.)*, Adv. Proc. No. 11-03118 (EPK), 2013 WL 1881712, at *2 (Bankr. S.D. Fla. Apr. 30, 2013) (applying nationwide minimum contacts test to evaluate defendant's jurisdictional contacts in an adversary proceeding commenced in a chapter 15 proceeding).  The rationale for this holding is that the sovereign exercising jurisdiction under 28 U.S.C. § 1334 is the U.S., not the particular state in which the federal court is situated.  *See Diamond Mortg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1244 (7th Cir. 1990) ("Since section 1334 provides federal question jurisdiction, the sovereign exercising its authority over the [defendants] is the United States, not the State of Illinois. Hence, whether there exist sufficient minimum contacts between the [defendants] and the State of Illinois has no bearing upon whether the United States may exercise its power over the [defendants] pursuant to its federal question jurisdiction."); *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir. 1997) ("[W]hen an action is in federal court on 'related to' jurisdiction, the sovereign exercising authority is the United States, not the individual state where the federal court is sitting." (citing *Diamond*, 913 F.2d at 1244; *Am. Freight Sys., Inc. v. W.A. Walker & Assocs., Inc. (In re Am. Freight Sys., Inc.)*, 153 B.R. 316, 321 (D. Kan. 1993); *J.T. Moran Fin. Corp. v. Am. Consolidated Fin. Corp. (In re J.T. Moran Fin. Corp.)*, 124 B.R. 931, 943 (S.D.N.Y. 1991)).

Despite having been served pursuant to Bankruptcy Rule 7004(f), the Defendants argue that a nationwide minimum contacts test is inappropriate where, as here, the Plaintiffs' claims are all based on state law and the Plaintiffs' only jurisdictional hook to federal court is the Debtor's chapter 15 proceeding.  (*See* Apax/TPG Mot. at 12; TCW Mot. at 8.)  However, the fact that the

Plaintiffs' claims are grounded in state law is not dispositive.  *See Diamond*, 913 F.2d at 1244

(holding that nationwide minimum contacts test applies to non-core bankruptcy proceedings

involving state law claims, where service has been made pursuant to Bankruptcy Rule 7004(d));

*see also J.T. Moran*, 124 B.R. at 942–43 (noting in dicta that nationwide minimum contacts

continue to satisfy due process requirements even after withdrawal of the reference of non-core

state law claims).  Nationwide contacts satisfy due process requirements where the court has

federal jurisdiction and nationwide service of process is authorized under an applicable federal

statute.  Indeed, courts have routinely held that a nationwide minimum contacts test applies

where nationwide service of process is authorized by federal law.  *See, e.g.*, *Enron*, 316 B.R. at

444 (noting that, after the 1996 amendments to the Bankruptcy Rules, "courts have recognized in

federal question cases that no inquiry into a defendant's 'minimum contacts' with the forum state

is needed to exercise jurisdiction pursuant to Bankruptcy Rule 7004; rather, only a federal

'minimum contacts' test is required, whereby the Fifth Amendment's Due Process Clause limits

a bankruptcy court's exercise of personal jurisdiction over a defendant" (citations omitted)).

Accordingly, each Defendant's contacts with the U.S. as a whole, rather than with New York

specifically, should be evaluated for purposes of personal jurisdiction.

With the exception of TPG London, which the Plaintiffs allege is organized under U.K.

law and has a principal place of business in England (*see* Compl. ¶ 31), all TPG Defendants are

subject to general jurisdiction because the U.S. is their domicile, place of incorporation, or

principal place of business.  *See Daimler*, 134 S. Ct. at 760.  The Plaintiffs allege, and TPG

admits, that Bonderman resides in Fort Worth, Texas and that Coulter resides in San Francisco,

California.[26]  (*See* Compl. ¶¶ 27, 29; Apax/TPG Mot. at 16.)  Additionally, the Plaintiffs allege, and TPG admits, that "[e]ach TPG Advisors IV Defendant, T[3] II Defendant, and TPG Capital [Management, L.P.] is . . . a company or limited partnership organized under the laws of Texas or Delaware with their principal place of business in Fort Worth, Texas."  (*See* Apax/TPG Mot. at 11; Compl. ¶¶ 23, 49–51, 53–56.)  Thus, the Complaint sufficiently alleges the paradigm bases for general jurisdiction described in *Daimler* with respect to each TPG Defendant, with the exception of TPG London.

The paradigm bases for general jurisdiction are similarly alleged with respect to each TCW Defendant.[27]  The Plaintiffs allege, and TCW admits, that each TCW Defendant is organized under the laws of Nevada, California, or Delaware and has principal places of business in those states.  (*See* Compl. ¶¶ 65–70; TCW Mot. at 9–13.)

By contrast, the Plaintiffs do not allege that the U.S. is the domicile, place of incorporation, or principal place of business for any Apax Defendant moving under the Apax/TPG Motion.  Nor do the Plaintiffs allege facts establishing that any Apax Defendant's contacts with the U.S. are sufficiently continuous and systematic so as to render it "at home" in the U.S.  *See Daimler*, 134 S. Ct. at 761.  Thus, no Apax Defendant moving under the Apax/TPG Motion is subject to general jurisdiction.

---

[26]    While the Plaintiffs do not use the term domicile, the additional allegations that Bonderman and Coulter conduct business in the cities in which they reside support the Court's finding that their place of domicile is adequately alleged.  (*See* Compl. ¶¶ 27, 29.)

[27]    This conclusion results in a seeming anomaly.  If the Plaintiffs filed the same claims less than one mile away in New York Supreme Court, minimum contacts with New York rather than with the United States would be the applicable test for general jurisdiction.  But jurisdiction in the bankruptcy court is based on 28 U.S.C. § 1334 and is intended to permit a single bankruptcy court (or district court) to deal with all claims that arise under the Bankruptcy Code, arise in or are related to a bankruptcy case.  The Plaintiffs would still have to show "that the exercise of jurisdiction is reasonable in the circumstances."  *In re Terrorist Attacks*, 714 F.3d at 673.  As explained below, the Court concludes on the facts here that the exercise of jurisdiction is reasonable.

As to DB, for which an alleged paradigm basis of general jurisdiction in the U.S. is also

lacking, the analysis is more nuanced.  While *Daimler* suggests that a corporate defendant's

place of incorporation and principal place of business are two paradigm forums where it would

be subject to general jurisdiction, the Supreme Court did not hold that such paradigm forums

represent the only places where a defendant may be subject to general jurisdiction.  *Id.* at 760.

Here, the Plaintiffs rely on allegations that DB has substantial contacts with the U.S., including a

principal location "in New York, where it has $5 billion in assets and operates out of a massive

1.6 million square foot Regional Head Office at 60 Wall Street that employs some 1,600

personnel, including 1,000 executives."  (DB Supp. Opp. at 1; *see* McDowell Supp. Ex. 18.)  But

unlike in *Daimler*, the Plaintiffs do not allege that DB's New York office belongs to a subsidiary

or affiliate.  *See id.* at 751 ("Jurisdiction over the lawsuit was predicated on the California

contacts of Mercedes–Benz USA, LLC (MBUSA), a subsidiary of Daimler incorporated in

Delaware with its principal place of business in New Jersey.")  Rather, they allege that DB's

New York office is the North American Regional Head Office for DB itself, which "serves as a

critical hub of [DB's] core banking operations, and physically spans over 1.6 million square feet

of space, for which [DB] pays some $67 million annually in rent, pursuant to a 15-year lease."

(DB Opp. at 6 (citing McDowell Decl. Ex. 7 at 7).)  These allegations portray DB's presence in

the U.S. as more than merely transitory, but rather "so 'continuous and systematic' as to render

[it] essentially at home [here]."  *Daimler*, 134 S. Ct. at 761 (quoting *Goodyear*, 564 U.S. at ___,

131 S. Ct. at 2851).  The Plaintiffs allegations establish that DB maintains a substantial, long-

term presence in the U.S. and in New York; DB's contacts with the U.S. are not limited to the in-

state operations of its affiliate as in *Daimler*.  The Plaintiffs therefore adequately allege that DB

is subject to general jurisdiction.

In sum, all Defendants are subject to general jurisdiction, with the exception of TPG London and each Apax Defendant moving under the Apax/TPG Motion (collectively, the "Non-U.S. Defendants").  The Court considers whether these Non-U.S. Defendants are subject to specific jurisdiction below.

> ### 2.    *Specific Jurisdiction*

The Plaintiffs allege that specific jurisdiction exists over the Non-U.S. Defendants by virtue of their suit-related conduct directed at the U.S., including (i) their role in orchestrating the marketing and sale of U.S. dollar-denominated Sub Notes in order to partially fund the December 2006 CPEC Redemption; and (ii) their subsequent transfer of proceeds of the December 2006 CPEC Redemption to the U.S.  (*See* PJ Opp. at 4–10.)  More specifically, the Plaintiffs assert that, in light of diminished interest in an auction of Hellas II's subsidiaries to potential bidders, in an October 27, 2006 presentation to Apax and TPG, DB proposed "an aggressive recapitalization that will allow shareholders to realize a significant dividend."  (*Id.* at 5 (quoting Ashley Decl. Ex. 8 at 07190) (internal quotation marks omitted).)  In support of this allegation, the Plaintiffs point to a December 8, 2006 email in which TPG London's "Philippe Costeletos reported to TPG President David Bonderman that 'we decided to move ahead with a recap' and 'w[e] are issuing a 2nd unsecured €1.1 billion FRN [*i.e.*, Sub Notes].'"  (*Id.* at 6 (alterations in original) (quoting Ashley Decl. Ex. 11 at 10661).)  This email indicates that proceeds of the recapitalization would "'repay the current €540 million PIK and distribute €900 million to shareholders,' including '€400 million to TPG (on an initial investment of €194 million).'"  (*Id.* (quoting Ashley Decl. Ex. 11 at 10661).)  The email further indicates that if all went according to plan, TPG London "anticipated wiring funds to Fort Worth on December 19th."  (*Id.* (quoting Ashley Decl. Ex. 11 at 10661).)

According to the Plaintiffs, TPG, Apax, and DB subsequently endeavored to issue a dollar-denominated tranche of Sub Notes to target investors in the U.S.  (*See id.* at 7.)  The Plaintiffs allege that these Defendants developed an "agreed storyline for what [they] w[ould] tell the debt markets . . . for why [they] . . . decided to go down the recap route."  (*Id.* (quoting Ashley Decl. Ex. 19 at 14999).)  The alleged "storyline" originated with an Apax employee and set forth that "the auction was 'a limited process to test the market,' and that they 'received offers to refinance the company at attractive valuations, which would enable [them] to . . . support the [company's] future growth.'"  (*Id.* at 7–8 (alterations in original) (quoting Ashley Decl. Ex. 19 at 14999).)  An Apax employee later sent an email to a DB employee, providing "the story line as promised."  (*Id.* at 8 (quoting Ashley Decl. Ex. 19 at 14998).)

The Plaintiffs allege that after the fully subscribed Sub Notes were issued, proceeds from the dollar-denominated tranche of Sub Notes were held in a New York bank account maintained by DB, and such proceeds were subsequently transferred to Hellas II.  (*Id.* (citing Ashley Decl. Ex. 21 at 1942).)  According to the Plaintiffs, Apax and TPG then announced an "outsized dividend" (*id.*), collectively received €800 million in proceeds of the December 2006 CPEC Redemption (*see id.* at 9 (citing Compl. ¶¶ 26, 36–38, 40–43, 49–63; Ashley Decl. Exs. 30–34), and transferred approximately €516 million of those proceeds to the U.S. (*id.* (citing Compl. ¶¶ 26, 36–38, 40–43, 49–63; Ashley Decl. Exs. 30–34)).  Specifically, the Plaintiffs assert that "Apax Europe VI GP Co. Ltd., Apax Europe VI GP, L.P., Apax Europe VI-A, L.P., and Apax Europe VI-1, L.P. acknowledge receipt of Apax's €400 million share, of which on December 29, 2006 they distributed €115 million to 57 investors in the U.S. (with €16 million distributed in New York)."  (*Id.* at 10 (citing Ashley Decl. Ex. 37).)  The Plaintiffs allege that "TPG acknowledges that the full amount of its €400 million share of the proceeds was transferred to

the U.S. on December 27, 2006, of which $296 million was distributed that same day to 150

investors in the U.S. (with $45 million distributed in New York)." (*Id.* (citing Ashley Decl. Ex.

38).)

Apax and TPG argue that the Plaintiffs improperly group the various Apax and TPG

Defendants together, referring to them collectively as "Apax or "TPG" in the Complaint.

