**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA, | Chapter 15<br><br>Case No. 12-10631 (MG) |
| Debtor in a Foreign Proceeding. | |
| ANDREW LAWRENCE HOSKING and SIMON JAMES BONNEY, in their capacity as joint compulsory liquidators and duly authorized foreign representatives of HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA,<br><br>Plaintiffs,<br><br>-against-<br><br>TPG CAPITAL MANAGEMENT, L.P., *et al.*,<br><br>Defendants. | Adv. Proc. No. 14-01848 (MG) |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT**

*A P P E A R A N C E S:*

CHADBOURNE & PARKE LLP
*Attorneys for Plaintiffs as against*
*All Defendants except Defendant Deutsche Bank AG*
1301 Avenue of the Americas
New York, New York 10019
By:    Howard Seife, Esq.
       Andrew Rosenblatt, Esq.
       Marc D. Ashley, Esq.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
*Attorneys for Plaintiffs as against*
*Defendant Deutsche Bank AG*
270 Madison Avenue
New York, New York 10016
By:    Alan McDowell, Esq.
       Jeremy Cohen, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for the TPG Defendants*
1633 Broadway
New York, New York 10019
By:    Paul M. O'Connor III, Esq.
       Andrew K. Glenn, Esq.

ROPES & GRAY LLP
*Attorneys for Defendant Apax Partners, L.P.*
1211 Avenue of the Americas
New York, New York 10036
By:    Robert S. Fischler, Esq.
       Stephen C. Moeller-Sally, Esq.

CAHILL GORDON & REINDEL LLP
*Attorneys for Defendant Deutsche Bank AG*
80 Pine Street
New York, New York 10005
By:    Charles A. Gilman, Esq.
       Kevin J. Burke, Esq.
       Philip V. Tisne, Esq.
       Frederick W. Vaughan, Esq.

LATHAM & WATKINS LLP
*Attorneys for the TCW Defendants*
355 South Grand Avenue
Los Angeles, California 90071
By:    Wayne S. Flick, Esq. (*pro hac vice*)
       Amy C. Quartarolo, Esq. (*pro hac vice*)

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

       Andrew Lawrence Hosking and Bruce Mackay (together, the "Plaintiffs"), in their

capacity as Joint Compulsory Liquidators of Hellas Telecommunications (Luxembourg) II SCA

("Hellas II"), filed a complaint (the "Complaint," ECF Doc. # 1), seeking to avoid and recover an

initial transfer made by Hellas II to its parent entity in the amount of approximately €1.57 billion

and to avoid and recover approximately €973.7 million of subsequent transfers allegedly made to

several named defendants and an unnamed class of transferees (together, the "Original

Defendants").  The Complaint asserted actual and constructive fraudulent transfer causes of

action under the New York Debtor and Creditor Law ("NYDCL") against each of the Original

Defendants, and an unjust enrichment claim under unspecified law against the Original

Defendants affiliated with the private equity firms Apax Partners LLP ("Apax Partners") and

TPG Capital Management, L.P. ("TPG Capital").

The Original Defendants moved to dismiss the Complaint on various grounds, including

lack of standing, lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to

state a claim.  The Court granted in part and denied in part the motions to dismiss.  *See Hosking*

*v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 524 B.R. 488 (Bankr.

S.D.N.Y. 2015) ("Hosking I").  The Complaint was dismissed for lack of personal jurisdiction as

to Apax Partners and the foreign-based Original Defendants affiliated with Apax Partners and

TPG Capital, *see id.* at 512; however, the Court concluded that personal jurisdiction could be

exercised over each of the other Original Defendants, *see id.* at 513.[1]  The Plaintiffs' NYDCL

fraudulent transfer claims were dismissed for lack of standing.[2]  *See id.* at 529 & n.41.  Only the

unjust enrichment claim survived against the United States ("U.S.")-based Original Defendants

affiliated with Apax Partners and TPG Capital.  *See id.* at 529, 539.

The Plaintiffs now seek leave to file a first amended complaint (the "First Amended

Complaint" or "FAC," Ashley Decl. Ex. A) that:  (1) joins additional proposed defendants (the

"Proposed Defendants");[3] (2) withdraws the unjust enrichment claim against Apax NY; (3)

---

[1]    Specifically, the Complaint was dismissed for lack of personal jurisdiction as to:  (i) Apax Partners, Apax Partners Europe Managers Ltd., Apax Europe VI GP Co. Ltd., Apax Europe VI GP, L.P., Apax Europe VI-A, L.P., Apax Europe VI-1, L.P., Apax WW Nominees Ltd., and Martin Halusa (collectively, "Apax Europe"); and (ii) TPG Capital, LLP ("TPG Europe").

[2]    Additionally, the Court dismissed the Plaintiffs' actual fraudulent conveyance claim alleged under the NYDCL on choice of law grounds, finding that United Kingdom ("UK") or Luxembourg law, rather than New York law, applied to such claims.  *See Hosking I*, 524 B.R. at 521.

[3]    The Proposed Defendants include:  (1) TPG FOF IV, L.P., TPG FOF IV-QP, L.P., TPG Equity IV-A, L.P. f/k/a TPG Equity IV, L.P., TPG Management IV-B, L.P., TPG Coinvestment IV, L.P., TPG Associates IV, L.P.,

removes TCW Asset Management Company ("TCW Asset") and TCW Group Inc. ("TCW Group") as Defendants; and (4) pleads new causes of action sounding in fraudulent transfer under UK and Luxembourg law (the "Additional Claims") against several of the Original Defendants and the Proposed Defendants (together, the "Defendants").[4]  (*See* the "Motion," ECF Doc. # 153 at 1–3.)

The Additional Claims include:  (1) an actual fraudulent transfer claim under section 423 of the UK's Insolvency Act 1986 (the "Insolvency Act") against all Defendants except Apax NY (the "Section 423 Claim");[5] (2) a fraudulent trading claim under section 213 of the Insolvency Act against all Defendants except for the TPG Affiliate Defendants and the Transferee Class (the "Section 213 Claim"); and, (3) in the alternative to the Section 423 Claim and the Section 213 Claim, an actual fraudulent transfer claim under Article 1167 of the Luxembourg Civil Code and Article 448 of the Luxembourg Commercial Code against all Defendants except Apax NY (the "Article 1167 Claim").  (*Id.* at 2.)  The First Amended Complaint also asserts an unjust enrichment claim against the TPG Capital Defendants, the TPG Advisors IV Defendants, and the

---

TPG Management IV, L.P., TPG Management III, L.P., Bonderman Family Limited Partnership, Bondo-TPG Partners III, L.P., Dick W. Boyce, Kevin R. Burns, Justin Chang, Jonathan Coslet, Kelvin Davis, Andrew J. Dechet, Jamie Gates, Marshall Haines, John Marren, Michael MacDougall, Thomas E. Reinhart, Richard Schifter, Todd B. Sisitsky, Bryan M. Taylor, Carrie A. Wheeler, James B. Williams, and John Viola (collectively, "the TPG Affiliate Defendants"), and William S. Price III ("Price"); and (2) TCW Capital Investment Corporation ("New TCW").

[4]      The Defendants include:  (1) Apax Partners, L.P. ("Apax NY"); (2) (a) TPG Capital, David Bonderman, James Coulter, and Price (collectively, the "TPG Capital Defendants"); (b) TPG Advisors IV, Inc., TPG GenPar IV, L.P., and TPG Partners IV, L.P. (collectively, the "TPG Advisors IV Defendants"); (c) T3 Advisors II, Inc., T3 GenPar II, L.P., T3 Partners II, L.P., and T3 Parallel II, L.P. (collectively, the "T3 Advisors II Defendants"); and (d) the TPG Affiliate Defendants (together with the TPG Capital Defendants, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, the "TPG Defendants"); (3) TCW/Crescent Mezzanine III, LLC, TCW/Crescent Mezzanine Partners III L.P., TCW/Crescent Mezzanine Trust III, TCW/Crescent Mezzanine Partners III Netherlands, L.P., and New TCW (collectively, "TCW"); (4) Deutsche Bank Aktiengesellschaft ("DB"); and (5) an unnamed class of transferees (the "Transferee Class").

[5]      The Section 423 Claim is asserted against:  (i) the TPG Defendants, DB, and TCW (collectively, the "Transferee Defendants"); (ii) the Transferee Class; and (iii) TPG Capital.  (*See* FAC ¶¶ 205–212.)

T3 Advisors II Defendants under New York or, in the alternative, UK or Luxembourg law. (FAC ¶¶ 227–231.)

Oppositions to the Motion (collectively, the "Oppositions") were filed by: (i) Apax NY (the "Apax Opposition," ECF Doc. # 164);[6] (ii) the TPG Defendants (the "TPG Opposition," ECF Doc. # 161);[7] (iii) TCW (the "TCW Opposition," ECF Doc. # 158); and (iv) DB (the "DB Opposition," ECF Doc. # 162).[8] The Plaintiffs filed a reply (the "Reply," ECF Doc. # 174).[9] On July 22, 2013, the Court heard argument and took the Motion under submission.

The Defendants argue that the Motion should be denied because it was filed in bad faith, was unduly delayed, and is unduly prejudicial to the Defendants. According to the Defendants, the Plaintiffs made a poor decision to plead their original claims solely under New York law and now improperly seek a do-over after the parties spent months and millions of dollars litigating. The Defendants also argue that amending the Complaint is futile because each of the claims in the First Amended Complaint fails to state a plausible claim for relief: (1) a claim under section 423 of the Insolvency Act cannot be adjudicated by a court outside the UK; (2) the Section 213 Claim fails to adequately plead scienter; (3) the Plaintiffs lack standing to bring the Article 1167 Claim (a "creditor" claim); (4) the unjust enrichment claim is barred because (i) contracts governed the challenged transfers, (ii) the claim is duplicative of fraudulent transfer claims, (iii) section 546(e) of the Bankruptcy Code preempts the claim, and (iv) the claim is barred in a

---

[6]     The Apax Opposition is supported by the declarations of Robert S. Fischler (the "Fischler Decl.," ECF Doc. # 164-1) and André Prüm (the "Prüm Decl.," ECF Doc. # 164-2).

[7]     The TPG Opposition is supported by the declarations of Barry Isaacs QC (the "Isaacs Decl.," ECF Doc. # 166) and André Prüm (the "Prüm Decl.," ECF Doc. # 167).

[8]     The DB Opposition is supported by the declaration of Peter J. Linken (the "Linken Decl.," ECF Doc. # 163).

[9]     The Reply is supported by the declarations of Gabriel Moss QC (the "Moss Decl.," ECF Doc. # 172) and Marc Thewes (the "Thewes Decl.," ECF Doc. # 173).

chapter 15 case by section 1521(a)(7) of the Bankruptcy Code because it seeks identical relief to a claim under section 548 (which cannot be brought in a chapter 15 case); (5) the claims should be dismissed on international comity grounds; and, finally, (6) the claims should be dismissed based on *forum non conveniens*. The Court must also address choice of law principles in deciding whether UK or Luxembourg law applies.

As explained below, the Court concludes that the First Amended Complaint was not filed in bad faith, was not unduly delayed, and is not unduly prejudicial to the Defendants; the Section 423 Claim can be adjudicated by this Court; UK law governs the Plaintiffs' claims because it has a palpably greater interest in the subject of the claims; the First Amended Complaint adequately pleads the Section 213 Claim against each applicable Defendant; the Article 1167 Claim is futile—the Plaintiffs lack standing to bring the claim because it belongs to creditors; the unjust enrichment claim is not futile for any of the reasons argued; the claims should not be dismissed on international comity grounds because permissive abstention is not available under the circumstances; and the claims should not be dismissed under the *forum non conveniens* doctrine because the Defendants have failed to establish that an adequate alternative forum exists to adjudicate the claims. Accordingly, the Motion for leave to file the First Amended Complaint is **GRANTED in part** and **DENIED in part**.

# I.    BACKGROUND

## A.    Facts Alleged in the First Amended Complaint[10]

In June 2005, eight investment funds (the "Sponsors") allegedly formed by TPG Capital

and Apax Partners used a special purpose vehicle ("Troy GAC") to acquire approximately 80%

of the equity in TIM Hellas Communications S.A. ("TIM Hellas")—a Greek telecommunications

services provider—in a leveraged transaction.  (*See* FAC ¶¶ 111–116.)  In March 2005, TPG[11]

and Apax[12] allegedly organized a group of entities under Luxembourg law in preparation for the

acquisition of TIM Hellas, including Hellas II, Hellas Telecommunications, S.àr.l. ("Hellas"),

Hellas Telecommunications I, S.à.r.l. ("Hellas I"), Hellas Telecommunications Finance SCA

("Hellas Finance"), and other related entities.  (*See id.* ¶ 113.)  Hellas II and Hellas Finance were

wholly owned by Hellas I, which in turn was wholly owned by Hellas.  (*Id.* ¶ 114.)  Hellas, the

ultimate parent of the Hellas entities, was wholly owned by the Sponsors.  (*Id.*)  The Sponsors

acquired the remaining shares of TIM Hellas in November 2005 through Troy GAC, and the

acquisition was principally funded by debt issued by the Hellas entities.  (*See id.* ¶ 118.)

Subsequently, the Sponsors' equity interests in TIM Hellas were cancelled, and TIM Hellas

merged into Troy GAC; the surviving entity became a wholly owned subsidiary of Hellas II.

(*See id.* ¶ 119.)

On June 15, 2005, Hellas issued 490,000 convertible preferred equity certificates

("CPECs") to the Sponsors with a par value of €49 million.  (*Id.* ¶ 124.)  The Sponsors

---

[10]    The facts recited in this Opinion are the facts alleged in the proposed First Amended Complaint and accepted as true for purposes of resolving the Motion.  *See E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 282 (S.D.N.Y. 2006) ("For the purposes of evaluating futility [of a proposed amendment to a pleading], the 12(b)(6) standard is applied:  all well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader." (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993))).

[11]    "Apax" refers collectively to the Apax NY Defendant and its non-party affiliates, Apax Europe.

[12]    "TPG" refers collectively to the TPG Defendants and their non-party affiliate, TPG Europe.

transferred €49 million to Hellas in exchange for the CPECs.  (*Id.*)  At the same time, Hellas I—

the direct subsidiary of Hellas and direct parent of Hellas II—issued 490,000 CPECs to Hellas,

and Hellas II issued an equivalent number of CPECs to Hellas I.  (*Id.*)

       In a stock purchase deal that closed on January 31, 2006, TPG and Apax allegedly used

Hellas and its related entities to acquire Q-Telecom, a business unit of a large mobile

telecommunications provider in Greece.  (*See id.* ¶ 131.)  The Q-Telecom acquisition was

principally financed with debt issued by a subsidiary of Hellas II and cash contributed by one or

more of Hellas II's other subsidiaries.  (*See id.* ¶ 132.)  On the same day, the Sponsors

transferred €28.3 million to Hellas in exchange for 282,681 additional CPECs issued by Hellas to

the Sponsors.[13]  (*Id.* ¶ 133.)

       By June 2006, TPG and Apax "put in motion plans to dispose of [Hellas II]'s subsidiaries

in a sale to a third party."  (*Id.* ¶ 139.)  TPG and Apax engaged Morgan Stanley and Lehman

Brothers as financial advisors in connection with an auction of TIM Hellas.  (*See id.* ¶ 141.)

Morgan Stanley and Lehman Brothers prepared an information memorandum to be distributed to

prospective purchasers (the "Information Memorandum"), which was prepared with input from

TPG and Apax and approved by TIM Hellas's board of directors.  (*Id.*)  TPG and Apax

demanded a sale price of at least €3.5 billion, more than double the total consideration paid to

acquire TIM Hellas and Q-Telecom.  (*Id.* ¶ 142.)

       Morgan Stanley and Lehman Brothers contacted more than 30 parties to solicit their

participation in the auction; however, less than half of these parties expressed sufficient interest

to receive a copy of the Information Memorandum.  (*Id.* ¶ 143.)  On October 9, 2006, five parties

submitted first-round, non-binding bids to acquire TIM Hellas.  (*Id.*)  These bids implied an

---

[13]    Hellas transferred the €28.3 million to Hellas I, who then transferred this amount to Hellas II; in exchange,
corresponding CPECs were issued from Hellas II to Hellas I, and then from Hellas I to Hellas.  (*See* FAC ¶ 133.)

enterprise value of TIM Hellas ranging from €2.5–3.8 billion.  (*See id.*)  Three parties were invited to the second round of the auction and provided access to certain diligence information.  (*See id.*)  The deadline for these second-round bidders to submit binding offers was extended from November 27, 2006 to November 30, 2006; however, the auction failed to generate any binding offers despite the extension.  (*Id.* ¶ 144.)  By December 2006, TPG and Apax abandoned the auction after bidders failed to meet their price and "instead took steps to extract those returns from [Hellas II] under the guise of a purported 'refinancing' of its debt."  (*Id.*)

On or about December 21, 2006, the following multi-step transaction was completed (the "December 2006 Transaction"):  (1) Hellas II issued €960 million and $275 million of Floating Rate Subordinated Notes due 2015 (the "Sub Notes"); (2) Hellas Finance and certain subsidiaries of Hellas issued additional series of notes, the proceeds of which were transferred or loaned to Hellas II; (3) Hellas II transferred a total of approximately €1.57 billion to its parent, Hellas I, of which approximately €978.7 million was paid to redeem CPECs issued by Hellas II;[14] (4) Hellas I paid approximately €973.7 million to Hellas to redeem CPECs issued by Hellas I; and (5) Hellas paid the Sponsors approximately €973.7 million to redeem CPECs issued by Hellas (the "December 2006 CPEC Redemption").  (*See id.* ¶¶ 160–61, 68.)  The Sponsors subsequently transferred the proceeds of the December 2006 CPEC Redemption to the Transferee Defendants and the Transferee Class.  (*See id.* ¶¶ 170, 207, 221.)

In February 2007, TPG and Apax sold Hellas and its subsidiaries to Weather Investments S.p.A.—later renamed WIND Telecom S.p.A. ("Weather Investments")—an Italian corporation.  (*See id.* ¶ 192.)  Weather Investments purchased 100% of the equity of Hellas for €500 million,

---

[14]    The remaining portion of the €1.57 billion transferred from Hellas II to Hellas I was allegedly used to pay the €500 million Floating Rate Senior PIK Notes due 2014 issued by Hellas Finance (and guaranteed by Hellas I), as well as interest on such notes, and approximately €48.8 million in additional transaction costs associated with the December 2006 Transaction.  (*See* FAC ¶¶ 135, 160.)

€6,435,736 of which was allocated toward the purchase of the remaining CPECs previously issued by Hellas to the Sponsors at the par value of €1 per CPEC. (*Id.* ¶ 195.) Hellas II's financial statements for the year ending December 31, 2007 indicated that its debt-service obligations grew and resulted in a net financial loss of more than €259.5 million; its "leverage remained high at 12.4x EBIT, while its cash interest coverage declined to 1.2x EBIT." (*Id.* ¶ 198.) On June 5, 2008, Apax Partners paid Weather Investments €500 million for a 5% equity stake in the company. (*Id.* ¶ 199.)

