**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA, | Chapter 15 |
| | Case No. 12-10631 (MG) |
| Debtor in a Foreign Proceeding. | |
| ANDREW LAWRENCE HOSKING and SIMON JAMES BONNEY, in their capacity as joint compulsory liquidators and duly authorized foreign representatives of HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA, | |
| Plaintiffs, | Adv. Proc. No. 14-01848 (MG) |
| -against- | |
| TPG CAPITAL MANAGEMENT, L.P., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER DENYING THE MOTION OF CERTAIN
TPG DEFENDANTS TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

*A P P E A R A N C E S:*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for the TPG Defendants*
1633 Broadway
New York, New York 10019
By:    Paul M. O'Connor III, Esq.
       Andrew K. Glenn, Esq.
       David J. Abrams. Esq.

CHADBOURNE & PARKE LLP
*Attorneys for Plaintiffs as against all*
*Defendants except Defendant Deutsche Bank AG*
1301 Avenue of the Americas
New York, New York 10019
By:    Howard Seife, Esq.
       Andrew Rosenblatt, Esq.
       Marc D. Ashley, Esq.
       Robert M. Kirby, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the *Motion of Certain TPG Defendants to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction* (the "Motion," ECF Doc. # 211). The Motion is supported by the TPG Moving Defendants'[1] memorandum of law (the "Memorandum," ECF Doc. # 212). Each of the TPG Moving Defendants filed a declaration in connection with the Motion and Memorandum. (ECF Docs. # 213–29.) The TPG Moving Defendants seek dismissal of the First Amended Complaint (as defined below) against them for lack of personal jurisdiction. The Plaintiffs (as defined below) filed the *Memorandum of Law in Opposition to TPG Executive Defendants' Motion to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction* (the "Opposition," ECF Doc. # 244). In response, the TPG Moving Defendants filed the *Reply Memorandum of Law in Further Support of Motion of Certain TPG Defendants to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction* (the "Reply," ECF Doc. # 252). For the reasons set forth more fully below, the Motion is **DENIED**.[2]

---

[1]    The "TPG Moving Defendants" or the "Movants" are William S. Price III, Dick W. Boyce, Kevin R. Burns, Justin Chang, Jonathan Coslet, Kelvin Davis, Andrew J. Dechet, Jamie Gates, Marshall Haines, John Marren, Michael MacDougall, Thomas E. Reinhart, Todd B. Sisitsky, Bryan M. Taylor, Carrie A. Wheeler, James B. Williams, and John Viola.

[2]    In an Order dated February 4, 2016 (ECF Doc. # 263), the Court denied several other motions by defendants, including the *Motion by Deutsche Bank AG to Dismiss the First Amended Complaint* ("Deutsche Bank Motion," ECF Doc. # 211) for lack of personal jurisdiction. Because the Court had already denied Deutsche Bank AG's motion to dismiss for lack of personal jurisdiction once before, the Court denied Deutsche Bank's motion, concluding that the "law of the case doctrine" applied, precluding Deutsche Bank from raising the issue again at this stage of the case. Because the issue of personal jurisdiction for newly-added defendants—the TPG Executives—had not previously been decided, the Court scheduled argument on the Motion and resolves the issue in this Opinion.

# I.  BACKGROUND

## A.    Procedural Background

This is the fourth opinion written by the Court in this case.  The three earlier opinions are referred to below.  Familiarity with the prior opinions is assumed.

Hellas Telecommunications (Luxembourg) II SCA ("Hellas II" or the "Debtor") was a Greek telecommunications company.  The Debtor is in the process of being wound up in England, and the joint compulsory liquidators appointed by the UK court (the "Foreign Representatives" or the "Plaintiffs") sought and obtained recognition of the English liquidation proceeding as a foreign main proceeding from this Court on March 14, 2012.

On March 13, 2014, the Plaintiffs filed an adversary proceeding complaint (the "Complaint") seeking to avoid and recover an initial transfer made by Hellas II to its parent entity in the amount of approximately €1.57 billion and to avoid and recover approximately €973.7 million of subsequent transfers allegedly made to several named defendants and an unnamed class of transferees (together, the "Original Defendants").  The Complaint asserted actual and constructive fraudulent transfer causes of action under the New York Debtor and Creditor Law ("NYDCL") against each of the Original Defendants, and an unjust enrichment claim under unspecified law against the Original Defendants affiliated with the private equity firms Apax Partners LLP ("Apax Partners") and TPG Capital Management, L.P. ("TPG Capital").

The Original Defendants moved to dismiss the Complaint on various grounds, including lack of standing, lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim.  On January 29, 2015, the Court granted in part and denied in part the motions to dismiss.  *See Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 524 B.R. 488 (Bankr. S.D.N.Y. 2015) ("Hosking I").  The Complaint was dismissed for lack of

personal jurisdiction over Apax Partners and the foreign-based Original Defendants affiliated

with Apax Partners and TPG Capital; however, the Court concluded that personal jurisdiction

could be exercised over each of the other Original Defendants, *see id.* at 512–13. The Plaintiffs'

NYDCL fraudulent transfer claims were dismissed for lack of standing. *See id.* at 529 n.41.

Only the unjust enrichment claim survived against the United States-based Original Defendants

affiliated with Apax Partners and TPG Capital. *See id.* at 529, 539.

On February 13, 2015, the TPG and Apax Original Defendants filed a motion seeking

limited reargument on their motion to dismiss the unjust enrichment claim, arguing that the

Court should reconsider Hosking I and dismiss the unjust enrichment claim because the opinion

did not address their argument that the unjust enrichment claim is barred by section 546(e) of the

Bankruptcy Code. On March 9, 2015, the Court issued an opinion granting the TPG and Apax

Original Defendants' motion for limited reargument in order to address the section 546(e)

argument, but denying their motion to dismiss the unjust enrichment claim, holding that such

claim is not preempted by section 546(e) as a matter of law. *See Hosking v. TPG Capital Mgmt.,*

*L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 526 B.R. 499, 515 (Bankr. S.D.N.Y. 2015)

("Hosking II").

On February 17, 2015, the Plaintiffs filed motion for leave to amend a first amended

complaint (the "First Amended Complaint") to: (1) join additional proposed defendants (the

"Proposed Defendants")[3]; (2) withdraw the unjust enrichment claim against Apax NY; (3)

remove TCW Asset Management Company ("TCW Asset") and TCW Group Inc. ("TCW

Group") as Defendants; and (4) plead new causes of action sounding in fraudulent transfer under

---

[3]    The Proposed Defendants include the Movants, as well as Richard Schifter. Mr. Schifter decided to not join the Motion.