(Apax/TPG Reply at 1.)  As such, Apax and TPG contend that the Complaint fails to adequately

allege that specific jurisdiction exists over any Non-U.S. Defendant individually.  (*See id.*)  In

any event, Apax and TPG argue that DB's contacts with the U.S. do not support the exercise of

specific jurisdiction over any Non-U.S. Defendant because the Plaintiff's claims are not

sufficiently related to DB's alleged U.S. contacts.  (*See id.* at 2.)  Because the Plaintiffs' claims

are premised on an initial fraudulent conveyance between Hellas II and Hellas I, and on

subsequent transfers to the Non-U.S. Defendants, all of which "occurred entirely overseas,"

Apax and TPG contend that the "potential 'transferee' liability of the Non-U.S. Defendants does

not depend on how or to whom DB marketed Sub Notes in the U.S."  (*Id.* ("[T]his case is about

the transfers, not the Sub Notes sales." (citation omitted)).)  Apax and TPG also argue that the

dollar-denominated Sub Notes sales and the transfers underlying the Plaintiffs' claims are too

attenuated to support the exercise of specific jurisdiction over the Non-U.S. Defendants in light

of the fact that (i) "the U.S. tranche represented only 18% of the Sub Notes offering, which

primarily was marketed in Europe" (*id.* at 3 (emphasis omitted)); and (ii) the Plaintiffs "have

made no showing . . . that any proceeds raised in the U.S. were transferred to or otherwise

touched any Non-U.S. Defendant . . . ." (*id.* (emphasis omitted)).  Apax and TPG further assert

that the Plaintiffs have not shown that DB acted as an agent of any Non-U.S. Defendant in

marketing and selling Sub Notes in the U.S.  (*Id.* at 4.)  To the contrary, pursuant to the

applicable purchase agreement between Hellas II and DB and other underwriters, TPG and Apax

argue that DB engaged in a "firm commitment underwriting" of the Sub Notes whereby it

purchased the Sub Notes from Hellas II for its own account.[28]  (*See id.* (citing Lestelle Decl. Ex.

B § 1, at 2).)

Moreover, Apax and TPG argue that transfers of proceeds of the December 2006 CPEC

Redemption from the Non-U.S. Defendants to the U.S. are not sufficiently connected to the

Plaintiffs' claims because the "[P]laintiffs seek to impose *transferee*, not *transferor*, liability on

the Non-U.S. Defendants based solely on transfers made *to* them, not *by* them."  (*Id.* at 6

(emphasis in original).)  Accordingly, any Non-U.S. Defendant's transfer of proceeds made

subsequent to its receipt thereof bears no relationship to the Plaintiffs' claims and is therefore

irrelevant to a determination of whether specific jurisdiction may be exercised over such Non-

U.S. Defendant.[29]  (*See id.* at 6–7.)

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident

defendant focuses on the relationship among the defendant, the forum, and the litigation."

*Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465

U.S. 770, 775 (1984)) (internal quotation marks omitted).  The defendant's suit-related conduct

with the forum must form the basis for specific jurisdiction.  *See id.* at 1121; *Picard*, 418 B.R. at

80 ("Specific personal jurisdiction exists where a foreign defendant 'purposefully direct[s] his

---

[28]    "Indeed, in the Purchase Agreement between Hellas II and the Initial Purchasers (*i.e.*, the underwriters, including DB), Hellas II acknowledged that 'the Initial Purchasers have acted at arm's length, *are not agents of* . . . the Issuer *or any other person*.'"  (*Id.* (emphasis in original) (quoting Lestelle Decl. Ex. B § 12, at 22).)

[29]    Apax and TPG also contest the accuracy of the Plaintiffs' allegations regarding the Non-U.S. Defendants' transfers of redemption proceeds to the United States.  First, they state that the Non-U.S. Defendants only transferred €115 million of redemption proceeds to the United States, not the €516 million alleged by the Plaintiffs. (*Id.* at 6 (citing Ashley Decl. Ex. 37, Nos. 7–62, 64).)  Second, they maintain that the Non-U.S. Defendants did not make "[m]ore than 200 bank transfers totaling $296 million and €115 million," as alleged by the Plaintiffs.  (*Id.* (citing PJ Opp. at 19).)  "In fact, two Apax Moving Defendants made a total of 56 such transfers totaling €115 million."  (*Id.* (citing Ashley Decl. Ex. 37, Nos. 7–62, 64).)

activities at residents of the forum,' and the underlying cause of action 'arise[s] out of or relate[s]

to those activities.'" (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985))).

"Where the claim arises out of, or relates to, the defendant's contacts with the forum—i.e.,

specific jurisdiction [is asserted]—minimum contacts [necessary to support such jurisdiction]

exist where the defendant purposefully availed itself of the privilege of doing business in the

forum and could foresee being haled into court there." *Licci ex rel. Licci v. Lebanese Canadian

Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) (alteration in original) (quoting *Bank Brussels

Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002)).

      The circuit courts have adopted different approaches for determining whether a claim

"arises from or relates to" a defendant's contacts with a forum for purposes of evaluating the

existence of specific jurisdiction. *Del Ponte v. Universal City Dev. Partners, Ltd.*, No. 07-CV-

2360 (KMK) (LMS), 2008 WL 169358, at *9 (S.D.N.Y. Jan. 16, 2008). Under one approach,

"jurisdiction over a defendant is proper only when the defendant's conduct within the forum is

the 'proximate cause' of the plaintiff's injury." *Id.* (citing *Chew v. Dietrich*, 143 F.3d 24, 29 (2d

Cir. 1998)). Under an alternative approach, sufficient minimum contacts exist when a

defendant's forum-related conduct is merely a "but for" cause of the plaintiff's injury. *Id.*

(citation omitted). The Second Circuit has adopted a third, more flexible standard:

> Where the defendant has had only limited contacts with the state it
> may be appropriate to say that he will be subject to suit in that state
> only if the plaintiff's injury was proximately caused by those
> contacts. Where the defendant's contacts with the jurisdiction that
> relate to the cause of action are more substantial, however, it is not
> unreasonable to say that the defendant is subject to personal
> jurisdiction even though the acts within the state are not the
> proximate cause of the plaintiff's injury.

*Chew*, 143 F.3d at 29 (citations and internal quotation marks omitted).

In this case, the alleged contacts between the Non-U.S. Defendants and the U.S. are not sufficiently related to the Plaintiffs' claims such that specific jurisdiction over the Non-U.S. Defendants exists.  The Plaintiffs allege that "[t]hrough the December 2006 Transaction and the December 2006 CPEC Redemption, [Hellas II] transferred approximately €1.57 billion in cash proceeds to its parent Hellas I, of which at minimum €973,657,610 was transferred" ultimately to the Defendants.  (Compl. ¶¶ 156, 162).  The remainder of the approximately €1.57 billion transferred to Hellas I was used to pay other outstanding debt and transaction costs associated with the December 2006 Transaction.  (*Id.*)  Of the €1.57 billion transferred from Hellas II to Hellas I, only 13% was comprised of the $275 million attributable to the dollar-denominated Sub Notes.  (DB Reply at 7 n.6.)  The dollar-denominated Sub Notes only constituted a fraction of the entire Sub Notes offering, which in turn was "only one series of three separate notes issuances used to fund the ultimate transfer from Hellas II . . . to Hellas I, of which '€978,659,712 was paid to Hellas I in redemption of outstanding CPECs.'"  (*Id.* at 7 (citations omitted).)

No cause of action is asserted in this case challenging the sale of the Sub Notes; nor is it clear that the Plaintiffs, as foreign representatives (as opposed to the trustee under the note indenture or the note holders), would have standing to challenge that sale.[30]  Instead, the Plaintiffs' claims arise from challenged transfers, including the December 2006 CPEC Redemption and the Consulting Fees Transfer.  (*See* Compl. ¶¶ 155–168.)  They are also premised on Apax and TPG unjustly retaining benefits belonging to Hellas II by virtue of their receipt of proceeds from the December 2006 CPEC Redemption and the Consulting Fees

---

[30]    Indeed, the Hellas transactions at issue in this case have been the source of other litigation in the district court and this Court.  *See Cortlandt St. Recovery Corp. v. Aliberti*, No. 12-CV-8686 (JPO), 2014 WL 6907548 (S.D.N.Y. Dec. 9, 2014); *TCS Capital Mgmt., LLC v. Apax Partners, L.P.*, No. 06–CV–13447 (CM), 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008); *In re TPG Troy, LLC*, 492 B.R. 150 (Bankr. S.D.N.Y. 2013).

30

Transfer. (*Id.* ¶¶ 169–173.)  However, the Non-U.S. Defendants' alleged U.S. contacts relating to the challenged transfers were not "but for" causes of such transfers.  The proceeds generated from the issuance of dollar-denominated Sub Notes were not required to fund the December 2006 CPEC Redemption.  Nor was the Non-U.S. Defendants' transfer of December 2006 CPEC Redemption proceeds to the U.S., after the fact, a cause of the challenged transfers underlying the Plaintiffs' claims.  To contend that these subsequent transfers from the Non-U.S. Defendants to the U.S. in any way *caused* the December 2006 CPEC Redemption or the Consulting Fees Transfer is to put the cart before the horse.

To be sure, the December 2006 CPEC Redemption could have been accomplished if Hellas II never even issued the dollar-denominated Sub Notes.  Hellas II possessed over €1 billion before accounting for the proceeds from the dollar-denominated Sub Notes, an amount greater than the amount allegedly transferred to the Defendants.  (*See* Compl. ¶ 18 (alleging that approximately €200 million was transferred to Hellas II from a subsidiary, and €960 million of proceeds were received by Hellas II from the issuance of the euro-denominated Sub Notes).) Accordingly, the Plaintiffs fail to allege that the sale of the dollar-denominated Sub Notes was the proximate, let alone "but for," cause of the December 2006 CPEC Redemption.

Additionally, any attempt of the Plaintiffs to implicate the Non-U.S. Defendants by way of the transfer of the December 2006 CPEC Redemption proceeds is unpersuasive because (1) the Non-U.S. Defendants were the recipients, not the transferors of such proceeds, and (2) the Non-U.S. Defendants' receipt of those proceeds occurred abroad, not in the U.S.  (*See* Ashley Decl. Ex. 37 (flow of funds document indicating a foreign country of origin for each transfer of redemption proceeds made by an Apax Defendant); *id.* Ex. 38 (flow of funds document indicating no transfers from TPG London to the U.S.).)  Any subsequent transfer of redemption

proceeds made by the Non-U.S. Defendants to recipients in the U.S. is irrelevant to their liability

as transferees and therefore cannot constitute sufficient minimum contacts for purposes of

establishing specific jurisdiction.  The Apax/TPG Motion is therefore **GRANTED** in part and all

claims against the Non-U.S. Defendants are **DISMISSED**.

<em>3.    Reasonableness of Exercising Personal Jurisdiction</em>

In determining the reasonableness of exercising jurisdiction over a defendant, "the

defendant's contacts with the forum State must be such that maintenance of the suit does not

offend traditional notions of fair play and substantial justice."  *World-Wide Volkswagen*, 444

U.S. at 292 (internal quotation marks omitted) (quoting *Int'l Shoe*, 326 U.S. at 316).  "The Court

must take into account five factors in this inquiry:  (1) the burden that the exercise of jurisdiction

will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the

plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's

interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest

of the states in furthering substantive social policies."  *Schutte Bagclosures Inc. v. Kwik Lok

Corp.*, No. 12 Civ. 5541 (JGK), ___ F. Supp. 3d ___, ___, 2014 WL 4802917, at *7 (S.D.N.Y.

Sept. 29, 2014) (citations omitted).  Where constitutional minimum contacts have been

established, "often the interests of the plaintiff and the forum in the exercise of jurisdiction will

justify even the serious burdens placed on the alien defendant."  *Bozel*, 434 B.R. at 100 (quoting

*Asahi*, 480 U.S. at 114) (internal quotation marks omitted).  In such instance the burden shifts to

the defendant "to present a 'compelling case' that establishing personal jurisdiction would be

unreasonable."  *Id.* (citations omitted).

The Defendants subject to general jurisdiction do not satisfy their burden of making a

compelling case that the exercise of general jurisdiction would be unreasonable.  The TPG

Defendants raised this argument for the first time in their Reply Brief, stating in a conclusory fashion that "it would be unreasonable to exercise personal jurisdiction over [them] because none of them had reason to expect being haled into court in New York in relation to the claims in this litigation, and neither the [Plaintiffs] nor any Moving Defendant has meaningful ties to the forum." (Apax/TPG Mot. at 17 n.9.) Neither TCW nor DB address whether it would be unreasonable for the Court to exercise personal jurisdiction over them.

The burden on these Defendants to litigate in this Court is not great, as each such Defendant is "at home" in the U.S. and is represented by counsel in the U.S. The U.S. has a significant interest in adjudicating this adversary proceeding, since it facilitates the foreign Plaintiffs' efforts to maximize the value of the Debtor's estate. *See In re British Am. Ins. Co. Ltd. v. Fullerton (In re British Am. Ins. Co. Ltd.)*, Adv. Proc. Nos. 11-03118, 11-03117 (EPK), 2012 WL 4508611, at *5 (Bankr. S.D. Fla. Sept. 28, 2012) ("By enacting chapter 15 of the Bankruptcy Code, Congress exhibited a clear intent for the United States to participate in a coordinated manner with insolvency proceedings taking place in foreign nations."). The Plaintiffs also have an interest in obtaining convenient and effective relief. Finally, at this time, there does not appear to be another more efficient forum for resolving the Plaintiffs' claims, as they arise under New York law with which this Court is familiar. Accordingly, with respect to the TPG, DB, and TCW Defendants subject to general jurisdiction, the exercise of personal jurisdiction over such Defendants is reasonable under the circumstances. The Apax/TPG Motion is therefore **DENIED** in part as to all TPG Defendants other than TPG London, and the DB Motion and the TCW Motion are both **DENIED**.