From December 21, 2006 (i.e., the date of the December 2006 Transaction) through the February 2007 sale of Hellas to Weather Investments, TPG and Apax collected "consulting fees" from Hellas II. (*See id.* ¶ 191.) Over this period of time, Hellas II "paid a minimum of €1.22 million in additional 'consulting fees' to Hellas I and, directly or indirectly, Hellas I then paid approximately those same amounts to TPG and Apax (the "Consulting Fees Transfer")." (*Id.*)

In 2009, Hellas II began considering a potential restructuring of its capital structure. (*See id.* ¶ 201.) In anticipation of such a restructuring, Hellas II moved its center of main interests from Luxembourg to the UK in August 2009, including by moving its head office and operating office to London, England. (*Id.*) On November 26, 2009, the High Court of Justice of England and Wales (the "High Court") approved placing Hellas II into administration in England and appointed joint administrators (the "Administrators"). (*Id.*) On December 1, 2011, the High Court discharged the Administrators and ruled that Hellas II should be instead wound-up through a compulsory liquidation. (*Id.* ¶ 152.) The UK's Secretary of State for Trade and Industry appointed the Plaintiffs as Joint Compulsory Liquidators on December 5, 2011.[15] (*See id.* ¶ 18.)

---

[15]     Andrew Lawrence Hosking and Carl Stuart Jackson were originally appointed as Joint Compulsory Liquidators; Mr. Jackson was replaced by Simon James Bonney on May 17, 2013, and Mr. Bonney was replaced by Bruce Mackay on May 7, 2014. (FAC ¶ 18.)

### B.    Procedural History

On February 16, 2012, the Debtor filed a chapter 15 petition for recognition of its foreign

proceeding in this Court.  (*See* Case No. 12-10631, ECF Doc. # 1.)  The Court entered an order

granting recognition of the Debtor's foreign main proceeding on March 14, 2012.  (*See* Case No.

12-10631, ECF Doc. # 17.)  This adversary proceeding was commenced nearly two years later,

on March 13, 2014.  (*See* ECF Doc. # 1.)

In the Complaint, the Plaintiffs alleged that Hellas II was insolvent at the time of the

December 2006 CPEC Redemption and that the Original Defendants received portions of the

proceeds of such transaction from one or more Sponsors.  (*See* Compl. ¶¶ 23–74, 118.)  The

Plaintiffs sought to avoid and recover the following transfers as actual or constructive fraudulent

transfers under the NYDCL:  (i) the initial transfer of €1.57 billion Hellas II made to Hellas I;

(ii) the subsequent transfers Hellas II ultimately made to the Original Defendants through the

Sponsors; and (iii) the Consulting Fees Transfer made from Hellas II to TPG and Apax.  (*See id.*

¶¶ 155–168.)  The Plaintiffs also asserted an unjust enrichment claim against TPG and Apax for

their receipt of payments made in the course of the December 2006 Transaction, the December

2006 CPEC Redemption, and the Consulting Fees Transfer.  (*See id.* ¶¶ 169–173.)

The Original Defendants filed motions to dismiss the Complaint on various grounds,

including lack of personal jurisdiction, lack of subject matter jurisdiction, lack of standing, and

failure to state a claim.  (*See* ECF Doc. ## 37, 41, 46, 50.)  The Plaintiffs filed oppositions to the

motions to dismiss (ECF Doc. ## 79, 83, 84), and the Original Defendants filed reply briefs

(ECF Doc. ## 90, 91, 94, 98).[16]

---

[16]    The Plaintiffs also filed a supplemental opposition to DB's reply brief (ECF Doc. # 104), and DB
responded by surreply (ECF Doc. # 106).

On November 7, 2014, the Court entered an order scheduling a hearing on the motions to dismiss and directing the parties to brief choice of law issues.  (ECF Doc. # 115)  On November 21, 2014, the Plaintiffs and the Original Defendants (collectively) filed supplemental briefs on choice of law.  (ECF Doc. ## 121, 122.)  On December 3 and 16, 2014, the Court heard oral argument on the motions to dismiss and took the matter under submission.

On January 29, 2015, the Court issued the *Hosking I* opinion granting in part and denying in part the motions to dismiss.  *See Hosking I*, 524 B.R. at 536.  On February 13, 2015, the TPG and Apax Original Defendants filed a motion seeking limited reargument on their motion to dismiss the unjust enrichment claim (ECF Doc. # 139), arguing that the Court should reconsider *Hosking I* and dismiss the unjust enrichment claim because the opinion did not address their argument that the unjust enrichment claim is barred by section 546(e) of the Bankruptcy Code. (*See id.* at 1–2.)  The Plaintiffs filed an objection to the motion for reargument (ECF Doc. # 144), and the TPG and Apax Original Defendants filed a reply (ECF Doc. # 146).  On March 9, 2015, the Court issued an opinion granting the TPG and Apax Original Defendants' motion for limited reargument in order to address the section 546(e) argument, but denying their motion to dismiss the unjust enrichment claim, holding that such claim is not preempted by section 546(e) as a matter of law.  *See Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 526 B.R. 499, 515 (Bankr. S.D.N.Y. 2015) ("Hosking II").

Briefing on the Plaintiffs Motion to amend was completed on June 3, 2015.  The Court held a hearing on the Motion to amend the Complaint on July 22, 2015 and took the matter under submission.  This Opinion follows.

### C.    The Parties' Arguments

#### 1.    *The Plaintiffs*

The Plaintiffs argue that they should be granted leave to amend the Complaint because the First Amended Complaint:  (1) is not futile; (2) is not proposed in bad faith; (3) has not been unduly delayed; and (4) would not unduly prejudice the Defendants.  (Motion at 7.)

First, the Plaintiffs contend that the First Amended Complaint is not futile because it states a claim upon which relief can be granted as to each of the Additional Claims.  (*Id.*) According to the Plaintiffs, the First Amended Complaint adequately alleges each Additional Claim (*id.* at 8–10), they have standing to assert each Additional Claim (*id.* at 10–13), and each Additional Claim is timely (*id.* at 13–16).

Second, the Plaintiffs assert that there is no plausible basis to find that the Motion reflects malice or any other bad faith on the part of the Plaintiffs.  (*Id.* at 16)  The Plaintiffs note that the Court dismissed their NYDCL fraudulent transfer claims for lack of standing in *Hosking I*, but stated that it would not prejudge whether the Plaintiffs would have standing to assert fraudulent transfer claims under applicable foreign law.  (*Id.*)  According to the Plaintiffs, the Motion is consistent with this observation and reflects their good faith intention to amend the Complaint to assert the Additional Claims under applicable foreign law.  (*Id.*)

Third, the Plaintiffs argue that the Motion was not unduly delayed.  (*Id.* at 17.)  Soon after the *Hosking I* opinion was issued and before any Defendant filed an answer to the Complaint, the Plaintiffs negotiated the *Fourth Case Management and Scheduling Order* (the "Scheduling Order," ECF Doc. # 142), which provided them 30 days to file a motion for leave to amend the Complaint from the date the order was entered.  (*See* Motion at 5–6, 17.)  The Court

entered the Scheduling Order on February 17, 2015 (*id.* at 5), and the Plaintiffs timely filed their

Motion 30 days later (*see id.* at 17).

Finally, the Plaintiffs assert that the Defendants will not be unduly prejudiced by the First

Amended Complaint. (*Id.*) Because the Additional Claims all relate to the same conduct,

transactions, and occurrences alleged in the Complaint, the Defendants would be required to

spend few, if any, incremental resources to defend against the Additional Claims. (*Id.* at 17–18.)

       2.    *Apax NY*

The only claim asserted against Apax NY in the First Amended Complaint is the Section

213 Claim. (Apax Opp. at 1.) Apax NY argues that the Motion should be denied because it is

futile against it for two reasons:[17] (1) the substantive law of Luxembourg applies under New

York choice of law rules, and Luxembourg law has no equivalent to section 213 of the

Insolvency Act; and (2) the First Amended Complaint does not adequately plead that Apax NY

had knowledge of, or was party to, Hellas II's alleged fraud. (*See id.*)

First, Apax NY argues that there is an actual conflict between the laws of the UK and

Luxembourg, and therefore a choice of law analysis is required under New York choice of law

rules. (*See id.* at 5.) An actual conflict between UK and Luxembourg law exists because

(i) Luxembourg law has no equivalent to section 213 of the Insolvency Act (*id.* (citing Prüm

Decl. ¶¶ 6–12)); and (ii) a claim under the Luxembourg statute most closely resembling section

213, article 495-1 of the Luxembourg Commercial Code, can only be asserted in a Luxembourg

bankruptcy proceeding (*id.* (citing Prüm Decl. ¶¶ 13–16)). According to Apax NY, the Court

should hold that Luxembourg law governs because Luxembourg has a greater interest in this

---

[17]      Apax NY also asserts that the Motion should be denied for reasons briefed by other Defendants and joins in the Oppositions filed by the TPG Defendants and DB to the extent they argue that the Motion should be denied due to the Plaintiffs' bad faith and undue delay, on international comity grounds, and *forum non conveniens* grounds. (*See* Apax Opp. at 5 & n.2.)

litigation than the UK (*Id.* at 5–6.) The UK's interest in having its law applied to this adversary proceeding is primarily based on the fact that Hellas II's foreign main proceeding is pending in the UK as a result of Hellas II changing its "center of main interests" from Luxembourg to the UK well after the December 2006 Transaction took place. (*Id.* at 7.) In contrast, the actions underlying the Section 213 Claim significantly involved Luxembourg entities and individuals and were effected pursuant to agreements governed by Luxembourg law. (*See id.* at 6–7.)

Second, Apax NY argues that the First Amended Complaint does not state a claim against Apax NY because it fails to adequately plead that Apax NY had knowledge of, or was a party to, Hellas II's alleged fraud in effectuating the December 2006 Transaction.[18] (*See id.* at 9 n.4.) Specifically, Apax NY asserts that the First Amended Complaint does not adequately allege two necessary elements of a section 213 claim against Apax NY—(i) knowledge of the alleged fraud; and (ii) knowing participation in the alleged fraud. Instead, it improperly uses group-pleading that does not sufficiently identify any conduct supportive of this claim against Apax NY individually. (*See id.* at 13–14.)

### 3.  The TPG Defendants

The TPG Defendants argue that the Motion should be denied because the Plaintiffs' proposed amendments (i) are unduly delayed, evincing bad faith (*see* TPG Opp. at 9–13); and (ii) are futile (*see id.* at 13).[19] According to the TPG Defendants, the Plaintiffs could have alleged the Additional Claims at the outset of this Adversary Proceeding but strategically chose not to, opting instead to forum- and law-shop by asserting solely New York law claims in a U.S.

---

[18]    According to Apax NY, the Section 213 Claim is subject to Federal Rule of Civil Procedure ("FRCP") 9(b)'s heightened pleading standards for fraud claims. (Apax Opp. at 8.)

[19]    The TPG Defendants also join the other Defendants' Oppositions on a number of issues. (*See* TPG Opp. at 1 n.1.)

court. (*See id.* at 9–10.)  Despite the Court raising issues with the Plaintiffs' choice of pleading New York law claims nearly a year before the Motion was filed, the Plaintiffs did not seek to amend the Complaint until after the Court issued the *Hosking I* opinion dismissing the NYDCL claims. (*See id.* at 11.)  Moreover, the Plaintiffs admit that they seek to amend their Complaint to address the *Hosking I* opinion, essentially seeking to use *Hosking I* as an advisory opinion and to "obtain a complete do-over after [the] adverse ruling."  (*Id.* (emphasis omitted).)

The TPG Defendants also argue that the First Amended Complaint is futile because each of the claims asserted would be dismissed as a matter of law (*id.* at 13) and the First Amended Complaint would be dismissed under the doctrine of *forum non conveniens* (*id.* at 28).  First, they argue that the Section 423 Claim is futile because it can only be brought in a court that has jurisdiction to wind up Hellas II and, since this Court lacks such jurisdiction, it also lacks subject matter jurisdiction over the Section 423 Claim.  (*See id.* at 13–14.)  Second, they contend that the Section 213 Claim is futile because the First Amended Complaint does not adequately plead that Hellas II defrauded its creditors (*id.* at 15), or that any of the TPG Defendants were "knowingly parties" to the alleged fraud (*see id.* at 16–18).[20]  The TPG Defendants argue that the Plaintiffs fail to plead fraudulent intent with the requisite degree of specificity, especially in light of the advanced stage of fact discovery, and they instead rely on improper group pleading.  (*See id.* at 17–18.)  Third, the TPG Defendants assert that the Article 1167 Claim is futile because the Plaintiffs lack standing to assert it:  such a claim belongs to a company's creditors, not its liquidators appointed under non-Luxembourgish law.  (*See id.* at 18–20.)  Fourth, the TPG Defendants argue that the Plaintiffs' "new" unjust enrichment claim is futile because:

(i) contracts governed the CPEC redemptions, and an unjust enrichment claim must be dismissed

---

[20]    The TPG Defendants also join in the section of the Apax Opposition that argues that the Section 213 Claim is futile on choice of law grounds.  (*See* TPG Opp. at 15.)

where an enforceable contract governs the dispute (*see id.* at 20–21); (ii) it duplicates the other

tort-based claims, and an unjust enrichment claim is not available where it simply duplicates a

tort claim (*see id.* at 21–22); (iii) it is preempted by section 1521(a)(7) of the Bankruptcy Code

because it is virtually identical to an actual fraudulent transfer claim under the Bankruptcy Code

and therefore seeks the same relief available under section 548 (*see id.* at 22–23); and (iv) it is

barred by section 546(e) of the Bankruptcy Code (*see id.* at 23–28).  Finally, the TPG

Defendants argue that the First Amended Complaint would be dismissed under the doctrine of

*forum non conveniens*.  (*See id.* at 28–35).

     *4.*     *TCW*

The First Amended Complaint asserts the Section 423 Claim and the Article 1167 Claim

against TCW.  (*See* FAC ¶¶ 205–212, 219–226.)  TCW argues that the Motion is futile because

the First Amended Complaint fails to state either claim against any TCW Defendant.[21]  (*See*

TCW Opp. at 1.)

First, TCW contends that section 423 of the Insolvency Act must be read in conjunction

with section 425(2), which provides that an order made under section 423:

> (a) shall not prejudice any interest in property which was acquired
> from a person other than the debtor and was acquired in good faith,
> for value and without notice of the relevant circumstances, or
> prejudice any interest deriving from such an interest, and
>
> (b) shall not require a person who received a benefit from the
> transaction in good faith, for value and without notice of the
> relevant circumstances to pay any sum unless he was a party to the
> transaction.

(*Id.* at 6–7 (quoting Insolvency Act 1986, c. 45, § 425(2) (Eng.)).)  TCW asserts that section

425(2)(a) applies because each TCW Defendant allegedly received proceeds from "a person

---

[21]    TCW also joins in the sections of the TPG Opposition that argue that:  (i) the proposed amendments are not in good faith; (ii) the Section 423 Claim is futile because it cannot be asserted in this Court; and (iii) the Article 1167 Claim is futile because it belongs to creditors, not the Plaintiffs, as liquidators.  (*See* TCW Opp. at 1.)

other than the debtor." (*Id.* at 7.)  Accordingly, TCW argues that the Section 423 Claim against

TCW is futile because the First Amended Complaint does not allege that:  (i) any TCW

Defendant acted in bad faith; (ii) knew of Hellas II's alleged fraudulent intent in carrying out the

December 2006 Transaction or knew that the price of the December 2006 CPEC Redemption

may have been inflated; (iii) was involved in the December 2006 CPEC Redemption in a

capacity other than as a passive recipient of funds; or (iv) any TCW Defendant received proceeds

from the December 2006 CPEC Redemption without providing any value in return.  (*See id.* at

8.)  TCW further argues that section 425(2)(b) bars the Section 423 Claim against certain TCW

Defendants because the First Amended Complaint does not allege that such Defendants were a

party to the challenged December 2006 CPEC Redemption.  (*See id.* at 11.)

Second, TCW contends that the First Amended Complaint fails to state the Article 1167

Claim against TCW because it does not allege either of two alternative, necessary elements for

such claim:  (1) that any TCW Defendant is an "accomplice of the fraud;" or (2) that the transfer

of proceeds of the December 2006 CPEC Redemption to TCW lacked "valuable consideration."

(*See id.* at 12–14.)

     *5.    DB*

Each of the Additional Claims is asserted against DB in the First Amended Complaint.

(*See* FAC ¶¶ 205–226.)  DB argues that the Motion should be denied as futile for three reasons.[22]

First, DB argues that principles of international comity mandate denying the Motion because the

Additional Claims are asserted by foreign Plaintiffs, under foreign law, and are based on conduct

that occurred overseas.  (*See* DB Opp. at 5–8.)  According to DB, these overwhelmingly foreign

---

[22]    DB also joins in the section of the Apax Opposition that argues that the Section 213 Claim is futile on choice of law grounds (*see* DB Opp. at 22), and in the sections of the TPG Opposition that argue that:  (i) the Motion should be denied due to the Plaintiffs' inexcusable, undue delay in filing the Motion; (ii) the Section 423 Claim is futile because it cannot be asserted in this Court; and (iii) the Article 1167 Claim is futile because it belongs to creditors, not the Plaintiffs, as liquidators (*see id.* at 4–5, 22).

claims should be resolved in the UK and/or Luxembourg, not in this Court.  (*See id.*)  Second,

DB argues that the doctrine of *forum non conveniens* favors the dismissal of the Additional

Claims because:  (i) the foreign Plaintiffs' choice of forum, admittedly selected for strategic

reasons, is entitled to no deference (*see id.* at 9–10); (ii) a UK court is an adequate alternative

forum (*see id.* at 10–11); and (iii) the balance of public and private factors considered in a *forum

non conveniens* analysis weigh in favor of dismissal (*see id.* at 12–16).  Third, DB contends that

the Section 213 Claim against DB is futile because the First Amended Complaint does not plead

a strong inference of DB's fraudulent intent, which is required in light of the extensive discovery

taken to date.  (*See id.* at 16–21.)

## II.    DISCUSSION

### A.    Amendment of a Pleading under FRCP 15(a)

FRCP 15(a), made applicable to this Adversary Proceeding by Federal Rule of

Bankruptcy Procedure ("Bankruptcy Rule") 7015, provides:

> A party may amend its pleading once as a matter of course within:
> (A) 21 days after serving it; or (B) if the pleading is one to which a
> responsive pleading is required, 21 days after service of a
> responsive pleading or 21 days after service of a motion under
> [FRCP] 12(b), (e), or (f), whichever is earlier.

FED. R. CIV. P. 15(a)(1); *see* FED. R. BANKR. P. 7015 (adopting FRCP 15 for adversary

proceedings).  "In all other cases, a party may amend its pleading only with the opposing party's

written consent or the court's leave."  FED. R. CIV. P. 15(a)(2).  In such cases, "[t]he court should

freely give leave when justice so requires."  *Id.*; *accord In re Metzeler*, 66 B.R. 977, 981 (Bankr.

S.D.N.Y. 1986) ("Leave to amend is to be freely granted as Rule 15(a) provides.").  The liberal

standard for granting leave to amend must be balanced by other important goals such as the need

to preserve the integrity and efficiency of the judicial system. *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 570 (Bankr. S.D.N.Y. 1999).

A court may deny a motion for leave to amend "if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) [would prejudice] the opposing party . . . , or (4) would be futile." *Lee v. Regal Cruises, Ltd.*, 916 F. Supp. 300, 303 (S.D.N.Y. 1996) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "An amendment to a complaint is futile if the proposed claim could not withstand a motion to dismiss pursuant to [FRCP] 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citing *Dougherty v. N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)).