UK and Luxembourg law (the "Additional Claims")[4] against several of the Original Defendants

and the Proposed Defendants (together, the "Defendants").    The First Amended Complaint also

asserts an unjust enrichment claim against the TPG Capital Defendants, the TPG Advisors IV

Defendants, and the T3 Advisors II Defendants (each of these three groups of defendants as

defined in the First Amended Complaint) under New York or, in the alternative, UK or

Luxembourg law.  The Defendants objected to the Motion.

The Court issued an opinion granting in part and denying in part the Plaintiffs' motion for

leave to file the First Amended Complaint on August 19, 2015.  S*ee Hosking v. TPG Capital*

*Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, --- B.R. ---, Adv. Proc. No. 14-01848

(MG), 2015 WL 4931412 (Bankr. S.D.N.Y. 2015) ("Hosking III").  Specifically, the Plaintiffs

were not permitted to assert their claims under Luxembourg law, but their motion was granted in

all other respects.  Importantly, the Court held that the Section 423 Claim could be adjudicated

by this Court.

### B.    The First Amended Complaint

On August 20, 2015, the Plaintiffs filed the First Amended Complaint.  (ECF Doc. #

189.)  The causes of actions asserted in the First Amended Complaint arise from the events that

transpired after the acquisition of TIM Hellas Communications S.A. ("TIM Hellas") by TPG

Capital and Apax Partners.  In March 2005, in preparation for the acquisition of TIM Hellas,

---

[4]      The Additional Claims include: (1) an actual fraudulent transfer claim under section 423 of the UK's
Insolvency Act 1986 (the "Insolvency Act") against all Defendants except Apax NY (the "Section 423 Claim");5 (2)
a fraudulent trading claim under section 213 of the Insolvency Act against all Defendants except for the TPG
Affiliate Defendants and the Transferee Class (the "Section 213 Claim"); and, (3) in the alternative to the Section
423 Claim and the Section 213 Claim, an actual fraudulent transfer claim under Article 1167 of the Luxembourg
Civil Code and Article 448 of the Luxembourg Commercial Code against all Defendants except Apax NY (the
"Article 1167 Claim").  (First Am. Compl. at 4.)

TPG[5] and Apax[6] allegedly organized a group of entities under Luxembourg law, including:

Hellas Telecommunications, S.àr.l. ("Hellas"), Hellas Telecommunications I, S.à.r.l. ("Hellas I"),

Hellas Telecommunications (Luxembourg) III, S.à.r.l. ("Hellas III"), Hellas Telecommunications

IV, S.à.r.l. ("Hellas IV"), Hellas Telecommunications (Luxembourg) V SCA ("Hellas V"), and

Hellas Telecommunications Finance SCA ("Hellas Finance").  (*See* First Amended Compl.

¶ 113.)  Each of the foregoing entities, and Hellas II, which was organized in 2003 and had

remained dormant as a "shelf company" until the contemplated acquisition of TIM Hellas

(collectively, the "Hellas Entities").  (*Id.*) Hellas II and Hellas Finance were wholly owned by

Hellas I, which in turn was wholly owned by Hellas.  (*Id.* ¶ 114.)  Hellas, the ultimate parent of

the Hellas Entities, was wholly owned by eight investment funds (the "Sponsors").  (*Id.*)

In June 2005, the Sponsors acquired approximately 80% of the equity in TIM Hellas, a

Greek telecommunications services provider, through a special purpose vehicle ("Troy GAC") in

a leveraged buyout transaction.  (*See* First Amended Compl. ¶¶ 114–16.)  The purchase price for

the acquisition was approximately €1.114 billion, *plus* (i) €166.0 million to pay the existing debt

of TIM Hellas and (ii) €69.6 million for transaction costs.  (*Id.* ¶ 116.)  This acquisition was

primarily financed with €1.195 billion in debt incurred by the Hellas Entities, including short-

terms loans of approximately €863 million and €143 million borrowed by Hellas II's indirect

subsidiaries Hellas V and Hellas III, respectively.  (*Id.*)  Allegedly, TPG and Apax through the

Sponsors contributed approximately €211 million of the total financing.  (*Id.*)  In November

2005, the Sponsors acquired the remaining shares of TIM Hellas through Troy GAC for an

---

[5]    "TPG" refers collectively to all of the entities and individuals named as defendants and defined below as the TPG Capital Defendants, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, and the TPG Affiliate Defendants, plus non-party TPG Capital, LLP.  (First Am. Compl. ¶ 21.)

[6]    "Apax" refers collectively to defendant Apax Partners, L.P., plus all of the non-party entities and individuals defined below as Apax Partners, Martin Halusa, and the Apax Europe VI Entities.  (*Id.* ¶ 22.)

additional €263.5 million. (*See id.* ¶ 118.)  The acquisition was again principally funded by debt issued by the Hellas entities. (*Id.*)  Subsequently, the Sponsors' equity interests in TIM Hellas were cancelled and TIM Hellas merged into Troy GAC; the surviving entity became a wholly owned subsidiary of Hellas II.  (*See id.* ¶ 119.)

In mid-June 2005, Hellas issued 490,000 convertible preferred equity certificates ("CPECs") to the Sponsors with a par value of €49 million.  (*Id.* ¶ 124.)  At the same time, Hellas I—the direct subsidiary of Hellas and direct parent of Hellas II—issued 490,000 CPECs to Hellas, and Hellas II issued an equivalent number of CPECs[7] to Hellas I.  (*Id.*)

TPG and Apax allegedly used Hellas and its related entities to acquire Q-Telecom, a business unit of a large mobile network operator in Greece, in a stock purchase deal that closed on January 31, 2006.  (*See id.* ¶ 131.)  The acquisition was principally financed with debt issued by a subsidiary of Hellas II and cash contributed by certain other Hellas II subsidiaries.  (*See id.* ¶ 132.)  In exchange for the transfer of €28.3 million from the Sponsors to Hellas, Hellas issued an additional 282,681 CPECs to the Sponsors.[8]  (*Id.* ¶ 133.)