### B.    Subject Matter Jurisdiction

In ruling on a motion to dismiss for lack of subject matter jurisdiction pursuant to FRCP

12(b)(1), "the district court must take all uncontroverted facts in the complaint (or petition) as

true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v.*

*Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citing *Amidax*

*Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)).  A motion to

dismiss for lack of subject matter jurisdiction is properly granted where the court "lacks the

statutory or constitutional power to adjudicate it."  *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177

(2d Cir. 2014) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)) (internal

quotation marks omitted).  Where the parties dispute jurisdictional facts, the court must decide

issues of fact by reference to evidence beyond the pleadings, including affidavits.  *Tandon*, 752

F.3d at 243 (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).  In the event of such a

dispute, "the party asserting subject matter jurisdiction 'has the burden of proving by a

preponderance of the evidence that it exists.'"  *Id.* (quoting *Makarova*, 201 F.3d at 113).

According to the Defendants, the Complaint should be dismissed on the basis that "the

Court lacks core subject matter jurisdiction over this dispute."  (Defs.' Mot. at 35.)  They

contend that the Plaintiffs' claims neither arise under title 11 nor arise in proceedings under the

Bankruptcy Code, because unlike claims asserted under section 544 of the Bankruptcy Code, the

Plaintiffs' NYDCL and unjust enrichment claims "unquestionably exist outside of bankruptcy."

(*Id.* at 36 (citation omitted).)  Additionally, while 28 U.S.C. § 157(b)(2)(P) provides for core

jurisdiction over chapter 15 recognition proceedings, "only that recognition itself is core;

whether another proceeding in [c]hapter 15 is core must be determined elsewhere."  (*Id.* (citing

*In re Fairfield Sentry Ltd.*, 458 B.R. 665, 674 (S.D.N.Y. 2011).)  The Defendants assert that the

34

Plaintiffs' claims do not fall within 28 U.S.C. § 157(b)(2)(P) because such section applies only to chapter 5 claims, which may not be brought in a chapter 15 proceeding. (*See id.* at 37.) The Defendants emphasize that the Court cannot render a final judgment on the Plaintiffs' claims where, as here, the Defendants did not file proofs of claim; however, they admit that the Court's inability to finally adjudicate the Plaintiffs' claims is not determinative of whether the Court has subject matter jurisdiction. (*Id.* at 38.)

According to the Plaintiffs, the Defendants do not contest the Court's subject matter jurisdiction over the claims at issue in this adversary proceeding pursuant to 28 U.S.C. § 1334; rather, the Defendants conflate the concepts of "subject matter jurisdiction" and "core proceedings" by asserting that "the Court lacks core subject matter jurisdiction over this dispute." (Opp. at 48 (quoting Defs.' Mot. at 45).) The Plaintiffs maintain that the U.S. Code's division of proceedings into "core" and "non-core" has nothing to do with subject matter jurisdiction, but instead "allocates the authority to enter final judgment between the bankruptcy court and the district court." (*Id.* (quoting *Stern v. Marshall*, 131 S. Ct. 2594, 2607 (2011)) (internal quotation marks omitted).) The Plaintiffs argue that the determination of whether their adversary proceeding is "core" or "non-core" is irrelevant to the Court's subject matter jurisdiction, which exists. (*Id.*)

Section 1334 of title 28 of the U.S. Code provides federal district courts with jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). District courts may refer "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district." *Id.* § 157(a). Section 157 also divides matters referred to the bankruptcy court into two categories: core and non-core proceedings. *See generally id.* § 157.

35

While *Stern v. Marshall*, 131 S. Ct. 2594 (2011), and its progeny limit the authority of a bankruptcy judge to enter final orders or judgment on core claims that would not be resolved as part of the claims allowance process, the bankruptcy court's jurisdiction remains unaffected, and the court may submit proposed findings of fact and conclusions of law. As the Supreme Court stated in *Stern*, ''[s]ection 157 [of title 28] allocates the authority to enter final judgment between the bankruptcy court and the district court. That allocation does not implicate questions of subject matter jurisdiction.'' *Stern*, 131 S. Ct. at 2607; *see also Residential Funding Co. v. UBS Real Estate Sec., Inc.*, 515 B.R. 52, 62 (Bankr. S.D.N.Y. 2014) (concluding that *Stern* did not alter the subject matter jurisdiction of the bankruptcy courts); *Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 848 n.26 (Bankr. S.D.N.Y. 2013) (''*Stern*, which affects the constitutional power of a bankruptcy judge to issue a final judgment in a matter as to which the bankruptcy court already has subject matter jurisdiction, does not in any way deprive bankruptcy courts of subject matter jurisdiction.''). With respect to "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11," a bankruptcy judge may submit proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c)(1).

This Court has "related to" subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. Section 1334(b) provides that "district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). In the Second Circuit, the test for determining the existence of related to jurisdiction under 28 U.S.C. § 1334 is whether the outcome of a proceeding might have any "conceivable effect" on the bankrupt estate, or whether the proceeding has a "significant connection" with the bankrupt estate. *See Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992).

"[C]ommencement of a chapter 15 case does not create an 'estate' as that term is used in the Bankruptcy Code." *In re JSC BTA Bank*, 434 B.R. 334, 341 (Bankr. S.D.N.Y. 2010). However, in the context of a case under former Bankruptcy Code section 304—the precursor to chapter 15—the Second Circuit noted that "[t]he fact that a § 304 proceeding, by definition, involves a bankruptcy estate located abroad does not short circuit the 'related to' analysis." *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011). In *Parmalat*, the Second Circuit held that the district court properly exercised removal jurisdiction over the foreign debtors' state law civil action filed in state court, finding that the foreign debtors' civil action seeking damages might have a conceivable effect on their bankruptcy estates, and therefore the district court had "related to" jurisdiction over the state law action. *See id.* n.7 ("State law claims are 'related to' § 304 proceedings so long as they satisfy [the] 'related to' test set forth in *Cuyahoga*, 980 F.2d at 114. Nothing more is required.").

The outcome of this adversary proceeding would clearly have an effect on the Debtor's foreign estate, as it could potentially recover approximately €1 billion for the benefit of the estate. *See Cuyahoga*, 980 F.2d at 114 (holding that certain section 502 and 506(c) claims were related to the debtors' bankruptcy cases where such "claims bring into question the very distribution of the estate's property"). Notwithstanding that the Plaintiffs' claims are all state law claims brought in an adversary proceeding related to a chapter 15 proceeding, this adversary proceeding is related to a case under title 11. *See Parmalat*, 639 F.3d at 579.

The Court will assume for purposes of this decision that it would not have authority to finally adjudicate the Plaintiffs' claims without the consent of the parties. The Court would still have authority to issue proposed findings of fact and conclusions of law, regardless of whether the claims are core or non-core. *See Exec. Benefits Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2168

(2014) ("We hold today that when, under *Stern's* reasoning, the Constitution does not permit a

bankruptcy court to enter final judgment on a bankruptcy-related claim, the relevant statute

nevertheless permits a bankruptcy court to issue proposed findings of fact and conclusions of law

to be reviewed *de novo* by the district court.")  And, as already discussed, whether this Court has

the authority to enter a final judgment on the Plaintiffs' claims does not affect the Court's

jurisdiction to consider the claims and enter a non-final judgment.  *See British Am. Ins. Co. Ltd.

v. Fullerton (In re British Am. Ins. Co. Ltd.)*, 488 B.R. 205, 221 (Bankr. S.D. Fla. 2013)

("Whether a particular proceeding is core or non-core—whether the bankruptcy court may enter

a final order or judgment therein—has no impact on whether there is federal bankruptcy

jurisdiction over the proceeding.").  The Defendants' Motion is therefore **DENIED** to the extent

it seeks dismissal for lack of subject matter jurisdiction.

## C.    Choice of Law

There are three jurisdictions' laws potentially implicated in this case:  New York law,

U.K. law, and Luxembourg law.[31]  To determine which of these laws applies to the substance of

the causes of action asserted in the Complaint, the parties agree that the Court must employ New

York choice of law rules.  (*See* Defs.' Supp. Br. at 3; Pls.' Supp. Opp. at 3.)  *See also Geron v.

Seyfarth Shaw LLP (In re Thelen LLP)*, 736 F.3d 213, 219 (2d Cir. 2013) ("[W]here no

significant federal policy, calling for the imposition of a federal conflicts rule, exists, a

bankruptcy court must apply the choice of law rules of the forum state." (alteration in original)

(citations and internal quotation marks omitted)).  Under New York choice of law rules, the

Court must first determine whether there is an "actual conflict" between the relevant laws of the

implicated jurisdictions.  *GlobalNet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377,

---

[31]    As an initial matter, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."  FED. R. CIV. P. 44.1.

382 (2d Cir. 2006) (citing *In re Allstate Ins. Co. v. Stolarz*, 613 N.E.2d 639, 937 (N.Y. 1993);

*Zurich Ins. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065 (N.Y. 1994)).  An actual conflict

exists where such laws provide different substantive rules; such differences must be relevant to

the issue to be determined and have a "significant *possible* effect on the outcome of the trial."

*Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005)

(emphasis in original) (citations and internal quotation marks omitted).  However, "[i]f no actual

conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply

New York law."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir.

2012) ("Licci I") (citations omitted).

The Complaint alleges three causes of action:  Count I of the Complaint asserts an actual

fraudulent conveyance claim against all the Defendants and the Transferee Class under NYDCL

section 276; Count II asserts a constructive fraudulent conveyance claim against all Defendants

and the Transferee Class under NYDCL sections 273, 274, 275, and 277; and Count III asserts

an unjust enrichment claim against Apax and TPG only.  (Compl. ¶¶ 155–173.)  With respect to

Counts I and III, the parties purport to agree that there is no actual conflict between New York

law on the one hand and either U.K. law or Luxembourg law on the other.  (*See* Defs.' Supp. Br.

at 1 ("Defendants are not at this time aware of an actual conflict between New York law and

either Luxembourg law or U.K. law that would require the Court to engage in a choice of law

analysis regarding the First Cause of Action or the Third Cause of Action in the Complaint.");

Dec. 3, 2014 Hr'g. Tr. 118:21–23 (Plaintiffs' counsel stating "we would have actually fraudulent

transfer claims and unjust enrichment claims under with [sic] English or Luxembourg [law].").)

New York law therefore applies to Counts I and III of the Complaint.  *See Licci I*, 672 F.3d at

157; *see also Park Place Entm't Corp. v. Transcon. Ins. Co.*, 225 F. Supp. 2d 406, 408 (S.D.N.Y.

2002) ("If the party advocating a choice of law analysis fails to demonstrate an actual conflict

between New York and another state's laws, no choice of law analysis need be undertaken."

(citations omitted)).[32]

       With respect to Count II of the Complaint—the Plaintiffs' constructive fraudulent

conveyance claim—the parties agree that there are differences between New York law and the

laws of U.K. and Luxembourg.  (*See* Defs.' Supp. Br. at 2–3; Pls.' Supp. Opp. 6.)  The Plaintiffs,

however, dispute the impact of such differences, arguing that the conflicts among the laws are

not sufficiently material to constitute "actual conflict[s]" triggering the next inquiry of a New

York choice of law analysis.  (Pls.' Supp. Opp. at 6–7.)  The Court disagrees.

       Under NYDCL sections 273, 274, 275, and 277, as cited in the Complaint (*see* Compl.