To survive a motion to dismiss under FRCP 12(b)(6), a complaint need only allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation omitted). Plausibility "is not akin to a probability requirement," but rather requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted).

FRCP 9(b) requires a plaintiff alleging claims sounding in fraud to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). On the other hand, a party's requisite mental state, or scienter, "may be alleged generally." *Id.*; *see Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) ("[T]he language of Rule 9(b) means that great specificity [is] not required with respect to . . . allegations of . . . scienter." (citation omitted)). Despite FRCP 9(b)'s relaxed standard for pleading scienter, allegations of scienter must "give

20

rise to a strong inference of fraudulent intent." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

The parties disagree about the standard applicable to pleading the fraud-based elements of the Section 213 Claim. With respect to pleading the circumstances constituting fraud, the Plaintiffs argue that they are subject to a more liberal pleading standard because they are outsiders to the December 2006 CPEC Redemption (*see* Reply at 12), while the Defendants contend that such a relaxed pleading standard does not apply where, as here, the "Plaintiffs have received extensive document discovery . . . and taken multiple depositions of key witnesses" (DB Opp. at 17; *see* TPG Opp. at 18). In response, the Plaintiffs contend that they have not completed important discovery, including depositions of potentially key witnesses, and a heightened pleading standard only applies when discovery is complete. (Reply at 12–13.)

Courts relax, but do not eliminate, the particularity requirement for pleading fraud where the plaintiff is a bankruptcy trustee or a "third party[] who is pleading fraud on secondhand information." *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987) (quoting *Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.)*, 32 B.R. 199, 202 (Bankr. S.D.N.Y. 1983)). Reflecting the policy concerns underlying the relaxed particularity standard imposed on trustees and other third parties, the Second Circuit explained that "the degree of particularity required should be determined in light of such circumstances as whether the plaintiff has had an

opportunity to take discovery of those who may possess knowledge of the pertinent facts." *Id.*;
*see Billard v. Rockwell Int'l Corp.*, 683 F.2d 51, 57 (2d Cir. 1982) ("The policies underlying
Rule 9(b) call upon us to require greater precision than is found in this complaint when full
discovery has been had in a prior case."); *Liquidating Tr. v. Daimler AG (In re Old CarCo LLC)*,
435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010) (finding no justification to relax the particularity
requirement for trust's intentional fraudulent conveyance claim where complaint was filed after
"Rule 2004 discovery was conducted that allowed access to numerous documents, as well as the
depositions of many witnesses"); *Devaney v. Chester*, 709 F. Supp. 1255, 1261 (S.D.N.Y. 1989)
(dismissing trustee's fourth amended complaint for deficient allegations of fraud where trustee
"had the benefit of wide-ranging discovery before filing" the complaint).  While the Court is
mindful of the Plaintiffs' assertion that they have not been able to depose every potential witness,
fact discovery is overwhelmingly complete.  Accordingly, the Plaintiffs will be afforded some,
but little, latitude in pleading fraud with particularity.

### B.    Futility

#### 1.    The Section 423 Claim[23]

The Defendants against whom the Section 423 Claim is asserted argue that the Section
423 Claim is futile because the Court lacks subject matter jurisdiction over the claim.  Section
423(4) of the Insolvency Act provides that only the High Court or another court with jurisdiction
to wind up the debtor may grant relief under section 423.  (*See* TPG Opp. at 13–14; TCW Opp.
at 6 n.3.)  Because this Court is neither the High Court nor a court with jurisdiction to wind up

---

[23]    "Determination of a foreign country's law is an issue of law." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998) (citing Fed. R. Civ. P. 44.1 and *Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir. 1970)).  To determine foreign law, FRCP 44.1 provides that "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1.  Additionally, FRCP 44.1 permits "the court . . . to conduct '[its] own research and interpretation' into the content of foreign law." *In re Tyson*, 433 B.R. 68, 78 (S.D.N.Y. 2010) (citations omitted).

Hellas II, the Defendants contend that the Court lacks subject matter jurisdiction over the Section

423 Claim.  (*See* TPG Opp. at 14; TCW Opp. at 6 n.3.)  The Plaintiffs respond that section

423(4) "is a purely procedural English venue statute, and is therefore inapplicable in this Court

even where English substantive law applies."  (Reply at 7.)  Because federal procedural law

applies where a federal court adjudicates non-federal claims, the Plaintiffs contend, section

423(4) must be disregarded in favor of the applicable federal venue statutes, which establish that

this Court is the proper venue for the Adversary Proceeding.  (*See id.* at 7–9.)

　　　After the Plaintiffs filed their Reply, TCW filed a letter on behalf of all the Defendants

against whom the Section 423 Claim is asserted (the "Section 423 Defendants' Letter," ECF

Doc. # 177), advancing a new argument based on a recent Ninth Circuit decision, *Seismic

Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330 (9th Cir. 2015).  The Defendants argue that the

reasoning in *Siesmic*, affirming dismissal of a Canadian statutory claim which, the court

concluded, could only be brought in a specified court in Canada, likewise applies to a claim

under section 423.  (*See* Section 423 Defs.' Letter at 1 (citing *Seismic Reservoir*, 785 F.3d at

335).)  Therefore, the Defendants argue, the Section 423 Claim fails to state a claim upon which

relief may be granted.  (*See id.* (citing *Seismic Reservoir*, 785 F.3d at 335).)

　　　TCW and the TPG Defendants also object to the Section 423 Claim on an alternative

basis, arguing that section 425(2) of the Insolvency Act provides exceptions to a transferee's

liability under section 423 but the Plaintiffs failed to plead the absence of each element of section

425(2).  (*See* TCW Opp. at 6–14; TPG Opp. at 18 n.18.)  In response, the Plaintiffs argue that

section 425(2) is an affirmative defense to liability under section 423 for good faith transferees;

the Plaintiffs do not have to plead the absence of good faith.  (Reply at 21.)  But even if the

Plaintiffs must plead the inapplicability of a section 425(2) defense, the Plaintiffs argue the

defense is unavailable under the circumstances because TCW and the TPG Defendants provided no consideration to Hellas II in the December 2006 CPEC Redemption.  (*See id.* at 22–24.) Finally, the Plaintiffs argue the section 425(2) defense only applies to subsequent transferees; the First Amended Complaint alleges sufficient facts to collapse the steps of the December 2006 CPEC Redemption and find that none of the TCW or TPG Defendants was a subsequent transferee.  (*See id.* at 24–25.)

As discussed below, the Court concludes:  (1) it has subject matter jurisdiction over the Section 423 Claim under statutes enacted by Congress; (2) adjudication of the Section 423 Claim by this Court is consistent with the UK's cross-border insolvency regime; (3) this Court can grant the Plaintiffs relief under section 423 of the Insolvency Act; and (4) the Plaintiffs need not plead the inapplicability of section 425(2) to state a claim under section 423.  Accordingly, the Section 423 Claim is not futile.

a.    The Court Has Subject Matter Jurisdiction over the Section 423 Claim

Section 423 of the Insolvency Act applies to "transactions entered into at an undervalue." Insolvency Act 1986, c. 45, § 423(1) (Eng.).  Under such circumstances, "the court may . . . make such order as it thinks fit for—(*a*) restoring the position to what it would have been if the transaction had not been entered into, and (*b*) protecting the interests of persons who are victims of the transaction."  *Id.* § 423(2).  However, section 423(4) provides:

> In this section "the court" means the High Court or—
>
> (*a*) if the person entering into the transaction is an individual, any other court which would have jurisdiction in relation to a bankruptcy petition relating to him;
>
> (*b*) if that person is a body capable of being wound up under Part IV or V of this Act, any other court having jurisdiction to wind it up.

*Id.* § 423(4).

According to Gabriel Moss QC ("Moss"), the Plaintiffs' expert on UK law, "section 423(4) is a provision relating to venue in the English courts and is procedural in nature."  (Moss Decl. ¶ 4(a).)  Moss asserts that section 423(4) addresses "complex English venue problems" concerning insolvency proceedings.  (*See id.* ¶ 7.)  Section 423(4) provides that any section 423 claim can be filed in the High Court.  (*Id.*)  Additionally, a section 423 claim may also proceed in "a local court with personal insolvency jurisdiction" in the case of an individual debtor, and in a local court with jurisdiction to wind up "a corporate debtor (or a debtor treated as if it were a corporate debtor, such as a partnership)" in the case of a corporate debtor.  (*Id.*)  Barry Isaacs QC ("Isaacs"), the TPG Defendants' expert on UK law, does not address whether section 423(4) is a purely procedural venue provision.  Rather, Isaacs states that section 117 of the Insolvency Act sets forth the jurisdiction to wind up a company registered in England and Wales.  (Isaacs Decl. ¶ 10; *see id.* ¶¶ 8–9.)  Section 117(1) provides the High Court with such jurisdiction, and section 117(2) "provides that the county court of the district in which the company's registered office is situated has concurrent jurisdiction with the High Court where the amount of the company's share capital paid up or credited as paid up does not exceed €120,000."  (*Id.* ¶ 10.)

The Defendants argue that the Court lacks subject matter jurisdiction over the Section 423 Claim, citing *Sunnyside Development Company LLC v. Cambridge Display Technology Limited*, No. C 08-01780 (MHP), 2008 WL 4450328 (N.D. Cal. Sept. 29, 2008).  (*See* TPG Opp. at 14 (citing *Sunnyside*, 2008 WL 4450328, at *9); TCW Opp. at 6 n.3 (same).)  In *Sunnyside*, the U.S. District Court for the Northern District of California granted the defendants' motion to dismiss a claim under section 423 of the Insolvency Act for lack of subject matter jurisdiction. 2008 WL 4450328, at *9.  The defendants in *Sunnyside* argued that the district court lacked

subject matter jurisdiction over the section 423 claim, emphasizing that section 423(4) defines

"the court" authorized to issue appropriate orders under section 423 as "the High Court [of

England and Wales]." *Id.* In response, the plaintiff argued that jurisdiction over claims brought

under section 423 is conferred to foreign courts under section 426(4), which provides that

"courts having jurisdiction in relation to insolvency law in any part of the United Kingdom shall

assist the courts having the corresponding jurisdiction in any other part of the United Kingdom

or any relevant country or territory." *Id.* (citing Insolvency Act 1986, c. 45,§ 426(4) (Eng.)).

The court agreed with the defendants, finding that "section 426(4) does not confer jurisdiction on

any court" but rather "only provides for cooperation among courts that already have

jurisdiction." *Id.*

The Plaintiffs argue that the TPG Defendants' reliance on *Sunnyside* is misplaced

because the court in that case "failed to consider whether section 423(4) should be disregarded

on the grounds that it is procedural rather than substantive in nature." (Reply at 10.) Rather, the

Plaintiffs contend, the proper choice of law analysis was performed by the court in *Perforaciones

Martímas Mexicans S.A. de C.V. v. Grupo TMM S.A. de C.V.*, 2007 WL 1428654 (S.D. Tex. May

10, 2007), a case that is purportedly "directly on point." (Reply at 10.)

The court in *Perforaciones* held that Mexican substantive law applied to a dispute arising

from a collision between a Mexican-owned ship and a Mexican-owned mobile drilling unit in

Mexican waters. *See Perforaciones*, 2007 WL 1428654, at *3–5. Thereafter, the defendants

filed a petition to limit its liability for the incident in Mexico. *Id.* at *1. Because applicable

Mexican law required all claims regarding the incident to be brought in the same Mexican court

in which the limitation petition was filed, the defendants moved to dismiss the plaintiffs' Texas

federal court action on the grounds that the Mexican statute's forum limitation provision

controlled.  *Id.* at *6.  However, the court rejected the defendants' argument, finding that the

forum limitation provision is procedural and "[s]ince U.S. courts apply U.S. procedural law, the

instant claim does not have to be heard in the same court in which the Mexican [petition] is

pending."  *Id.*

      While *Sunnyside* is the only decision directly addressing whether a U.S. court has

jurisdiction to adjudicate a claim under section 423 of the Insolvency Act, it does not provide

much guidance.  The *Sunnyside* decision did not address the issue before this Court—whether

section 423(4) constitutes a venue provision that need not be applied by U.S. federal courts.[24]

      In *Wachovia Bank v. Schmidt*, 546 U.S. 303 (2006), the U.S. Supreme Court

distinguished venue from subject matter jurisdiction as follows:

> [V]enue and subject-matter jurisdiction are not concepts of the
> same order.  Venue, largely a matter of litigational convenience, is
> waived if not timely raised.  Subject-matter jurisdiction, on the
> other hand, concerns a court's competence to adjudicate a
> particular category of cases; a matter far weightier than venue,
> subject-matter jurisdiction must be considered by the court on its
> own motion, even if no party raises an objection.

*Id.* at 305.  Unlike jurisdiction, which concerns a court's power to render a valid judgment, venue

"relates solely to the place where jurisdiction should or may be exercised."  *U.S. ex rel. Rudick v.

Laird*, 412 F.2d 16, 20 (2d Cir. 1969).  Whether a U.S. federal court has subject matter

jurisdiction is a question of federal law, even where the applicable substantive law at issue is

foreign.  *See Al Fatah Int'l Navigation Co. Ltd. v. Shivsu Canadian Clear Waters Tech. (P) Ltd.*,

649 F. Supp. 2d 295, 299 n.4 (S.D.N.Y. 2009) ("The subject matter jurisdiction of federal courts

is limited and supplied by federal statutes; it could not possibly be supplied by foreign law."

---

[24]    Additionally, because the plaintiff in *Sunnyside* was a private party, rather than Joint Compulsory
Liquidators appointed in a UK winding-up proceeding, as is the case here, the *Sunnyside* court did not address
whether UK's adoption of the Cross-Border Insolvency Regulations 2006, addressed in Section II.B.1.b., below,
provides authority for the Plaintiffs to maintain the Section 423 Claim in this case.

(citing *Euro Tr. Trading S.A. v. Allgrains U.K. Co.*, Case No. 09 Civ. 4483 (GEL), 2009 WL 2223581, at *3 (S.D.N.Y. July 27, 2009))); *Flame S.A. v. Freight Bulk Pte. Ltd.*, 762 F.3d 352, 366 (4th Cir. 2014) (Wilkinson, J., concurring) (concurring in holding that domestic law determines whether a contract or judgment is maritime and emphasizing that "[w]hile foreign law may or may not be instructive under the circumstances, it cannot determine the subject matter jurisdiction of an American court"); *cf. Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) ("Only Congress may determine a lower federal court's subject-matter jurisdiction." (citing U.S. CONST. art. III, § 1)). Additionally, federal law governs the determination whether venue for an action pending in federal court is proper. *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27–28 (1988) (holding that federal law governed parties' venue dispute because federal statute controlled the issue and "represent[ed] a valid exercise of Congress' constitutional powers"); *see also Martinez v. Bloomberg LP*, 740 F.3d 211, 220 (2d Cir. 2014) ("'Questions of venue and the *enforcement* of forum selection clauses are essentially procedural, rather than substantive, in nature,' and therefore should be governed by federal law." (quoting *Jones v. Weibrecht*, 901 F.2d 17, 19 (2d Cir. 1990)) (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994)); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 46–47 (Bankr. S.D.N.Y. 1999) (applying federal common law to determine that New York was proper venue for ancillary proceeding under former Bankruptcy Code section 304); *Friedman v. Revenue Mgmt. of N.Y., Inc.*, 839 F. Supp. 203, 206 (S.D.N.Y. 1993), *aff'd*, 38 F.3d 668 (2d Cir. 1994) ("Determination as to proper federal venue strictly depends on federal law." (citing *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183 n.15 (1979))). Consequently, applicable federal law—not section 423(4) of the Insolvency Act—dictates whether the Court lacks subject matter jurisdiction over the Section 423 Claim and whether venue is proper.

The Court has already held that it has subject matter jurisdiction over this Adversary Proceeding under section 1334(b) of title 28 of the United States Code (the "Judicial Code"). *See Hosking I*, 524 B.R. at 515 ("Notwithstanding that the Plaintiffs' claims are all state law claims brought in an adversary proceeding related to a chapter 15 proceeding, this adversary proceeding is related to a case under title 11 [of the Judicial Code]." (citing *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011))).  The fact that the First Amended Complaint asserts claims under foreign law, rather than New York state law, does not alter the Court's conclusion.  Additionally, this Court is the proper venue for this Adversary Proceeding because it is where Hellas II's chapter 15 case is pending.  Section 1410 of the Judicial Code governs venue of cases ancillary to foreign proceedings and provides that a case under chapter 15 of the Bankruptcy Code may be commenced in the federal district court for the district:

> (1) in which the debtor has its principal place of business or principal assets in the United States;
>
> (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or
>
> (3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

28 U.S.C. § 1410.  Section 1409 of the Judicial Code governs venue of proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code and provides, in relevant part, that such a proceeding "may be commenced in the district court in which such case is pending."  *Id.* § 1409(a).

The Court's conclusion that it has subject matter jurisdiction over the Section 423 Claim

is bolstered by the following additional observations.  First, section 423(4) of the Insolvency Act

appears to be a procedural venue provision clarifying where a section 423 claim may be brought

in the UK.  (*See* Moss Decl. ¶ 7.)  While the Court is bound to apply the substantive law of the

UK to adjudicate the Section 423 Claim, it is not bound to follow UK procedural law.  *See, e.g.*,

*Bournias v. Atl. Mar. Co.*, 220 F.2d 152, 154 (2d Cir. 1955) ("In actions where the rights of the

parties are grounded upon the law of jurisdictions other than the forum, it is a well-settled

conflict-of-laws rule that the forum will apply the foreign substantive law, but will follow its

own rules of procedure." (citing RESTATEMENT OF CONFLICT OF LAWS § 585 (1934); JOSEPH H.

BEALE, THE CONFLICT OF LAWS § 584.1 (1935); GEORGE WILFRED STUMBERG, PRINCIPLES OF

CONFLICT OF LAWS 134 *et seq.* (2d ed. 1951))); *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624

F. Supp. 2d 292, 307 (holding that substantive law of Pennsylvania but procedural law of the U.S

District Court for the Southern District of New York governed claims because "[a] court usually

applies its own local law rules prescribing how litigation shall be conducted even when it applies

the local law rules of another state to resolve other issues in the case" (citing RESTATEMENT

(SECOND) OF CONFLICT OF LAWS § 122 (1971))).[25]

Second, neither Isaacs nor Moss has identified any English decision indicating that

section 423(4) is an exclusive jurisdiction provision.  However, even if section 423(4) were an

exclusive jurisdiction provision, this Court is not bound to enforce it.  *See, e.g., Randall v.*

---

[25]   The Court in *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), held that "[e]xcept in matters
governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the
state." *Erie*, 304 U.S. at 78.  Simply put, the *Erie* doctrine requires "federal courts sitting in diversity [to] apply state
substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).
However, the *Erie* doctrine is not limited to federal courts sitting in diversity.  Rather, the *Erie* doctrine applies,
"whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law." *Maternally
Yours v. Your Maternity Shop*, 234 F.2d 538, 540 n.1 (2d Cir. 1956) (citations omitted); *cf. In re Coudert Bros. LLP*,
673 F.3d 180, 187 (2d Cir. 2012) (noting that *Erie* clarified that "state law provides the rules of decision for the
*merits* of state law claims in bankruptcy court" (citing *Erie*, 304 U.S. at 77)).