The Plaintiffs allege that by early 2006, TPG and Apax decided to withdraw the funds that they had contributed to the TIM Hellas and Q-Telecom acquisitions.  (*Id.* ¶ 135.)  On or around April 12, 2006, Hellas Finance issued €500 million of Floating Rate Senior PIK Notes due 2014 (the "Original PIK Notes"), guaranteed by Hellas I.  (*Id.*)  Deutsche Bank, as one of the underwriters, received approximately €4.17 million in fees.  (*Id.*)  Approximately, €376.6 million of the €500 million was transferred to the Sponsors on or about the same day.  (*Id.*)  The

---

[7]      The Plaintiffs contend that CPECs were subordinate to all other present or future obligations of Hellas II, accrued no interest, and would mature, at par value, 30 years after their issue date.  (*Id.* ¶ 125.)  The holder of the CPECS had no right, at any time, to demand conversion or redemption of the CPECs.  (*Id.*)

[8]      Cash was allegedly transferred from Hellas to Hellas I, and then to Hellas II; in exchange, corresponding CPECs were then issued up the corporate structure from Hellas II to Hellas I, and then to Hellas.  (*See id.* ¶ 133.)

Plaintiffs allege that of the approximately €376.6 million transferred to the Sponsors, €43.5 million passed through Hellas II to redeem CPECs held at par by its parent Hellas I. (*Id.*)  In turn, Hellas I paid €43.5 million to redeem CPECs held at par by its parent Hellas, and Hellas paid €43.5 million to redeem CPECs held at par by the Sponsors. (*Id.*)  On or about the same date, April 12, 2006, all outstanding CPECs underwent a 1-100 split by agreement of the Sponsors and Hellas. (*Id.* ¶ 137.)

The Plaintiffs allege that TPG and Apax "put in motion plans to dispose of [Hellas II]'s subsidiaries in a sale to a third party" no later than June 2006. (*Id.* ¶ 139.)  However, the sale process purportedly did not generate interest at the prices sought by TPG and Apax, and subsequently "they instead took steps to extract those returns from [Hellas II] under the guise of a purported 'refinancing' of its debt." (*Id.* ¶ 146.)

In December 2006, through a multi-step transaction (the "December 2006 Transaction"), (i) Hellas II issued €960 million and $275 million of Floating Rate Subordinated Notes due 2015 (the "Sub Notes")[9]; (ii) Hellas Finance and certain subsidiaries of Hellas issued additional series of notes, the proceeds of which were transferred or loaned to Hellas II; and (iii) Hellas II transferred a total of approximately €1.57 billion to its parent, Hellas I, of which approximately €978.7 million was paid to redeem CPECs issued by Hellas II. (*Id.* ¶ 160.)  Subsequently, Hellas I paid approximately €973.7 million to Hellas to redeem CPECs issued by Hellas I, and Hellas then paid the Sponsors approximately €973.7 million to redeem CPECs issued by Hellas (the "December 2006 CPEC Redemption"). (*Id.*)  The remaining portion of the €1.57 billion

---

[9]        The Sub Notes were marketed and sold to, as well as ultimately purchased by, investors located in jurisdictions including New York and elsewhere in the United States. (*Id.* ¶¶ 163–64.)  The offering memorandum provides that the Sub Notes and the indenture for the Sub Notes would be New York law. (*Id.* ¶ 165.)

transferred from Hellas II to Hellas I was allegedly used to retire other outstanding debt issued by the Hellas entities and to pay costs associated with the December 2006 Transaction. [10]   (*Id.*)

The Sub Notes, as well as the Senior Notes and New PIK Notes, were issued on December 21, 2006.  (*Id.* ¶ 167.)  The Plaintiffs contend that later on December 21, 2006, Hellas II paid €978,659,712 in proceeds from the December 2006 Transaction to Hellas I to redeem 27.3 million CPECs at €35.82 per CPEC, Hellas I then paid €973,657,610 to Hellas (after payment of approximately €5 million in advisor fees) to redeem 27.4 million CPECs at €35.57 per CPEC, and Hellas then paid the €973,657,610 it had received from Hellas I to the Sponsors to redeem 27.4 million CPECs at €35.57 per CPEC.  (*Id.* ¶ 168.)

In February 2007, TPG and Apax sold Hellas and its subsidiaries to Weather Investments S.p.A., later renamed WIND Telecom S.p.A. ("Weather Investments"), a stock corporation organized under the laws of Italy.  (*Id.* ¶ 192.)  Weather Investments purchased 100% of the equity of Hellas for €500 million, €6,435,736 of which was allocated toward the purchase of the remaining CPECs previously issued by Hellas to the Sponsors at the par value of €1 per CPEC.  (*Id.* ¶ 195.)  Hellas II's financial statements for the year ending December 31, 2007 indicated that its debt-service obligations grew and resulted in a net financial loss of more than €259.5 million; its "leverage remained high at 12.4x EBIT, while its cash interest coverage declined to 1.2x EBIT."  (*Id.* ¶ 198.)  On or about June 5, 2008, Apax Partners paid €500 million to Weather Investments for a 5% equity stake in Weather Investments.  (*Id.* ¶ 199.)  Additionally, Hellas II "paid a minimum of €1.22 million in additional 'consulting fees' to Hellas I and, directly or indirectly, Hellas I then paid approximately those same amounts to TPG and Apax (the "Consulting Fees Transfer")."  (*Id.* ¶ 191.)

---

[10]    Specifically, the proceeds was used to retire the €500 million Original PIK Notes and interest, plus approximately €48.8 million in transaction costs associated with the December 2006 Transaction.

In 2009, Hellas II began considering a potential restructuring of its capital structure.  (*See id.* ¶ 201.)  On November 26, 2009, the High Court of Justice of England and Wales (the "High Court") approved placing Hellas II into administration in England and appointed joint administrators (the "Administrators").  (*Id.*)  On December 1, 2011, the High Court discharged the Administrators and ruled that Hellas II should be instead wound-up through a compulsory liquidation.  (*Id.* ¶ 202.)  The Plaintiffs were thereafter appointed as joint compulsory liquidators.  (*See id.* ¶ 18.)

The Plaintiffs allege that Hellas II was insolvent at the time of the December 2006 CPEC Redemption and that the Defendants received portions of the proceeds of such transaction from one or more Sponsors.  (*See, e.g.*, *id.* ¶ 182.)  The Plaintiffs assert the following causes of action:

1. Actual fraudulent transfer against the Transferee Defendants (as defined in the First Amended Complaint), the Transferee Class (as defined in the First Amended Complaint), and TPG Capital pursuant to Section 423 of the Insolvency Act 1986. In support, the Plaintiffs argue that (i) the December 2006 CPEC Redemption was a dividend or distribution to shareholders devoid of any consideration; (ii) the Consulting Fees Transfer was made without fair or adequate consideration, including because TPG and Apax provided no "consulting" or "management" services of value to Hellas II or its subsidiaries.