¶¶ 161–168), "a transfer made without fair consideration constitutes a fraudulent conveyance,

regardless of the intent of the transferor."  *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re

Sharp Int'l Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005) (quoting *HBE Leasing Corp. v. Frank*, 48 F.3d

623, 633 (2d Cir. 1995) (acknowledging that New York follows the Uniform Fraudulent

---

[32]     The twist here is that while the Defendants' counsel state that there is no conflict with respect to the actual fraudulent conveyance claim, they separately argue that the NYDCL does not have extraterritorial application to the transfers challenged in this case, while U.K. or Luxembourg law might apply.  The NYDCL's lack of extraterritorial effect may indeed create an actual conflict requiring a further choice of law analysis.  *See Meyers v. Kallestead*, No. 91 C 20362,1992 WL 280450, at *4 (N.D. Ill. Sept. 30, 1992) (holding that an actual conflict triggering a choice of law analysis existed between the Illinois Dram Shop Act, which does not apply extraterritorially, and the Iowa Dram Shop Act, which does apply extraterritorially); *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815–18 (1993) (discussing extraterritorial reach of statutes as a choice-of-law and/or comity principle); *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 220 (2d Cir. 2014) ("The question whether the application of [a securities fraud statute] to a particular set of transnational facts would be impermissibly extraterritorial has much in common with the choice-of-law question that arises when a court must determine which state or nation's law most appropriately governs a case involving interstate or transnational facts."); *see also Maxwell Commc'n Corp. plc v. Barclays Bank plc (In re Maxwell Commc'n Corp. plc)*, 170 B.R. 800, 809–10 (Bankr. S.D.N.Y. 1994) (recognizing the view that extraterritoriality should be construed as a sub-genre of choice of law), *aff'd*, 186 B.R. 807 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036, 1055 (2d Cir. 1996) (affirming lower courts on basis of international comity while declining to decide whether presumption against extraterritorial application of Bankruptcy Code avoidance provisions would "compel a conclusion that the Bankruptcy Code does not reach the pre-petition transactions at issue").  Despite this, the Court will assume, as the parties purport to do, that no conflict exists and that New York law therefore applies to Count I.  As explained below, the Court concludes that the NYDCL actual fraudulent conveyance claim must be dismissed for lack of standing, making it further unnecessary to reach the issue of the extraterritorial effect of the statute.

Conveyance Act, which identifies several types of constructive fraud)).  By contrast, the

proffered U.K. and Luxembourg law equivalents to the NYDCL require proof of some degree of

purpose or intent.[33]  First, under U.K. law, section 423(3) of the Insolvency Act requires a

creditor to prove that the "'actual subjective purpose' of the transferor in entering into the

transaction was to (i) put assets beyond the reach of a person who is making or may make a

claim against him; or (ii) to otherwise prejudice the interests of such person in relation to the

claim which he is making or may make."  (Pls.' Supp. Opp. at 3 (citing Supp. Isaacs Decl.

¶¶ 12.2, 16).)  Second, article 1167 of the Luxembourg Civil Code, also known as the "*Actio*

*Pauliana*," requires a plaintiff-creditor to prove the transferor's "actual intent to defraud."  (*See*

Defs.' Supp. Br. at 2 (citing Prüm Decl. ¶ 7).)  Since other causes of action under the NYDCL

require a showing of "an intent to defraud," these foreign laws are clearly different from the

constructive fraudulent transfer claim asserted in Count II of the Complaint.  *See, e.g.*, N.Y.

DEBT. & CRED. L. § 276.  Indeed, the Plaintiffs plead a separate actual fraudulent conveyance

claim under the applicable NYDCL provisions that require a showing of an intent to defraud,

evincing an acknowledgement that there is a distinction between constructive and actual

fraudulent conveyance claims under New York law.  (*See* Compl. ¶¶ 155–168.)

---

[33]     The Plaintiffs' expert opines that section 238 of the U.K. Insolvency Act 1986 (the "Insolvency Act") is
analogous to the NYDCL's provisions governing constructive fraudulent conveyances in that section 238 does not
require proof of an "actual subjective purpose," (*see* Pls.' Supp. Opp. at 6 (citing Supp. Moss. Decl. ¶¶ 12, 15)), but
both parties' experts agree that the Plaintiffs are not entitled to bring a claim pursuant to section 238 of the
Insolvency Act under the circumstances of this case (*see id.* ("[W]hile England's Section 238 is analogous to a claim
for a constructive fraudulent conveyance, it appears that such a claim is only available where insolvency
proceedings have been commenced within two years of the challenged transfer (which was not the case here).");
Supp. Isaacs Decl. ¶ 7 ("The [December 2006] CPEC Redemption Transaction occurred on 21 December 2006.
Hellas II entered administration on 26 November 2009.  It follows that the [December 2006] CPEC Redemption
Transaction did not take place at a 'relevant time' within the meaning of section 240.  Accordingly, no order could
now be made under section 238 . . . .").)  The Plaintiffs also conceded at the hearing that they could not assert this
U.K. constructive fraudulent conveyance claim.  (*See* Dec. 16, 2014 H'rg. Tr. 28:4–29:18.)  Accordingly, the
parties, and in turn the Court, focus the analysis with respect to U.K. law on section 423 of the Insolvency Act for
purposes of determining the applicable law for Count II of the Complaint.

The Court therefore concludes that an "actual conflict" exists between New York law on the one hand and U.K. and Luxembourg law on the other as to Count II of the Complaint. *See, e.g.*, *Lyman Commerce Solutions, Inc. v. Lung*, No. 12-cv-4398 (TPG), 2014 WL 476307, at \*3 (S.D.N.Y. Feb. 6, 2014) (discussing the court's prior holding that an actual conflict exists between New York constructive fraudulent conveyance law, under which "a plaintiff need not prove [fraudulent] intent," and Iowa and Delaware law, under which "a plaintiff must still prove actual fraudulent intent" (citations and internal quotation marks omitted)); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 495 (S.D.N.Y. 2014) (finding an actual conflict between Mississippi and Texas laws governing rescission of an insurance policy based on a misrepresentation of material fact because Mississippi law does not require a finding of an "intent to deceive," whereas "under Texas law, [the plaintiff] must prove intent to deceive and reliance, and any ambiguity will be construed in favor of coverage").

Upon the identification of an "actual conflict" among fraudulent conveyance laws, the New York choice of law analysis requires the Court to apply the "interest-analysis." *See, e.g.*, *Drenis v. Haligannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (characterizing fraudulent conveyance laws as conduct-regulating laws subject to New York's choice of law rules' "interest analysis"); *Lyman*, 2014 WL 476307, at \*3 (citing cases finding that fraudulent conveyance laws are conduct-regulating for purposes of applying New York's "interest analysis"). "New York's interest analysis requires that 'the law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'" *Thelen*, 736 F.3d at 219 (alterations in original) (quoting *GlobalNet*, 449 F.3d at 384). "[G]iven that fraudulent conveyance laws are 'conduct regulating,' the law of the jurisdiction where the

tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Lyman*, 2014 WL 476307, at *3; *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 215–16 (S.D.N.Y. 2002) (finding that Canadian law applied to plaintiffs' fraudulent conveyance claim because "the conveyance alleged by [the plaintiffs] to be fraudulent—the transfer of funds held by [one defendant] to the [other defendants]—took place in Canada").

New York choice of law rules do not require a blind adherence to this rule. *See Golden Archer Invs., LLC v. Skynet Fin. Sys.*, 908 F. Supp. 2d 526, 539 (S.D.N.Y. 2012) (noting that the court "do[es] not blindly follow the *lex loci* rule" in applying the interest analysis to conduct-regulating laws (citations and internal quotation marks omitted)).  But when the alleged wrongful conduct occurs in a place different from the place of injury, the Second Circuit dictates that "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectation of the parties who relied [on the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50–51 (2d Cir. 2013) ("Licci II") (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684–85 (N.Y. 1985)); *see also Lyman*, 2014 WL 476307, at *3 (concluding that for fraudulent conveyance claims, "the location of injury does not control; instead, it is the location of the defendant's conduct that controls." (citation omitted)).

The Plaintiffs argue that New York has the greatest interest in seeing its law applied to their claims.  (Pls.' Supp. Opp. at 9–15.)  According to the Plaintiffs, (i) securities clearing house reports indicate that a greater number of Sub Notes were held by U.S. custodians than Luxembourg custodians (*see* Supp. Ashley Decl. Exs. 22–23, 42); (ii) the majority of U.S.

43

custodians holding Sub Notes were located in New York (*see id.*); (iii) the offering memorandum and indenture for the dollar-denominated Sub Notes were governed by New York law, provided for Hellas II's consent to New York jurisdiction, and appointed a New York trustee, registrar, and paying agent for the Sub Notes (*see* Compl. ¶ 122); (iv) the Sub Notes were aggressively "marketed and sold to investors located in . . . New York and elsewhere in the [U.S.]" (*id.* ¶ 121; Pls.' Supp. Opp. at 13–14); and (v) a greater sum of the December 2006 CPEC Redemption proceeds obtained by both Apax and TPG was ultimately distributed in New York than in Luxembourg (Pls.' Supp. Opp. at 14–15 (citing Compl. ¶¶ 118–19; Ashley Decl. Exs. 37–38, 50)).

By contrast, the Defendants assert that Luxembourg has a superior interest in seeing its laws applied to Count II because:  (i) the "conveyances" at issue in Count II are the redemptions of CPECs, not the sale of Sub Notes (*see* Defs.' Supp. Br. at 4–5); (ii) the "principal steps" of the December 2006 CPEC Redemption were carried out in Luxembourg, by Hellas entities formed under Luxembourg law and located in Luxembourg (*see id.* at 4 (citing Compl. ¶ 118)); (iii) Hellas II's principal place of business was located in Luxembourg (*see id.* (citing Glenn Decl. Ex. A at ii; *Thelen*, 736 F.3d at 221 (indicating that for fraudulent conveyance claims, the "principal place of business is certainly relevant in deciding the law applicable to actions taken in the course of that business")); (iv) each series of CPECs was redeemed by Luxembourg-based Hellas entities, and each of the redemption agreements governing those transactions was governed by Luxembourg law (*see id.* at 5 (citing Glenn Decl. Ex. B § 5.6)); and (v) the corporate resolutions authorizing the CPEC redemptions were adopted by Hellas, a Luxembourg entity, in its capacity as the "sole manager and general partner" of Hellas II (*id.* (citing Compl. ¶ 127)).

Applying the Second Circuit's holding in *Licci II*, if the Court only had to choose between New York and Luxembourg law, Luxembourg appears to have a greater interest than New York. According to the parties' arguments, the allegedly wrongful conduct occurred more substantially in Luxembourg, whereas the alleged injury occurred more substantially in New York.[34] However, the Court is also faced with the laws of the U.K., which may have a countervailing interest pursuant to the European Union's Council Regulation (EC) No. 1346/2000 of 29 May 2000 on insolvency proceedings (the "EU Insolvency Regulation").[35]

Article 4 of the EU Insolvency Regulation indicates that the law of a debtor's Centre of Main Interests ("COMI") "continues to govern aspects of that entity's bankruptcy throughout the [European Union], including the choice of which avoidance law will control." Segaal Schorr, Comment, *Avoidance Actions under Chapter 15: Was Condor Correct?*, 35 FORDHAM INT'L L.J. 350, 360 (2011) (citations omitted). This article thus establishes a default rule that the law of the debtor's COMI governs the avoidance of antecedent transactions. *See* Nigel John Howcroft, *Universal vs. Territorial Models for Cross-Border Insolvency: The Theory, the Practice, and the Reality that Universalism Prevails*, 8 U.C. DAVIS BUS. L.J. 366, 414–15 (2008) [hereinafter Howcraft, *Universal vs. Territorial*]. Since August 2009, the Debtor's COMI is the U.K. (Compl. ¶ 151.) The Plaintiffs assert that the EU Insolvency Regulation's default rule effectively displaces the applicability of Luxembourg law and Luxembourg's interests in the instant case. (*See* Pls.' Supp. Opp. at 7–9.) However, the Plaintiffs ignore article 13 of the EU Insolvency Regulation, which provides an exception to the default rule, "enabl[ing] the disapplication of the [default rule] where the person who benefitted from the impugned transaction can prove that the

---

[34]     The argument that the injury sustained occurred in New York is questionable. The Plaintiffs are the liquidators appointed by a U.K. court—recognized in this Court as foreign representatives—seeking to avoid and recover transfers initially made from London or Luxembourg. The alleged injury appears to have been suffered in Luxembourg, where Hellas II was based, or in the U.K., where the Debtor's insolvency proceeding is pending.

[35]     Council Regulation 1346/2000, On Insolvency Proceedings, 2000 O.J. (L 160) 1 (EC).

law of another member state governs the transaction and that the transaction is valid under that law." Howcraft, *Universal vs. Territorial*, at 415.

The Defendants assert that, in light of the EU Insolvency Regulation, both Luxembourg and the U.K. arguably have interests superior to that of New York in seeing their laws applied to Count II, but that the Court need not apply the EU Insolvency Regulation to determine which of the two foreign laws apply. (*See* Dec. 3, 2014 Hr'g. Tr. 100:13–17, 19–25, 106:2–8.) According to the Second Circuit, "[i]t is settled law that 'New York courts look to New York and not foreign conflicts provisions' in order to avoid the prospect of *renvoi*." *Weiss v. La Suisse*, 141 F. App'x 31, 34 (2d Cir. 2005) (summary order) (citations omitted). Since the EU Insolvency Regulation constitutes a foreign choice of law rule in these circumstances, rather than a substantive law, it is not applicable here. *Id.*

In any event, the Court need not go further in determining which law applies to Count II of the Complaint. The Court concludes that either Luxembourg or U.K. law applies to Count II, not New York law. The Plaintiffs only pleaded Count II under New York law in their Complaint. Count II of the Complaint is therefore **DISMISSED**.[36]

### D.    Count I – NYDCL Section 276

The Plaintiffs' standing to assert Count I poses a threshold issue. *See Official Comm. of Unsecured Creditors of the Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 502–03 (Bankr. S.D.N.Y. 1999) ("Standing is a jurisdictional requirement that must be met in order to have claims litigated in federal court." (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir. 1991))). Because standing is a jurisdictional matter, "it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' . . . 'to [clearly]

---

[36]    As explained below, the Court also concludes that the foreign representatives lack standing to bring this claim, which is an independent ground for dismissal.

allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'"

*Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (quoting *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)).  The court may base its finding regarding a plaintiff's standing on the complaint, the complaint supplemented by undisputed facts, or the complaint and any disputed factual issues resolved by the court.  *See id.* at 249.