*Arabian Am. Oil Co.*, 778 F.2d 1146, 1152–53 (5th Cir. 1985) (refusing to enforce exclusive

jurisdiction provision of Saudi Arabian labor law statute); *Seismic Reservoir*, 785 F.3d at 334

(holding that exclusive jurisdiction provision of Canadian statute did not divest the district court

of jurisdiction to adjudicate claim alleged under such statute); RESTATEMENT (SECOND) OF

CONFLICT OF LAWS § 91 ("A state may entertain an action even though the state of the applicable

law has provided that action on the particular claim shall not be brought outside its territory.").

Consequently, the Section 423 Claim is not futile on the basis that the Court lacks subject matter

jurisdiction over such claim.

> b.    Resolution of the Section 423 Claim by this Court Is Consistent
> with the UK's Cross-Border Insolvency Regulations

The United Nations Commission on International Trade Law ("UNCITRAL") proposed

the adoption of a model law on cross-border insolvency in 1997 (the "Model Law"). *See* G.A.

Res. 52/158, annex, Model Law on Cross-Border Insolvency of the United Nations Commission

on International Trade Law (Dec. 15, 1997). The Model Law was developed in an effort to

address unpredictable and efficient procedures for dealing with international insolvency

proceedings. *See* Tristan G. Axelrod, *UK Supreme Court Highlights Parochial Roadblocks to

Cooperative Cross-Border Insolvency in* Rubin v. Eurofinance SA, 31 WIS. INT'L L.J. 818, 825

(2014). Under the Model Law, a central authority is granted administrative powers over the

debtor's estate; debtors and creditors are encouraged "to then file ancillary proceedings in

foreign countries." *Id.* "Issues in these ancillary proceedings can be litigated and assets can be

administered in a manner consistent with the laws of the debtor's 'centre of main interests' []."

*Id.*

The U.S. and the UK each adopted versions of the Model Law. *See id.* at 820. "In 2005,

Congress adopted chapter 15 of the Bankruptcy Code, which is based on the Model Law . . . ."

*In re Atlas Shipping A/S*, 404 B.R. 726, 732–33 (Bankr. S.D.N.Y. 2009).  In 2006, the UK

adopted the Cross-Border Insolvency Regulations 2006 (the "CBIR"), also based on the Model

Law.  *See* Cross-Border Insolvency Regulations 2006, SI 2006/1030, ¶ 2(1) (hereinafter CBIR);

*see also Hosking I*, 524 B.R. at 524 (noting that the CBIR is UK's equivalent to chapter 15 of the

Bankruptcy Code).  The CBIR incorporates a modified version of the Model Law and has the

force of law in the UK.  CBIR, sch. 1 (hereinafter UK Model Law).

In advancing their argument that the Court cannot adjudicate the Section 423 Claim, the

Defendants ignore that the CBIR trumps British insolvency law where the two conflict.

Specifically, the CBIR modifies British insolvency law as follows:

> (1)   British insolvency law (as defined in article 2 of the
> UNCITRAL Model Law as set out in Schedule 1 to these
> Regulations) and Part 3 of the Insolvency Act 1986 shall apply
> with such modifications as the context requires for the purpose of
> giving effect to the provisions of these Regulations.
>
> (2)  In the case of any conflict between any provision of British
> insolvency law or of Part 3 of the Insolvency Act 1986 and the
> provisions of these Regulations, the latter shall prevail.

CBIR ¶ 3.  The UK Model Law defines "British insolvency law" in relevant part as "provision

extending to England and Wales and made by or under the Insolvency Act 1986 (with the

exception of Part 3 of that Act) or by or under that Act as extended or applied by or under any

other enactment (excluding the[] [CBIR]) . . . ."  UK Model Law, art. 2(a)(i).  Accordingly, to

the extent that Section 423(4) of the Insolvency Act conflicts with the CBIR, the CBIR prevails.

*See* CBIR ¶ 3(2).

If section 423(4) were an exclusive jurisdiction provision, as the Defendants suggest, but

which the Court rejects, it would conflict with the CBIR.  Article 1 of the UK Model Law

provides in relevant part that the CBIR applies where "assistance is sought in a foreign State in

connection with a proceeding under British insolvency law . . . ." UK Model Law, Art. 1, ¶ 1(b).

Additionally, Article 5 of the UK Model Law provides that "[a] British insolvency officeholder

is authorised to act in a foreign State on behalf of a proceeding under British insolvency law, as

permitted by the applicable foreign law." *Id.* art. 5. The Plaintiffs filed the Adversary

Proceeding in this Court—a foreign court—in connection with Hellas II's proceeding under

British insolvency law and to obtain personal jurisdiction over the Defendants. The Plaintiffs, as

the Joint Compulsory Liquidators of Hellas II, fall within the definition of "British insolvency

officeholder." *See id.* Art. 2(b)(ii) (including within definition "a person acting as an insolvency

practitioner within the meaning of [S]ection 388" of the Insolvency Act); Insolvency Act 1986,

c. 45, § 388(1)(a) (Eng.) (including within definition a company's "liquidator"). The Plaintiffs

allege various avoidance claims under foreign law, which may be adjudicated by this Court

under chapter 15 of the Bankruptcy Code. *See* 11 U.S.C. § 1521(a)(7) (permitting court to grant

foreign representative "any additional relief that may be available to a trustee, except for relief

available under sections 522, 544, 545, 547, 548, 550, and 724(a)"); *Fogerty v. Petroquest Res.,

Inc. (In re Condor Ins. Ltd.)*, 601 F.3d 319, 329 (5th Cir. 2010) (holding that section 1521(a)(7)

of the Bankruptcy Code does not preclude court from adjudicating claims under foreign

avoidance law). To the extent that section 423(4) would preclude the Plaintiffs from seeking

relief on their Section 423 Claim in this Court, it conflicts with the CBIR's provisions

authorizing the Plaintiffs to act "on behalf of a proceeding under British insolvency law" in the

U.S. "as permitted by" U.S. law. UK Model Law, art. 5. Consequently, even if section 423(4)

were an exclusive jurisdiction provision, it would be trumped by the provisions of the CBIR.[26]

---

[26]      Unlike the issue in *Sunnyside*, 2008 WL 4450328, where the court concluded that section 426(4) of the
Insolvency Act, which provides that a UK court shall assist courts in foreign countries, does not provide jurisdiction
for a foreign court to adjudicate a claim under section 423, this case raises a different issue under UK Model Law,
Art. 1, ¶ 1(b), which provides authority for a foreign court to assist UK courts in insolvency proceedings.

The Defendants argument, if successful, would effectively mean that the Joint Compulsory

Liquidators could not recover undervalue transfers if personal jurisdiction could not be obtained

against the transferee defendants in the High Court in the UK.  The Model Law as adopted in the

UK and the US was designed to prevent such a result.

> c.    The Court Can Grant Relief under Section 423 of the Insolvency
> Act

In the Section 423 Defendants' Letter, the Defendants against whom the Section 423

Claim is asserted advance a new theory why the Section 423 Claim is futile.  According to these

Defendants, the Section 423 Claim would not survive a motion to dismiss for failure to state a

claim upon which relief can be granted because "Section 423 . . . empowers only certain courts

to grant the remedies set forth in the statute and . . . this Court is not among the courts

empowered under Section 423 to grant the remedies Plaintiffs seek."  (Section 423 Defs.' Letter

at 1.)  To support this argument, the Defendants attach the Ninth Circuit's recent *Seismic

Reservoir* decision.

In *Seismic Reservoir*, a California corporation asserted federal and state law claims

against a California shareholder and director of the plaintiff's Canadian parent company.

*Seismic Reservoir*, 785 F.3d at 332.  The defendant asserted various counterclaims against two

Canadian directors of the plaintiff under state and foreign law, including a counterclaim for

shareholder oppression under section 242 of the Alberta Business Corporations Act (the "Alberta

Act").  *See id.*  The district court dismissed the Alberta Act counterclaim for lack of subject

matter jurisdiction, finding that "the Alberta Act vested exclusive jurisdiction in the Court of the

Queen's Bench of Alberta."  *Id.*  On appeal, the Ninth Circuit held that the district court erred in

dismissing the counterclaim for lack of jurisdiction but affirmed the judgment of dismissal on the

grounds that the "counterclaim arising under the Alberta Act d[id] not raise a cause of action for which the district court could grant relief." *Id.* at 333. Specifically, the Ninth Circuit held that the district court had jurisdiction over the Alberta Act counterclaim under section 1332 of the Judicial Code, and the Alberta Act's exclusive jurisdiction did not divest the district court of its jurisdiction because foreign law does not dictate the subject matter jurisdiction of U.S. courts. *See id.* at 334–35. The Ninth Circuit concluded that dismissal was nonetheless appropriate under FRCP 12(b)(6) because the Alberta Act "provided a remedy available only through 'the Court of Queen's Bench of Alberta,'" *id.* at 335 (quoting Business Corporations Act, R.S.A. 2000, c. B-9, s. 1(m) (Can.)), and therefore "the counterclaim . . . [wa]s one upon which no relief could be granted by the district court," *id.*

This Adversary Proceeding is distinguishable from *Seismic Reservoir* in several respects. First, the counterclaim at issue in *Seismic* arose under a Canadian corporate governance statute, not section 423 of the Insolvency Act. While the Ninth Circuit noted that Canadian law conclusively established that "only an Alberta Court has jurisdiction to grant a remedy for oppression brought in respect of an Alberta corporation," *id.* at 333, the Court has been unable to locate any equally determinative UK precedent addressing whether section 423(4) is an exclusive jurisdiction provision. Second, it is not clear whether section 242 of the Alberta Act has extraterritorial effect. Section 423 of the Insolvency Act, on the other hand, does apply extraterritorially if the transactions to be avoided bear a sufficient connection with the UK. *See Concept Oil Servs. Ltd. v. En-Gin Grp. L* [2013] EWHC (Comm) 1897 [77] (Eng.); *accord Fortress Value Recovery Fund I LLP v Blue Skye Special Opportunities Fund LP* [2013] EWHC (Comm) 14 [113]–[114] (Eng.). Third, and significantly, *Seismic* did not involve chapter 15 of the Bankruptcy Code, the purpose of which is to provide means to facilitate cooperation between

U.S. and foreign courts and efficiently administer cross-border insolvencies.  *See* 11 U.S.C.

§ 1501(a).  Finally, the Court concludes that it can grant relief upon the Section 423 Claim

Where a person has entered into an undervalue transaction, section 423(2) provides that

the court may make an order to "(*a*) restor[e] the position to what it would have been if the

transaction had not been entered into, and (*b*) protect[] the interests of persons who are victims of

the transaction."  Insolvency Act 1986, c. 45, § 423(2).  Additionally, section 425 provides a

non-exhaustive list of provisions that may be included in an order made under section 423.  *See*

*4Eng Ltd. v. Harper* [2009] EWHC (Ch) 2633 [12] (Eng.).  Specifically, section 425(1) provides:

> Without prejudice to the generality of [S]ection 423, an order made under that section with respect to a transaction may (subject as follows)—
>
> (*a*) require any property transferred as part of the transaction to be vested in any person, either absolutely or for the benefit of all the persons on whose behalf the application for the order is treated as made;
>
> (*b*) require any property to be so vested if it represents, in any person's hands, the application either of the proceeds of sale of property so transferred or of money so transferred;
>
> (*c*) release or discharge (in whole or in part) any security given by the debtor;
>
> (*d*) require any person to pay to any other person in respect of benefits received from the debtor such sums as the court may direct;
>
> (*e*) provide for any surety or guarantor whose obligations to any person were released or discharged (in whole or in part) under the transaction to be under such new or revived obligations as the court thinks appropriate; [and]
>
> (f) provide for security to be provided for the discharge of any obligation imposed by or arising under the order, for such an obligation to be charged on any property and for such security or charge to have the same priority as a security or

> charge released or discharged (in whole or in part) under
> the transaction.

*Id.* § 425(1).  While it is not clear that the Court could grant all the relief enumerated in section

425(1), it does not follow that—consistent with section 423(2)—the Court cannot order the

avoidance and recovery of assets transferred by Hellas at an undervalue if they are located in the

U.S.  Furthermore, the CBIR specifically contemplates a foreign court providing assistance to a

UK court "where assistance is sought in connection with a proceeding under British insolvency

law." UK Model Law, Art. 1, ¶ 1(b).  Chapter 15 expressly provides that the foreign

representatives may be entrusted with the "realization of all or part of the debtor's assets in the

United States."  11 U.S.C. § 1521(a)(5); *see also id.* § 1521(b) (permitting entrusting distribution

of debtor's assets in the U.S. to the foreign representative).  A judgment entered in a foreign

representative's avoidance action in the U.S. will be enforced in the UK under common law

principles if the defendant appears in the action.  *See Rubin v. Eurofinance SA* [2010] UKSC 46

[6]–[10] (Eng.) (holding that avoidance orders made in insolvency proceedings by foreign court

will not be enforced in the UK unless the defendant was present in the foreign country when the

proceedings were commenced or submitted to the foreign court's jurisdiction).  Based on the

foregoing, the Court concludes that the Section 423 Claim is not futile—the Court can grant

relief under section 423 of the Insolvency Act.

> d.    The Plaintiffs Need Not Plead the Inapplicability of Section 425(2)
>       of the Insolvency Act

"The pleading requirements in the Federal Rules of Civil Procedure . . . do not compel a

litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to

affirmatively plead facts in avoidance of such defenses."  *Abbas v. Dixon*, 480 F.3d 636, 640 (2d

Cir. 2007) (citing *Jones v. Bock*, 549 U.S. 199 (2007)); *see United States ex rel. Maritime Admin.*

*v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 889 F.2d 1248, 1254 (2d Cir. 1989) (holding that

plaintiff was not required to plead that defendant affirmative defense because FRCP 8(c)

"imposed upon [the defendant] the burden of pleading it"); *Gomez v. Toledo*, 446 U.S. 635, 640

(1980) (holding that plaintiff did not have burden of pleading lack of defendant's qualified

immunity to state a civil rights claim under 42 U.S.C. § 1983, finding that "[s]ince qualified

immunity is a defense, the burden of pleading it rests with the defendant" (citation omitted)).  A

statutory exception constitutes an affirmative defense, which the defendant has the burden of

pleading.  *Rosen v. Brookhaven Capital Mgmt., Co., Ltd.*, 194 F. Supp. 2d 224, 227 (S.D.N.Y.

227 (S.D.N.Y. 2002).  Moreover, a defendant, not plaintiff, bears the burden of proof with

respect to good faith transferee affirmative defenses to fraudulent transfer actions under New

York law and the Bankruptcy Code.  *See Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452

B.R. 391, 445–51 (Bankr. S.D.N.Y. 2011) (holding that defendants bear burden of proof

regarding good faith affirmative defenses under the NYDCL and section 548 of the Bankruptcy

Code); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou

Grp., LLC)*, 439 B.R. 284, 303 (S.D.N.Y. 2010) ("[The plaintiff] was not obligated to plead and

prove that [the defendants] had received their redemption payments in bad faith.  Instead, [the

defendants] had the obligation under Section 548(c) [of the Bankruptcy Code] to prove their

good faith as an affirmative defense." (citing *Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re

Sharp Int'l Corp.)*, 403 F.3d 43, 54–55 (2d Cir. 2005))); *Gredd v. Bear, Stearns Sec. Corp. (In re

Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002) ("[S]ection 548(c) [of the

Bankruptcy Code] designates the transferee's good faith as an *affirmative defense* which may be

raised and proved by the transferee at trial." (citing 11 U.S.C. § 548(c))).  *But see Silverman v.

Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 802 (Bankr. S.D.N.Y. 2005)

(citing *United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994)) (observing that plaintiff has

burden of proof on element of transferee's lack of good faith under the NYDCL's constructive

fraudulent transfer provision, "since it is essential to a finding of fair consideration," an element

of the claim).

According to the Plaintiffs' expert on UK law, English law recognizes a general bona

fide purchaser defense, which must be pleaded and proved by the defense.  (Moss Decl. ¶ 14.)

This bona fide purchaser defense was codified in section 241(2) of the Insolvency Act and

applies to actions to set aside undervalue and preference transactions.  (*Id.* ¶ 15.)  Section 425(2)

reflects "a similarly worded statutory defense," which "is described in a standard annotated

version of the statute as 'protection for bona fide purchasers for value and without notice.'"  (*Id.*

(quoting LEN SEALY & DAVID MILMAN, ANNOTATED GUIDE TO THE INSOLVENCY LEGISLATION

492 (16th ed. 2013)).)  While Moss acknowledges that he is not aware of any case interpreting

whether section 425(2) constitutes an affirmative defense (*see id.* ¶ 18), the English Court of

Appeal has held that the comparable defense set forth in section 241(2) must be pleaded by the

defendant (*see id.* ¶ 19 (citing *Re Sonatacus Ltd* [2007] EWCA (Civ) 31 (Eng.), [2007] BCC

186.)  According to Moss, the similar language and structure between section 241(2) and section

425(2) leads him to conclude that section 425(2) "inevitably will have the same interpretation [as

section 241(2)], namely that it provides a defense rather than constituting an element of the

claim, and that the onus is on the defendant to plead and prove good faith within section 425(2)."

(*Id.* ¶ 20.)

In *4Eng Ltd.*, the High Court considered the operation of sections 423 and 425—a novel

issue of law.  *4Eng Ltd.* [2009] EWHC at [12] (noting that "there is no relevant authority

governing the operation of these statutory provisions").  Justice Sales observed that section

423(2) sets forth the "broad objective" of a remedy for a claim under section 423, and "[a] wide

39

jurisdiction is . . . conferred upon the court to fashion a suitable remedy." *4Eng Ltd.* [2009]

EWHC at [12]. Section 425, on the other hand, provides "[a]n extensive, non-exhaustive list of

the wide range of orders which may be made in pursuit of that objective . . . ." *Id.* Justice Sales

noted that while a transferee's liability under section 423 does not depend on "any particular

mental state or action . . . that does not mean that such matters are irrelevant for defining the

extent of the liability to be imposed, or the order to be made, at the next stage in the analysis,

when the court considers the question of remedy under [section] 423(2) and [section 425]." *Id.*

at [11].

In light of Moss's arguments and Justice Sales's observations in the *4Eng Ltd.* decision,

the Court finds that section 425(2) of the Insolvency Act is either an affirmative defense or a

provision establishing factors for the court to consider in fashioning a remedy under section

423—it does not set forth any elements of a claim under section 423. Thus, the Section 423

Claim is not futile on the basis that the Plaintiffs failed to plead the inapplicability of section

425(2).