2. Fraudulent Trading against the TPG Capital Defendants, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, Apax New York, and Deutsche Bank pursuant to Section 213 of the Insolvency Act 1986. In support, the Plaintiffs allege that Hellas II, by and through its sole manager Hellas and the members of the Board of Managers of Hellas, carried on business with a fraudulent purpose including the intent to defraud the actual or potential creditors of Hellas II and in particular the holders of the Sub Notes, when it executed the December 2006 CPEC Redemption and the Consulting Fees Transfer.

3. Unjust Enrichment against the TPG Capital Defendants, the TPG Advisors IV Defendants, and the T3 Advisors II Defendants pursuant to New York Law or, in the alternative, English or Luxembourgish law. TPG has been unjustly enriched through its receipt and retention of the proceeds from the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer.

In response to the First Amended Complaint, various parties-in-interest filed motions to dismiss the First Amended Complaint.[11]  On February 4, 2016, the Court entered an order dismissing TCW Motion (ECF Doc. # 200), the TPG Joinder Motion (ECF Doc. # 230) and the DB Motion (ECF Doc. # 205).  Accordingly, this Motion and the Forum Non Conveniens Motion (ECF Doc. # 254) remain pending before the Court.

## C.    <u>The Motion</u>

The TPG Moving Defendants seek dismissal of the First Amended Complaint against them for lack of personal jurisdiction.  The Movants, who primarily reside and work in California and Texas, contend that (i) they have no relevant jurisdictional contact with New York, (ii) they had no involvement with the December 2006 Transaction, and (iii) are only named as defendants because of the indirect receipt of certain funds connected the December 2006 Transaction.  (Mem. at 1.)

### 1.    *The Movants and their Connections to New York*

The Movants each contend that they (i) "never traveled to New York, attended or participated in any meetings or had any other contacts in New York in connection with the acquisition, financing, recapitalization or sale of [Hellas] in the 2005-2007 time period" and (ii) "never traveled to New York, attended or participated in any meetings or had any other contacts in New York in connection with the redemptions of certain [the CPECs] and/or preferred equity certificates (PECs) by Hellas-related entities in December 2006."  (*See, e.g.*, Decl. of Dick W.

---

[11]    Specifically, the following motions were filed seeking to dismiss the First Amended Complaint: (A) Motion to Dismiss of TCW/Crescent Mezzanine III, LLC, TCW/Crescent Mezzanine Trust III, TCW/Crescent Mezzanine Partners III Netherlands, L.P., TCW/Crescent Mezzanine Partners III, L.P., and TCW/Capital Investment Corp. (the "TCW Motion," ECF Doc. # 200), which was joined by the TPG Defendants (the "TPG Joinder" ECF Doc. # 230); (B) Motion by Deutsche Bank AG to Dismiss the First Amended Complaint (the "DB Motion," ECF Doc. # 205); (C) Motion of Certain TPG Defendants to Dismiss the First Amended Complaint for Lack of Personal Jurisdiction (the "TPG Personal Jurisdiction Motion," ECF Doc. # 211); and (D) Motion to Dismiss the First Amended Complaint based on Forum Non Conveniens (the "Forum Non Conveniens Motion," ECF Doc. # 254).

Boyce, ECF Doc. # 213.)  The chart below lists each of Movant, as well as the pertinent facts

associated with each of them.

| Name | TPG Employment Status[12] | Current Place of Residence | Ties to New York | Distributions Received From December 2006 CPEC Redemption[13] |
|---|---|---|---|---|
| Dick W. Boyce (ECF Doc. # 213) | Former Employee – Partner & Head of Operations Group | California | <u>Paid NY Taxes</u>: Not since 1997 when he moved to CA<br><br><u>Approx. Annual Travel to NY</u>: 5–10 times (primarily business) | The following distributions were made to the Dick W. Boyce Revocable Trust:<br><br>$2,987,806 from TPG GenPar IV, L.P.<br><br>$489,115 from T3 GenPar II, L.P.<br><br>Total: $3,476,921 |
| Kevin R. Burns (ECF Doc. # 214) | Current Employee – Partner & Head of Operations | California | <u>Apartment</u>: He has an apartment leased in his name by Chobani, LLC (a company that he advises on behalf of an affiliate of TPG Capital Management)<br><br><u>Approx. Annual Travel to NY</u>: 24 times primarily in his capacity as an adviser to Chobani and occasionally for other TPG business | $769,403 from TPG GenPar IV, L.P. |

---

[12]    This category addresses whether the Movant is or has been employed by an affiliate of TPG Capital Management, L.P., a limited partnership registered under the laws of Texas, with its principal place of business at 301 Commerce Street, Suite 3300, Fort Worth, Texas 76102.  The employment titles were taken from the First Amended Complaint.

[13]    The source of the information in this column is the unredacted version of the First Amended Complaint. The distribution amounts were filed under seal with the Court and, as such, the public version of the First Amended Complaint included redacted amounts.  Given the significance of the distribution amounts, the Court is including the amounts in this Opinion.

| Justin Chang (ECF Doc. # 215) | Former Employee – Partner | California | Paid NY Taxes: Not since 1993<br><br>Approx. Annual Travel to NY: 15–20 times (primarily business) | $2,070,655 from TPG GenPar IV, L.P.<br><br>$409,538 from T3 GenPar II, L.P.<br><br>Total: $2,480,193 |
| --- | --- | --- | --- | --- |
| Jonathan Coslet (ECF Doc. # 216) | Current Employee – Senior Partner & Chief Investment Officer | California | Approx. Annual Travel to NY: 3–6 times (primarily business) | The following distributions were made to the Coslet Partners:<br><br>$3,820,877 from TPG GenPar IV, L.P.<br><br>$605,827 from T3 GenPar II, L.P.<br><br>Total: $4,426,704 |
| Kelvin Davis (ECF Doc. # 217) | Current Employee – Senior Partner & Head of the North American Buyouts Group | California | Paid NY Taxes: Not in over 20 years<br><br>Approx. Annual Travel to NY: 10 times (primarily business) | $2,857,744 from TPG GenPar IV, L.P.<br><br>$497,295 from T3 GenPar II, L.P.<br><br>Total: $3,355,039 |
| Andrew J. Dechet (ECF Doc. # 218) | Former Employee – Partner | Washington | Paid NY Taxes: Not in over 15 years<br><br>Approx. Annual Travel to NY: 2 times (personal reasons) | The following distributions were made to the Andrew Dechet Family Trust:<br><br>$2,082,364 from TPG GenPar IV, L.P.<br><br>$354,210 from T3 GenPar II, L.P.<br><br>Total: $2,436,574 |
| Jamie Gates (ECF Doc. # 219) | Current Employee – Senior Partner | California | Approx. Annual Travel to NY: 4–5 times (primarily business) | $2,158,894 from TPG GenPar IV, L.P.<br><br>$409,538 from T3 GenPar II, L.P.<br><br>Total: $2,568,432 |
| Marshall Haines (ECF Doc. # 220) | Former Employee – Principal | California | Approx. Annual Travel to NY: 1 time (primarily business) | $537,058 from TPG GenPar IV, L.P. |