"It is well settled that in order to set aside a fraudulent conveyance [under NYDCL section 276], one must be a creditor of the transferor; those who are not injured by the transfer lack standing to challenge it."  *Eberhard v. Marcu*, 530 F.3d 122, 131–35 (2d Cir. 2008) (concluding that the history and plain language of NYDCL section 276 dictate that creditors have standing to assert an actual fraudulent conveyance claim under New York law).  Standing to assert a NYDCL actual fraudulent conveyance claim, however, is not necessarily limited to *creditors* only—other plaintiffs vested with the authority to assert claims on behalf of creditors, for example, have standing.  *See, e.g.*, *id.* at 132 (recognizing that other courts have held that "receivers [appointed by the Securities and Exchange Commission (the "SEC")] have standing to pursue fraudulently conveyed assets . . . when one of the entities in receivership is a creditor of the transferor" (citing *Troelstrup v. Index Futures Grp., Inc.*, 130 F.3d 1274 (7th Cir. 1997); *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995))); *Barnet v. Drawbridge Special Opportunities Fund LP*, No. 14-cv-1376 (PKC), 2014 WL 4393320, at *15 (S.D.N.Y. Sept. 5, 2014) ("In general, the issue of standing does not arise when bankruptcy trustees . . . seek to avoid a fraudulent transfer made by the insolvent entity.  This is because section 544(b) of the Bankruptcy Code confers upon [bankruptcy] trustees the ability to stand in the shoes of the bankruptcy estate's unsecured creditors and 'avoid any transfer of an interest of the debtor in the

property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . .'" (quoting 11 U.S.C. § 544(b)(1))).

Here, the Plaintiffs are liquidators in the Debtor's U.K. insolvency proceeding, and foreign representatives before this Court under chapter 15 of the Bankruptcy Code pursuant to the Court's prior order granting recognition of the Debtor's U.K. insolvency proceeding.  (*See* ECF Doc. # 17, Case No. 12-10631.)  They are *not* creditors of the Debtor.  The parties therefore dispute whether the Plaintiffs have standing to assert their NYDCL section 276 claim by way of some other authority vested in them as foreign representatives or U.K. liquidators.

Upon recognition of a foreign proceeding, foreign representatives are entitled to certain mandatory relief pursuant to section 1520 of the Bankruptcy Code as well as the assistance of the U.S. Bankruptcy Court in administering the foreign main proceeding.  *See In re Atlas Shipping A/S*, 404 B.R. 726, 738–39 (Bankr. S.D.N.Y. 2009).

> In addition to the mandatory provisions under § 1520, two other provisions in chapter 15 . . . allow the Court, in its discretion, to grant further relief to the foreign representative.  Section 1521(a) outlines the discretionary relief a court may order upon recognition of a foreign proceeding, whether main or non-main.  The discretion that is granted is "exceedingly broad" since a court may grant "any appropriate relief" that would further the purposes of chapter 15 and protect the debtor's assets and the interests of creditors.

> The exercise of discretion is, however, circumscribed by the Bankruptcy Code.  Section 1522(a) provides that the court may only grant discretionary relief under § 1521 if the interests of creditors are sufficiently protected. . . .  Standards that inform the analysis of § 1522 protective measures in connection with discretionary relief emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interest of those affected by such relief, without unduly favoring one group of creditors over another.

*Id.* at 739 (citations and internal quotation marks omitted).  In pertinent part, section 1521(a) of

the Bankruptcy Code states:

> . . . the court may, at the request of the foreign representative, grant
> any appropriate relief, including–
>
> . . .
>
> (5) entrusting the administration or realization of all or part of the
> debtor's assets within the territorial jurisdiction of the United
> States to the foreign representative or another person, including an
> examiner, authorized by the court;
>
> . . .
>
> (7) granting any additional relief that may be available to the
> trustee, except for relief available under sections 522, 544, 545,
> 547, 548, 550, and 724(a).

11 U.S.C. § 1521(a).

The parties agree that the Plaintiffs, as foreign representatives in the Debtor's chapter 15

proceeding, do not have standing to assert Count I if the Plaintiffs need to rely on section 544 to

provide that standing because section 1521(a)(7) of the Bankruptcy Code does not permit a

foreign representative to utilize section 544 to gain standing in a chapter 15 case.  (Defs.' Mot. at

10–15; Opp. at 27.)  *See also* 11 U.S.C. § 1521(a)(7) (granting a foreign representative access to

only certain relief available to a bankruptcy trustee); *Barnet*, 2014 WL 4393320, at *15

("[S]ection 1521(a)(7) of the Bankruptcy Code expressly precludes a court from granting for a

foreign representative "relief that may be available to a trustee . . . under section . . . 544 . . . .'  In

the context of a grant of recognition of a foreign proceeding under Chapter 15, a foreign

representative has standing to initiate a fraudulent transfer action only 'in a case concerning the

debtor pending under another chapter of [Title 11] . . . .'" (alterations in original) (internal

citations omitted)).  The question remains, however, whether the Plaintiffs are entitled to bring

their NYDCL actual fraudulent conveyance claim under section 1521(a)(5) (i.e. without using

section 544) consistent with New York law's standing requirements.[37]  Resolving this issue

requires an examination of the Plaintiffs' authority as liquidators under U.K. law.  *See Barnet*,

2014 WL 4393320, at *15–17 (examining whether the plaintiffs, who were foreign

representatives in an ancillary chapter 15 proceeding and liquidators in an Australian insolvency

proceeding, were vested with authority under Australian law to assert a NYDCL fraudulent

conveyance claim consistent with New York law's standing requirements); *see also Koreag,

Controle et Revision S.V. v. Refco F/X Assocs. (In re Koreag, Controle et Revision S.A.)*, 961

F.2d 341, 348 (2d Cir. 1992) (holding that for purposes of section 304, the predecessor to chapter

15, "the estate of a foreign debtor is defined by the law of the jurisdiction in which the foreign

proceeding is pending, with other applicable law serving to define the estate's interest in

particular property." (emphasis omitted) (citation omitted)); *In re Atlas Shipping*, 404 B.R. at

741 ("[T]he legislative history confirms that Congress expected courts to interpret the provisions

[of chapter 15 of the Bankruptcy Code] consistently with prior law under § 304.").  The

Plaintiffs' standing, then, turns on whether U.K. law vests the Plaintiffs, as liquidators, with the

authority to assert causes of action on behalf of the Debtor's creditors.

---

[37]        The Court does not decide the issue whether the Plaintiffs have standing to assert avoidance claims under
applicable state or foreign law pursuant to section 1521(a)(7) without invoking section 544 to provide such standing.
*See* 11 U.S.C. § 1521(a)(7) (authorizing a court to "grant[] any additional relief that may be available to the
trustee").  This Court has previously recognized and the Fifth Circuit has held that section 1521(a)(7)'s restrictions
on a foreign representative's use of certain provisions of chapter 5, such as section 544, do not necessarily bar a
foreign representative from asserting an avoidance claim under the applicable foreign law.  *See Fogerty v.
Petroquest Resources, Inc. (In re Condor Ins. Ltd.)*, 601 F.3d 319, 322–29 (5th Cir. 2010) (holding that the
exceptions listed in section 1521(a)(7) to the relief available to a foreign representative in a chapter 15 ancillary
proceeding do not exclude avoidance actions brought pursuant to domestic law of the foreign main proceeding); *In
re Atlas Shipping A/S*, 404 B.R. at 743–45, & n.16 (noting that "it is unclear whether chapter 15's replacement of §
304 precludes a foreign representative from bringing an avoidance action under foreign law"); *In re Metzler*, 78 B.R.
674, 677 (Bankr. S.D.N.Y. 1987) (holding "that a foreign representative may assert, under § 304 [or chapter 15's
predecessor], only those avoiding powers vested in him by the law applicable to the foreign estate").  The key to this
issue, however, is whether the plaintiff-foreign representative has standing to assert such claims *without* reliance on
section 544 of the Bankruptcy Code.  Although the Plaintiffs argue that New York law, in conjunction with U.K.
law, provides them with standing to assert their NYDCL claims without relying on section 544 (*see, e.g.*, Dec. 16,
2014 H'rg. Tr. 9:15–19:25), it is unnecessary for the Court to reach this section 1521(a)(7) issue here because the
Court finds that the Plaintiffs fail to establish that they have standing under the applicable New York and U.K. laws.

The Plaintiffs assert, by way of a four-pronged argument, that they are vested with such authority.  (*See* Dec. 16, 2014 Hr'g. Tr. at 15:8–19:25.)  The Plaintiffs focus the first two prongs of their argument on the Debtor's U.K. insolvency proceeding.  First, the Plaintiffs cite to the U.K. High Court's judgment converting the Debtor's prior U.K. administration into liquidation.  (Dec. 16, 2014 Hr'g. Tr. 16:15–17:22.)  According to the Plaintiffs, in this judgment, the High Court (1) converted the Debtor into a compulsory liquidation due to the request of "a significant portion of the unsecured creditors . . . unopposed by any other creditor;" and (2) contemplated the role of the liquidators as including the investigation into the transactions now at issue before this Court to determine whether there were any viable claims that could be pursued.  (*Id.*)  Second, the Plaintiffs cite to a resolution of the U.K. Liquidation Committee comprised of certain of the Debtor's creditors that sanctioned the Plaintiffs to pursue this lawsuit in the U.S.  (*Id.* at 18:9–25.)

Neither the judgment nor the resolution, however, provides evidence establishing that the Plaintiffs were granted express authority in the Debtor's U.K. insolvency proceeding to assert claims on behalf of the Debtor's creditors.  The Plaintiffs ignore that the judgment does not specify that the Plaintiffs have standing to assert any or all of the potentially "viable claims," let alone claims on behalf of the Debtor's creditors.  (*See* Pls.' Dec. 16, 2014 Hr'g. Binder, Tab 20, *In the Matter of Hellas Telecommunications (Luxembourg) II SCA (in administration)*, [2011] EXHC 3176 (Ch) ¶ 91.)  The Plaintiffs further ignore that the resolution does not specifically sanction the Plaintiffs to pursue claims on behalf of the Liquidation Committee (i.e. creditors).  (*See* Pls.' Dec. 16, 2014 Hr'g. Binder, Tab 21, Resolutions Considered at the Second Meeting of the Liquidation Committee Held on 20 February 2014 at 25 Farrington Street London EC4A 4AB, dated 28 February 2013.)

The second two prongs of the Plaintiffs' argument focus on U.K. statutory law. First, the

Plaintiffs argue that they have authority to bring their NYDCL actual fraudulent conveyance

claim outside of the U.K. and under New York law. (Moss. Decl. ¶¶ 30–44.) According to the

Plaintiffs' expert, Moss, the Plaintiffs' assertion of the NYDCL actual fraudulent conveyance

claim is "within the express powers granted liquidators by Article 5" of the U.K.'s chapter 15

equivalent, the Cross-Border Insolvency Regulations (the "CBIR"). (*Id.* ¶¶ 15, 34.) Article 5 of

the CBIR provides that "[a] British insolvency officeholder [which includes U.K. liquidators] is

authorized to act in a foreign State on behalf of a proceeding under British insolvency law, as

permitted by the applicable foreign law." The Cross-Border Insolvency Regulations, 2006, No.

1030, art. 5; *see also id*. art. 2, ¶ (b) (defining "British insolvency officeholder"). Moss asserts

that the Plaintiffs' NYDCL claim is brought "on behalf of" the Debtor's U.K. insolvency

proceeding and that the only U.K. law restriction on the avoidance action is that it be in

accordance with New York law. (Moss. Decl. ¶ 32.) The Plaintiffs assert that nothing in New

York law prevents them from asserting their NYDCL actual fraudulent conveyance claim.

According to the Plaintiffs, NYDCL section 276-a confers standing upon them to assert the

NYDCL section 276 claim, and the Seventh Circuit's decision in *Scholes v. Lehmann*, 56 F.3d

750 (7th Cir. 1995), holding that the SEC receiver had standing to assert a claim under Illinois's

then-equivalent version of a NYDCL section 276 claim, further supports the Plaintiffs' standing

under New York law. (*See* Dec. 16, 2014 Hr'g. Tr. at 9:22–15:20.)