### 2.    The Section 213 Claim

Section 213 of the Insolvency Act imposes liability on knowing participants in any

business of a debtor company that was carried on with the intent to defraud creditors or any other

person. *See* Insolvency Act 1986, c. 45, § 213 (Eng.). The Defendants argue that the Section

213 Claim is futile for two reasons: (1) Luxembourg law applies under choice of law principles,

but Luxembourg law has no equivalent to section 213 of the Insolvency Act (*see* Apax Opp. at

5–7; TPG Opp. at 15; DB Opp. at 22); and (2) the Plaintiffs fail to adequately plead that Hellas II

defrauded its creditors by completing the December 2006 CPEC Redemption (*see* Apax Opp.

at 9 n.4; TPG Opp. at 15–16; DB Opp. at 22), or that the Defendants were knowing parties to the

40

alleged fraud (*see* TPG Opp. at 16–18; Apax Opp. at 10–16; DB Opp. at 22).  The Plaintiffs

respond by arguing that England, not Luxembourg, has the greater interest in the application of

its law to the Plaintiffs' claims (Reply at 16–19), and the Section 213 Claim is adequately

pleaded under UK law (*see id.* at 10–16).

a.    UK Law Applies to the Section 213 Claim

First, the parties agree that the Court should apply New York choice of law rules to

determine which jurisdiction's law applies to the Section 213 Claim.  (*See* Apax Opp. at 5–7

(arguing that Luxembourgish law applies under New York choice of law rules); Reply at 17–19

(arguing that UK law applies under New York choice of law rules).)  Under New York choice of

law rules, the Court must first determine whether there is an "actual conflict" between the

relevant laws of the implicated jurisdictions.  *GlobalNet Financial.com, Inc. v. Frank Crystal &

Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (citing *In re Allstate Ins. Co. v. Stolarz*, 613 N.E.2d 639,

937 (N.Y. 1993); *Zurich Ins. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065 (N.Y. 1994)).

An actual conflict exists where such laws provide different substantive rules; the differences

must be relevant to the issue to be determined and have a "significant *possible* effect on the

outcome of the trial."  *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325,

331 (2d Cir. 2005) (emphasis in original) (citations marks omitted).  However, "[i]f no actual

conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply

New York law."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir.

2012) ("Licci I") (citations omitted).

Second, the parties agree that there is an actual conflict between UK law and

Luxembourg law with respect to the Section 213 Claim.  "[W]here there is a conflict of law in

cases involving tort claims, 'New York applies an "interest analysis" to identify the jurisdiction

that has the greatest interest in the litigation based on the occurrences within each jurisdiction, or

41

contacts of the parties with each jurisdiction, that relate to the purpose of the particular law in conflict.'"[27] *Drenis v. Haligannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006)); *see also Geron v. Seyfarth Shaw LLP (In re Thelen LLP)*, 736 F.3d 213, 219 (2d Cir. 2013) ("New York's interest analysis requires that 'the law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict.'" (quoting *GlobalNet*, 449 F.3d at 384))).  For conduct-regulating laws, including fraudulent conveyance statutes, courts generally follow the *lex loci* rule and "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *Drenis*, 452 F. Supp. 2d at 427 (quoting *Pension Comm.*, 446 F. Supp. 2d at 192); *accord Lyman Commerce Solutions, Inc. v. Lung*, Case No. 12-cv-4398 (TPG), 2014 WL 476307, at *3 (S.D.N.Y. Feb. 6, 2014); *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 215–16 (S.D.N.Y. 2002) (holding that Canadian law applied to fraudulent conveyance claim because "the conveyance alleged by [the plaintiffs] to be fraudulent—the transfer of funds held by [one defendant] to the [other defendants]—took place in Canada").

New York choice of law rules do not require an uncompromising adherence to the *lex loci* rule.  *See Golden Archer Invs., LLC v. Skynet Fin. Sys.*, 908 F. Supp. 2d 526, 539 (S.D.N.Y. 2012) (noting that the court "do[es] not blindly follow the *lex loci* rule" in applying the interest analysis to conduct-regulating laws (citations omitted)).  But when the allegedly wrongful conduct occurs in a place different from the place of injury, the Second Circuit dictates that "it is

---

[27]    While it is not clear that the Section 213 Claim is a tort claim, the parties' assume that it is for choice of law purposes.  (*See* Apax Opp. at 6; Reply at 17.)  Accordingly, the Court applies New York's interest analysis to the Section 213 Claim without deciding whether it constitutes a tort claim.

42

the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectation of the parties who relied [on the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50–51 (2d Cir. 2013) ("Licci II") (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684–85 (N.Y. 1985)); *see also Lyman*, 2014 WL 476307, at *3 (concluding that for fraudulent conveyance claims, "the location of injury does not control; instead, it is the location of the defendant's conduct that controls" (citation omitted)).

The Plaintiffs argue that England has the greatest interest in seeing its law applied to the claims alleged in the First Amended Complaint. (Reply at 17.) According to the Plaintiffs, the First Amended Complaint alleges that little material conduct relating to the December 2006 CPEC Redemption occurred in Luxembourg. (*Id.*) Specifically, the First Amended Complaint asserts that: (i) the December 2006 Transaction was planned, authorized, and executed by entities and personnel operating out of England, Italy, Germany, and the U.S., not Luxembourg (*id.* (citing FAC ¶¶ 22–39, 49–57, 86–91, 99–100, 122, 147–178)); (ii) the December 2006 CPEC Redemption was overwhelmingly funded with the proceeds of Sub Notes that were marketed and sold in substantially greater amounts to U.S. and English investors, not Luxembourgish investors (*id.* (citing FAC ¶¶ 163–164)); (iii) the funds raised by Hellas II and its subsidiaries were subsequently transferred among non-Luxembourgish accounts, including accounts in England, Germany, and the U.S. (*see id.* (citing FAC ¶ 167); (iv) with the exception of two Luxembourgish individuals, the majority of the managers who signed the board resolutions authorizing the December 2006 CPEC Redemption were located in England and Italy (*see id.* (citing FAC ¶ 175)); (v) TPG and Apax executives located in England and Italy signed

the redemption agreements authorizing the December 2006 CPEC Redemption (the "Redemption Agreements") (*id.* (citing FAC ¶¶ 173–174)); (vi) the initial transfer from Hellas II to Hellas I and the subsequent transfer from Hellas I to Hellas were made between English bank accounts (*id.* (citing FAC ¶ 168)); and (vii) after passing through a Luxembourgish bank account, the overwhelming proportion of proceeds from the Hellas-entity transfers was disbursed around the world, including to Defendants located in the U.S., England, and Belgium; only €2.5 million and $2.88 million was subsequently distributed in Luxembourg (*id.* at 17–18 (citing FAC ¶¶ 169–170)). Because Luxembourg's relationship to the challenged transfers is relatively insignificant as compared to England and other jurisdictions, the Plaintiffs argue that English law applies. (*See id.* at 18–19.)

The Plaintiffs further contend that the European Union's (the "E.U.") insolvency regime may be considered by the Court. (*Id.* at 19.) Under the policies embodied in the E.U.'s Council Regulation (EC) No. 1346/2000 of 29 May 2000 on insolvency proceedings (the "E.U. Insolvency Regulation")[28]—which has been adopted by England and Luxembourg— Luxembourg would defer to English insolvency law (subject to certain inapplicable exceptions) because Hellas II's insolvency proceedings were opened in the UK. (*See id.*) Accordingly, the Plaintiffs suggest, applying English law to the Section 213 Claim would be consistent with the insolvency regime applicable to both the UK and Luxembourg.

By contrast, the Defendants argue that the choice of law analysis weighs in favor of the application of Luxembourg law because: (1) Hellas II was a Luxembourg entity that had its registered offices in Luxembourg in December 2006 (Apax Opp. at 6 (citing FAC ¶ 113)); (2) Hellas, the entity that authorized Hellas II's participation in the December 2006 Transaction,

---

[28]    Council Regulation 1346/2000, On Insolvency Proceedings, 2000 O.J. (L 160) 1 (EC) (hereinafter E.U. Insolvency Regulation).

also was a Luxembourg entity that had its registered offices in Luxembourg in December 2006

(*see id.* (citing FAC ¶ 113)); (3) Hellas's board of managers included two residents of

Luxembourg (*id.* (citing FAC ¶¶ 19, 113); (4) the non-debtor Hellas entities that redeemed the

CPECs were Luxembourg entities with registered offices in Luxembourg (*id.* (citing FAC

¶ 113)); and (5) the CPECs and the Redemption Agreements are governed by Luxembourg law

and contain forum selection clauses that require litigation to be brought in a Luxembourg court

(*id.* (citation omitted)).  According to the Defendants, the Plaintiffs have effectively conceded

that Luxembourg has a significant interest in the December 2006 Transaction by virtue of the

fact that they brought two other lawsuits relating to the CPEC redemptions in Luxembourg.  (*Id.*

at 6–7.)  Additionally, the Defendants argue that England's interest in the December 2006

Transaction largely stems from the fact that Hellas II's "foreign main proceeding is pending in

the U.K. as a result of [Hellas II]'s change of its 'center of main interests' well after the

December 2006 Transaction was effected."  (*Id.* at 7.)

    While the interest analysis does not clearly favor the application of either jurisdiction's

law, the Court holds that the UK has the greater interest in having its substantive law govern the

Plaintiffs' claims.  At all times relevant to the December 2006 Transaction, Hellas II and its

parent entities were Luxembourg entities with their registered offices in Luxembourg.  (*See* FAC

¶ 113.)  However, the First Amended Complaint alleges that these entities were dormant shelf

companies that did not generate any operating revenues or have any employees.  (*Id.*)  The

nominal registration status of these entities in Luxembourg is not enough to tip the interest

analysis toward the application of Luxembourg law.  *See Thelen LLP*, 736 F.3d at 220 (holding

that partnership's status as a registered California entity did not alter conclusion that New York

law should apply to fraudulent transfer claims).  The Court acknowledges that the First Amended

Complaint alleges that the initial transfers were made between these Luxembourg-based shelf companies (*see id.* ¶¶ 113, 160–161), and the Redemption Agreement authorizing the initial transfer between Hellas II and Hellas I indicated that it was signed in Luxembourg (*see id.* ¶ 173). However, the First Amended Complaint also alleges that the signors of that Redemption Agreement were located in England and Italy when it was executed. (*Id.*) Moreover, the First Amended Complaint alleges that this initial transfer was made between English bank accounts (*see id.* ¶ 168) and was principally funded from the proceeds of the Sub Notes, a substantially greater proportion of which was held by UK custodians than by Luxembourg custodians (*see id.* ¶¶ 160–164). Furthermore, the First Amended Complaint alleges that a substantial amount of the actions relating to the December 2006 Transaction were taken by entities and individuals located in countries outside Luxembourg, including the UK. (*See id.* ¶¶ 23–29, 49–57, 86–91, 99–100, 122, 147–178.)

Finally, it bears mentioning that the application of UK law to the Plaintiffs' claims does not lead to an absurd result under the insolvency regime applicable to both the UK and Luxembourg. To the contrary, applying the substantive law of the UK to the Plaintiffs' claims is consistent with the result militated under the E.U. Insolvency Regulation. While the Court need not apply foreign choice of law rules under the circumstances, *see Hosking I*, 524 B.R. at 521 (citing *Weiss v. La Suisse*, 141 F. App'x 31, 34 (2d Cir. 2005)), it is appropriate to underscore that a UK or Luxembourg court faced with determining which law to apply to the claims at issue would likely conclude that UK law governs, *see* E.U. Insolvency Regulation, art. 4(m) (providing that the law of the state in which a debtor's proceedings are opened determines "the rules relating to the voidness, voidability or unenforceability of legal acts detrimental to creditors"). Consequently, the Section 423 Claim is not futile on choice of law grounds.

b.    <u>Whether the Section 213 Claim is Adequately Pleaded</u>

Section 213 of the Insolvency Act governs fraudulent trading claims and provides:

> (1)  If in the course of the winding up of a company it appears that any business of the company has been carried on with *intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose*, the following has effect.

> (2)  The court, on the application of the liquidator may declare that any persons who were *knowingly parties to the carrying on of the business in the manner above-mentioned* are to be liable to make such contributions (if any) to the company's assets as the court thinks proper.

Insolvency Act 1986, c. 45, § 213 (Eng.) (emphasis added).  A person is a "part[y] to the carrying on of the business" if it "is involved in, and assists and benefits from, the offending business."  *Banque Arabe Internationale d'Investissement SA v. Morris* [2002] B.C.C. 407, 414 (Eng.).  With respect to the scienter element, a plaintiff need not allege that a defendant had actual knowledge of the business's fraudulent purpose to state a claim for fraudulent trading under section 213; however, something more than gross negligence on the part of the defendant is required.  *See Morris v. Bank of India* [2005] EWCA (Civ) 693 [14] (Eng.).  Indeed, liability under section 213 will lie if a defendant has "blind-eye" knowledge of a fraudulent intent to carry on any business of the debtor.  *Id.*  "[B]lind-eye knowledge requires . . . a suspicion that the relevant facts do exist and a *deliberate decision to avoid confirming that they exist*."  *Id.* (emphasis added).  However, blind-eye knowledge is not established where a defendant has an amorphous or speculative suspicion that the relevant facts exist.  *Id.*  "[I]n order for there to be blind-eye knowledge, the suspicion must be *firmly grounded and targeted on specific facts*," and the defendant's "deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has *good reason to believe*."  *Id.* (emphasis added).

47

As a threshold matter, the Defendants argue that the Section 213 Claim is futile because the First Amended Complaint does not adequately plead that Hellas II's business was carried on with fraudulent intent and, therefore, the Defendants necessarily could not be knowing participants to such fraud.  (*See* Apax Opp. at 9 n.4; TPG Opp. at 15–16.)  The Court disagrees. The First Amended Complaint alleges facts giving rise to the strong inference that Hellas II carried on business with the intent to defraud its creditors when it executed the December 2006 CPEC Redemption and the Consulting Fees Transfer.

For instance, the First Amended Complaint alleges that Hellas II carried out the December 2006 CPEC Redemption "in knowing disregard of the fact that [Hellas II] was insolvent or would be rendered insolvent thereby, and of the foreseeable disastrous consequences for [Hellas II] and its creditors, and in particular the holders of the Sub Notes . . . ." (FAC ¶ 210(a).)  Hellas II's intent to defraud creditors through this transaction is further supported by the allegation that the December 2006 CPEC Redemption "was made without fair or adequate consideration because the CPECs were redeemed at a premium of €951.3 million over their aggregate par value."  (*Id.* ¶ 207.)  Moreover, Hellas II allegedly fixed the redemption price for the transaction "without a good-faith, arm's-length determination of market value" (*id.* ¶ 210(c)), and without obtaining an independent appraisal (*id.* ¶ 210(d)).  Additionally, Hellas II allegedly consummated the December 2006 CPEC Redemption and the Consulting Fees Transfer to the detriment of its creditors and "in knowing disregard of the fact that TPG and Apax would improperly benefit" from such transactions.  (*Id.* ¶ 210(i).)

These allegations sufficiently give rise to a strong inference that the December 2006 CPEC Redemption and the Consulting Fees Transfer were carried out with the intent to defraud Hellas II's creditors.  Whether the First Amended Complaint adequately pleads that each

Defendant against whom the Section 213 Claim is asserted was a knowing party to these transactions is a different matter that is examined next as to each Defendant.

### i. The Section 213 Claim against All TPG Defendants Except the TPG Affiliate Defendants

The organizational structure of the TPG Defendants and their relationship to the Hellas entities is complex but important to describe. TPG Capital, the hub of the intricate network of affiliated investment funds, was founded by Bonderman, Coulter, and Price in 1992.[29] (*Id.* ¶ 23.) Bonderman is the President of TPG Capital, and Coulter is the Senior Vice President of TPG Capital. (*Id.* ¶¶ 27, 29.) TPG Capital's founders are also the sole shareholders of TPG Advisors IV, Inc., the general partner of TPG GenPar IV, L.P., which, in turn, is the general partner of TPG Partners IV, L.P. and was a manager of Sponsor TPG Troy LLC until its dissolution. (*Id.* ¶¶ 49–50.) Accordingly, TPG Capital's founders are the sole owners of the TPG Advisors IV Defendant with management control over the other TPG Advisors IV Defendants and Sponsor TPG Troy LLC. (*See id.* ¶¶ 28, 42, 49–52.)

Bonderman and Coulter are also the sole shareholders of T3 Advisors II, Inc. (*Id.* ¶ 53.) Additionally, Bonderman is the President and Chairman of the board of directors of T3 Advisors II, Inc., and Coulter is the Vice President and a member of the board of directors of T3 Advisors II, Inc. (*Id.*) T3 Advisors II, Inc. is the general partner of T3 GenPar II, L.P., which, in turn, is the general partner of each of the other T3 Advisors II Defendants and was the manager of Sponsor T3 Troy LLC until its dissolution. (*See id.* ¶¶ 54–56.) Accordingly, Bonderman and Coulter—two of TPG Capital's founders and the senior management of TPG Capital—are the sole owners, managers, and directors of the T3 Advisors II Defendant with management control over the other T3 Advisors II Defendants and Sponsor T3 Troy LLC. (*See id.* ¶¶ 28, 43, 53–57.)

---

[29]    Price became a Partner Emeritus of TPG Capital in 2006. (FAC ¶ 31.)

Non-party TPG Europe is a London-based limited liability partnership and affiliate of

TPG Capital.  (*See id.* ¶ 23.)  TPG Europe's managing members are two Delaware limited

liability companies, whose sole members are Bonderman and Coulter, respectively.  (*Id.* ¶ 32.)

Non-party Philippe Costeletos ("Costeletos") "was at all relevant times a member and co-head of

TPG Europe, and . . . served as a director of Hellas and TIM Hellas."  (*Id.*)  Non-party Matthias

Calice ("Calice") "was at all relevant times a member of TPG Europe and served as a director of

Hellas, TIM Hellas, and several of the Sponsors."  (*Id.*)  Specifically, Calice was a director of

seven of the eight Sponsors that collectively held all of Hellas's CPECs and common stock.  (*See*

*id.* ¶¶ 42–47.)

Altogether, TPG Defendants were members of only two of the eight Sponsors:  TPG

Troy LLC and T3 Troy LLC.  (*See id.* ¶¶ 42–43.)  No TPG Capital Defendant was directly a

member of these Sponsors; however, all of TPG Capital's founders are the sole shareholders of

the TPG Advisors IV Defendant with management control over Sponsor TPG Troy LLC (*see id.*

¶¶ 28, 42, 49–52), and Bonderman and Coulter are the sole shareholders of the T3 Advisors II

Defendant with management control over Sponsor T3 Troy LLC (*see id.* ¶¶ 28, 43, 53–57).

The board of managers of Hellas—Hellas II's ultimate parent entity—consisted of six

non-party individuals, only two of which—Calice and Costeletos—are affiliated with TPG

Capital by virtue of their membership and management roles in TPG Europe.  (*See id.* ¶¶ 19, 32.)

The board of directors of TIM Hellas—Hellas II's subsidiary operating company—was

comprised of ten members, again, only three of which—Calice, Costeletos, and Vincenzo

Morelli—are affiliated with TPG Capital.  (*See id.* ¶¶ 32, 122.)

Having laid out the complicated organizational structure of the TPG Defendants and their

relationship to the Hellas entities, the Court now turns to the allegations in the First Amended

Complaint concerning the TPG Defendants against whom the Section 213 Claim is asserted to determine whether the Section 213 Claim is adequately pleaded.