| | | | | |
|---|---|---|---|---|
| Michael Macdougall (ECF Doc. # 221) | Current Employee – Partner | Texas | Prior NY Residence: From 2005–2010, he was a senior employee of TPG Capital New York, Inc.  During that time, he resided in NY and paid NY resident income taxes.  Since moving to Texas in 2011, he has reported and paid NY income taxes based on the number of days worked in NY.  In 2014, he expected to report and pay NY income taxes for 13 days.<br><br>Property:  He maintains several banking and brokerage accounts in New York.<br><br>Phone Number:  He still maintains NY work and mobile telephone numbers.<br><br>Approx. Annual Travel to NY: 15 times (primarily business) | $715,456 from TPG GenPar IV, L.P. |
| John Marren (ECF Doc. # 222) | Current Employee – Partner | California | Approx. Annual Travel to NY: 8 times (primarily business) | $3,023,874 from TPG GenPar IV, L.P.<br><br>$460,749 from T3 GenPar II, L.P.<br><br>Total: $3,484,623 |
| William S. Price, III (ECF Doc. # 223) | Former Employee – Co-Founder & Partner Emeritus | California | Approx. Annual Travel to NY: 1 time (primarily business) | $5,950,869 from TPG GenPar IV, L.P.<br><br>$1,251,074 from T3 GenPar II, L.P.<br><br>Total: $7,201,943 |

| | | | | |
|---|---|---|---|---|
| Thomas E. Reinhart (ECF Doc. # 224) | Former Employee-Partner and Chief Operating Officer | California | <u>Paid NY Taxes</u>: Not in over 30 years<br><br><u>Approx. Annual Travel to NY</u>: 3 times (primarily business) | The following distributions were made to the Reinhart Family Trust:<br><br>$823,329 from TPG GenPar IV, L.P.<br><br>$176,360 from T3 GenPar II, L.P.<br><br>Total: $999,689 |
| Todd B. Sisitsky (ECF Doc. # 225) | Current Employee – Partner | California | <u>Paid NY Taxes</u>:  Not in over 10 years<br><br><u>Approx. Annual Travel to NY</u>: 2–3 times (primarily business) | $508,822 from TPG GenPar IV, L.P. |
| Bryan M. Taylor (ECF Doc. # 226) | Current Employee – Partner | California | <u>Approx. Annual Travel to NY</u>: 12 times (primarily business) | $736,184 from TPG GenPar IV, L.P. |
| John Viola (ECF Doc. # 227) | Current Employee – Partner & Chief Financial Officer | Texas | <u>Approx. Annual Travel to NY</u>: 1–2 times (primarily business) | $805,456 from TPG GenPar IV, L.P. |
| Carrie A. Wheeler (ECF Doc. # 228) | Current Employee – Partner & Head of Retail and Consumer Investing | California | <u>Paid NY Taxes</u>: Not since 1996<br><br><u>Approx. Annual Travel to NY</u>: 12 times (primarily business) | $901,904 from TPG GenPar IV, L.P.<br><br>$209,454 from T3 GenPar II, L.P.<br><br>Total: $1,111,358 |
| James B. Williams (ECF Doc. # 229) | Current Employee – Partner | California | <u>Paid NY Taxes</u>: Not in over 30 years<br><br><u>Approx. Annual Travel to NY</u>: 2 times (primarily business) | $643,505 from TPG GenPar IV, L.P.<br><br>$108,008 from T3 GenPar II, L.P.<br><br>Total: $751,513 |

2.    *Legal Arguments*

The Movants argue that, while Bankruptcy Rule 7004(d) permits nationwide service of

process, Bankruptcy Rule 7004(f) limits the exercise of personal jurisdiction so that it is

"consistent with the Constitution."  (*See generally* Mem. of Law.)  Moreover, the Movants argue

that courts have recognized that the exercise of personal jurisdiction can be unfair and

unreasonable under the Fifth Amendment.  (*Id.* at 5 (citing to *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 946 (11th Cir.1997)).)

In this case, the Movants argue it is unreasonable and unfair for the Court to exercise general jurisdiction over them because they do not have any significant or jurisdictionally relevant connections to New York.  (*Id.*)  The Movants argue that the Plaintiffs have failed to include any substantive allegations against them, other than the indirect receipt of proceeds related to the December 2006 Transaction.  (*Id.* at 7.)  The Movants contend that the sole allegation with respect to any of the Movants is against Mr. Price and state that he "approved TPG's participation in the December 2006 Transaction" (*Id.* at 8 (citing First Am. Compl. ¶ 154).)  However, the Movants argue that the allegation is belied by the deposition of James Coulter, where he testified that a recapitalization, such as the December 2006 Transaction, would not have required formal TPG approval.  (*Id.* (citing to ECF Doc. # 185-5 at 167:25–168:2).)

### D.   The Opposition

The Plaintiffs argue that the Court should not need to apply a "reasonableness" test, because the analysis ends once the Court finds that a defendant is "at home" in the forum exercising general jurisdiction; the Movants are "at home" in the United States and, thus, this Court may exercise general jurisdiction over them.  However, even if the Court were to apply a reasonableness test, the Plaintiffs argue that the Movants are unable to satisfy their burden of showing that an exceptional situation exists that warrants dismissal of this adversary proceeding against the Movants.

#### 1.   *General Jurisdiction over the Movants Exists*

The Plaintiffs argue that each Movant is "at home" in the United States and subject to general jurisdiction in the adversary proceeding because, among other things, each Movant: (i) admits that he or she is a domiciliary and citizen of the United States, (ii) lives and works in the

United States, (iii) owns and/or leases real property in the United States, (iv) maintains a mail

address and phone number in the United States, (v) maintains at least one bank and/or brokerage

account in the United States, and (vi) files federal and state tax returns in the United States. (*Id.*

at 9.)