Second, the Plaintiffs argue that the U.K.'s Insolvency Act vests the Plaintiffs, as

liquidators, with the authority to assert claims not just on behalf of the company, but also on

behalf of the company's creditors more broadly. (*See* Dec. 16, 2014 Hr'g. Tr. at 19:9–25.) The

Plaintiffs primarily rely on paragraph 13 of schedule 4 of the Insolvency Act ("Paragraph 13"),

which states that the liquidator has the "[p]ower to do all such other things as may be necessary for winding up the company's affairs and distributing its assets."  Insolvency Act, 1986, c. 45, §§ 165, 167, sch. 4 ¶ 13.  Moss explains that Paragraph 13 is known as a "sweep-up" provision and is to be interpreted broadly so as to "authori[ze] expressly anything 'necessary' for the winding up" of a company.  (Moss Decl. ¶ 39.)  Moss opines that the NYDCL fraudulent conveyance claim is "undoubtedly 'necessary' in order to reconstitute the estate for the creditors and to distribute the assets to creditors, which in turn is a 'necessary' aspect of winding up the company."  (*Id*.)  Moss concludes that, "despite there being no specific mention of this in Schedule 4, liquidators have power under the Insolvency Act 1986 inter alia to take proceedings abroad in their own name and under a local statute, and not just to take proceedings in the name of or on behalf of the debtor company."  (*Id*. ¶ 43.)  In essence, Moss opines that the Plaintiffs have authority to bring their NYDCL fraudulent conveyance claim pursuant to this "sweep-up" provision of the Act.  (*Id*. ¶¶ 39–41.)

By contrast, the Defendants' expert, Isaacs, disagrees with both of Moss's conclusions, opining that neither Article 5 of the CBIR nor Paragraph 13 of the Insolvency Act empowers a U.K. liquidator to bring claims outside of the U.K. and under New York law that belong to creditors.  (Isaacs Reply Decl. ¶¶ 4, 11.)  As to Article 5 of the CBIR, Isaacs underscores Moss's concession that the NYDCL claim may only be brought if permitted by the applicable foreign law.  (*Id*. ¶ 6.)  Isaacs opines that Article 5 does not vest a liquidator with the substantive authority to override foreign law—instead, it merely authorizes a liquidator to act in accordance with New York law.  (*Id*. ¶¶ 9–10; *see also id.* ¶ 6 ("[i]f the Liquidators are not permitted by the [NY]DCL to bring fraudulent conveyance claims which belong to creditors, Article 5 does not authorize them to do so.").)  The Defendants argue that because U.K. liquidators cannot act as or

on behalf of creditors under U.K. law, it follows that the Plaintiffs are not permitted to assert

their actual fraudulent conveyance claim under the NYDCL. (Defs.' Reply at 7–8.)

With regard to Paragraph 13, Isaacs opines that in spite of its function as a "sweep-up"

provision, Paragraph 13 should not be read to confer substantive rights upon the liquidator that

do not already exist via other U.K. statutes. (Isaacs Reply Decl. ¶ 11.4 (discussing *Re Phoenix*

*Oil & Transport Co Ltd (No 2)* [1958] Ch 565 (rejecting liquidators' contention that the

distribution of surplus assets is one of the "other things" which the liquidator had power to do

under Paragraph 13, because the provision was properly regarded as a mopping-up provision at

the end of a list of functions which the liquidator is enabled to perform in connection with the

administration of the particular company's affairs and no more); *Re MF Global Ltd* [2013]

1 BCLC 552 at 565 ("While an administrator has power 'to do all other things incidental to the

exercise of the foregoing powers' (para 23 of Sch 1), the equivalent power of a liquidator is

limited to doing 'all such other things as may be necessary for winding up the company's affairs

and distributing its assets.'")).) Isaacs explains that other provisions of schedule 4 of the

Insolvency Act, which lists the powers of a U.K. liquidator, are more specific than Paragraph 13

and do not "empower the liquidator to bring a claim which is not already vested in him or the

company"; as such, Paragraph 13 should not be interpreted to do so either. (*Id.* ¶ 11.) Even if

Paragraph 13 could confer non-existent substantive rights upon a U.K. liquidator, Isaacs opines

that the NYDCL actual fraudulent conveyance claim should not be considered "necessary" under

Paragraph 13, as Moss suggests. (*Id.* ¶ 11.2 (citing *Re Wreck Recovery & Salvage Co* [1880] 15

Ch D 353, 361 (holding that the word "necessary" in Schedule 4's statutory predecessor means

more than merely beneficial)).) According to Isaacs, the proceeds of such avoidance

proceedings are not assets of the company, but rather are assets of the company's creditors. (*Id.*)

Although obtaining those assets would be serving interests beneficial to creditors, Isaacs opines

that the assets themselves are not in fact "necessary" to the administration of the company's

estate in the U.K. within the meaning of the Insolvency Act.  (*Id*.)  Isaacs also explains that

Hellas II's creditors have the right to bring the actions themselves—meaning the U.K. liquidators

cannot be construed as the only or "necessary" plaintiff.  (*See id*. ¶ 11.3.)

Based on the parties' arguments and the expert declarations, the Court concludes that

U.K. law does not vest a liquidator with standing to assert claims on behalf of creditors broadly,

despite there being clear authority vested in a liquidator to assert claims on behalf of the

insolvent company.  *See* Insolvency Act, 1986, c. 45 §§ 165, 167 sch. 4 ¶ 4; *see also* GOODE,

PRINCIPLES OF CORPORATE INSOLVENCY LAW ¶ 5-04 (4th ed. 2011) ("On behalf of the creditors,

the [U.K.] liquidator can bring proceedings in the name of the company in respect of causes of

action vested in the company *but he has no locus standing to pursue claims vested in persons*

*qua creditors*." (emphasis added)).

The parties agree that under the Insolvency Act, a liquidator involved in a winding up of

a company by a U.K. court has the power to exercise any powers listed in parts I and II of

schedule 4 of the Act "with the sanction of the court or liquidation committee," and to exercise

any powers listed in part II of schedule 4 "with or without that sanction."  Insolvency Act, 1986,

c. 45, § 167; *see also id*. c. 45, §§ 165, 167, sch. 4.  Here, only three of the enumerated powers in

schedule 4 are potentially relevant to the question of a liquidator's standing:  (i) "[p]ower to

bring legal proceedings under section 213, 214, 238, 239, 242, 243 or 423" of the Act, *id*. c. 45,

§§ 165, 167, sch. 4 ¶ 3A ("Paragraph 3A"); (ii) "[p]ower to bring or defend any action or other

legal proceeding in the name and on behalf of the company," *id*. c. 45, §§ 165, 167, sch. 4 ¶ 4

("Paragraph 4"); and (iii) "[p]ower to do all such other things as may be necessary for winding up the company's affairs and distributing its assets," *id*. c. 45, §§ 165, 167, sch. 4 ¶ 13.

It is clear from Paragraph 4 that a liquidator under U.K. law is vested with the authority to bring actions "in the name and on behalf of the company." *Id*. c. 45, §§ 165, 167, sch. 4 ¶ 4. It is also clear that under Paragraph 3A, a liquidator may assert a claim under the proffered U.K. equivalent to a NYDCL fraudulent conveyance claim, section 423 of the Insolvency Act—the only creditor-like standing that a liquidator appears to have under U.K. law.[38]  Generally, "a victim of the transaction," or a creditor, has standing to bring a claim under section 423.  *Id*. § 424(1)(c).  But in the event that a company is bankrupt or undergoing a winding up proceeding, the action may be brought "by the official receiver, by the trustee of the bankrupt's estate or the liquidator or administrator of the body corporate or (with leave of the court) by a victim of the transaction[.]" *Id*. § 424(1)(a).  Regardless of which plaintiff under section 424(1) files the action, the action "is to be treated as made on behalf of every victim of the transaction." *Id*. § 424(2).

---

[38]        Section 423 states in part:

> (1)  This section relates to transactions entered into at an undervalue; and a person enters into such a transaction with another if —
> . . . .
>
>> (c)  he enters into a transaction with the other for a consideration the value of which, in money or money's worth, is significantly less than the value, in money or money's worth, of the consideration provided by himself.
>
> (2)  Where a person has entered into such a transaction, the court may, if satisfied under the next subsection, make such order as it thinks fit for —
>
>> (a)  restoring the position to what it would have been if the transaction had not been entered into, and
>
>> (b)  protecting the interests of persons who are victims of the transaction.

Insolvency Act, 1986, c. 45, § 423.

Although liquidators have express authority to bring a section 423 claim on behalf of the company's creditors, it does not follow that liquidators have the authority to bring *any or all* claims on behalf of the company's creditors.  Nothing in schedule 4 of the Insolvency Act, the CBIR, or any U.K. law presented to the Court by the parties leads to such a conclusion.  Indeed, the Plaintiffs' expert concedes that the Plaintiffs' actual fraudulent conveyance claim was not brought under section 423 of the Insolvency Act, leaving open the question of the Plaintiffs' standing.  (Moss Decl. ¶ 30.)  Moss further concedes that the CBIR requires that actions brought by a U.K. liquidator abroad be "permitted by the applicable foreign law."  (*Id.* ¶ 34 (citing CBIR, 2006, No 1030, art. 5).)  The "applicable foreign law" in this case is New York law, and the Second Circuit has clearly set forth the standing requirements for plaintiffs seeking to assert a NYDCL section 276 claim.  *See Eberhard*, 530 F.3d at 129–35.  The Plaintiffs fail to satisfy their burden in establishing that they meet these requirements.  *See Thompson*, 15 F.3d at 249 (holding that the "party who seeks the exercise of jurisdiction in his favor" bears the burden in establishing that he or she is the proper party to do so (citation omitted)).

*First*, the Plaintiffs cannot argue that they have standing under New York law without looking to U.K. law for supplemental vested authority.  In light of the Second Circuit's (1) extensive examination of the history and plain language of NYDCL section 276, and (2) ultimate conclusion that section 276's standing restrictions stem from the section's purpose of affording relief to creditors, *Eberhard*, 530 F.3d at 129–35, the Court finds the Plaintiffs' reliance on NYDCL section 276-a—which merely authorizes a court to award attorney's fees to a successful section 276 plaintiff—unpersuasive.[39]  Although NYDCL section 276-a contemplates the ability

---

[39]    NYDCL section 276-a states:

> In an action or special proceeding brought by *a creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors* to set aside a conveyance by

of plaintiffs other than actual creditors to assert a NYDCL section 276 claim, the Court is

unconvinced that section 276-a on its own confers standing upon each of those potential

plaintiffs.  Moreover, the Plaintiffs mischaracterize the Seventh Circuit's holding in *Scholes* in

an unsuccessful attempt to circumvent the Second Circuit's detrimental holding in *Eberhard*.  At

oral argument, the Plaintiffs argued that unlike the Second Circuit in *Eberhard*, the Seventh

Circuit found that the SEC receiver in *Scholes* "had a somewhat broader role" such that he had

standing to pursue a state law actual fraudulent conveyance claim, "because the receiver, like

[the Plaintiffs, as liquidators, was] acting for the benefit of all creditors."  (*See* Dec. 16, 2014

Hr'g. Tr. at 11:9–13:6.)  The Seventh Circuit, however, did not base its finding of the SEC

receiver's standing upon the fact that the receiver was "acting for the benefit of all creditors," but

rather on the fact that three creditors were entities subject to the receivership, meaning the SEC

receiver was tasked with acting on those creditors' behalves.  *See Scholes*, 56 F.3d at 753–55.

Indeed, the Second Circuit distinguished the holding in *Scholes* and a similar Seventh Circuit

case, because no creditors were subject to the receivership in *Eberhard*.  *See Eberhard*, 530 F.3d

at 132–35 (distinguishing *Scholes*, 56 F.3d at 753–55, and *Troelstrup*, 130 F.3d at 1275–76).

---

a debtor, where such conveyance is found to have been made by the debtor and
received by the transferee with actual intent, as distinguished from intent
presumed in law, to hinder, delay or defraud either present or future creditors, in
which action or special proceeding the creditor, receiver, trustee in bankruptcy,
or assignee for the benefit of creditors shall recover judgment, the justice or
surrogate presiding at the trial shall fix the reasonable attorney's fees of the
creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors
in such action or special proceeding, and the creditor, receiver, trustee in
bankruptcy, or assignee for the benefit of creditors shall have judgment therefor
against the debtor and the transferee who are defendants in addition to the other
relief granted by the judgment.  The fee so fixed shall be without prejudice to
any agreement, express or implied, between the creditor, receiver, trustee in
bankruptcy, or assignee for the benefit of creditors and his attorney with respect
to the compensation of such attorney.

N.Y. DEBT. & CRED. LAW § 276-a (emphasis added).

Without demonstrating under U.K. law that the Plaintiffs are authorized to act on behalf of the Debtor's creditors, the Plaintiffs' reliance on *Scholes* is inapposite.