The First Amended Complaint alleges that "the operations of TPG Capital and its affiliates, including TPG Europe, have been governed by a unified management at all relevant times." (*Id.* ¶ 24.)  All partners of TPG Capital and TPG Europe are permitted to participate in the "Investment Review Committee, which considers investment recommendations concerning TPG's investments from acquisition through exit" (*id.*), and, at all relevant times, all final decisions concerning TPG's investments, including the investments in TIM Hellas and Q-Telecom, were allegedly made by the vote of TPG's founders, including Bonderman, Coulter, and Price (at least until Price became Partner Emeritus in 2006) (*id.*).  Moreover, TPG's Investment Review Committee was allegedly presented with the December 2006 Transaction in early December 2006.  (*Id.*)  On December 16, 2006, Vincenzo Morelli, an employee of an unidentified TPG entity, wrote Coulter an email "warning of the precarious position in which [Hellas II] would find itself upon execution of the December 2006 Transaction . . . ."  (*Id.* ¶ 159.)  "Upon information and belief," TPG Capital—through its founders Bonderman, Coulter, and Price—approved TPG's participation in the December 2006 Transaction.  (*Id.*)

Hellas—as sole manager and general partner of Hellas II—adopted board resolutions approving the December 2006 CPEC Redemption on December 18, 2006 (the "December 18 Resolutions"), which were executed by the members of Hellas's board of managers, including Calice and Costeletos.  (*See id.* ¶ 175.)  The December 18 Resolutions set forth that Hellas II "intends to participate in a new refinancing of the existing indebtedness . . . the proceed[s] of which shall be used for the repayment of existing deeply subordinated shareholder loans."  (*Id.* ¶ 176.)  The December 18 Resolutions also recited that the "Optional Redemption Price" for the

redemption of CPECs would be set by the board "based on the equity value of [Hellas II] and its Subsidiaries on an arm's length basis." (*Id.*) However, no meeting of the board to determine the Optional Redemption Price was allegedly held and no arm's length determination of the Optional Redemption Price was ever made. (*See id.* ¶ 176–179.) Instead, KPMG LLP ("KPMG") allegedly reverse engineered the Optional Redemption Price based on "an invented enterprise value" of Hellas II supplied by Tanguy Serra ("Serra"), an employee of an unidentified TPG entity.[30] (*Id.* ¶ 178.)

Subsequently, the December 2006 CPEC Redemption was completed. To redeem the CPECs issued by Hellas II to Hellas I, the entities entered into a redemption agreement dated December 21, 2006 (the "Hellas I Redemption Agreement"). (*Id.* ¶ 173.) "The Hellas Redemption Agreement recited that the Optional Redemption Price of €35.82 per CPEC allegedly had been 'determined by the Board of Managers on the basis of the equity value of the Company and its Subsidiaries by resolutions adopted on December 18, 2006.'" (*Id.*) Calice— along with Giancarlo Aliberti ("Aliberti") of Apax Partners—executed the Hellas I Redemption Agreement on behalf of Hellas II and Hellas I. (*Id.*) To redeem the CPECs issued by Hellas to the Sponsors, the entities entered into a separate redemption agreement dated December 21, 2006 (the "Sponsor Redemption Agreement"). (*Id.* ¶ 174.) "The Sponsor Redemption Agreement likewise recited that the Optional Redemption Price of €35.57 per CPEC allegedly had been 'determined by the Board of Managers on the basis of the equity value of the Company and its Subsidiaries by resolutions adopted on December 18, 2006.'" (*Id.*) Again, Calice and Aliberti executed the Sponsor Redemption Agreement on behalf of Hellas and each Sponsor. (*Id.*)

---

[30]    The First Amended Complaint does not specify which TPG entity Serra was employed by or whether it was a TPG Defendant as opposed to TPG Europe. However, because Serra is not a Defendant, he presumably was employed by non-party TPG Europe.

The Sponsors managed by entities owned by the TPG Capital Defendants received nearly €400 million in cash proceeds from the December 2006 CPEC Redemption. (*See id.* ¶¶ 42–43.) TPG Troy LLC received approximately €352,934,646, and T3 Troy LLC received approximately €46,667,144. (*See id.*) Ultimately, Bonderman, Coulter, and Price each received cash proceeds from these amounts. (*See id.* ¶¶ 28, 30–31.) TPG Capital also received €495,000 from the Consulting Fees Transfer. (*Id.* ¶ 191.)

Accepting all the alleged facts as true, the Court concludes that the First Amended Complaint pleads facts giving rise to the strong inference that each of the TPG Defendants had the requisite scienter to support liability under section 213 of the Insolvency Act. While TPG's active participation in the December 2006 Transaction was primarily taken through the actions of non-party TPG Europe's employees, TPG Capital and TPG Europe share a unified management. Moreover, the TPG Defendants against whom the Section 213 Claim is asserted include TPG Capital, its founders and top executives, and entities they wholly own and control. The December 2006 Transaction was allegedly submitted to these ultimate decision makers for approval and received their blessing, notwithstanding that concerns regarding the quantum of debt involved in the transaction and the "crisis and setback [that needed] to be absolutely avoided" were shared with one of TPG Capital's co-founders. (*Id.* ¶ 159.) These shared concerns raise a strong inference that the TPG Defendants' top brass had a factual basis to suspect that Hellas II was carrying on business with a fraudulent purpose through the December 2006 Transaction, but the TPG Defendants turned a blind eye to this suspicion. Consequently, the Court concludes that the First Amended Complaint adequately pleads a Section 213 Claim against the applicable TPG Defendants.

###### ii.    The Section 213 Claim against Apax NY

The First Amended Complaint alleges that Apax Partners is a London-based private equity firm and "the holding partnership for the worldwide Apax partnership," of which Apax NY is a part.  (*See id.* ¶ 34.)  Like TPG Capital, "[t]he operations of Apax Partners and Apax [NY] have been governed by a unified management . . . ."  (*Id.* ¶ 35.)  Apax's management consists of a seven-member "Executive Committee," including two executives of Apax NY— John Megrue ("Megrue") and Mitch Truwit ("Truwit").  (*Id.*)  Truwit is co-CEO for the worldwide Apax organization (*id.*), while Megrue is the Chairman of Apax NY and sits on various committees for the global organization, "which consider potential investments and make investment decisions concerning Apax's investments from acquisition through exit, including with respect to Apax's investment in TIM Hellas and Q-Telecom" (*id.* ¶ 39).

On December 4, 2006, Apax's "International Exit Committee"—one of such committees that considers and makes investment decisions—held a meeting to discuss, and ultimately approve, "Apax's participation in the December 2006 Transaction."  (*Id.* ¶ 154.)  According to the minutes of this meeting (the "International Exit Committee Minutes," Fischler Decl. Ex. A), Megrue—the Chairman of Apax NY—and the Apax deal team members that helped plan the transaction were in attendance.[31]  (*See* FAC ¶ 154; Fischler Decl. Ex. A.)  Among the Apax deal team members in attendance at the meeting were Frank Ehmer ("Ehmer") and Shashank Singh ("Singh").  (Fischler Decl. Ex. A.)  In a December 2, 2006 email, TPG's Serra emailed Singh

---

[31]    While the First Amended Complaint does not allege that the December 4, 2006 meeting of the Apax International Exit Committee was attended by these deal team members, the minutes of the meeting indicate their attendance.  (*See* Fischler Dec. Ex. A.)  Ordinarily a court cannot consider documents extraneous to a complaint for purposes of determining the sufficiency of the pleadings, *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 15 (2d Cir. 2002), but a document may be considered "where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint," *id.* (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  The Court will consider the minutes of the International Exit Committee's December 4, 2006 meeting because they are integral to the Plaintiffs' allegations regarding the presence of committee members at that meeting and were relied on by the Plaintiffs in drafting the First Amended Complaint.  (*See* Reply at 14 (citing Fischler Decl. Ex. A).)

and indicated that the parties were "putting the business under huge pressure to take [their] money out a few months early." (FAC ¶ 152.) Additionally, during a conference call among DB, TPG, and Ehmer in the days preceding the December 4 meeting, the parties discussed the "[c]oncern . . . that an aggressive recap overburdens the company and risks the equity at a 2 year exit," as memorialized in a December 3, 2006 email from David Bugge ("Bugge"), an employee of DB. (FAC ¶ 153.) As a result of this concern, Bugge wrote that the "[b]alance seems to be going away from a mega recap to doing a smaller recap of around 500m [euro]." (*Id.*) The International Exit Committee Minutes reflect that two alternative recapitalization proposals were considered along with the relative risks and rewards. (*See* Fischler Decl. Ex. A.) However, "TPG and Apax nonetheless decided to execute the December 2006 Transaction with the largest quantum of debt available, putting the interests of themselves and their investors over [Hellas II] and its creditors." (FAC ¶ 154.)

These allegations tenuously give rise to a strong inference that Megrue had a suspicion that the December 2006 Transaction was being conducted with a fraudulent purpose but refrained from confirming that this was the case. While these allegations barely plead requisite scienter on the part of Apax NY, they are sufficiently particular in light of the fact that the depositions of "Megrue, Singh, and Bugge—all noticed and awaiting proposed dates from [the] Defendants—remain to be conducted." (Reply at 16.) Accordingly, the Court holds that the Section 213 Claim is not futile against Apax NY.

### iii.        The Section 213 Claim against DB

The First Amended Complaint alleges that DB prepared a presentation for TPG and Apax on October 17, 2006, which proposed that "'[a]s an alternative to the current ongoing sale process,' they 'aggressively recapitalise [sic] the business' to 'allow for significant distributions to shareholders.'" (FAC ¶ 149.) DB's presentation offered two refinancing options: one

proposal that would provide a €746 million distribution to CPEC holders with Hellas II bearing

€2.8 billion in total debt, and another proposal that would provide a €531 million distribution to

CPEC holders at a €2.5 billion total debt load.  (*Id.*)  On the same date, Apax's Ehmer responded

to DB by email:  "Come on – we love you guys.  Even more so if you up your proposal to €3bn."

(*Id.* ¶ 150.)  Ehmer sent another email to DB on October 20, 2006, indicating that there was a

reasonable chance that Apax and TPG would pursue a recapitalization and stating "frankly, you

will need to think a bit more about quantum."  (*Id.*)  In response, DB submitted a subsequent

presentation on November 10, 2006, laying out two revised recapitalization options.  (*Id.*)  Each

of the two options would result in Hellas II bearing €2.95 billion in total debt; "'Recap option 1'

and 'Recap option 2' would permit a distribution to CPEC holders of €896 million or €944.3

million, respectively."  (*Id.*)

    As alleged in the First Amended Complaint, TPG and Apax ultimately determined to

trudge forward with the December 2006 Transaction, "despite internal concerns that a debt

quantum and shareholder of th[e] size would risk overleveraging [Hellas II] and render[] it

insolvent."  (*Id.* ¶ 152.)  These concerns were allegedly shared with DB, as evidenced by

Bugge's December 3, 2006 email memorializing a conference call among DB, TPG, and Apax,

in which Bugge wrote that the concern was that the December 2006 Transaction "overburdens

the company" and the "[b]alance seems to be going away from a mega recap to doing a smaller

recap of around 500m [euro]."  (*Id.* ¶ 153.)

    These particularized allegations of DB's scienter are meager.  However, in light of the

fact that "none of the four [DB] personnel that [the] Plaintiffs noticed last year has . . . been

made available for deposition" (Reply at 13), these allegations give rise to a strong inference that

DB had blind-eye knowledge that the December 2006 Transaction was being pursued with a

fraudulent purpose.  The facts alleged support the inference that DB had a suspicion, grounded in

identifiable facts, that Hellas II and its controlling entities had determined to complete the

December 2006 Transaction with the intent to defraud creditors.  Consequently, the Section 213

Claim is not futile as to DB.

### 3.    The Article 1167 Claim

The Plaintiffs plead their Article 1167 Claim in the alternative to the Section 423 Claim

and the Section 213 Claim.  (*See* Motion at 2.)  The Defendants argue that the Article 1167

Claim is futile because the Plaintiffs lack standing.[32]  (*See* TPG Opp. at 18–20; TCW Opp. at 1;

DB Opp. at 22.)  Specifically, the Defendants assert that a claim under article 1167 of the

Luxembourg Civil Code (restated in article 448 of the Luxembourg Commercial Code) belongs

solely to the debtor's creditors.  (*See* TPG Opp. at 18–19.)  While a Luxembourg bankruptcy

receiver (i.e., *curateur*) would have standing to bring such an action on behalf of creditors, the

Plaintiffs have submitted no authority establishing that a receiver or liquidator of a foreign debtor

has standing to bring such an action on behalf of creditors in a foreign court.  (*See id.* at 19.)  The

Plaintiffs acknowledge the truth of the Defendants' premises but reject their conclusion.  The

Plaintiffs assert that they represent the interests of Hellas II's creditors in the same manner a

*curateur* would and, therefore, they "should be treated identically as a matter of Luxembourg

law."  (Reply ¶ 20.)

According to Marc Thewes ("Thewes"), the Plaintiffs' expert on Luxembourg law,

"[a]rticle 1167 . . . is a codification of what is commonly known as the Paulian Action . . . [and]

provides that creditors may on their own behalf, attack transactions made by their debtor in fraud

of their rights."  (Thewes Decl. ¶ 3.)  Thewes asserts that "[t]here is no principle of Luxembourg

---

[32]    TCW also argues that the Article 1167 Claim is not adequately pleaded as to any TCW Defendant.  (*See* TCW Opp. at 12–14.)  Because the Court holds that the Article 1167 Claim is futile for other reasons, it is unnecessary to address this argument.

law or any Luxembourg court judgment of which [he is] aware that would prevent court-appointed liquidators in English insolvency proceedings . . . from likewise bringing a Paulian Action in the collective interest of the creditors . . . ."  (*Id.* ¶ 4.)  To the contrary, pursuant to the E.U. Insolvency Regulation "Luxembourg must recognize the authority of court-appointed liquidators in English insolvency proceedings as on par with the authority of court-appointed receivers in Luxembourgish insolvency proceedings."  (*Id.*; *see id.* Ex. 1, art. 2(a).)  However, Thewes further asserts that under the E.U. Insolvency Regulation, "a court-appointed liquidator in an English insolvency proceeding would not have occasion to rely upon Article 1167 even in secondary proceedings pending in Luxembourg."  (*Id.* ¶ 9.)  Under article 4(2)(m) of the E.U. Insolvency Regulation, "a liquidator appointed in an insolvency proceeding opened in a Member State outside of Luxembourg . . . [must] use the remedies offered by that Member State's insolvency law instead of using Article 1167 of the Civil Code."  (*Id.*; *see* E.U. Insolvency Regulation, art. 4(2)(m).)

As the Court previously held, "[n]othing in schedule 4 of the Insolvency Act, the CBIR, or any U.K. Law presented to the Court by the parties" supports the conclusion that the Plaintiffs, as liquidators, "have the authority to bring *any or all* claims on behalf of [Hellas II]'s creditors."  *Hosking I*, 524 B.R. at 527.  And the Plaintiffs have not provided any further evidence establishing that they have carte blanche authority to bring such claims on behalf of creditors, including the Article 1167 Claim.  Accordingly, the Article 1167 Claim is futile due to the Plaintiffs lack of standing.[33]  The Motion for leave to amend the Complaint to assert the Article 1167 Claim is therefore **DENIED**.

---

[33]    Alternatively, the Article 1167 Claim is futile on choice of law grounds because the Court holds that UK, not Luxembourg, law governs the Plaintiffs' claims.  (*See* discussion *supra* Section B.2.a.)

4.    *The Unjust Enrichment Claim*

The TPG Defendants argue that the Plaintiffs' unjust enrichment claim is futile for a

number of reasons.  First, the unjust enrichment claim would not survive a motion to dismiss for

failure to state claim because the Redemption Agreements governed the challenged transfers, and

an unjust enrichment claim must be dismissed where an enforceable contract governs the subject

of such claim.  (TPG Opp. at 20.)  Second, the unjust enrichment claim would be dismissed

because it merely duplicates the Plaintiffs' other tort-based claims.  (*See id.* at 21–22.)  Third, the

unjust enrichment claim is preempted by section 1521(a)(7) of the Bankruptcy Code, which bars

foreign representatives from seeking the relief available under section 548 of the Bankruptcy

Code.  (*Id.* at 22.)  Because the unjust enrichment claim is virtually identical to an actual

fraudulent transfer claim under section 548 of the Bankruptcy Code, the TPG Defendants argue,

the Plaintiffs seek the same relief available under section 548.  (*Id.*)

Finally, the TPG Defendants renew their argument made in *Hosking II*:  The unjust

enrichment claim is barred by section 546(e) of the Bankruptcy Code, which prohibits the

avoidance of certain types of applicable transfers.  (*See id.* at 23.)  First, the TPG Defendants

acknowledge that in *Hosking II*, the Court adhered to its ruling in *Hosking I* and denied their

motion to dismiss the unjust enrichment claim, holding that section 546(e) does not preempt an

unjust enrichment claim as a matter of law "where . . . the common law claim alleges facts

substantially identical to an *actual* fraudulent conveyance claim under section 548(a)(1)(A) [of

the Bankruptcy Code]."  (*Id.* (citing *Hosking II*, 526 B.R. at 510).)  However, the TPG

Defendants argue that the unjust enrichment claim is not virtually identical to a claim under

section 548(a)(1)(A) because it is based on transfers that occurred beyond section 548's two-year

look-back period.  (*See id.* at 25–26.)  Second, in light of the fact that the Court questioned

whether section 546(e) applies extraterritorially in *Hosking II*, the TPG Defendants argue that

section 546(e) indeed does apply to extraterritorial transfers.  (*See id.* at 27–28.)

The Plaintiffs first assert that their unjust enrichment has already survived the TPG

Defendants' motions to dismiss and for reargument, and none of the TPG Defendants' rehashed

arguments warrant the Court revisiting its prior rulings.  (Reply at 25.)  Second, the Plaintiffs

argue that their unjust enrichment claim is not futile on the basis that the Redemption

Agreements purportedly governed the December 2006 CPEC Redemption because the First

Amended Complaint alleges facts sufficient to put the validity of such contracts in dispute.  (*See

id.* at 26–29.)  Third, the Plaintiffs contend that their unjust enrichment claim need not be

dismissed on the basis that it "duplicates" their tort-based fraudulent transfer claims because they

were pleaded in the alternative.  (*See id.* at 30.)  Fourth, the Plaintiffs argue that section 546(e)

does not preempt their unjust enrichment claim because:  (i) the redemption payments do not fall

within the scope of section 546(e) (*see id.* at 31–32); (ii) section 546(e) does not preempt the

unjust enrichment claim because such claim is virtually identical to a claim under section

548(a)(1)(A) of the Bankruptcy Code (*see id.* at 32–33); and (iii) section 546(e) does not apply

extraterritorially (*see id.* at 33–34).  Finally, the Plaintiffs argue that section 1521(a)(7) of the

Bankruptcy Code does not preempt their unjust enrichment claim because such claim constitutes

a common law claim that exists independently of federal bankruptcy law.  (*See id.* at 34–36.)

a.    The Unjust Enrichment Claim Is Not Futile on the Basis that
Contracts Governed the Subject Matter of the Claim

"It is a general rule under New York law that no claim for unjust enrichment lies where

the subject matter of the claim is covered by a written contract."  *Sofi Classic S.A. de C.V. v.