### 2.    *There is No Additional Reasonableness Test*

The Plaintiffs argue that the Supreme Court clarified in *Daimler* that it is wholly

superfluous for a court to consider the "reasonableness" of exercising general jurisdiction over a

defendant found to be "at home" in that forum. (*Id.* at 10 (citing to *Daimler AG v. Bauman*, 134

S. Ct. 746, n.20 (2014)).) On this basis, the Plaintiffs argue that the Movants' assertion that the

exercise of general jurisdiction is meritless. (*Id.*) Additionally, the Plaintiffs argue that before

and independent of *Daimler*, it was well settled in this Circuit that a federal court may exercise

general jurisdiction over a U.S. domiciliary served under Rule 7004 without consideration of the

"reasonableness" test. (*Id.* (citing to *Enron Corp. v. Arora (In re Enron Corp.)*, 316 B.R. 434,

449 (Bankr. S.D.N.Y. 2004)).) Moreover, the Plaintiffs also point to various Courts outside of

this Circuit that have agreed with this approach. (*Id.* at 12–14.)

In response to the Movant's reliance on *Republic of Panama*, a case that pre-dates

*Daimler*, the Plaintiffs argue that *Republic of Panama* is an outlier that should not influence this

Court. (*Id.* at 15 (referring to *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119

F.3d 935, 946 (11th Cir.1997)).) In support, the Plaintiffs point to the fact that the Eleventh

Circuit conceded that its opinion "depart[ed] from the reasoning and holdings of the majority of

[its] sister courts." *Republic of Panama*, 119 F.3d at 947, n.23.

Additionally, the Plaintiffs cite to *Mariash v. Morrill* in support of the proposition that

the Second Circuit has rejected the view that where Congress has authorized nationwide service

17

of process, the exercise of personal jurisdiction requires anything more than minimum contacts

with the United States and notice and opportunity to be heard.  (*Id.* at 17 (citing to 496 F.2d

1138, 1143 (2d Cir. 1974) (stating that although "Congress, in providing for nationwide service

of process, remains subject to the constraints of the Due Process Clause of the Fifth

Amendment," the *Mariash* Court deemed those constraints satisfied so long as "service

authorized by statute [is] reasonably calculated to inform the defendant of the pendency of the

proceedings.")).)

> ### 3. *Even if A Reasonableness Test Were Applied, the Court Should Exercise Personal Jurisdiction*

The Plaintiffs argue that even if the Court was required to consider the "reasonableness"

question, the Movants are unable to satisfy their burden of showing that an exceptional situation

exists that warrants dismissal of this adversary proceeding against the Movants.  (*Id.* at 19.)   The

Plaintiffs argue that only an "exceptional situation" can render a jurisdiction unreasonable even

though minimum contracts are present.  (*Id.* (citing to *Bank Brussels Lambert*, 305 F.3d 120, 130

(2d Cir. 2002)).)

In this case, the Plaintiffs contend that it is unlikely that any of the Movants would need

to be present in the Court during any part of the trial, because the Movants assert "they had no

real involvement" with the execution of December 2006 CPEC Redemption.  (*Id.* at 20.)

Moreover, even if the Movants needed to travel to New York, it would not be unreasonable

given that numerous Courts in the Second Circuit have recognized that this is only a slight

burden, insufficient to divest a court of personal jurisdiction.  (*Id.* at 20–21.)  In further support,

the Plaintiffs point to the fact that the Movants routinely travel to New York.  (*Id.* at 21.)

Moreover, the Plaintiffs point to the fact that any inconvenience associated with

defending the adversary proceeding should be minimized by the fact that each Movant is

defended by TPG's New York counsel. (*Id.* at 22.)  The Plaintiffs argue that this fact supports the conclusion that New York is a *more* convenient forum than another federal district, because New York counsel need not travel and local counsel need not be retained.

### 4.    Benefit to the Estate

The Plaintiffs argue that the conclusion that this Court may exercise jurisdiction over the Defendants is further supported by the fact that the alternative would require the Plaintiffs to commence duplicative litigation in each of the five federal districts in which the Movants reside, which would cause undue delay and costs.  (Opp'n at 4.)  Moreover, the Plaintiffs argue that these harms would potentially be multiplied a hundred-fold if the Plaintiffs were required to sue each member of the putative defendant class of transferees of the December 2006 CPEC Redemption in every federal district in which any of them reside.  (*Id.*)

### E.    The Reply

In response, the Movants argue that regardless of whether the relevant forum is New York or the United States, there is an outer constitutional limit to the exercise of personal jurisdiction.  (Reply at 1.)  However, the Movants contend that the Plaintiffs are requesting that the Court reject any constitutional limitations on the Court's jurisdiction over them.  (*Id.*)

### 1.    The Court Should Apply a Reasonableness Test

The Movants argue that this Court has interpreted Bankruptcy Rule 7004(f) to mean that the exercise of personal jurisdiction must comport with the Fifth Amendment of the United States.  (*Id.* at 4. (citing to Hosking I at 506).)  The Movants try to distinguish *Mariash* on the ground that it addressed nationwide service of process pursuant to the Securities Exchange Act of 1934 in a case where the alleged violation occurred in New York.  (*Id.* at 5.)  The Movants argue this case is distinguishable because jurisdiction is asserted pursuant to Bankruptcy Rule 7004 in a chapter 15 adversary proceeding where only foreign law claims are asserted.  (*Id.*)

19

The Movants cite to *Hallwood Realty Partners, L.P.*, a case that declined to follow the Second Circuit's *Mariash* decision and held that "[t]he Fifth Amendment stands as a bulwark against the arbitrary exercise of governmental power." *Id.* (citing to 104 F. Supp. 2d 279, 285 (S.D.N.Y. 2000)). The Movants argue that in *In re Enron Corp.*, 316 B.R. 434 (Bankr. S.D.N.Y. 2004), the court stated that "an unduly burdensome or inconvenienced" test can be applied in certain circumstances. (*Id.* at 6.) Additionally, the Movants also cite to *Republic of Panama* again in support of their position. (*Id.* at 5.)

In response to the *Daimler* case, the Movants argue that *Daimler* did not consider due process under the Fifth Amendment. (*Id.* at 5–6.) Rather, *Daimler* addressed the Fourteen Amendment and the limits of exercising general jurisdiction over corporations. (*Id.*) Accordingly, the Movants conclude that the Court should apply a reasonableness standard in this case.

2.      *Reasonableness Analysis*

In turning to the reasonableness analysis, the Movants argue that it would be unreasonable to force them to defend this action in New York given the lack of each Movants ties to New York. (*Id.* at 7.) The Movants argue that the Court's analysis regarding its exercise of personal jurisdiction over Messrs. Bonderman and Coulter is not dispositive in this case, because the Movants connection to the December 2006 Transaction is further attenuated than the alleged connection of Messrs. Bonderman and Coulter.[14] (*Id.* at 8.)