*Second*, the Plaintiffs' reliance on a broad interpretation of the Insolvency Act's "sweep-up" provision, Paragraph 13, is wholly unsubstantiated. The Plaintiffs could not produce a single case supporting their argument and their expert's opinion that Paragraph 13 confers standing on U.K. liquidators to assert causes of action on behalf of a company's creditors.[40] While this Court is authorized in its discretion to grant broad relief to the foreign representatives before it, *see In re Atlas Shipping*, 404 B.R. at 738–39 (discussing a bankruptcy court's discretion to grant relief under sections 1521 and 1522 of the Bankruptcy Code), the Court's discretion is not without limitation, nor is it so broad as to stretch the laws of a foreign jurisdiction—certainly without any basis grounded in that foreign jurisdiction's laws.

The Court concludes that the Plaintiffs fail to meet their burden in establishing that they have standing to assert their NYDCL section 276 claim. Count I is therefore **DISMISSED**.[41]

---

[40]     At oral argument, the Plaintiffs provided the Court with a U.K. court case purportedly in support of their argument. (*See* Dec. 16, 2014 Hr'g. Tr. at 20:1–22:22; Pls.' Dec. 16, 2014 Hr'g. Binder, Tab 2, *The Connaught Income Fund, Series 1 (in liquidation) v. Capita Fin. Managers Ltd.*, [2014] EWHC 3619 (Comm).) As the Court indicated at the hearing, the case is insufficient to take the leap the Plaintiffs seek to make with respect to a liquidator's authority to act on behalf of creditors. (*See* Dec. 16, 2014 Hr'g. Tr. at 21:16–22:19 ("COURT: I see where [the case] says [Paragraph 13] is standalone, but I still don't see how it authorizes a liquidator to pursue claims that belong to somebody else. . . . [Standalone] may mean nothing more than the liquidator can pursue all rights that belong to the *estate*, . . . I see this as saying [Paragraph 13] is standalone, it is authority for a liquidator to pursue whatever rights the *estate* may have . . . even if there isn't some other section of the insolvency statute that says you can do it." (emphasis added)).)
        Although the Defendants could not provide a case directly on point to the contrary, the Defendants' expert did provide case law holding that Paragraph 13 was not broadly construed in other circumstances. (*See* Isaacs Decl. ¶ 11.4 (discussing *Re Phoenix Oil & Transport Co Ltd (No 2)* [1958] Ch 565 (rejecting liquidators' contention that the distribution of surplus assets is one of the "other things" which the liquidator had power to do under Paragraph 13 because the provision is merely a sweep-up provision at the end of a list of functions which the liquidator is enabled to perform in connection with the administration of a company's affairs and no more); *Re MF Global Ltd* [2013] 1 BCLC 552 at 565 ("While an administrator has power 'to do all other things incidental to the exercise of the foregoing powers' (para 23 of Sch 1), the equivalent power of a liquidator is *limited* to doing 'all such other things as may be necessary for winding up the company's affairs and distributing its assets.'" (emphasis added))).)

[41]     While Count II is dismissed under the Court's choice of law analysis, the claim is also barred for lack of standing for the same reasons articulated as to Count I. *See Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368 (S.D.N.Y. 2013) ("In order to bring a fraudulent conveyance claim, the plaintiff must therefore be a creditor of the transferor [as] [n]on creditors can find no relief in a statute whose object . . . is to enable a creditor to

E.    **Count III – Unjust Enrichment Claim**

Apax and TPG argue that Count III of the Complaint, asserting an unjust enrichment

claim against Apax and TPG must be dismissed for three reasons:  (1) the Plaintiffs lack standing

to assert the unjust enrichment claim (Defs.' Mot. at 18–19); (2) the unjust enrichment claim is

not timely (*id.* at 19–21); and (3) the Complaint fails to state a claim for unjust enrichment (*id.* at

33–35).  As set forth below, the Court finds that at this stage in the pleadings, the Plaintiffs have

adequately alleged standing to bring their unjust enrichment claim against the Apax and TPG

Defendants over which the Court has personal jurisdiction (collectively, the "U.S. Apax/TPG

Defendants").  The Court also concludes that the unjust enrichment claim is not barred by the

applicable statute of limitations and that the Complaint adequately pleads the claim.  Therefore,

the Defendants' Motion to Dismiss Count III is **DENIED**.

1.    *Standing*

Apax and TPG argue that the Plaintiffs lack standing to bring their unjust enrichment

claim under the Second Circuit's *Wagoner* rule, which holds that "[a] claim against a third party

for defrauding a corporation with the cooperation of management accrues to creditors, not to the

guilty corporation."  (Defs.' Mot. at 18 (quoting *Giddens v. D.H. Blair & Co. (In re A.R. Baron

& Co.)*, 280 B.R. 794, 800 (Bankr. S.D.N.Y. 2002)).)  They contend that "[i]n federal court,

prudential considerations deprive a bankruptcy trustee of standing even to bring a claim that

would be barred by the affirmative defense of *in pari delicto*."  (*Id.* at 18–19 (citing *O'Connell v.*

---

obtain his due despite efforts on the part of a debtor to elude payment." (quoting *Harris v. Coleman*, 863 F. Supp. 2d 336, 341 (S.D.N.Y. 2012)) (conducting a standing analysis for a NYDCL constructive fraudulent conveyance claim).  Since Counts I and II are dismissed on standing and/or choice of law grounds, it is unnecessary for the Court to resolve whether the NYDCL provisions asserted by the Plaintiffs in their Complaint should be afforded extraterritorial effect.

Even though the Court concludes that both Counts I and II asserted under the NYDCL are dismissed with prejudice, the Court does not decide whether, on a motion for leave to amend the Complaint to assert fraudulent conveyance claims under U.K. or other foreign law, the Plaintiffs would have the requisite standing to assert such foreign law claims or the merits of such claims.

*Pension Fin. Servs. (In re Arbco Capital Mgmt., LLP)*, 498 B.R. 32, 45 (Bankr. S.D.N.Y. 2013)).)  Apax and TPG base this argument on the following allegation in the Complaint:  "The December 2006 CPEC Redemption and the Consulting Fees Transfer were made by the Company, by and through its sole manager Hellas and the members of the Board of Managers of Hellas, with actual intent to hinder, delay, and/or defraud the present and future creditors of the company . . . ."  (*Id*. at 19 (quoting Compl. ¶ 158).)  According to Apax and TPG, this allegation illustrates that the unjust enrichment claim is based on misconduct that Hellas II "essentially took part in," and the Plaintiffs lack standing as a result.  (*Id*. at 18–19.)

The Plaintiffs contend that Apax and TPG may not rely on an *in pari delicto* defense because they are not third parties; rather they are insiders who "advised and managed" Hellas II. (Opp. at 25.)  According to the Plaintiffs, the *in pari delicto* defense may not be raised by insiders (*id.* (citing *KDI Holdings*, 277 B.R. at 518; *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 124 (Bankr. S.D.N.Y. 2011)), and Hellas II's management "was comprised of TPG and Apax executives" (*id.* (citing Compl. ¶¶ 95, 125–27)).  Specifically, the Plaintiffs assert that "[w]here, as alleged here, 'controlling shareholder[s] forced the corporation to act for the benefit of the shareholder[s],' the *in pari delicto* defense is 'unavailable.'"  (*Id.* (citing *KDI Holdings*, 277 B.R. at 518; *Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, 2010 WL 6549830, at *15 (S.D.N.Y. Dec. 6, 2010) ("[I]t would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation as a defense."), *adopted in relevant part by* 779 F. Supp. 2d 372 (S.D.N.Y. 2011)).)

In response, Apax and TPG contend that only "[g]eneral partners, sole shareholders, and sole decision makers" are considered insiders barred from asserting an *in pari delicto* defense (Defs.' Reply at 17 (quoting *Picard*, 458 B.R. at 124)); however, the Plaintiffs have not alleged

that any Apax or TPG Defendants had such a relationship to Hellas II (*id.* (citing Compl. ¶ 40)).

To the contrary, "the Complaint concedes that the Sponsors, only one of which is a Defendant

. . . were the shareholders of Hellas II's ultimate parent." (*Id.* (citing Compl. ¶ 40)). Moreover,

Apax and TPG argue that the Plaintiffs do not allege that any Apax or TPG Defendant was an

officer or director of Hellas II; instead, they make "conclusory allegations that unspecified TPG

and Apax Defendants 'controlled' Hellas II . . . ." (*Id.* at 17–18 (citing Compl. ¶ 95).)  At the

Hearing, counsel for Apax and TPG elaborated on this point, arguing that the allegations in the

Complaint improperly lumped the Apax and TPG Defendants together, without specifying which

such Defendants engaged in conduct amounting to any requisite degree of control. (*See* Dec. 16,

2014 Hrg. Tr. 49:21–50:3, 52:11–20.)

As discussed above, with the exception of the relief available under the Bankruptcy

Code's avoidance powers, the Plaintiffs, as foreign representatives of the Debtor, may be granted

any relief available to a trustee.  11 U.S.C. § 1521(a)(7).  "As a general matter, a trustee stands in

the shoes of the debtor and has standing to bring any action that the debtor could have instituted

prepetition." *Giddens*, 280 B.R. at 799 (quoting *Wagoner*, 944 F.2d at 118).  While a trustee has

standing to bring claims belonging to the debtor, it does not have standing to assert claims on

behalf of individual creditors. *Id.* (citations omitted); *see Picard v. Taylor (In re Park S. Sec.,*

*LLC)*, 326 B.R. 505, 514 (Bankr. S.D.N.Y. 2005) ("[A]bsent another basis for standing, the

Trustee may not pursue a claim on the estate's behalf if it is particular only to certain creditors."

(citation omitted)).  Whether a claim belongs to the debtor or to individual creditors is

determined by state law.  *Id.* (citing *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d

822, 826 (2d Cir. 1997); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995)).

In *Wagoner*, the Second Circuit developed a prudential standing rule referred to as the *Wagoner* rule. *McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009) (citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86–87 (2d Cir. 2000)). The *Wagoner* rule provides that "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Wagoner*, 944 F.2d at 118; *see Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 63 (2d Cir. 2013) ("The debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative." (citations omitted)). Post-*Wagoner*, "courts in this Circuit have consistently held that bankrupt corporations, and trustees standing in the shoes of the bankrupt corporation, lack standing to assert claims against third parties for assisting in defrauding the company where corporate management conducted the alleged fraud." *McHale*, 420 B.R. at 197 (collecting cases).

"The doctrine of *in pari delicto* is a well-established principle of New York law based on the notion that 'one wrongdoer may not recover against another.'" *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 987 F. Supp. 2d 311, 314 (S.D.N.Y. 2013) (citation omitted). *In pari delicto* is an "equitable defense similar to the unclean hands doctrine," *McHale*, 420 B.R. at 197 (citation omitted), which "exists because, as a matter of equity, courts should not help plaintiffs profit from their wrongdoings," *id.* (citing *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990)). "Although, under New York State law, *in pari delicto* is an affirmative defense, in federal court prudential considerations deprive a bankruptcy trustee of standing to even bring a claim that would be barred by *in pari delicto*." *Picard v. HSBC Bank PLC*, 454 B.R. 25, 29 (S.D.N.Y. 2011) (citations omitted).

Both the *Wagoner* rule and the *in pari delicto* doctrine are "grounded in common law agency principles." *Id.* (citations omitted). Because a trustee in bankruptcy may assert whatever claims the debtor corporation may have brought prepetition, subject to all available defenses, "any wrongdoing imputed to the corporation under a theory of agency also taints the trustee's claims." *Id.* at 198–99. "Because management's misconduct is imputed to a corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Id.* (citing *Wight*, 219 F.3d at 87). Likewise, under the *in pari delicto* doctrine, "[t]raditional agency principles play an important role in an *in pari delicto* analysis." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 950 (N.Y. 2010) (emphasis added).

"It is a 'fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation.'" *McHale*, 420 B.R. at 199 (citing *Wight*, 219 F.3d at 86); *see Kirschner*, 938 N.E.2d at 951 ("[A] corporation 'is represented by its officers and agents, and their fraud in the course of the corporate dealings [] is in law the fraud of the corporation.'" (citations omitted)). This principle is premised on a presumption that agents communicate all information to their principals and thereby receive tacit consent for their actions, *McHale*, 420 B.R. at 199 (citing *Bankr. Servs., Inc. v. Ernst & Young, Ernst & Young LLP (In re CBI Holding Co.)*, 529 F.3d 432, 448 (2d Cir. 2008)), and a presumption that "the principal is generally better suited than a third party to control the agent's conduct, which at least in part explains why the common law has traditionally placed the risk [of loss] on the principal," *Kirschner*, 938 N.E.2d at 951.

Because both the *Wagoner* rule and *in pari delicto* doctrine "are grounded in substantive agency law, and identical tests appear to apply to both doctrines," this Court will analyze the

parties' *in pari delicto* and *Wagoner* rule arguments together.[42]  *McHale*, 420 B.R. at 198

(citations omitted).