Hurowitz*, 444 F. Supp. 2d 231, 249 (S.D.N.Y. 2006) (citing *Mathias v. Jacobs*, 238 F. Supp. 2d

556, 571 (S.D.N.Y. 2002)).  However, this general rule only applies "when the existence of a

contract governing the transaction in question is undisputed." *Id.* (citing *Mathias*, 238 F. Supp. 2d at 571); *see Robinson v. Day*, 103 A.D.3d 584, 586–87 (N.Y. App. Div. 2013) (rejecting defendants' argument that unjust enrichment claim fails because contracts cover its subject matter, finding that "there is a bona fide dispute as to the existence of a contract" (quoting *IIG Capital LLC v. Archipelago, L.L.C.*, 36 A.D.3d 401, 405 (N.Y. App. Div. 2007))); *Am. Tel. & Util. Consultants v. Beth Israel Med. Ctr.*, 307 A.D.2d 834, 835 (N.Y. App. Div. 2003) ("[W]here there is a bona fide dispute as to the existence of a contract or where the contract does not cover the dispute in issue, plaintiff may proceed upon a theory of quantum meruit and will not be required to elect his or her remedies." (citation omitted)).

The Court concludes that the First Amended Complaint alleges facts sufficient to put the validity of the Redemption Agreements in dispute. The First Amended Complaint alleges that the Redemption Agreements misrepresent that the Optional Redemption Price to be used for the December 2006 CPEC Redemption was determined by Hellas's board of managers on the basis of the equity value of Hellas II and its subsidiaries when in fact such Optional Redemption Price was reverse engineered from an enterprise value invented by TPG and Apax. (*See* FAC ¶¶ 173–174, 176–178.) The First Amended Complaint also alleges facts plausibly suggesting that the Redemption Agreements are unenforceable for want of consideration by stating that "the December 2006 CPEC Redemption was a dividend or distribution to shareholders devoid of any consideration." (*Id.* ¶¶ 207, 210.) To the extent the TPG Defendants argue that the Consulting Fees Transfer, which is subject to the unjust enrichment claim, is also governed by a valid contract (*see* TPG Opp. at 21), the First Amended Complaint alleges facts suggesting that any such contract also lacked consideration (*see* FAC ¶ 208 ("The Consulting Fees Transfer was

made without fair or adequate consideration, including because TPG and Apax provided no

'consulting' or 'management' services of value to the Company or its subsidiaries.")).

> b.    The Unjust Enrichment Claim Is Not Futile on the Basis that it Is
> Duplicative of the Fraudulent Transfer Claims

"An unjust enrichment claim is not available where it simply duplicates, or replaces, a

conventional contract or tort claim." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185

(N.Y. 2012) (citations omitted) ("Unjust enrichment is not a catchall cause of action to be used

when others fail."); *see Samiento v. World Yacht Inc.*, 883 N.E.2d 990, 996 (N.Y. 2008)

(affirming dismissal of unjust enrichment claim because "plaintiffs have an adequate remedy at

law"). A fraudulent transfer claim shares many features of a claim for unjust enrichment. *See*

*Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC)*, 490 B.R. 84, 99 (Bankr. S.D.N.Y.

2013) ("The doctrine of fraudulent conveyance rests on principles of unjust enrichment."

(quoting RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 48 cmt. a (2011))).

However, FRCP 8(a) provides that "[r]elief in the alternative or of several different types may be

demanded." FED. R. CIV. P. 8(a)(3). Indeed, courts have refused to dismiss unjust enrichment

claims on the basis that they were duplicative of fraudulent transfer claims, noting that "it is

conceivable that the plaintiff could recover under one theory but not the other." *In re Operations*

*NY LLC*, 490 B.R. at 100; *see Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.)*, 387

B.R. 365, 412 (Bankr. E.D.N.Y. 2008) ("While there can be no doubt that the Trustee would not

be entitled to duplicative relief, there similarly is no doubt that at the pleadings stage, a plaintiff

is not required to elect a single theory upon which to proceed."); *cf. Amusement Indus., Inc. v.*

*Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 529–32, 537–38 (S.D.N.Y. 2011) (denying

motions to dismiss unjust enrichment and NYDCL fraudulent transfer claims without addressing

whether such claims were duplicative of one another). The Court holds that the unjust

enrichment claim is not barred as duplicative of the Additional Claims sounding in fraudulent

transfer.  Rather, the unjust enrichment claim is validly pleaded in the alternative to such

Additional Claims pursuant to FRCP 8(a).

> c.    The Unjust Enrichment Claim Is Not Futile on the Basis that
> Section 546(e) of the Bankruptcy Code Bars Such Claim

The TPG Defendants' argument that the unjust enrichment claim is futile because it is

barred under section 546(e) has already been considered and rejected.  The Court declines to

further address this argument under the law of the case doctrine.  *See Sanders v. Sullivan*, 900

F.2d 601, 605 (2d Cir. 1990) ("Under the law of the case doctrine, this court adheres 'to its own

decision at an earlier stage of the litigation' unless there are 'cogent' or 'compelling' reasons not

to, such as 'an intervening change of controlling law, the availability of new evidence, or the

need to correct a clear error or prevent manifest injustice.'" (quoting *Doe v. N.Y.C. Dep't of Soc.*

*Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Young*,

Case No. 91 Civ. 2923 (CSH), 1996 WL 383135, at *1 (S.D.N.Y. July 9, 1996) ("The law of the

case doctrine posits that 'when a court decides upon a rule of law, that decision should continue

to govern the same issues in subsequent stages in the same case" unless the decision "is clearly

erroneous and would work a manifest injustice.'" (quoting *Arizona v. California*, 460 U.S. 605,

618 n.8 (1983))).

> d.    The Unjust Enrichment Claim Is Not Futile on the Basis that
> Section 1521(a)(7) of the Bankruptcy Code Preempts Such Claim

Upon recognition, a foreign representative is entitled to certain mandatory relief pursuant

to section 1520 of the Code and the assistance of the bankruptcy court in administering the

foreign main proceeding.  *See Atlas Shipping*, 404 B.R. at 738–39; 11 U.S.C. § 1520.  Section

1521(a) of the Bankruptcy Code also authorizes the court to grant a foreign representative certain

additional forms of relief upon recognition, including "any additional relief that may be available

to a trustee, *except for* relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."

11 U.S.C. § 1521(a)(7).  In other words, a foreign representative may obtain relief available to a

trustee under the Bankruptcy Code except for the relief available under chapter 5's avoidance

provisions.[34]  *See Metzeler v. Bouchard Transp. Co. (In re Metzeler)*, 78 B.R. 674, 677 (Bank.

S.D.N.Y. 1987) ("[A] foreign representative may assert, under [chapter 15's predecessor statute],

only those avoiding powers vested in him by the law applicable to the foreign estate.").

        This restriction on asserting avoidance actions is unique to chapter 15 of the Bankruptcy

Code.  The UNCITRAL Model Law upon which chapter 15 is based does not include this

exception and instead permits "the recognizing court to grant any appropriate relief and grant[]

standing to the foreign representatives to bring avoidance actions under the law of the

recognizing state[, ] purposefully le[aving] open the question of which law the court should

apply . . . ."  *Condor*, 601 F.3d at 326–27 (citing UNCITRAL, *Model Law on Cross Border

Insolvency*, art. 23 (1997); UNCITRAL, *Guide to Enactment of the UNCITRAL Model Law on

Cross-Border Insolvency*, ¶ 166 (1997)).  During the debates and negotiations that led to the

enactment of the Model Law, the U.S. representatives expressed concerns about the choice of

law issues raised in allowing foreign representatives to bring avoidance actions in the

recognizing court.  *Id.*  The Fifth Circuit has explained that

> [a]voidance laws have the purpose and effect of re-ordering the
> distribution of a debtor's assets, erasing the results of debtor and
> creditor actions in favor of the collective priorities established by
> the distribution statute. . . .  When courts mix and match different
> aspects of bankruptcy law, the goals of any particular bankruptcy
> regime may be thwarted and the end result may be that the final
> distribution is contrary to the result that either system applied alone
> would have reached.

---

[34]     Section 1507 of the Bankruptcy Code also provides that "[s]ubject to the specific limitations stated
elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign
representative under this title or under other laws of the United States."  *Id.* § 1507(a).

*Id*. at 326 (citations omitted).  In an attempt to resolve or address these choice of law issues, the

U.S. prohibits foreign representatives of ancillary chapter 15 cases from bringing avoidance

actions under U.S. law, but permits foreign representatives of chapter 15 cases who have filed a

corresponding plenary chapter 7 or 11 case to bring such claims.  *Compare* 11 U.S.C.

§ 1521(a)(7), *with id*. § 1523(a).  This does not mean, however, that ancillary chapter 15 foreign

representatives are prohibited from bringing *all* avoidance actions—in *Condor*, the Fifth Circuit

held that foreign representatives are entitled to bring avoidance actions under applicable foreign

law.  *Condor*, 601 F.3d at 329.  In so holding, the *Condor* court observed that section

1521(a)(7)'s prohibition on bringing chapter 5 avoidance actions does not necessarily reflect

Congress's intention to deny foreign representatives any avoidance powers supplied under

applicable foreign law.  *Id.* at 324 ("If Congress wished to bar all avoidance actions whatever

their source, it could have stated so; it did not.").

    In any event, the Plaintiffs' unjust enrichment claim is not identical to an avoidance

action, particularly an avoidance action authorized by chapter 5 of the Bankruptcy Code, but

rather is a "standard common law" claim that "exist[s] independently of the bankruptcy."  *In re*

*Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 684 (S.D.N.Y. 2011) (holding that unjust enrichment

claim was a state law claim not created by federal bankruptcy law).  While the unjust enrichment

claim bears close resemblance to the Plaintiffs' Additional Claims sounding in fraudulent

transfer, it is not a cause of action created by chapter 5 of the Bankruptcy Code.  The relief the

Plaintiffs seek in connection with their unjust enrichment claim is similar to the relief available

to a trustee under chapter 5's avoidance powers, but not identical relief.  Through a successful

avoidance action, a plaintiff may void a fraudulent transfer, effectively rendering it as if it never

occurred.  *See* 11 U.S.C. § 544 ("The trustee . . . may avoid any transfer of property of the debtor

or any obligation incurred by the debtor that is voidable . . . ."); *id.* § 548 ("The trustee may

avoid any transfer . . . ."). While a plaintiff may seek rescission of a transfer as a remedy for an

unjust enrichment claim, RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 54,

the primary aim of a claim for unjust enrichment is restitution, *see, e.g.*, *Beth Israel Med. Ctr. v.*

*Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (observing that

an element of a claim for unjust enrichment is "that equity and good conscience require

restitution" (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000))). Furthermore, the

Plaintiffs do not seek avoidance of the December 2006 CPEC Redemption or the Consulting

Fees Transfer in connection with their unjust enrichment claim. Rather, they "seek restitution

from TPG and an order of this Court disgorging all payments, profits, fees, benefits, incentives

and other compensation obtained by TPG as a result of its wrongful conduct." (FAC ¶ 230.) For

all of the above reasons, the Court concludes that the unjust enrichment claim is not futile.

5. *International Comity*

The Defendants argue that the Motion should be denied on the basis of international

comity because the Additional Claims are asserted under foreign law and based on conduct that

occurred overseas. (*See* DB Opp. at 5–8; TPG Opp. at 1 n.1.) According to the Defendants,

given that Hellas II's insolvency proceeding is pending in England, and England has a greater

interest in applying and interpreting its law under the circumstances, the Additional Claims

should proceed before an English court. (*See* DB Opp. at 5–8.) The Plaintiffs argue that the

Defendants effectively seek abstention based on the principle of international comity; however,

federal law explicitly does not permit permissive abstention from an adversary proceeding that is

related to a chapter 15 case. (*See* Reply at 47.) Moreover, according to the Plaintiffs, comity

militates in favor of granting their Motion because: (i) federal courts must exercise the

66

jurisdiction conferred on them (*id.*); (ii) "courts apply international comity in favor of foreign bankruptcy proceedings to protect the interest of the estates and the equitable distribution to creditors" (*id.* at 48 (citation omitted)); and (iii) "courts regularly refuse to abstain from actions where the wrongful conduct occurred abroad" (*id.* (citation omitted)).

The Plaintiffs are correct:  Federal law does not authorize permissive abstention of this Adversary Proceeding.[35]  Section 1334 of the Judicial Code confers jurisdiction over bankruptcy cases.  *See* 28 U.S.C. § 1334(a)–(b).  Section 1334(c)(1) sets forth the circumstances under which a court may abstain from hearing certain types of bankruptcy-related proceedings and provides, in relevant part:

> *Except with respect to a case under chapter 15 of title 11*, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

*Id.* § 1334(c)(1) (emphasis added).  Most courts that have interpreted the exclusionary scope of this provision have held that it applies to "both the Chapter 15 case itself and cases 'arising in or related to' Chapter 15 cases . . . ."  *Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, --- F.3d ---, Case No. 14-30857, 2015 WL 3540718, at *3 (5th Cir. June 5, 2015); *British Am. Ins. Co. Ltd. v. Fullerton (In re British Am. Ins. Co. Ltd.)*, 488 B.R. 205, 239–40 (Bankr. S.D. Fla. 2013) (holding that there is no "provision in federal law permitting abstention from matters arising under chapter 15 or arising in a chapter 15 case"); *Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 452 B.R. 64, 83 (Bankr. S.D.N.Y. 2011), *rev'd on other grounds*, 458 B.R. 665 (S.D.N.Y. 2011) (same).  *But see Abrams v. Gen. Nutrition Cos.*, Civil Action No. 06-1820 (MLC), 2006 WL 2739642, at *7 (D.N.J. Sept. 25, 2006) (holding that

---

[35]     Mandatory abstention is also not applicable because no Defendant has timely moved for abstention.  *See* 28 U.S.C. § 1334(c)(2) ("*Upon timely motion* of a party in a proceeding based upon a State law claim or State law cause of action . . . .") (emphasis added).

section 1334(c)(1) only prevents a court from exercising discretionary abstention over a case

"under" chapter 15, not "an action that is 'related to' a bankruptcy case").

The court in *Abrams* held that section 1334(c)(1) did not limit its discretion to abstain

from hearing a removed state court action related to a chapter 15 case, finding that the statute

only provided an exception to permissive abstention with respect to cases "under" chapter 15 and

the removed "action [wa]s only 'related to', not 'under' th[e] bankruptcy case." *Id.*  However,

the *Abrams* court's analysis has been criticized on the basis that its reading of section 1334(c)(1)

"conflate[d] the terms 'proceeding' and 'case.'"  *In re Fairfield Sentry Ltd.*, 452 B.R. at 83 n.19.

As the *Fairfield Sentry* court correctly observed, "[t]he language of the statute provides that the

case, not the proceeding, exists 'under' title 11; the proceeding still need only 'aris[e] under title

11 or aris[e] in or [be] related to a case under title 11.'"  *Id.* (quoting 28 U.S.C. § 1334(c)(1)).

In *Maxwell Communication Corporation plc v. Barclays Bank plc (In re Maxwell

Communication Corporation plc)*, 170 B.R. 800 (Bankr. S.D.N.Y. 1994), the bankruptcy court

dismissed an adversary proceeding related a case under chapter 15's predecessor, former section

304 of the Bankruptcy Code, holding that international comity militated dismissal of the claims.

*See id.* at 818, *aff'd*, 186 B.R. 807 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2d Cir. 1996) ("Because

I find that English law ought govern, considerations of comity dictate that these suits be

dismissed.").  However, the *Maxwell* decision is inapposite because it predated Congress's

enactment of chapter 15 and the corresponding amendments to section 1334(c) that exclude

chapter 15 cases and related proceedings from permissive abstention.  *See* Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 1501, 119 Stat 23, 215

(2005) (providing that the amendment to section 1334(c) shall take effect 180 days after April

20, 2005 and shall not apply to cases commenced before such date).

68

Since the Court may not abstain from hearing an adversary proceeding related to a case

under chapter 15, the First Amended Complaint is not futile on international comity grounds.[36]

### 6.    *Forum Non Conveniens*

Finally, the Defendants argue that the Motion should be denied as futile because the First

Amended Complaint would be dismissed under the doctrine of *forum non conveniens*.  (*See* TPG

Opp. at 28–35; Apax Opp. at 5 n.2; DB Opp. at 9–16.)  They argue that *forum non conveniens*

dismissal is warranted because the Additional Claims are asserted under foreign law,[37] which

requires the parties to rely on foreign law experts to brief foreign law issues, the Plaintiffs'

choice of forum deserves little or no deference, adequate alternative forums can adjudicate the

Plaintiffs' claims, and the various public and private factors considered in determining whether

to dismiss an action for *forum non conveniens* weigh in favor of dismissal.  (*See* TPG Opp. at

28–35.)  According to the Plaintiffs, courts in the Second Circuit apply a two-step test to

determine whether to dismiss an action for *forum non conveniens*.  (Reply at 36 (citation

omitted).)  Under this two-step test, the defendant bears the burden of demonstrating that:  (i) an

adequate, presently available alternative forum exists; and (ii) the balance of public and private

interest factors militate heavily in favor of such alternative forum.  (*Id.* (citation omitted).)  The

---

[36]    Even if permissive abstention could be applied to an adversary proceeding in a chapter 15 case, the Court would decline to abstain here.  Permissive abstention is a doctrine affording courts discretion whether to abstain from hearing certain matters, but "Courts must be sparing in their exercise of permissive abstention, and may abstain only for a few extraordinary and narrow exceptions."  *CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC*, 396 B.R. 602, 607 (S.D.N.Y. 2008) (internal citations omitted); *accord In re Residential Capital, LLC*, 519 B.R. 890, 903 (Bankr. S.D.N.Y. 2014) ("A federal court must be 'sparing' in its exercise of permissive abstention 'because [it] possess[es] a virtual unflagging obligation . . . to exercise the jurisdiction given [to it].'" (quoting *Kirschner v. Grant Thorton LLP (In re Refco, Inc. Sec. Litig.)*, 628 F. Supp. 2d 432, 446 (S.D.N.Y. 2008))).  Courts in this district commonly consider multiple factors in deciding whether to permissively abstain, *see In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 332 (S.D.N.Y. 2003), many of which are similar to the factors courts apply in considering application of *forum non conveniens*, which is considered and rejected in the next section of this Opinion.
[37]    The unjust enrichment claim is also asserted under foreign law in the alternative.  (TPG Opp. at 30.)

69

Plaintiffs argue that the Defendants have not, and cannot, satisfy their burden of establishing either of these prongs.  (*Id.*)

Whether to dismiss an action on *forum non conveniens* grounds is a decision that "'lies wholly within the broad discretion of the district court' and should be reversed only if 'that discretion has been clearly abused.'"  *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir. 1996) (quoting *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)).  A federal court may act *sua sponte* to dismiss an action on grounds of *forum non conveniens*.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) (discussing the courts' inherent power to dismiss an action *sua sponte* for *forum non conveniens*); *see In re Alcon Shareholder Litig.*, 719 F. Supp. 2d 263, 279 (S.D.N.Y. 2010) (dismissing action *sua sponte* on *forum non conveniens* grounds).  Additionally, a motion to dismiss on *forum non conveniens* grounds may be made at any time.  15 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3828 (4th ed. 2008); *cf. Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 742 (S.D.N.Y. 2001) ("[T]he caselaw seems to be clear that *forum non conveniens* motions are not governed by the same time constraints imposed by Rule 12(h) of the Federal Rules of Civil Procedure on personal jurisdiction and venue motions." (citations omitted)).  However, in evaluating whether a plaintiff's choice of forum is convenient, the court may consider the defendant's delay in bringing a motion to dismiss on the basis of *forum non conveniens*.  *Genpharm Inc. v. Pliva-Lachema a.s.*, 361 F. Supp. 2d 49, 59 (E.D.N.Y. 2005) (citation omitted).