Additionally, the Movants point to the fact this Court stated at a prior hearing that Nikesh Arora, an individual without contacts to New York who was named as a defendant solely as a subsequent transferee, had a "credible reasonableness argument." (*Id.* at 2.) The Movants argue

---

[14]     The Court held that the Court could exercise general jurisdiction over Messrs. Bonderman and Coulter in the prior opinion in *Hosking I*, 524 B.R. at 507.

that they had even less involvement with the December 2006 Transaction than Mr. Arora.[15]  (*Id.* at 3.)

## II.   <u>DISCUSSION</u>

### A.   <u>Dismissal for Lack of Personal Jurisdiction</u>

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), a plaintiff bears the burden of making a *prima facie* showing "through its own affidavits and supporting materials" that personal jurisdiction exists.  *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 418 B.R. 75, 79 (Bankr. S.D.N.Y. 2009) (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *see also Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) ("[T]he plaintiff bears the burden of showing that the court has jurisdiction over the defendant.").  In order to make such prima facie showing, the plaintiff must make "legally sufficient allegations of jurisdiction, including an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) (citation and internal quotation marks omitted).  When the issue of personal jurisdiction is addressed, as it is here, on affidavits or declarations, "all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) (citations omitted).

Bankruptcy Rule 7004(f) provides

> [i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service in accordance with this rule . . . is effective to establish personal jurisdiction over the person of any defendant

---

[15]   The Plaintiffs and Arora reached a settlement of this case and Arora was dismissed as a defendant.

> with respect to a case under the Code or a civil proceeding arising
> under the Code, or arising in or related to a case under the Code.

FED. R. BANKR. P. 7004(f).  Pursuant to Bankruptcy Rule 7004(d), "[t]he summons and complaint and all other process except a subpoena may be served anywhere in the United States." *Id.* 7004(d).  The Movants were served pursuant to Bankruptcy Rule 7004 (ECF Doc. # 197–98) and later agreed to "waive any objection to the sufficiency or validity of service of process under Rule 7004."  (ECF Doc. # 194–95.)  Accordingly, the Defendants are subject to personal jurisdiction so long as Constitutional due process requirements are met.  *See Bickerton v. Bozel S.A. (In re Bozel S.A.)*, 434 B.R. 86, 97 (Bankr. S.D.N.Y. 2010) ("Since [defendant] does not contend that service of process was improper [under Bankruptcy Rule 7004], he is subject to personal jurisdiction in this Court so long as the Due Process requirements are satisfied.").

For a court to exercise personal jurisdiction, a person or entity must have sufficient "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.*, 66 S.Ct. 154 (1945) (internal quotation marks and citation omitted).  A court can exercise two categories of personal jurisdiction—general jurisdiction or specific jurisdiction.  *See Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014); *Walden v. Fiore*, 134 S.Ct. 1115, 1121 n.6 (2014).  General, or "all-purpose" jurisdiction, over a foreign defendant allows a court to hear any and all claims against such defendant.  *Daimler*, 134 S. at 754 (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (U.S. 2011)).  Specific jurisdiction over a foreign defendant allows a court a court to hear claims that "aris[e] out of or relate[] to the defendant's contacts with the forum . . . ."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*,

466 U.S. 408, 414 n.8 (1984) (citation omitted).  If insufficient contacts exist for a court to

exercise general personal jurisdiction, it may still exercise specific jurisdiction. *See Burger King*

*Corp. v. Rudzewicz*, 105 S.Ct. 2174 (1985).

### A.    General Jurisdiction

Central to the determination of whether the Movants are subject to general jurisdiction is

the issue whether their minimum contacts are to be assessed with respect to New York or the

United States.  If the pertinent forum for assessing minimum jurisdictional contacts is the United

States, then each Movant who is "at home" in the U.S. is subject to general jurisdiction;

however, if minimum contacts must be assessed with respect to New York, then each Movant's

contacts with New York must be evaluated in order to determine whether it is "essentially at

home" in New York.  *See Daimler*, 134 S.Ct. at 761.

In bankruptcy proceedings where jurisdiction is based on 28 U.S.C. § 1334(b), a district

court (and by reference a bankruptcy court) has original but not exclusive jurisdiction of all civil

proceedings arising under, arising in, or related to cases under title 11.  Because the sovereign

exercising jurisdiction is the United States, not a particular state, minimum contacts with the

United States is sufficient to satisfy the Fifth Amendment due process requirement, whether the

claims asserted arise under federal, state or foreign law.  *See Owens–Illinois, Inc. v. Rapid Am.*

*Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630 (4th Cir.1997) (considering state law claims and

stating that "[o]n the topic of whether the exercise of personal jurisdiction over Rapid is

consistent with the Constitution and the laws of the United States, the question of whether Rapid

had minimum contacts with West Virginia is irrelevant.  This is so because when an action is in

federal court on 'related to' jurisdiction, the sovereign exercising authority is the United States,

not the individual state where the federal court is sitting.  Rather, we need only ask whether

Rapid has minimum contacts with the United States such that subjecting it to personal

23

jurisdiction does not offend the Due Process Clause of the Fifth Amendment to the United States

Constitution.  Given that Rapid is a Delaware corporation with its principal place of business in

New York, we have no doubt that this is the case.") (internal citations omitted); *Diamond Mortg.*

*Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1244 (7th Cir. 1990) (considering state law claims and

stating that "[s]ince section 1334 provides federal question jurisdiction, the sovereign exercising

its authority over the [defendants] is the United States, not the State of Illinois.  Hence, whether

there exist sufficient minimum contacts between the [defendants] and the State of Illinois has no

bearing upon whether the United States may exercise its power over the [defendants] pursuant to

its federal question jurisdiction.") (state law claims); s*ee also Enron Corp. v. Arora (In re Enron*

*Corp.)*, 316 B.R. 434, 444 (Bankr. S.D.N.Y. 2004) ("[I]n federal question cases . . .  no inquiry

into a defendant's 'minimum contacts' with the forum state is needed to exercise jurisdiction

pursuant to Bankruptcy Rule 7004; rather, only a federal 'minimum contacts' test is required,

whereby the Fifth Amendment's Due Process Clause limits a bankruptcy court's exercise of

personal jurisdiction over a defendant.") (internal citations omitted); *British Am. Ins. Co. Ltd. v.*

*Fullerton (In re British Am. Ins. Co. Ltd.)*, Adv. Proc. No. 11–03118(EPK), 2013 WL 1881712,

at *2 (Bankr. S.D. Fla. Apr. 30, 2013) (applying nationwide minimum contacts test to evaluate

defendant's jurisdictional contacts in an adversary proceeding commenced in a chapter 15

proceeding); *In re Bozel, S.A.*, 434 B.R. at 99 (finding that, in the context of an adversary

proceeding commenced in a bankruptcy court, applying foreign corporate governance law, "the

minimum contacts analysis should evaluate the defendant's contacts with the United States as a

whole, not merely contacts with the forum state" (citation omitted)).

Nationwide contacts satisfy due process requirements where the court has federal

jurisdiction and nationwide service of process is authorized under an applicable federal statute.

24

Indeed, courts have routinely held that a nationwide minimum contacts test applies where

nationwide service of process is authorized by federal law. *See, e.g.*, *Enron*, 316 B.R. at 444

(noting that, after the 1996 amendments to the Bankruptcy Rules, "courts have recognized in

federal question cases that no inquiry into a defendant's 'minimum contacts' with the forum state

is needed to exercise jurisdiction pursuant to Bankruptcy Rule 7004; rather, only a federal

'minimum contacts' test is required, whereby the Fifth Amendment's Due Process Clause limits

a bankruptcy court's exercise of personal jurisdiction over a defendant" (internal citations

omitted)). Accordingly, each Movant's contacts with the United States as a whole, rather than

with New York specifically, should be evaluated for purposes of personal jurisdiction.

All of the Movants are subject to general jurisdiction because each Movant is "at home"

in the United States. The Movants (i) admit that they are domiciliaries and citizens of the United

States, (ii) live and work in the United States, (iii) own and/or lease real property in the United

States, (iv) maintain mailing addresses and phone numbers in the United States, (v) maintain at

least one bank and/or brokerage account in the United States, and (vi) file federal and state tax

returns in the United States. Thus, the Complaint sufficiently alleges the paradigm bases for

general jurisdiction with respect to each of the Movants.

### B.    Daimler and the "Reasonableness Test"

The Movants argue that the Court should apply a second step, reasonableness analysis, in

its determination whether to exercise personal jurisdiction. They point to this Court's earlier

personal jurisdiction decision in *Hosking I*, 524 B.R. at 512–13, where the Court tested whether

general personal jurisdiction was established over other defendants, by applying a reasonableness

analysis. While *Hosking I* was written after *Daimler*, the prior opinion failed to recognize that

the Supreme Court in *Daimler* disavowed using a reasonableness analysis when evaluating

general jurisdiction; such analysis is only relevant in evaluating specific jurisdiction. *Daimler*,

134 S.Ct. at 762 n.20 (stating that while "a multipronged reasonableness check was articulated in *Asahi*" [*Metal Indus. Co., Ltd. v. Superior Court*, 480 U.S. 102, 113 (1987)], that text is "to be essayed when *specific* jurisdiction is at issue." (emphasis in original).)  "When a corporation [or person] is genuinely at home in the forum State . . . any second-step inquiry would be superfluous."  *Id.*  The Supreme Court explained that "to import [the] 'reasonableness' check into the general jurisdiction determination . . . would indeed compound the jurisdictional inquiry [and] . . . . [i]mposing such a [test] in cases of general jurisdiction would hardly promote the efficient disposition of an issue that should be resolved expeditiously at the outset of litigation."  *Id.*  Accordingly, in light of the Supreme Court's ruling in *Daimler*, the Court need not apply a "reasonableness" test in determining whether it may exercise general jurisdiction over a defendant.

The Movants attempt to argue that *Daimler* is distinguishable because it addressed the Fourteen Amendment, as opposed to the Fifth Amendment.  However, this argument fails because the minimum contacts analysis is the same under the Fifth Amendment and the Fourteenth Amendment.  *See, e.g., Estate of Klieman v. Palestinian Auth.*, 82 F. Supp. 3d 237, 246 (D.D.C. 2015) (rejecting the argument that *Goodyear* and *Daimler* were not controlling because both cases were decided under the Fourteenth Amendment) (citing *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("[B]ecause the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due process clause, the same general principles guide the minimum contacts analysis."))

Even if, for argument's sake, the Court were to apply the reasonableness analysis, the Movants have failed to satisfy their burden of making a compelling case that the exercise of

general jurisdiction would be unreasonable. Under the reasonableness test, the Court must take

into account five factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant;

> (2) the interests of the forum state in adjudicating the case;

> (3) the plaintiff's interest in obtaining convenient and effective relief;

> (4) the interstate judicial system's interest in obtaining the most efficient resolution of
> the controversy; and

> (5) the shared interest of the states in furthering substantive social policies.

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*, No. 12 Civ. 5541 (JGK), 2014 WL 4802917, at *7

(S.D.N.Y. Sept. 29, 2014) (internal citations omitted).

Under this reasonableness test, the burden shifts to the defendant "to present a

'compelling case' that establishing personal jurisdiction would be unreasonable." *In re Bozel

S.A.*, 434 B.R. at 100 (citations omitted). The burden on the Movants to litigate in this Court is

not great, as each Movant is at home in the United States and is represented by counsel in the

United States (factor (1)). The United States has a significant interest in adjudicating this

Adversary Proceeding, since it facilitates the foreign Plaintiffs' efforts to maximize the value of

the value of the Debtor's estate  (factor (2)). *See In re British Am.*, 2012 WL 4508611, at *5

("By enacting chapter 15 of the Bankruptcy Code, Congress exhibited a clear intent for the

United States to participate in a coordinated manner with insolvency proceedings taking place in

foreign nations."). The Plaintiffs have an interest in obtaining convenient, effective relief (factor

(3)).  Finally, at this time it does not appear that there would be any more efficient forum for resolving the Plaintiffs' claims (factors (4)–(5)).[16]

Moreover, the Plaintiffs point to the fact that any inconvenience associated with defending the Adversary Proceeding should be minimized given that each Movant is defended by TPG's New York Counsel. (*Id.* at 22.)  The Plaintiffs argue that this fact supports the conclusion that New York is a *more* convenient forum than another federal district, because New York counsel need not travel and local counsel need not be retained.

Accordingly, with respect to the Movants subject to general jurisdiction, the exercise of personal jurisdiction over them would be reasonable.

### III.    CONCLUSION

In light of the foregoing, the Motion is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated:    March 31, 2016
          New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge

---

[16]    The defendants have also renewed a Forum Non Conveniens Motion, because an action is now pending in High Court in London, raising the same English law claims alleged in the Amended Complaint, against the defendants that were previously dismissed for lack of personal jurisdiction in *Hosking I.*  Nothing in this Opinion is intended to determine any of the issues raised by that motion.