      The *in pari delicto* doctrine "does not apply to the actions of fiduciaries who are insiders

in the sense that they either are on the board or in management, *or in some other way control the*

*corporation.*"  *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 383, 400 (S.D.N.Y. 2011) (emphasis in

original) (quoting *Refco*, 2010 WL 6549830, at *15) (internal quotation marks omitted); *see*

*Mediators*, 105 F.3d at 826–27 (noting that the *Wagoner* rule and the *in pari delicto* doctrine do

not prevent "a bankruptcy trustee, suing on behalf of the debtor under New York law, [from]

pursu[ing] an action for breach of fiduciary duty against the debtor's fiduciaries" (citing *Keene*

*Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 853 (Bankr. S.D.N.Y. 1994))); *Global*

*Crossing Estate Representative v. Winnick*, No. 04 Civ. 2558 (GEL), 2006 WL 2212776, at *15

(S.D.N.Y. Aug. 3, 2006) ("[T]o the extent plaintiff can establish that defendants' alleged control

and domination of [the debtor] rendered them corporate insiders and fiduciaries, *Wagoner* and

the "in pari delicto" rules will not bar plaintiff's fiduciary duty claims."); *see also Teras Int'l*

*Corp. v. Gimbel*, No. 13-CV 6788 (VEC), 2014 WL 7177972, at *10 (S.D.N.Y. Dec. 17, 2014)

(holding that breach of fiduciary duty claims against defendants alleged to be directors of

bankrupt corporation were not barred by the *in pari delicto* doctrine).  The rationale for not

extending the *in pari delicto* defense to insiders is that "[i]n such cases, the element of mutual

fault [*in pari delicto*] is not present, thereby rendering the defense unavailable."  *KDI Holdings*,

277 B.R. at 518; *see Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993)

("[W]here the parties do not stand on equal terms and one party controls the other, the *in pari*

*delicto* doctrine does not apply." (citing *Ross*, 904 F.2d at 824 (2d. Cir. 1990))).

---

[42]     Because the Court applies New York law to the Plaintiffs' unjust enrichment claim, the Court takes no position whether the *in pari delicto* doctrine would apply to an unjust enrichment claim asserted under U.K. law.

"General partners, sole shareholders, and sole decision makers" are paradigmatic insiders for purposes of the *in pari delicto* doctrine under New York law. *Picard*, 458 B.R. at 124 (citing *Devon Mobile Commc'ns Liquidating Trst v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 322 B.R. 509, 529 n.18 (Bankr. S.D.N.Y. 2005); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 308 (S.D.N.Y. 1998)). However, "[e]ven a third-party professional, typically the quintessential outsider, may surrender an *in pari delicto* defense where it exerts sufficient domination and control over the guilty corporation to render itself an insider." *Id.* (citing *KDI Holdings*, 277 B.R. at 518; *In re IDI Constr. Co.*, 345 B.R. 60, 67 (Bankr. S.D.N.Y. 2006)).

In *KDI Holdings*, the bankruptcy court rejected the defendants' *in pari delicto* defense, finding that the complaint sufficiently alleged that the defendants "may have gained control over the [d]ebtors," thereby rendering them insiders. 277 B.R. at 512. Specifically, the complaint alleged that the defendants, through a partnership with a family member that held an interest in certain unsecured creditors, were granted security interests in the debtors' assets in exchange for certain loans made by the defendants. *See id.* at 499. As a result of the defendants extending such loans, an entity formed by one of the defendants' family members gained control of the each of the debtors' voting stock. *See id.* Thereafter, individuals connected to the defendants were appointed as directors and managers of the debtors, "obtain[ing] unfettered control over the assets of the . . . [d]ebtors and the performance of such [d]ebtors' massive pre-petition obligations." *Id.* (citation and internal quotation marks omitted). The court found that the plaintiff "alleged sufficient facts with regard to [the defendants'] insider status through domination and control to render the *in pari delicto* defense in applicable . . . ." *Id.* at 518–19.

Here, the Complaint is replete with allegations that Apax and TPG dominated and

controlled the management of Hellas II and exercised their control to accomplish the December

2006 CPEC Redemption.  (*See* Compl. ¶¶ 95, 125–129.)

First, the Complaint alleges that "[a]t all relevant times, TPG and Apax directed and

controlled the actions of the Sponsors, the Hellas Entities, [Hellas II], and [Hellas II]'s

subsidiaries."  (*Id.* ¶ 95.)  The Plaintiffs allege that each of the eight Sponsors were formed,

owned, and controlled by Apax and TPG.  (*See* Compl. ¶¶ 40–47.)  The Sponsors "collectively

held all of the CPECs and common stock issued by Hellas," and through the Sponsors Apax and

TPG "owned and controlled [Hellas II] and its affiliates and obtained proceeds from the

December 2006 CPEC Redemption."  (*Id.* ¶ 40.)  Apax and TPG "install[ed] certain key

personnel on the board of directors of TIM Hellas."  (*Id.* ¶ 95 (noting that the six of the ten

directors of TIM Hellas were employees of Apax and TPG, including three employees of Apax

and three employees of TPG).)  "Many of those same TPG and Apax personnel (and others) held

overlapping positions of authority on the Board of Managers of Hellas (the sole manager of the

Company) and in the management of the Sponsors," TPG, and Apax.  (*Id.*)

Second, the Plaintiffs allege that Apax and TPG exercised their control in accomplishing

the December 2006 CPEC Redemption.  Specifically, the Plaintiffs allege that the applicable

redemption agreement authorizing Hellas II's initial redemption of CPECs issued to Hellas I was

executed by Giancarlo Aliberti and Matthias Calice—members of Apax Partners and TPG

London, respectively—on behalf of both Hellas entities.  (*Id.* ¶ 125.)  A separate redemption

agreement authorizing Hellas's redemption of CPECs issued to the Sponsors was also executed

by Aliberti and Calice on behalf of Hellas and each of the eight Sponsors.  (*Id.* ¶ 126.)  Both

redemption agreements recited that the applicable redemption price per CPEC had been

"determined by the Board of Managers on the basis of the equity value of [Hellas II] and its Subsidiaries by resolutions adopted on December 18, 2006." (*Id.* ¶ 125–126.) According to the Plaintiffs, these referenced resolutions adopted by Hellas, as sole manager and general partner of Hellas II, "were executed by the members of the Board of Managers of Hellas, including Maurizio Bottinelli, Giancarlo Aliberti, Matthias Calice, Philippe Costeletos, Guy Harles, and Benoit Duvieusart (all or nearly all of whom were affiliated with TPG or Apax)." (Compl. ¶ 127.)

At this stage in the pleadings, the Court concludes that Apax's and TPG's group pleading argument fails and that the Plaintiffs have sufficiently alleged their standing to bring their unjust enrichment claim, as the allegations in the Complaint plausibly suggest that the U.S. Apax/TPG Defendants, through their affiliates, controlled Hellas II, thereby rendering them insiders. (*See* Compl. ¶¶ 23–32, 40 (describing the relationship among the TPG Defendants, and Bonderman and Coulter's degree of influence over TPG Defendants that allegedly owned and controlled the Sponsors and Hellas II); *id.* ¶¶ 33–40 (describing the relationship among the Apax Defendants. and Apax NY's chairman's degree of influence over the strategies and operations of the Apax Defendants generally).) Whether the U.S. Apax/TPG Defendants specifically exercised a requisite degree of control such that the *Wagoner* rule and *in pari delicto* doctrine do not apply to them raises factual issues that cannot be resolved on a motion to dismiss.[43]

---

[43]    Because the Court finds that the Plaintiffs have alleged sufficient facts to support a plausible inference that the U.S. Apax/TPG Defendants were insiders of Hellas II, the Court need not consider exceptions to the *in pari delicto* doctrine applicable to non-insiders. *See, e.g.*, *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 479 (Bankr. S.D.N.Y. 2006) ("Misconduct by a corporation's fiduciaries will not be imputed to the corporation, and the doctrine of *in pari delicto* will not apply, where the fiduciaries were acting outside the scope of their employment or engaged in self-dealing and according had an interest 'adverse to the corporation.'" (citations omitted)).

2. *Timeliness*

"Under New York law, the six-year limitations period for unjust enrichment accrues upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 364 (2d Cir. 2013) (citation and internal quotation marks omitted); *see also* N.Y. C.P.L.R. § 213(1) (McKinney 2014) (providing a statute of limitations of six years for claims "for which no limitation is specifically prescribed by law").

With regard to such claims, section 108(a) of the Bankruptcy Code provides:

> [i]f applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) two years after the order for relief.

11 U.S.C. § 108(a). "While there is no dispositive case law addressing whether [s]ection 108 relief is automatically applicable in . . . chapter 15 cases, this question is squarely addressed by section 103(a) of the Code, which incorporates [s]ection 108 into a chapter 15 proceeding." *In re Fairfield Sentry Ltd.*, 452 B.R. 52, 57 (Bankr. S.D.N.Y. 2011). Section 103(a) of the Bankruptcy Code provides that chapter 1, "sections 307, 362(o), 555 through 557, and 559 through 562 apply in a case under chapter 15." 11 U.S.C. § 103(a). Section 108's tolling provision therefore "appl[ies] in a [c]hapter 15 case by virtue of § 103(a)." *In re Fairfield Sentry Ltd.*, 452 B.R. at 61 (quoting Alesia Ranney-Marinelli, *Overview of Chapter 15 Ancillary and Other Cross-Border Cases*, 82 AM. BANKR. L.J. 269, 313 (2008)).

The challenged transfers underlying the Plaintiffs' unjust enrichment claim occurred in December 2006, well over six years ago. However, the Debtor's chapter 15 petition was filed in February 2012, before the expiration of the six-year limitations period. Pursuant to section 108 of the Bankruptcy Code, made applicable to this case through section 103(a), the statute of limitations was tolled as of the filing of the chapter 15 petition. Consequently, the Plaintiff's unjust enrichment claim is therefore timely.

### 3.    Sufficiency of Pleadings

TPG and Apax argue that the Plaintiffs fail to state a claim as a result of the same pleading deficiencies that plague their NYDCL claims. (*See* Defs.' Mot. at 33.) Specifically, they contend that the Plaintiffs do not plead a sufficiently close relationship between TPG and Apax and the holders of the Sub Notes required to allege a claim for unjust enrichment under New York law. (*Id.* at 33.) Additionally, they argue that "the unjust enrichment claim fails because Plaintiffs have not alleged that it would be against 'equity and good conscience' for the Defendants to retain any transfers made to them." (*Id.* at 34.)

In order to adequately plead an unjust enrichment claim a plaintiff must allege "that (1) the other party was enriched, (2) at [the plaintiff's] expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Ga. Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011)). The New York Court of Appeals has clarified that "a plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party." *Id.* (citation omitted). The relationship between the plaintiff and the other party must be one that is "not too attenuated," *id.* at 747 (citation and internal quotation marks omitted). and the plaintiff's complaint must indicate "a

relationship between the parties that could have caused reliance or inducement," *id.* (quoting *Mandarin*, 944 N.E.2d at 1111) (internal quotation marks omitted).

Here, the Plaintiffs have adequately alleged that a sufficient relationship exists between TPG and Apax, on the one hand, and Hellas II, on the other.[44]  Indeed, the Complaint sets forth that "[b]y their wrongful acts, statements and omissions, and through the wrongful diversion and receipt of proceeds from the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer, TPG and Apax have unjustly retained benefits that belong to the Company, and their retention of those benefits violates fundamental principles of justice, equity and good conscience."  (Compl. ¶ 170.)  The Plaintiffs need not allege that privity exists between Hellas II and TPG and Apax, nor do they need to allege that TPG and Apax were the direct transferees of the diverted funds.  "[T]he fact that money was transferred directly from [plaintiff's possession] to [defendant's] (albeit by a third party) is enough to sustain a claim for unjust enrichment."  *T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-CV-2843 (JG), 2010 WL 4038826, at *5 (E.D.N.Y. Oct. 14, 2010) (quoting *Newbro v. Freed*, No. 06-1722-CV, 2007 WL 642941, at *2 (2d Cir. Feb. 27, 2007)).

---

[44]    The Defendants appear to argue that the relevant relationship must be alleged between TPG and Apax and Hellas II at times, and between TPG and Apax and holders of the Sub Notes at other times.  Because the Plaintiffs purport to bring their unjust enrichment claim on behalf of the Debtor, the Defendants' relationship with Hellas II is the applicable focal point.

### III.      CONCLUSION

For the foregoing reasons, the Motions to Dismiss are granted in part and denied in part.

The Apax/TPG Motion is **GRANTED** as to the Non-U.S. Defendants, but **DENIED** as to the

U.S. Apax/TPG Defendants.[45]  The DB Motion and the TCW Motion are **DENIED**.  The

Motions to Dismiss are **GRANTED** as to Counts I and II, but **DENIED** as to Count III.

Dated:  January 29, 2015
        New York, New York

                                    *Martin Glenn*
                          _____
                              MARTIN GLENN
                          United States Bankruptcy Judge

---

[45]      For the avoidance of doubt, the Apax/TPG Motion is granted as to Apax Europe VI, Apax Partners, Apax Nominees, Halusa, and TPG London.  The Apax/TPG Motion is denied as to TPG Capital, Bonderman, Coulter, TPG IV, and TPG T[3] II.