In the Second Circuit, courts apply a three-step analysis to determine whether to dismiss an action for *forum non conveniens*.  *Wilson v. Eckhaus*, 349 F. App'x 649, 650 (2d Cir. 2009) (noting that the Second Circuit adopted a "three-step inquiry" to analyze *forum non conveniens*

dismissal); *see Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73–74 (2d Cir. 2001) (en banc)

(adopting three-step process for determining whether *forum non conveniens* dismissal is

appropriate). First, the court must "determine[] the degree of deference properly accorded the

plaintiff's choice of forum." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d

Cir. 2005) (citing *Iragorri*, 274 F.3d at 73). Second, "after determining whether the plaintiff's

choice is entitled to more or less deference," the court must determine "whether an adequate

alternative forum exists." *Iragorri*, 274 F.3d at 73; *see Wiwa v. Royal Dutch Petroleum Co.*, 226

F.3d 88, 100 (2d Cir. 2000) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981);

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506–07 (1947)). Third, the court must "then balance a

series of factors involving the private interests of the parties in maintaining the litigation in the

competing forums and any public interests at stake." *Wiwa*, 226 F.3d at 100 (citing *Gilbert*, 330

U.S. at 508–09). "The defendant has the burden to establish that an adequate alternative forum

exists and then to show that the pertinent factors 'tilt[] strongly in favor of trial in the foreign

forum.'" *Id.* (quoting *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991));

*see Iragorri*, 274 F.3d at 74–75 ("A defendant does not carry the day simply by showing the

existence of an adequate alternative forum. The action should be dismissed only if the chosen

forum is shown to be genuinely inconvenient and the selected forum significantly preferable.")

a.    Deference to the Plaintiffs' Choice of Forum

A plaintiff's choice of forum is entitled to great deference. *Allstate Life Ins. Co. v. Linter

Grp. Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (citations omitted); *Gilbert*, 330 U.S. at 508

("[U]nless the balance [of factors] is strongly in favor of the defendant, the plaintiff's choice of

forum should rarely be disturbed."). Where a plaintiff has brought an action in its home forum,

courts give the plaintiff's choice of forum substantial deference "because it is presumed to be

convenient." *Iragorri*, 274 F.3d at 71 (citing *Piper*, 454 U.S. at 255–56). A foreign plaintiff's

choice of the U.S. as a forum is entitled to less deference because "it 'is much less reasonable' to presume that the choice was made for convenience." *Id.* (quoting *Piper*, 454 U.S. at 256). "In such circumstances, a plausible likelihood exists that the selection was made for forum-shopping reasons . . . ." *Id.* Even if forum-shopping reasons did not inform the foreign plaintiff's decision to file an action in a U.S. court, "there is nonetheless little reason to assume that it is convenient for a foreign plaintiff." *Id.*

The Defendants argue that the Plaintiffs' choice of forum is entitled to little or no deference because they are foreign liquidators who have "admitted the strategic and tactical bases for filing suit in this jurisdiction, citing to the fact that New York law and the forum were chosen because 'constructive fraud claims no longer were—were never available in the U.K.'" (DB Opp. at 10 (citing Dec. 16, 2014 Hr'g Tr. 29:5–8).) Defendants argue that because the Plaintiffs' choice of forum clearly evidences forum shopping, their choice of forum is entitled to no deference. (*See id.*) Furthermore, the Defendants contend that the UK and Luxembourg are both adequate alternative forums to adjudicate the Plaintiffs' claims. (*See* TPG Opp. at 32–33.) While acknowledging that certain of the U.S.-based Defendants may not be amenable to service of process in these jurisdictions, the Defendants nonetheless assert that "courts regularly condition *forum non conveniens* dismissal on submission to jurisdiction in the alternative forum." (*Id.* at 33 (citing cases).)

The Plaintiffs argue that their choice of forum was motivated by "genuine convenience and should be afforded substantial deference." (Reply at 40.) According to the Plaintiffs, their choice of forum critically permits them "to perfect personal jurisdiction over all 44 Defendants named in the FAC plus the hundreds of additional U.S. transferees who are putative defendant class members." (*Id.*) Additionally, the majority of the proceeds of the December 2006 CPEC

Redemption ultimately "entered the U.S. and is thus potentially available for efficient judgment here." (*Id.* (citation omitted).)  The Plaintiffs contend that the Defendants have not established that all the Defendants and the Transferee Class are subject to foreign personal jurisdiction. (*Id.* at 37–39.)  Moreover, Luxembourg lacks subject matter jurisdiction over the Plaintiffs' avoidance-based claims under the E.U. Insolvency Regulation. (*Id.* at 39 & n.26.)

In determining the degree of deference to be afforded to a foreign plaintiff's choice of a U.S. forum, courts consider various factors to ascertain whether the plaintiff's forum choice was motivated by convenience or instead the desire to forum shop. *See Norex*, 416 F.3d at 155 (citing *Iragorri*, 274 F.3d at 72).  The following factors are generally considered relevant in determining whether the plaintiff's choice of forum was motivated by genuine convenience:  "[1] the convenience of the plaintiff's residence in relation to the chosen forum, [2] the availability of witnesses or evidence to the forum district, [3] the defendant's amenability to suit in the forum district, [4] the availability of appropriate legal assistance, and [5] other reasons relating to convenience or expense." *Id.* (quoting *Iragorri*, 274 F.3d at 72).  "Circumstances indicative of forum shopping . . . include '[1] attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, [2] the habitual generosity of juries in the United States or in the forum district, [3] the plaintiff's popularity or the defendant's unpopularity in the region, or [4] the inconvenience and expense to the defendant resulting from litigation in that forum.'" *Id.* (quoting *Iragorri*, 274 F.3d at 72).

The above factors weigh in favor of granting the Plaintiffs' choice of forum substantial deference.  First, the "[c]ircumstances indicative of forum shopping" are not present here.  There is no evidence that any of the parties are relatively more or less popular here than in any other jurisdiction.  It is likely that the Defendants, who are overwhelmingly U.S.-based entities and

individuals, would suffer less inconvenience and expense litigating in the U.S. than in a

European forum.  Except for the fact that the Plaintiffs' choice of forum was based, in part, on

their mistaken belief that they could assert a constructive fraudulent transfer claim under U.S.

law (*see* Reply at 41), it is not clear that they sought any tactical advantage resulting from local

laws that favor their case.

Second, the factors evidencing a plaintiff's motivation by genuine convenience indicate

that the Plaintiffs' choice of forum was substantially driven by such considerations.  While this

Court is not necessarily convenient in relation to England, the Plaintiffs' residence, the Plaintiffs'

counsel is located in New York.  Moreover, this Adversary Proceeding is related to a chapter 15

case and concerns Hellas II's assets located in the U.S.; it therefore necessarily was brought in

the U.S., and New York is a relatively convenient U.S. forum in relation to England.  The

twenty-three witnesses noticed for depositions are scattered throughout the world; eight

witnesses are located in the U.S., twelve witnesses (including the Plaintiffs) are located in

England, and the remaining three witnesses are located in Austria, Italy, and India.  (Reply at

44.).  The Defendants have allegedly not asserted that any witnesses under their control would be

unavailable to testify at deposition or trial.  (*Id.*)  Nor is there any single forum that appears to

obviate the issue regarding witness availability.  (*Id.*)  In any event, because the Defendants are

"sophisticated global financial institutions . . . for whom producing documents or witnesses in

any forum poses no special inconvenience" (*id.* at 43), this factor is not wholly consequential.

Moreover, the Defendants are subject to personal jurisdiction in this Court and are represented

by capable legal counsel located in New York.  (*Id.* at 41, 43.)  *See Norex*, 416 F.3d at 155–56

(noting that "substantial deference" to a plaintiff's choice of forum is generally appropriate when

"such a choice is made to obtain jurisdiction" over the defendant).  Finally, the Defendants have

not filed a motion to dismiss on *forum non conveniens* grounds more than one year after the

Adversary Proceeding was commenced, notwithstanding that motions to dismiss were briefed,

argued, and decided, and discovery has been overwhelmingly completed.  The Defendants' delay

in moving for *forum non conveniens* dismissal belies their assertion that this Court is not a

convenient forum.

<b>b.     The Existence of an Adequate Alternative Forum</b>

The Defendants have not established that an adequate alternative forum exists.  "An

alternative forum is ordinarily adequate if the defendants are amenable to service of process there

and the forum permits litigation of the subject matter of the dispute."  *In re Monegasque De*

*Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (citing *Piper*, 454 U.S. at

254 n.22).  A court cannot dismiss an action on *forum non conveniens* grounds unless it

"satisf[ies] itself that the litigation may be conducted elsewhere against all defendants."  *PT*

*United Can Co. Ltd. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998) (citing *Blanco v.*

*Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 981 (2d Cir. 1993)).  "If there is no adequate

alternative forum, the inquiry ends, and the motion to dismiss is denied."  *Id.* (citing *Piper*, 454

U.S. at 254 n.22).

The Defendants argue that the UK and Luxembourg are both adequate alternative forums.

(*See* TPG Opp. at 32–33.)  With respect to the UK, two of the Additional Claims are brought

exclusively under UK law, the unjust enrichment claim is asserted in the alternative under UK

law, and the majority of the relevant witnesses and certain Defendants dismissed for lack of

personal jurisdiction are located in the UK.  (*Id.* at 33.)  The Defendants argue that Luxembourg

is an adequate alternative forum because the Plaintiffs have already commenced litigation in

Luxembourg concerning the December 2006 Transaction, the Article 1167 Claim is asserted

75

under Luxembourg law, and the unjust enrichment claim is asserted in the alternative under Luxembourg law.  (*Id.*)

Yet, the Defendants have not established that each Defendant is amenable to service of process in either the UK or Luxembourg; nor have they asserted that they consent to personal jurisdiction in either jurisdiction.  While a defendant's agreement to submit to the jurisdiction of the foreign forum will generally satisfy the requirement that the defendant be amenable to process there, *see DiRenzo v. Phillip Servs. Corp.*, 232 F.3d 49, 57 (2d Cir. 2000), *vacated in part on other grounds*, 294 F.3d 21 (2d Cir. 2002), the Defendants have not agreed to submit to the jurisdiction of either the UK or Luxembourg.  They therefore have failed to establish the existence of an adequate alternative forum at this time.  *See Rio Tinto PLC v. Vale S.A.*, Case No. 14 Civ. 3042 (RMB), 2014 WL 7191250, at *13 (S.D.N.Y. Dec. 17, 2014) ("The Court finds that England is not, in this instance, an adequate alternative forum to New York because, as noted, Defendants Cilins and Touré, who reside in the United States, may not be amenable to service of process by English courts.").

It is important to note, however, that a UK court may very well have personal jurisdiction over DB, a German company that "conducted the majority of its activities in connection with the alleged claims from its London Branch . . . ."  (DB Opp. at 11 n.7.)  Indeed, counsel for DB acknowledged that a UK court would have jurisdiction over DB at the hearing on the Motion. (*See* July 22, 2015 Hr'g Tr. 79:15–17, ECF Doc. # 179.)  While the UK may therefore be an adequate (and even convenient) forum with respect to DB, the Court nonetheless concludes that the claims against DB should not be dismissed on *forum non conveniens* grounds under the circumstances.  First, the Plaintiffs have not filed and "have no current plan" to file an action in the UK against the foreign-based Original Defendants that were dismissed for lack of personal

jurisdiction in *Hosking I.* (*See id.* at 12:6–12.) Accordingly, there is no pending action in the UK to which the action against DB could be transferred. Second, the overwhelming majority of the Defendants—indeed every Defendant except DB—is located in the US and not indisputably subject to personal jurisdiction in the UK. Therefore, dismissing the action as to DB on *forum non conveniens* grounds would force the Plaintiffs to inefficiently litigate the same claims in two different courts, based on the same facts, and supported by the same evidence. At this time, the Court cannot agree that this would be an appropriate result.[38] As a result, for all the above reasons, the Court concludes that the First Amended Complaint is not futile on the basis of *forum non conveniens.*

### C.    Bad Faith

"[W]hile there is little law in the Second Circuit on what constitutes bad faith in the context of a motion for leave to amend a pleading, the precedent that exists indicates that the amendment itself must embody unfair strategic maneuvering." *On Track Innovations Ltd. v. T-Mobile USA, Inc.*, Case No. 12 Civ. 2224 (JCF), 2014 WL 406497, at *5 (S.D.N.Y. Feb. 3, 2014) (internal citations omitted); *see Primetime 24 Joint Venture v. DirecTV, Inc.*, Case No. 99 Civ. 3307 (MHD), 2000 WL 426396, at *5 (S.D.N.Y. Apr. 20, 2000) ("[W]hen the opponent of an amendment asserts that the movant is acting in bad faith, there must be something more than mere delay or inadvertence for the court to refuse to allow amendment." (citations omitted)).

The Defendants argue that the Motion should be denied on the basis that it was filed in bad faith, asserting that the Second Circuit's decision in *State Trading Corporation of India v. Assuranceforeningen Skuld*, 921 F.2d 409 (2d Cir. 1990), is directly on point. (TPG Opp. at 9

---

[38]    The Court does not decide whether *forum non conveniens* dismissal as to DB would be appropriate at a later time if, for instance, the Plaintiffs commenced a similar action in the UK against the Original Defendants that were dismissed for lack of personal jurisdiction in *Hosking I.*

(citing *State Trading*, 921 F.2d at 418).)  The Plaintiffs argue that *State Trading* is
distinguishable and "instead only serve[s] to illustrate that bad faith is absent here."  (Reply at 3.)

In *State Trading*, the Second Circuit held that the district court did not abuse its discretion
in denying a plaintiff's motion for leave to amend its complaint on the basis that the amendment
was unduly delayed and sought in bad faith.  921 F.2d at 417–18.  The plaintiff was an Indian
owner of cargo lost in a capsized ship who asserted claims solely under Connecticut law against
the Norwegian insurer of the Belgian ship owner.  *See id.* at 410–11.  The parties disputed
whether the choice of law provision in the insurance policy governing the dispute required the
application of Norwegian or Panamanian law, *see id.* at 411, but the magistrate judge granted the
defendant summary judgment, finding that, in any event, "it was inappropriate to apply
Connecticut law because the only nexus Connecticut had to the insurance policy was the
presence within the state of [the defendant]'s exclusive U.S. agent," *id.* at 412.  After judgment
was entered, the plaintiff moved for reconsideration and leave to amend its complaint to add
causes of action under Norwegian and Panamanian law.  *Id.*  The district court adopted the
magistrate judge's recommendation that the motion to amend be denied "because of [the
plaintiff]'s unjustified delay in seeking to amend its complaint nineteen months after [the
defendant] first challenged the applicability of Connecticut law."  *Id.*

On appeal, the Second Circuit held that the district court did not abuse its discretion in
denying leave to amend, finding that it was not unreasonable to impute lack of good faith to the
plaintiff for its undue delay in seeking leave to amend.  *Id.* at 418.  The plaintiff's lack of good
faith was further evidenced by the fact that it did not file a proposed amended complaint with its
motion for leave to amend.  *Id.* (citing *Twohy v. First Nat'l Bank of Chi.*, 758 F.2d 1185, 1197
(7th Cir. 1985) (holding that failure to include proposed amended complaint with motion for

78

leave to amend indicates lack of diligence and good faith)).  Additionally, the court gave

credence to the defendant's argument that the plaintiff "deliberately chose not to amend its

complaint earlier to include causes of action based on foreign law because any admission that

foreign law applied to this case would have increased the chance of dismissal on forum selection

clause or *forum non conveniens* grounds."  *Id.*

　　　*State Trading* is distinguishable for a number of reasons.  First, unlike in *State Trading*,

the Plaintiffs arguably had a good faith basis to originally assert NYDCL fraudulent transfer

claims based on transfers made to entities and individuals in the U.S., which were funded with

Sub Notes sold in the U.S. and governed by New York choice of law provisions.  (*See* Compl.

¶¶ 23–40, 49–73, 77–78, 121–122.)  Second, unlike in *State Trading*, there is little to suggest that

the Plaintiffs chose not to seek leave to amend its Complaint to assert the Additional Claims in

order to stymy a potential motion to dismiss on *forum non conveniens* grounds.  In light of the

fact that the Defendants never moved to dismiss for *forum non conveniens* despite having ample

opportunity to do so, it is not clear that the Plaintiffs' failure to originally plead the Additional

Claims was done in order to thwart the prospect of *forum non conveniens* dismissal.  Third,

unlike in *State Trading*, no judgment has been entered by the Court.  Indeed, no summary

judgment motions have yet been filed.  Finally, as set forth below, the Plaintiffs did not unduly

delay seeking leave to amend their Complaint.  While the Plaintiffs clearly could, and perhaps

should, have originally pleaded their claims under foreign law, the fact that they seek to do so

now is not necessarily indicative of bad faith.

## D.    Undue Delay and Undue Prejudice

　　　A party is generally allowed "to amend its pleadings in the absence of a showing by the

nonmovant of prejudice or bad faith."  *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.

1993) (citing *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).

Prejudice is considered in relation to the length of a plaintiff's delay in seeking leave to amend.

*See id.* "[T]he longer the period of an unexplained delay, the less will be required of the

nonmoving party in terms of a showing of prejudice." *Evans v. Syracuse City Sch. Dist.*, 704

F.2d 44, 47 (2d Cir. 1983). In determining whether a defendant is prejudiced by an amendment

adding a claim, courts in the Second Circuit "consider whether the assertion of the new claim

would: (i) require the opponent to expend significant additional resources to conduct discovery

and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the

plaintiff from bringing a timely action in another jurisdiction." *Block*, 988 F.2d at 350 (citations

omitted).

The Court concludes that the Plaintiffs did not unduly delay filing the First Amended

Complaint and the Defendants are not unduly prejudiced by the filing. First, soon after *Hosking*

*I* was decided and before any Defendant filed an answer to the Complaint, the Plaintiffs

negotiated the Scheduling Order permitting them 30 days to file the Motion. (Motion at 17.)

The Plaintiffs then filed the Motion within the time period allowed by the Scheduling Order.

(*Id.*) With the benefit of hindsight, the Plaintiffs should have filed a motion for leave to amend

their Complaint before the Court ruled on the prior motions to dismiss. However, the Plaintiffs

believed in good faith that their claims asserted under New York law would survive a motion to

dismiss. And they should not be denied leave solely on the basis that their assumption turned out

to be incorrect. Second, the First Amended Complaint does not unduly prejudice the

Defendants. The Additional Claims are based on the same events underlying the causes of action

asserted in the original Complaint and involve similar elements, thus requiring little incremental

discovery or further delay to resolve. Further, each of the Proposed Defendants is related to the

Original Defendants and therefore little incremental resources will be required to be spent on legal defense.

### III.      <u>CONCLUSION</u>

For all of the foregoing reasons, the Motion is **GRANTED in part** and **DENIED in part**.  The Motion is **DENIED** as to the Article 1167 Claim because such claim is futile.  The Motion is **GRANTED** in all other respects.

**IT IS SO ORDERED.**

Dated: August 19, 2015
       New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge