**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | FOR PUBLICATION |
| HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA, | Chapter 15 |
| | Case No. 12-10631 (MG) |
| Debtor in a Foreign Proceeding. | |
| ANDREW LAWRENCE HOSKING and BRUCE MACKAY, in their capacity as joint compulsory liquidators and duly authorized foreign representatives of HELLAS TELECOMMUNICATIONS (LUXEMBOURG) II SCA, | |
| Plaintiffs, | Adv. Proc. No. 14-01848 (MG) |
| -against- | |
| TPG CAPITAL MANAGEMENT, L.P., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' FORUM NON CONVENIENS MOTION AND STAYING THE ACTION ON CERTAIN CONDITIONS**

*A P P E A R A N C E S:*

CHADBOURNE & PARKE LLP
*Attorneys for Plaintiffs as against*
*All Defendants except Defendant Deutsche Bank AG*
1301 Avenue of the Americas
New York, New York 10019
By:    Andrew Rosenblatt, Esq.
       Howard Seife, Esq.
       Robert M. Kirby, Esq.
       Marc D. Ashley, Esq.

SCHWARTZ SLADKUS REICH GREENBERG ATLAS LLP
*Attorneys for Plaintiffs as against*
*Defendant Deutsche Bank AG*
270 Madison Avenue
New York, New York 10016
By:    Alan A.B. McDowell, Esq.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for the TPG Defendants*
1633 Broadway
New York, New York 10019
By:    Paul M. O'Connor, III, Esq.
       Andrew K. Glenn, Esq.

ROPES & GRAY LLP
*Attorneys for Defendant Apax Partners, L.P.*
1211 Avenue of the Americas
New York, New York 10036
By:    Robert S. Fischler, Esq.
       Stephen C. Moeller-Sally, Esq.

CAHILL GORDON & REINDEL LLP
*Attorneys for Defendant Deutsche Bank AG*
80 Pine Street
New York, New York 10005
By:    Charles A. Gilman, Esq.
       Kevin J. Burke, Esq.
       Philip V. Tisne, Esq.
       Frederick W. Vaughan, Esq.

LATHAM & WATKINS LLP
*Attorneys for the TCW Defendants*
355 South Grand Avenue
Los Angeles, California 90071
By:    Wayne S. Flick, Esq. (*pro hac vice*)
       Amy C. Quartarolo, Esq. (*pro hac vice*)

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

       The adversary proceeding in this chapter 15 case was filed on March 13, 2014.  Based on

the Court's prior rulings (discussed below), much has changed since the adversary proceeding

was initially filed.  Originally, the complaint asserted New York law avoidance claims and an

unjust enrichment claim against U.S.-based and foreign-based defendants.  The Court dismissed

the New York law avoidance claims against the U.S.-based defendants and dismissed the action

against the foreign-based defendants based on a lack of personal jurisdiction.  The Court then

permitted the complaint to be amended to allege avoidance claims under the law of the United

Kingdom ("U.K."), where the foreign debtor's recognized foreign main insolvency proceeding is pending.  In the opinion permitting the complaint to be amended, the Court also rejected defendants' argument that the proposed amendment to the complaint was futile because the case would be subject to dismissal based on *forum non conveniens*.  At that time, there was no avoidance action pending in the U.K. and only one of the defendants in this action acknowledged or consented to jurisdiction in the U.K.  Thus, there was no adequate alternative forum to adjudicate the claims against the remaining defendants in this action.  That all changed when, on November 26, 2015, the Plaintiffs filed an avoidance action in the U.K., asserting the same U.K. avoidance claims included in the First Amended Complaint (as defined below), against the nine defendants previously dismissed from this action based on lack of personal jurisdiction (the "U.K. Action").  On January 19, 2016, the named Defendants (as defined below) filed a *forum non conveniens* motion.  Each defendant has consented to jurisdiction in the U.K. Action, and also agreed that all of the discovery taken in this action could be used in the U.K. Action.

The question for this Court now is whether the changed circumstances support granting the Defendants' *forum non conveniens* motion.  In other words, should the Plaintiffs now be required to add the U.S.-based defendants to the U.K. Action, and to litigate all of their claims against all defendants in one forum?

While the Court previously concluded that it could adjudicate the U.K. law claims against the defendants in this case, it is important to recognize the role a bankruptcy court properly plays in a chapter 15 case.  This case is ancillary to the foreign main proceeding pending in the U.K.  This Court is supposed to provide assistance and cooperation to the U.K. court; the Court may also administer assets of the foreign debtor located within the U.S.  But this Court, a U.S. bankruptcy court, should not supplant the U.K. court on matters properly pending before the

U.K. court, particularly when issues of unsettled U.K. law are involved, as is the case here.

When the Court previously rejected the first *forum non conveniens* argument in permitting

amendment of the complaint to add the U.K. law claims, there was no pending avoidance action

in the U.K.

The Court concluded that the defendants failed to satisfy an essential requirement of the

doctrine, namely that the U.K. was an adequate alternative forum because each defendant was

either amenable to service of process in the U.K., or alternatively, that each defendant consented

to personal jurisdiction in the U.K.  That has now changed.  The Plaintiffs filed the U.K. Action,

and defendants have consented to jurisdiction in the U.K.  Quite clearly, there is now an

adequate alternative forum—indeed, as explained below, a superior forum—to adjudicate all of

the claims against the named defendants in this adversary proceeding.  Having the U.K. law

claims against all defendants—U.S.-based and foreign-based—resolved in one proceeding is

clearly superior; it avoids the risk of inconsistent results and it leaves the U.K. law claims to be

resolved by U.K. courts.  If the Plaintiffs prevail on their avoidance claims in the U.K., where the

foreign main insolvency proceeding is pending, the relief sections of the U.K.'s Insolvency Act

1986 appear to provide discretion to a U.K. court to tailor relief in a way that this Court could

not do.  *See* Insolvency Act 1986 § 425.

Several matters are pending before the Court and are ready for decision.  The Defendants

filed a memorandum in support of their motion to dismiss the First Amended Complaint based

on *forum non conveniens* (the "Forum Non Conveniens Motion," ECF Doc. # 255).  The Forum

Non Conveniens Motion is supported by the declaration of Paul M. O'Connor III (ECF Doc. #

256).  The Plaintiffs filed a memorandum of law in opposition to the Forum Non Conveniens

Motion (the "Opposition," ECF Doc. # 282).  The Opposition is supported by the declaration of

Marc D. Ashley (the "Ashley Declaration," ECF Doc. # 283) and the declaration of John

Rothwell Verrill (the "Verrill Declaration," ECF Doc. # 284). The Defendants also filed a

response to the Opposition (the "Reply," ECF Doc. # 296). Additionally, the Defendants filed a

motion seeking authorization to file certain unredacted papers under seal (the "Seal Motion,"

ECF Doc. # 285).

In response to an issue raised by the Court, whether Defendants' jury demand should be

stricken, Plaintiffs and Defendants argue that the parties are entitled to a jury trial in a U.S. court.

The Defendants filed *Defendants' Memorandum of Law in Support of Their Right to Trial by

Jury* (the "Defendants' Jury Demand Mem.," ECF Doc. # 274). The Plaintiffs filed *Plaintiff's

Memorandum of Law in Response to Order to Show Cause Why Defendants' Jury Trial Demand

Should Not Be Stricken* (the "Plaintiffs' Jury Demand Mem.," ECF Doc. # 273). In response, the

Defendants[1] filed *Defendants' Reply in Further Support of Their Right to Trial by Jury* (the

"Defendants' Jury Demand Reply," ECF Doc. # 280).

Finally, pending before the Court is the Plaintiffs' motion to certify a defendant class (the

"Class Certification Motion," ECF Doc. # 308). The Class Certification Motion is supported by

the Plaintiffs' memorandum of law (the "Class Certification Memorandum," ECF Doc. # 309)

and the declaration of Marc D. Ashley (the "Ashley Declaration II," ECF Doc. # 310).

---

[1]     The "Defendants" are TPG Capital Management, L.P., f/k/a TPG Capital, L.P., David Bonderman, James
Coulter, TPG Advisors IV, Inc., TPG GenPar IV, L.P., TPG Partners IV, L.P, T3 Advisors II, Inc., T3 GenPar II,
L.P., T3 Partners II, L.P., T3 Parallel II, L.P., TPG FOF IV, L.P., TPG FOF IV-QP, L.P., TPG Equity IV-A, L.P.,
f/k/a TPG Equity IV, L.P., TPG Management IV-B, L.P., TPG Coinvestment IV, L.P., TPG Associates IV, L.P.,
TPG Management IV, L.P., TPG Management III, L.P., Bonderman Family Limited Partnership, Bondo-TPG
Partners III, L.P., Richard Schifter, William S. Price III, Dick W. Boyce, Kevin R. Burns, Justin Chang, Jonathan
Coslet, Kelvin Davis, Andrew J. Dechet, Jamie Gates, Marshall Haines, John Marren, Michael MacDougall,
Thomas E. Reinhart, Todd B. Sisitsky, Bryan M. Taylor, Carrie A. Wheeler, James B. Williams, John Viola
(collectively, the "TPG Defendants"), Apax Partners, L.P. ("Apax New York"), Deutsche Bank AG ("Deutsche
Bank"), TCW/Crescent Mezzanine III, LLC, TCW/Crescent Mezzanine Trust III, TCW/Crescent Mezzanine
Partners III Netherlands, L.P., TCW/Crescent Mezzanine Partners III, L.P., also known as TCW/Crescent
Mezzanine Fund III, LP, and TCW Capital Investment Corporation (collectively, the "TCW Defendants").

Additionally, the Defendants filed a motion seeking authorization to file certain unredacted

papers under seal (the "Class Seal Motion," ECF Doc. # 311).  The Defendants responsive

papers to the Class Certification Motion are due on or before August 22, 2016 and the Plaintiffs'

reply is due on or before September 12, 2016.  (*See Eighth Case Management and Scheduling*

*Order*, ECF Doc. # 303.)

For the reasons explained below, the Forum Non Conveniens Motion is **GRANTED.**

Ordinarily, granting a *forum non conveniens* motion results in dismissal of the action.  During

the Hearing (as defined below) on the pending motions, the Court raised the question whether, in

the event that the Court grants the Forum Non Conveniens Motion, the parties would consent to

the entry of an order staying the action rather than dismissing it pending the conclusion of the

U.K. Action.  If the U.K. Action results in a judgment against the U.S.-based defendants, the stay

may be lifted for any proceedings seeking enforcement of the judgment.  A stay would also make

it unnecessary to resolve at this time the belatedly-filed Class Certification Motion.

Additionally, because a stay is an interlocutory order, the Court may enter the order while

avoiding the constitutional issue of whether a bankruptcy judge has the authority to enter an

order dismissing the action on *forum non conveniens* grounds.[2]  Granting a stay of this adversary

---

[2]     This adversary proceeding raising foreign law claims is a related-to action rather than a core proceeding. The Court may enter a final order or judgment in a related-to proceeding, or with respect to so-called *Stern* claims, only with the consent of the parties.  *See Wellness Int'l Network Ltd. v. Sharif*, 135 S. Ct. 1932 (2015).  The Defendants have not consented to the entry of final orders or judgment.  The Court is not aware of any cases resolving whether a bankruptcy judge may enter a final order or judgment without consent dismissing a related-to action based on *forum non conveniens*.  There is a split of authority about whether a motion to *remand* an action raising state law claims to state court is a "core" proceeding, on which a bankruptcy court may enter a final order remanding a case to state court, or whether the referenced "proceeding" is the underlying lawsuit subject to a remand motion.  *See Bayerische Landesbank v. Deutsche Bank AG (In re Residential Capital, LLC)*, 488 B.R. 565, 571–72 (discussing split in authority).  Because a remand order—like a dismissal order based on *forum non conveniens*—terminates the proceeding as far as the federal court is concerned, the argument is that it is a "final order" in a related-to action that, absent consent, must be entered by a district court.  A stay order, on the other hand, is an interlocutory order (since the stay may be lifted).  Bankruptcy judges may enter interlocutory orders without consent and without preparing proposed findings of fact and conclusions of law.  *See O'Tool v. McTagart (In re*

proceeding should in all events be subject to the conditions described below that include, among

other things, that the Defendants (i) consent to jurisdiction in the U.K. court, (ii) waive service of

process (or consent to their counsel accepting service of process) in the U.K. Action, and (iii)

consent to the use of all discovery taken in this action in the U.K. Action (subject, of course, to

the authority of the U.K. court to decide on all questions of admissibility of evidence).

Defendants' counsel agreed to these conditions during the Hearing and in letters filed with the

Court after the Hearing.[3]  (*See* ECF Doc. # 313.)

## I.    GENERAL BACKGROUND

### A.    Procedural Background

Hellas Telecommunications (Luxembourg) II SCA ("Hellas II" or the "Debtor") was a

Greek telecommunications company.  The Debtor is in the process of being wound up in

England, and the joint compulsory liquidators appointed by the U.K. court (the "Foreign

Representatives" or the "Plaintiffs") sought and obtained recognition of the English liquidation

proceeding as a foreign main proceeding from this Court on March 14, 2012.

On March 13, 2014, the Plaintiffs filed an adversary proceeding complaint (the

"Complaint") seeking to avoid and recover an initial transfer made by Hellas II to its parent

---

*Trinsum Grp., Inc.*), 467 B.R. 734 (Bankr. S.D.N.Y. 2012).  Appellate review of an interlocutory order is available, with leave of the district court, under 28 U.S.C. § 158(a)(3).  *Id.* at 740 n.8.

[3]      The issue raised *sua sponte* by the Court about whether Defendants' jury demand should be stricken (because, it appears, that the First Amended Complaint seeks equitable relief) is moot in light of the Court's ruling on the Forum Non Conveniens Motion.

This Opinion also does not address the merits of the Plaintiffs' Class Certification Motion, which is not yet fully briefed, and, in any event, is unnecessary to decide in light of the Court's ruling on the Forum Non Conveniens Motion.

Finally, the Seal Motion is **DENIED**.  The unredacted papers filed in support of the Forum Non Conveniens Motion contain facts relevant to understanding the Court's decision; also, the Court concludes that the unredacted papers do not contain material satisfying the requirements of Bankruptcy Code § 107(b).  The unredacted papers shall be filed on ECF within seven days of the entry of this Opinion.

entity in the amount of approximately €1.57 billion and to avoid and recover approximately

€73.7 million of subsequent transfers allegedly made to several named defendants and an

unnamed class of transferees (together, the "Original Defendants").  Through the Complaint, the

Plaintiffs asserted actual and constructive fraudulent transfer causes of action under the New

York Debtor and Creditor Law ("NYDCL") against each of the Original Defendants, and an

unjust enrichment claim under unspecified law against the Original Defendants affiliated with

the private equity firms Apax Partners LLP ("Apax Partners") and TPG Capital Management,

L.P. ("TPG Capital").

       The Original Defendants moved to dismiss the Complaint on various grounds, including

lack of standing, lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to

state a claim.  On January 29, 2015, the Court granted in part and denied in part the motions to

dismiss.  *See Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 524

B.R. 488, 497 (Bankr. S.D.N.Y. 2015) ("Hosking I").  The Court dismissed the Complaint for

lack of personal jurisdiction as to Apax Partners and the foreign-based Original Defendants

affiliated with Apax Partners and TPG Capital.  *See id.* at 512.  However, the Court concluded

that it could exercise personal jurisdiction over each of the other Original Defendants.  *See id.* at

513.  The Court dismissed the Plaintiffs' NYDCL fraudulent transfer claims for lack of standing.

*See id.* at 529 & n.41.  Only the unjust enrichment claim survived against the U.S.-based

Original Defendants affiliated with Apax Partners and TPG Capital.  *See id*. at 529.

       On February 13, 2015, the original TPG and Apax defendants filed a motion seeking

limited reargument on their motion to dismiss the unjust enrichment claim, arguing that the

Court should reconsider Hosking I and dismiss the unjust enrichment claim because the opinion

did not address their argument that the unjust enrichment claim is barred by section 546(e) of the

Bankruptcy Code.  On March 9, 2015, the Court issued an opinion granting the original TPG and

Apax Defendants' motion for limited reargument in order to address the section 546(e)

argument, but denying their motion to dismiss the unjust enrichment claim, holding that such

claim is not preempted by section 546(e) as a matter of law.  *See Hosking v. TPG Capital Mgmt.,*

*L.P. (In re Hellas Telecomms. (Lux.) II SCA)*, 526 B.R. 499, 515 (Bankr. S.D.N.Y. 2015)

("Hosking II").

On March 19, 2015, the Plaintiffs filed motion for leave to amend, and thus to file, a first

amended complaint (the "Motion to Amend," ECF Doc. # 151) to: (1) join additional proposed

defendants (the "Proposed Defendants"); (2) withdraw the unjust enrichment claim against Apax

NY; (3) remove TCW Asset Management Company ("TCW Asset") and TCW Group Inc.

("TCW Group") as defendants; and (4) plead new causes of action sounding in fraudulent

transfer under U.K. and Luxembourg law (the "Additional Claims")[4] against several of the

Original Defendants and the Proposed Defendants.  Through the First Amended Complaint, the

Plaintiffs sought to assert an unjust enrichment claim against the TPG Capital Defendants, the

TPG Advisors IV Defendants, and the T3 Advisors II Defendants under New York law or, in the

alternative, U.K. or Luxembourg law.  The defendants objected to the Motion to Amend.

The Court issued an opinion granting in part and denying in part the Motion to Amend on

August 19, 2015.  S*ee Hosking v. TPG Capital Mgmt., L.P. (In re Hellas Telecomms. (Lux.) II*

*SCA)*, 535 B.R. 543, 553 (Bankr. S.D.N.Y. 2015) ("Hosking III").  Specifically, the Court did

---

[4]        The Additional Claims include: (1) an actual fraudulent transfer claim under section 423 of the U.K.'s
Insolvency Act 1986 (the "U.K. Insolvency Act") against all Defendants except Apax NY (the "Section 423
Claim"); (2) a fraudulent trading claim under section 213 of the U.K. Insolvency Act against all Defendants except
for the TPG Affiliate Defendants and the Transferee Class (the "Section 213 Claim"); and, (3) in the alternative
to the Section 423 Claim and the Section 213 Claim, an actual fraudulent transfer claim under Article 1167 of the
Luxembourg Civil Code and Article 448 of the Luxembourg Commercial Code against all Defendants except Apax
NY (the "Article 1167 Claim").  (First Am. Compl. at 4.)

not permit the Plaintiffs to assert their claims under Luxembourg law, but the Court granted the

Motion to Amend in all other respects.  Importantly, the Court held that this Court could

adjudicate the claims under Sections 213 and 423 of the U.K. Insolvency Act.  Additionally, the

Court included a lengthy discussion of the *forum non conveniens* argument.  *See* Hosking III at

589–93.  The defendants argued that amendment of the complaint to assert U.K. law claims

would be futile because the amended complaint would have to be dismissed on *forum non*

*conveniens* grounds.  The Court rejected the defendants' arguments that *forum non conveniens*

would require dismissal, but the Court concluded that dismissal might be appropriate if "the

Plaintiffs commenced a similar action in the U.K. against the Original Defendants that were

dismissed for lack of personal jurisdiction in Hosking I."[5]  *Id.* at 593 n.38.

### B.    The First Amended Complaint[6]

On August 20, 2015, the Plaintiffs filed the amended complaint (the "First Amended

Complaint," ECF Doc. # 189).  The causes of action that the Plaintiffs assert in the First

Amended Complaint arise from the events that transpired after TPG Capital and Apax Partners

acquired TIM Hellas.  In March 2005, in preparation for the acquisition of TIM Hellas, TPG[7]

and Apax[8] allegedly organized a group of entities under Luxembourg law, including: Hellas,

Hellas I, Hellas Telecommunications (Luxembourg) III, S.à.r.l. ("Hellas III"), Hellas

---

[5]    The discussion in footnote 38 focused on defendant Deutsche Bank A.G., which admitted that it was subject to personal jurisdiction in the U.K.  At that time, none of the U.S.-based defendants agreed or consented to jurisdiction in the U.K.

[6]    The following facts are summarized from the First Amended Complaint.

[7]    "TPG" refers collectively to all of the entities and individuals named as defendants and defined below as the TPG Capital Defendants, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, and the TPG Affiliate Defendants, plus non-party TPG Capital, LLP.  (First Am. Compl. ¶ 21.)

[8]    "Apax" refers collectively to defendant Apax Partners, L.P., plus all of the non-party entities and individuals defined below as Apax Partners, Martin Halusa, and the Apax Europe VI Entities.  (*Id.* ¶ 22.)

Telecommunications IV, S.à.r.l. ("Hellas IV"), Hellas Telecommunications (Luxembourg) V

SCA ("Hellas V"), and Hellas Finance.  (*See* First Am. Compl. ¶ 113.)  Each of the foregoing

entities, and Hellas II, which was organized in 2003 and had remained dormant as a "shelf

company" until the contemplated acquisition of TIM Hellas (collectively, the "Hellas Entities"),

had its registered offices at 8-10, rue Mathias Hardt, Luxembourg.  (*Id.*)  Hellas II and Hellas

Finance were wholly owned by Hellas I, which in turn was wholly owned by Hellas.  (*Id.* ¶ 114.)

Hellas, the ultimate parent of the Hellas Entities, was wholly owned by eight investment funds

(the "Sponsors").  (*Id.*)

In June 2005, the Sponsors acquired approximately 80% of the equity in TIM Hellas, a

Greek telecommunications services provider, through a special purpose vehicle ("Troy GAC") in

a leveraged buyout transaction.  (*See Id.* ¶¶ 114–16.)  The purchase price for the acquisition was

approximately €1.114 billion, *plus* (i) €166.0 million to pay the existing debt of TIM Hellas and

(ii) €69.9 million for transaction costs.  (*Id.* ¶ 116.)  This acquisition was primarily financed with

€1.195 billion in debt incurred by the Hellas Entities, including short-terms loans of

approximately €863 million and €143 million borrowed by Hellas II's indirect subsidiaries,

Hellas V and Hellas III, respectively.  (*Id.*)  Allegedly, TPG and Apax, through the Sponsors,

contributed approximately €211 million of the total financing.  (*Id.*)  In November 2005, the

Sponsors acquired the remaining shares of TIM Hellas through Troy GAC for an additional

€263.5 million.  (*Id.* ¶ 118.)  The acquisition was again principally funded by debt issued by the

Hellas Entities. (*Id.*)  Subsequently, the Sponsors' equity interests in TIM Hellas were cancelled,

and TIM Hellas merged into Troy GAC; the surviving entity became a wholly owned subsidiary

of Hellas II.  (*Id.* ¶ 119.)

In mid-June 2005, Hellas issued 490,000 convertible preferred equity certificates ("CPECs") to the Sponsors with a par value of €49 million. (*Id.* ¶ 124.) At the same time, Hellas I—the direct subsidiary of Hellas and direct parent of Hellas II—issued 490,000 CPECs to Hellas, and Hellas II issued an equivalent number of CPECs[9] to Hellas I. (*Id.*)

TPG and Apax allegedly used Hellas and its related entities to acquire Q-Telecom, a business unit of a large mobile network operator in Greece, in a stock purchase deal that closed on January 31, 2006. (*Id.* ¶ 131.) The acquisition was principally financed with debt issued by a subsidiary of Hellas II and cash contributed by certain other Hellas II subsidiaries. (*See id.* ¶ 132.) In exchange for the transfer of €28.3 million from the Sponsors to Hellas, Hellas issued an additional 282,681 CPECs to the Sponsors.[10] (*Id.* ¶ 133.)

The Plaintiffs allege that by early 2006, TPG and Apax decided to withdraw the funds that they had contributed to the TIM Hellas and Q-Telecom acquisitions. (*Id.* ¶ 135.) On or around April 12, 2006, Hellas Finance issued €500 million of Floating Rate Senior PIK Notes due 2014 (the "Original PIK Notes"), guaranteed by Hellas I. (*Id.*) Deutsche Bank, as one of the underwriters, received approximately €4.17 million in fees. (*Id.*) Approximately, €376.6 million of the €500 million was transferred to the Sponsors on or about the same day. (*Id.*) The Plaintiffs allege that of the approximately €376.6 million transferred to the Sponsors, €43.5 million passed through Hellas II to redeem CPECs held at par by its parent Hellas I. (*Id.* ¶ 135.) In turn, Hellas I paid €43.5 million to redeem CPECs held at par by its parent Hellas, and Hellas paid €43.5 million to redeem CPECs held at par by the Sponsors. (*Id.*) On or about the same

---

[9]    The Plaintiffs contend that CPECs were subordinate to all other present or future obligations of Hellas II, accrued no interest, and would mature, at par value, 30 years after their issue date. (*Id.* ¶ 125.) The holder of the CPECS had no right, at any time, to demand conversion or redemption of the CPECs. (*Id.*)

[10]    Cash was allegedly transferred from Hellas to Hellas I, and then to Hellas II; in exchange, corresponding CPECs were then issued up the corporate structure from Hellas II to Hellas I, and then to Hellas. (*See id.* ¶ 133.)

date, April 12, 2006, all outstanding CPECs underwent a 1-100 split by agreement of the
Sponsors and Hellas.  (*Id.* ¶ 137.)

The Plaintiffs allege that TPG and Apax "put in motion plans to dispose of [Hellas II]'s
subsidiaries in a sale to a third party" no later than June 2006.  (*Id.* ¶ 139.)  However, the sale
process purportedly did not generate interest at the prices sought by TPG and Apax, and
subsequently "they instead took steps to extract those returns from [Hellas II] under the guise of
a purported 'refinancing' of its debt."  (*Id.* ¶ 146.)

In December 2006, through a multi-step transaction (the "December 2006 Transaction"),
(i) Hellas II issued €960 million and $275 million of Floating Rate Subordinated Notes due 2015
(the "Sub Notes");[11] (ii) Hellas Finance and certain subsidiaries of Hellas issued additional series
of notes, the proceeds of which were transferred or loaned to Hellas II; and (iii) Hellas II
transferred a total of approximately €1.57 billion to its parent, Hellas I, of which approximately
€978.7 million was paid to redeem CPECs issued by Hellas II.  (*Id.* ¶ 160.)  Subsequently, Hellas
I paid approximately €973.7 million to Hellas to redeem CPECs issued by Hellas I, and Hellas
then paid the Sponsors approximately €973.7 million to redeem CPECs issued by Hellas (the
"December 2006 CPEC Redemption").  (*Id.*)  The remaining portion of the €1.57 billion
transferred from Hellas II to Hellas I was allegedly used to retire other outstanding debt issued
by the Hellas entities and to pay costs associated with the December 2006 Transaction.[12]  (*Id.*)

The Sub Notes, as well as (i) €97.25 million of Senior Secured Floating Rate notes due
2012 and (ii) €200 million of Floating Rate Senior PIK Notes due 2015, were issued on

---

[11]    The Sub Notes were marketed and sold to, as well as ultimately purchased by, investors located in
jurisdictions including New York and elsewhere in the United States.  (*Id.* ¶¶ 163–64.)  The offering memorandum
provides that New York law governed the Sub Notes and the indenture for the Sub Notes.  (*Id.* ¶ 165.)

[12]    Specifically, the proceeds were used to retire the €500 million Original PIK Notes and interest, plus
approximately €48.8 million in transaction costs associated with the December 2006 Transaction.

December 21, 2006.  (*Id.* ¶ 167.)  The Plaintiffs contend that later on December 21, 2006, Hellas

II paid €978,659,712 in proceeds from the December 2006 Transaction to Hellas I to redeem

27.3 million CPECs at €35.82 per CPEC, Hellas I then paid €973,657,610 to Hellas (after

payment of approximately €5 million in advisor fees) to redeem 27.4 million CPECs at €35.57

per CPEC, and Hellas then paid the €973,657,610 it had received from Hellas I to the Sponsors

to redeem 27.4 million CPECs at €35.57 per CPEC.  (*Id.* ¶ 168.)

   In February 2007, TPG and Apax sold Hellas and its subsidiaries to Weather Investments

S.p.A., later renamed WIND Telecom S.p.A. ("Weather Investments"), a stock corporation

organized under the laws of Italy.  (*Id.* ¶ 192.)  Weather Investments purchased 100% of the

equity of Hellas for €500 million, €6,435,736 of which was allocated toward the purchase of the

remaining CPECs previously issued by Hellas to the Sponsors at the par value of €1 per CPEC.

(*Id.* ¶ 195.)  Hellas II's financial statements for the year ending December 31, 2007 indicated that

its debt-service obligations grew and resulted in a net financial loss of more than €259.5 million;

its "leverage remained high at 12.4x EBIT, while its cash interest coverage declined to 1.2x

EBIT."  (*Id.* ¶ 198.)  On or about June 5, 2008, Apax Partners paid €500 million to Weather

Investments for a 5% equity stake in Weather Investments.  (*Id.* ¶ 199.)  Additionally, Hellas II

"paid a minimum of €1.22 million in additional 'consulting fees' to Hellas I and, directly or

indirectly, Hellas I then paid approximately those same amounts to TPG and Apax (the

"Consulting Fees Transfer")."  (*Id.* ¶ 191.)

   In 2009, Hellas II began considering a potential restructuring of its capital structure.  (*See

id.* ¶ 201.)  On November 26, 2009, the High Court of Justice of England and Wales approved

placing Hellas II into administration in England and appointed joint administrators (the

"Administrators").  (*Id.*)  On December 1, 2011, the U.K. court discharged the Administrators

and ruled instead that Hellas II should be wound-up through a compulsory liquidation.  (*Id.*

¶ 202.)  The Plaintiffs were thereafter appointed as joint compulsory liquidators.  (*Id.* ¶ 18.)

The Plaintiffs allege that Hellas II was insolvent at the time of the December 2006 CPEC

Redemption and that the Defendants received portions of the proceeds of such transaction from

one or more Sponsors.  (*See, e.g.*, *id.* ¶ 182.)  The Plaintiffs assert the following causes of action:

1.  <u>Actual fraudulent transfer against the Transferee Defendants (as defined in the First Amended Complaint), the Transferee Class (as defined in the First Amended Complaint), and TPG Capital pursuant to Section 423 of the U.K. Insolvency Act</u>. In support, the Plaintiffs argue that (i) the December 2006 CPEC Redemption was a dividend or distribution to shareholders devoid of any consideration; and (ii) the Consulting Fees Transfer was made without fair or adequate consideration, including because TPG and Apax provided no "consulting" or "management" services of value to Hellas II or its subsidiaries.  (*Id.* ¶¶ 205–11.)

2.  <u>Fraudulent Trading against the TPG Capital Defendants, the TPG Advisors IV Defendants, the T3 Advisors II Defendants, Apax New York, and Deutsche Bank pursuant to Section 213 of the U.K. Insolvency Act</u>.  In support, the Plaintiffs allege that Hellas II, by and through its sole manager Hellas and the members of the Board of Managers of Hellas, carried on business with a fraudulent purpose including the intent to defraud the actual or potential creditors of Hellas II and in particular the holders of the Sub Notes, when it executed the December 2006 CPEC Redemption and the Consulting Fees Transfer.  (*Id.* ¶¶ 212–16.)

3.  <u>Unjust Enrichment against the TPG Capital Defendants, the TPG Advisors IV Defendants, and the T3 Advisors II Defendants pursuant to New York Law or, in the alternative, English or Luxembourgish law</u>.  The Plaintiffs allege that TPG has been unjustly enriched through its receipt and retention of the proceeds from the December 2006 Transaction, the December 2006 CPEC Redemption, and the Consulting Fees Transfer.  (*Id.* ¶¶ 217–21.)

In response to the First Amended Complaint, various defendants moved to dismiss the

First Amended Complaint.[13]  On February 1, 2016, the Defendants moved to withdraw the

reference and transfer this action to the district court.

_____

[13]    Specifically, the following motions were filed seeking to dismiss the First Amended Complaint: (A) Motion to Dismiss of TCW/Crescent Mezzanine III, LLC, TCW/Crescent Mezzanine Trust III, TCW/Crescent Mezzanine Partners III Netherlands, L.P., TCW/Crescent Mezzanine Partners III, L.P., and TCW/Capital Investment Corp. (the "TCW Motion," ECF Doc. # 200), which was joined by the TPG Defendants (the "TPG Joinder" ECF

On February 4, 2016, the Court entered an order denying the TCW Motion, the TPG

Joinder and the DB Motion.  On March 31, 2016, this Court entered a written memorandum

opinion and order denying the TPG Personal Jurisdiction Motion ("Hosking IV," ECF Doc. #

297).  Accordingly, the Forum Non Conveniens Motion remains pending before the Court.

### C.    The Luxembourg Action

The Plaintiffs also commenced an action against Hellas I in Luxembourg (the

"Luxembourg Action").  In the Luxembourg Action, the court held that the Plaintiffs did not

establish under Luxembourg law that Hellas II was entitled to a judgment against Hellas I.  (Case

No. 12-08686 (S.D.N.Y.), ECF Doc. #161 (citing to Stamell Decl. ¶ 5).)  The Plaintiffs appealed

the Luxembourg decision, and a second trial on the facts and the law will be held in the future.

(*Id.* at n.6.)

### D.    The U.K. Action

On November 26, 2015, the Plaintiffs commenced the U.K. Action, asserting Section 213

and Section 423 claims solely against the nine dismissed defendants—namely Apax Partners

LLP, Apax Partners Europe Managers Ltd., Apax Europe VI GP Co. Ltd., Apax Europe VI-A,

L.P., Apax Europe VI-1, L.P., Apax Europe VI GP, L.P., Apax WW Nominees Ltd., Martin

Halusa, and TPG Capital LLP (collectively, the "U.K. Respondents").  (Verrill Dec. ¶¶ 3–4 &

Exs. 1-2.)  The Plaintiffs stated therein that they commenced the U.K. Action "on a protective

basis to prevent the potential accrual of limitation defenses," and with the intent to "apply for a

stay of this [U.K. Action] including in light of the advanced proceedings in the pending US

Action."  (*Id.* ¶ 3, Ex. 2 ¶ 58.)

---

Doc. # 230); (B) Motion by Deutsche Bank AG to Dismiss the First Amended Complaint (the "DB Motion," ECF
Doc. # 205); (C) Motion of Certain TPG Defendants to Dismiss the First Amended Complaint for Lack of Personal
Jurisdiction (the "TPG Personal Jurisdiction Motion," ECF Doc. # 211); and (D) the Forum Non Conveniens
Motion.

On December 16, 2015, Plaintiffs completed service of process on the U.K. Respondents with the exception of those four entities with their registered office in Guernsey—namely Apax Europe VI GP Co. Ltd., Apax Europe VI-A, L.P., Apax Europe VI GP, L.P., and Apax Europe VI-I, L.P. (together, the "Guernsey Respondents").  (Verrill Dec. ¶ 5.)  On January 7, 2016, Registrar Clive Jones entered an ex parte order (the "January 7 Order") granting the Plaintiffs permission to serve the Guernsey Respondents out of the jurisdiction.  On January 12, 2016, the Plaintiffs served all four Guernsey Respondents pursuant to the January 7 Order.  (Verrill Dec. ¶ 5.)

The January 7 Order granted the Guernsey Respondents permission to apply to set aside or vary the January 7 Order by no later than 4:00 p.m. on January 28, 2016.  (*Id.* ¶ 6.)  On January 28, 2016, the four U.K. Respondents with their registered office in Guernsey moved to set aside the ex parte order of the Registrar (analogous to a magistrate judge) that had granted Plaintiffs permission to serve them out of the U.K. jurisdiction (the "U.K. Application").  (*Id.*)  On March 16, 2016, the U.K. court issued a decision declining to set aside the January 7 Order and dismissing the U.K. Application.  (Case No. 12-08686 (S.D.N.Y.), ECF Doc. # 160-7 ¶ 120.)

On July 14, 2016, this Court held a hearing regarding the Forum Non Conveniens Motion (the "Hearing").  Subsequent to the Hearing, the Plaintiffs filed papers in the U.K. court asking that, if their request for a stay pending determination of this proceeding is denied, that the U.K. court grant a temporary stay of the U.K. Action until December 1, 2016.  (ECF Doc. # 315, 323-1.)  The U.K. court denied the request and instead entered a temporary stay until October 3, 2016 to allow the U.K. court to receive this Court's decision on the Forum Non Conveniens Motion.  (ECF Doc. # 323-2.)  Additionally, the U.K. court scheduled a case management conference to be held on October 17, 2016.  (*Id.*)

## II.      THE PARTIES' ARGUMENTS

### A.      The Motion

The Defendants argue that this Court should dismiss this adversary proceeding because the Plaintiffs recently commenced the U.K. Action.[14]  (Forum Non Conveniens Mot. at 1.) Specifically, the Defendants argue that each factor that courts in this circuit consider in determining whether to dismiss an action on *forum non conveniens* weighs in favor of dismissal of the First Amended Complaint.[15]  (*Id.* at 7.)

First, the Defendants argue that—in light of the commencement of the U.K. Action—the Plaintiffs' choice of forum should be entitled to little, if any, deference.  (*Id.* at 8.)  The Defendants contend that there is simply "no reason" for this Court to apply any presumption in favor of the New York forum.  (*Id.*)

Second, the Defendants argue that the U.K. is an adequate alternative forum because (1) the Defendants are subject to jurisdiction in that forum and (2) that forum permits litigation of the subject matter of the dispute.  (*Id.* at 9–10.)  Specifically, the Defendants contend that they are subject to jurisdiction in the U.K. because all of the Defendants consented to jurisdiction there.  (*Id.* at 9.)  Moreover, the Defendants argue that the U.K. court permits litigation of the claims under Sections 213 and 423 of the U.K. Insolvency Act and recognizes an unjust enrichment claim.  (*Id.* at 10.)

Third, turning to the public interest factors, the Defendants argue that those factors also weigh in favor of dismissal of the First Amended Complaint.  (*Id.*)  The Defendants argue that

---

[14]      The Defendants contend that the TPG and Apax entities dismissed from this case on personal jurisdiction grounds have been served with pleadings commencing the case in the U.K.

[15]      As discussed earlier, all parties have consented to the entry of a stay of this action, rather than dismissal, in the event the Forum Non Conveniens Motion is granted.

the U.K. has the greatest interest in having its substantive law govern because, among other

things, (i) the First Amended Complaint alleges that the signatories to the redemption agreement

at issue were all located in the U.K. and Italy, (ii) the initial transfer of funds was made between

English bank accounts, (iii) a substantial portion of the Sub Notes was held by U.K. custodians,

and (iv) the actions relating to the December 2006 CPEC redemption were taken to a

considerable extent by entities located in the U.K.  (*Id.* at 11.)

Moreover, the U.K. has an interest in determining what *res judiciata* or collateral

estoppel effect to give its European Community sister state's judgment in the Luxembourg case.

(*Id.* at 12.)  Additionally, the Defendants contend that dismissal of this action will allow the

Plaintiffs' claims to go forward in a single forum and, as such, preserve judicial resources

because the U.K. Action and this action are duplicative in every material aspect given that the

two actions involve the same claims, the same underlying transaction, the same evidence, and the

same witnesses.  (*Id.* at 11–13.)

Fourth, the Defendants argue that the private interest factors also weigh in favor of

dismissal of the Amended Complaint.  The Defendants contend that they have consented to the

use of the fact discovery conducted, as of the date of the Forum Non Conveniens Motion, in this

case, subject to the same objections to admissibility that would be applicable in this Court.  (*Id.*

at 14.)  Additionally, the Defendants point to the fact that the Plaintiffs are unable to proceed in

this action against the defendants that were named in the U.K. Action and were previously

dismissed from the action for lack of personal jurisdiction.  (*Id.*)  The Defendants also argue that

a large number of key witnesses reside and/or work in the U.K. and that this fact should weigh in

favor of dismissal of the First Amended Complaint because the adjudication of these claims will

require the testimony of these foreign witnesses.  (*Id.* at 15–16.)

### B.    The Opposition

In the Opposition, the Plaintiffs argue that (i) the Defendants have failed to satisfy their burden of establishing that an alternative adequate forum exists and (ii) the balance of the private and public interest factors weigh against the alternative forum.  (Opp'n at 9.)

#### 1.    The Law of the Case Doctrine Applies

First, the Plaintiffs argue that this Court's prior ruling in Hosking III—holding that the Plaintiffs' choice of forum is entitled to substantial deference—should stand.  Accordingly, pursuant to the law of the case doctrine, the Court should not revisit the first step of the *forum non conveniens* analysis.  (*Id.*)

#### 2.    Defendants Have Failed to Demonstrate That the U.K. is an Adequate Alternative Forum

Despite the fact that all of the Defendants consented to jurisdiction in the U.K., the Plaintiffs argue that dismissal of this case would prejudice the Plaintiffs because there are approximately 600 U.S. members of the Transferee Class that have not consented to jurisdiction in the U.K.  (*Id.* at 2, 10.)  The Plaintiffs argue that the Defendants have failed to show that any of the members of the Transferee Class would be subject to U.K. personal jurisdiction, and that the fact that the First Amended Complaint fails to name the members of the Transferee Class should not change the result.  (*Id.* at 10–11.)  The Plaintiffs contend that those individuals are not named because they are so numerous that joinder of all of them would be impracticable.  (*Id.*)

3.    *Defendants Have Failed to Demonstrate That the Public and Private Interest Factors Favor Dismissal of This Case*

The Plaintiffs argue that the Defendants' arguments regarding the alleged inconvenience and judicial waste of litigation in two forums should be discounted because the Defendants chose to delay this Motion "for over 20 months while pursuing discovery and dispositive motion practice in this Court." (*Id.*)  They further contend that this delay is a factor that the Court should consider and weigh in favor of denying the Forum Non Conveniens Motion. (*Id.* at 11–12.)

Moreover, the Plaintiffs argue that the Defendants have exaggerated and failed to substantiate the difficulties posed by foreign witnesses and documents. (*Id.*)  The Plaintiffs point to the fact that discovery is essentially complete, as the Defendants have produced over one million pages of documents and 16 current or former employees for videotaped deposition. (*Id.* at 13.)  The sixteen witnesses are widely dispersed in multiple jurisdictions including four in the United States, eleven in the U.K., and one in India. (*ld.*)  The Plaintiffs note that the Defendants do not claim that any of the sixteen employees would be unavailable to testify in the United States. (*Id.*)  Moreover, the Plaintiffs argue that there is no single forum in which all likely witnesses could be compelled to testify. (*Id.* at 15.)  Accordingly, the Plaintiffs contend that the Defendants have failed to show that the location of witnesses will pose a significant obstacle. (*Id.* at 13)

Additionally, the Plaintiffs argue that a "local" dispute does *not* exist in this case. (*Id.* at 15.)  On the contrary, this action seeks to recover from hundreds of U.S. transferees' proceeds generated from an international transaction through which British, Italian, German, and American executives of TPG, Apax, and DB caused Hellas II, a Luxembourg entity, to raise funds from investors across the world under the imprimatur of U.S. law, and then to distribute

21

those proceeds through wire transfers in the U.K., Belgium, Luxembourg, and the U.S. to the detriment of creditors worldwide. (*Id.* 15–16.)

The Plaintiffs argue that the applicability of U.K. law alone does not warrant dismissal. (*Id.* at 17.) Instead, the Plaintiffs contend that the "need to apply foreign law is not alone sufficient to dismiss under the doctrine of *forum non conveniens.*" (*Id.* at 17 (citing to *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 169 (2d Cir. 1991); *Rahl v. Bande*, 328 B.R. 387, 411 (S.D.N.Y. 2005)).) As such, the Plaintiffs urge this Court to apply U.K. law to adjudicate the issues in this case. (*Id.* at 18.)

The Plaintiffs point to the fact that the U.K. Action was only filed against the U.K. Respondents (*e.g.*, nine defendants), as compared to this action that is asserted against the Defendants (*e.g.*, over forty defendants). (*Id.* at 2.) The Plaintiffs contend that the defendants in the U.K. Action chose to seek dismissal from this action on personal jurisdiction grounds and then rejected the Plaintiffs' offer to enter into a tolling agreement to defer any U.K. litigation. (*Id.* at 3.)

Moreover, the Plaintiffs argue that there are no grounds to conclude that this Court is less qualified than a U.K. court to understand the Luxembourg panel's decision. (*Id.* at 18.) The Plaintiffs contend that the Luxembourg decision does not "raise[] serious questions regarding [whether] Plaintiffs are collaterally estopped from pursuing [their] Section 213 and Section 423 claims." (*Id.* at 19 (citing to Forum Non Conveniens Mot. 3.) The Plaintiffs allege that the Luxembourg litigation asserted illegal dividend claims under Luxembourg companies law, and not fraudulent transfer claims. (*Id.*)

Finally, the Plaintiffs argue that the U.K. Action is not duplicative because the Plaintiffs are the only parties in common to both actions. (*Id.* at 20.)

22

4.    *Dismissal of This Action at This Stage Would Severely Prejudice the Plaintiffs*[16]

The Plaintiffs argue that dismissal of over forty named Defendants "and class representatives" from this action would result in dismissal with prejudice of the Plaintiffs' Section 423 claim as against the Transferee Class.  (*Id.* at 22.)  Moreover, the Plaintiffs contend that—even if the Court grants the Plaintiffs leave to amend to name the U.S. Transferee Class members as individual defendants—granting the Forum Non Conveniens Motion would prejudice the Plaintiffs because it would force Plaintiffs to start over in this Court, and require Plaintiffs and the U.S. Transferee Class members to litigate here without TPG, Apax, or DB.  (*Id.*)

Moreover, the Plaintiffs contend that dismissal in favor of the U.K. Action would be prejudicial because the parties through their U.S. counsel have briefed and argued nine motions to dismiss, reviewed 1.5 million pages of documents, conducted videotaped depositions of nineteen witnesses, answered hundreds of interrogatories and requests for admission, and served

---

[16]    In addition to the arguments enumerated herein, Plaintiffs' counsel argued at the Hearing that the Court should deny the Forum Non Conveniens Motion because the Plaintiffs did not have the financial resources to prosecute these actions in the U.K. and, as such, the Plaintiffs would be forced to withdraw the U.K. Action.  (Hr'g Tr. 38:7–39:7.)  In support, Plaintiffs' counsel cited *Murray v. British Broad. Corp.*, 81 F.3d 287 (2d Cir. 1996).  In *Murray*, the Second Circuit held that the financial hardship of a plaintiff, who was a New York resident, "may not be considered in determining the *availability* of an alternative forum but must be deferred to the balancing of interests relating to the forum's convenience." *Id.* at 292–93 (emphasis in original).  In turning to the balancing of the interests, the Second Circuit determined that (i) the unavailability of contingent fee arrangements in England was of little weight because the availability of such arrangements in the United States is based on a policy decision and that decision "was not designed to suck foreign parties disputing foreign claims over foreign events into American courts" and (ii) considering the plaintiff's financial information and creditworthiness, the Second Circuit was unpersuaded by the argument that the plaintiff's financial condition posed insurmountable barriers to litigation in England.  *Id.* at 294.  The Second Circuit ultimately affirmed the lower court's dismissal of the action on the grounds of *forum non conveniens*.  In this case, the foreign Plaintiffs' argument, raised for the first time during the Hearing, regarding their financial condition was made without any evidentiary support.  In light of the lack an evidentiary record, the Court finds this argument unpersuasive.  Moreover, even if this statement had sufficient evidentiary support, in light of the other factors that favor granting a *forum non conveniens* motion, the Court would still reach its same conclusion, that the Forum Non Conveniens Motion should be granted.  Additionally, Plaintiffs' counsel has failed to provide any case law involving a *forum non conveniens* motion where the plaintiff was foreign and attempted to argue that financial hardship should preclude granting a *forum non conveniens* motion.

extensive expert reports.  (*Id.*)  The Plaintiffs argue that the amount of time and effort that has

been expended by the parties in this case "greatly increases" the presumption against dismissal.

(*Id.* at 23.)  The Plaintiffs argue that there is no guarantee that the U.K. court would agree to

allow the fact discovery conducted to date in the United States to be used in the U.K. Action.

(*Id.* at 24.)

### C.    The Reply

#### 1.    *The U.K. is an Adequate Alternative Forum*

The Defendants argue that the class allegations are irrelevant because the members of the

speculative defendant class are *not* named defendants, and in any event, the class allegations are

peripheral to this action.  (Reply at 1, 2.)  The Defendants argue that the Plaintiffs have been

indifferent to the class allegations until being faced with the Forum Non Conveniens Motion and

that indifference reflects the following scenario: in the event that the Plaintiffs are successful on

their Section 423 claims against the named defendants, they expect to obtain full recovery from

those defendants, and, conversely, to the extent that the Plaintiffs are unsuccessful in avoiding

the transfers to the named defendants, they would not be able to pursue claims against

subsequent transferee members of the putative class.  (*Id.* at 3.)

The Defendants also argue that it is highly doubtful that the Court will certify a defendant

class in this case, because the members of the class are expected to assert individual defenses

and, as such, common issues would not predominate.  (*Id.*)

As an alternative, the Defendants assert that this Court may preserve those claims in the

event that it decides that the claims against the named Defendants should be heard in the U.K.

(*Id.* at 1.)  Specifically, the Defendants argue that the Court can sever those claims (and stay

them) pursuant to Second Circuit authority. (*Id.*)  Alternatively, even if the Court decides not to

sever and preserve the claims, the Plaintiffs would be free to pursue individual claims against the members of the speculative defendant class.  (*Id.* at 1–2.)

### 2.     Balancing of the Public and Private Interests Weighs in Favor of Dismissal

The Defendants reargue the importance of the existing U.K. Action.  (*Id.* at 4–5.)  The Defendants contend that Plaintiffs' argument—that the U.K. defendants are not the same as the Defendants in this action—is of no moment because proceeding with both actions creates the possibility that associated parties will be subject to conflicting rulings and judgments regarding the same issues and transaction.  (*Id.* at 5.)

Additionally, the Defendants contend that two trials regarding the same claims, brought by the same Plaintiffs, concerning the same transaction and evidence, would be inherently inefficient and wasteful, and it would impose unwarranted burdens and expense on Defendants. (*Id.*)

### 3.     Plaintiffs, Not Defendants, Are Guilty of Undue Delay

The Defendants argue that the undue delay in bringing the Forum Non Conveniens Motion was caused by the Plaintiffs.  The defendants in the U.K. Action were dismissed from this action in January 2015.  (*Id.* at 6.)  As of November 13, 2015, the Plaintiffs remained non-committal whether they would sue in the U.K.  (*Id.* at n.10.)  The Defendants received the U.K. filing in mid-December, and it was only then that they were able to file the Forum Non Conveniens Motion.  (*Id.* at 7.)

### 4.     The Applicability of U.K. Law Weighs in Favor of Dismissal

The Defendants recognize that this Court is capable of interpreting and applying U.K. law.  However, the Defendants contend that there is no sound reason for this Court to do so. (*Id.*)  The Defendants further argue that if this action remains pending before this Court, this Court will need to resolve a difficult issue of apparent first impression under U.K. law, *i.e.*,

whether a U.S. court is authorized to grant relief under Section 423 of the U.K. Insolvency Act. (*Id.* at 7–8.)

### 5.     *Dismissal Would Not Unduly Prejudice Plaintiffs*

The Defendants contend that in a multiple defendant case like this one, a court may, upon motion or "on its own," sever claims, pursuant to FED. R. CIV. P. 21, against one or more defendants, and grant a forum dismissal as to other defendants. (*Id.* at 8 (citing to *Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 723 (S.D.N.Y. 2011) (severing claims against one defendant in order "to facilitate a *forum non conveniens* dismissal" as to other defendants) (internal citations omitted)).)

The Defendants argue that, in this case, the absent members of the putative class are "only indirectly connected to the [alleged] manipulations which form the subject matter of [this] action," and the allegations against putative class members are peripheral.  (*Id.* at 9 (citing *Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 618 (2d Cir. 1968)).)  Thus, if the Court concludes that the claims against the putative class are worthy of being preserved in the context of a *forum non conveniens* dismissal of the named Defendants, the Court could *sua sponte* sever the claims against members of the putative class—and then stay the claims pending the U.K. court's decision.  (*Id.*)

The Defendants argue that their agreement that all discovery taken in this action may be used in the U.K. Action disposes of the Plaintiffs' argument that dismissal would prejudice them insofar as they would have to restart discovery.  (*Id.* at 10.)

# III.    DISCUSSION

## A.    Preliminary Issues

### 1.  Law of the Case Doctrine

Courts have discretion to reconsider or modify their interlocutory orders. *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991).  An "interlocutory order," as opposed to a final order, does not completely resolve all of the issues pertaining to a discrete claim.  *See, e.g.*, *Shimer v. Fugazy (In re Fugazy Exp., Inc.)*, 982 F.2d 769, 776 (2d Cir. 1992).  The principle of the law of the case doctrine is essentially that "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Zdanok v. Glidden Co., Durkee Famous Foods Div.,* 327 F.2d 944, 953 (2d Cir.1964).  The discretion to reconsider or modify an interlocutory order is informed by the law of the case doctrine.  *Uccio*, 940 F.2d at 758.  The decision whether or not to apply law of the case is, in turn, informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine.  (*Id.*)

Courts apply the law of the case doctrine "[over] the concern that disregard of an earlier ruling [will] prejudice the party seeking the benefit of the doctrine. In this context, 'prejudice' does not mean harm resulting from the failure to adhere to the prior decision; 'rather, it refers to a lack of sufficiency of notice' or a lack of sufficient 'opportunity to prepare armed with the knowledge that [the prior ruling is not deemed controlling].'" *Id.* (internal citations omitted).  In other words, "the law of the case is a discretionary doctrine that need not be applied when no prejudice results from its omission." *First Nat'l Bank of Hollywood v. Am. Foam Rubber Corp.,* 530 F.2d 450, 453 n.3 (2d Cir. 1976).  The doctrine is "admittedly discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Virgin Atl.*

*Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992); *see also Arizona v.*

*California*, 460 U.S. 605, 618 (1983) (law of case doctrine "does not limit the tribunal's power").

      If the law of the case doctrine applies, "[c]ourt[s] will adhere to prior rulings in a given

case absent cogent or compelling reasons to deviate." *Uccio*, 940 F.2d at 758 (internal

quotations and citations omitted).  The three primary reasons justifying a reconsideration include,

"an intervening change of controlling law, the availability of new evidence, or the need to correct

a clear error or prevent manifest injustice.'" *Virgin Atlantic Airways, Ltd.,* 956 F.2d, at 1255

(quoting 18B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COPPER, ET AL.,

FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed.)).  In general however, issues that were

justifiably not seen at an earlier time, including events or evidence, "may be seen as creating new

issues that have not been decided and thus lie outside the law of the case." WRIGHT § 4478.

      In this case, the Plaintiffs argue that this Court's prior ruling in Hosking III should stand

and the Court should not revisit the first step of the *forum non conveniens* analysis.  While the

Court previously held that the Plaintiffs' choice of forum was entitled to substantial deference,

now there is justification for the Court to reconsider whether the Plaintiffs' choice of forum

merits a substantial degree of deference.  Now, in light of the Plaintiffs' commencement of the

U.K. Action, it is appropriate for the Court to evaluate the deference that should be afforded to

the Plaintiffs' choice of forum.  In Hosking III, this Court declined to decide whether *forum non*

*conveniens* dismissal of DB would be appropriate, deferring such a decision to a later time "if,

for instance, the Plaintiffs commenced a similar action in the U.K. against the Original

Defendants that were dismissed for lack of personal jurisdiction." Hosking III at 593 n.38.

Since the entry of Hosking III, the Plaintiffs have commenced the U.K. Action, fulfilling the

scenario envisioned by the Court.  Accordingly, in light of the changed circumstances—which

the Court previously previewed—the Court, in its discretion, declines to apply the law of the case doctrine in light of the U.K. Action.

2.    *The Purpose of Chapter 15*

It is important to recognize the role of this Court in a chapter 15 case, as a gating issue, before diving into the *forum non conveniens* analysis.  Congress enacted chapter 15 of the Bankruptcy Code in 2005, as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub. L. No. 109–8, 119 Stat. 23), to foster international cooperation and comity, and provide greater certainty and more efficient administration of cross-border cases.  Chapter 15 implemented the Model Law on Cross–Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL").  In interpreting chapter 15, section 1508 requires the Court to "consider its international origin, and the need to promote an application of [the] chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."  11 U.S.C. § 1508.  The House Report contemplates courts looking to the UNCITRAL guide to enactment of the Model Law and the reports cited therein to aid the courts in achieving a uniform interpretation of chapter 15.   H.R. Rep. No. 109–31, pt. 1, 109–10, 2005 U.S.C.C.A.N. 88, 172–73 (the "House Report").  Chapter 15 cases are "generally intended to be supplementary to cases brought in a debtor's home country."  8 COLLIER ON BANKRUPTCY ¶ 1501.01 (15th ed. 2015) (citing to the House Report).)

Chapter 15 contains an express statement of purpose:  "[t]he purpose of [the] chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency," with the express objectives of, among other things, cooperation between "the courts and other competent authorities of foreign countries involved in cross-border insolvency cases."  11 U.S.C. § 1501.  The chapter expressly applies

29

where "*assistance* is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding." *Id.* (emphasis added).

This case is ancillary to the foreign main proceeding pending in the U.K. Here, as demonstrated by the chapter 15 petition for recognition of the foreign proceeding and the verified petition that were contemporaneously filed with the Court, the Plaintiffs sought recognition of the U.K. proceeding as it was "consistent with the goals of international cooperation and *assistance* to foreign courts which is embodied in Chapter 15 of the Bankruptcy Code." (Case No. 12-10631, ECF Doc. # 2 at 12 (emphasis added).) Indeed, the Plaintiffs sought recognition because "the [U.K.] Proceeding, with the *assistance* of this Court, offer[ed] the best means to liquidate the Company's assets and achieve a global, equitable resolution of the Company's liabilities." (*Id.* at 13 (emphasis added).)

In light of the origin and purpose of chapter 15, and as evidenced by the Plaintiffs' original request for recognition, the function of this Court is to provide *assistance* to the U.K. court. Additionally, the Court may also administer assets of the foreign debtor located within the U.S. However, this Court will not supplant the U.K. court on matters properly pending before the U.K. court, particularly when issues of unsettled U.K. law are involved, as is the case here. The U.K. court is in a better position to interpret and apply U.K. law to the complex facts raised by this case—that is certainly true, in the circumstances here, where (i) the U.K. Action is already pending, (ii) the U.K. court recently denied Plaintiffs' motion to stay the U.K. Action even if this case proceeds in this Court (*see* Judgment, dated 19th July 2016 (ECF Doc. # 323-2,

¶¶ 41, 44)), and (iii) all of the named Defendants have consented to jurisdiction in the U.K. court.[17]

## B.    Forum Non Conveniens

The doctrine of *forum non conveniens* "is a discretionary device permitting a court in rare instances to 'dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim.'"  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (citation omitted).  Whether to dismiss an action on *forum non conveniens* grounds is a decision that "'lies wholly within the broad discretion of the [] court' and should be reversed only if 'that discretion has been clearly abused.'"  *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir. 1996) (quoting *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)).

A motion to dismiss on *forum non conveniens* grounds may be made at any time.  14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COPPER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3828 (4th ed. 2016); *cf. Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 742 (S.D.N.Y. 2001) ("[T]he caselaw seems to be clear that *forum non conveniens* motions are not governed by the same time constraints imposed by Rule

---

[17]    In Hosking III, the Defendants argued that the Court should abstain from deciding the U.K. law claims based on international comity.  The Court rejected this argument, concluding that federal law "does not authorize permissive abstention of this Adversary Proceeding." 535 B.R. at 588.  The Court followed the Fifth Circuit's decision in *Firefighters' Ret. Sys. v. Citco Grp. Ltd.* 788 F.3d 425, 431 (5th Cir. 2015), determining that the exclusionary language in the first clause of 28 U.S.C. § 1334(c)(1) ("*Except with respect to a case under chapter 15 of title 11*, nothing in this section prevents a district court . . . , in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." (*emphasis added*)), applies to an adversary proceeding as well as the main case so that a bankruptcy court may not permissibly abstain from hearing an adversary proceeding related to a case under chapter 15.  Hosking III, 535 B.R. at 589.  The Court then separately rejected the Defendants' *forum non conveniens* argument.  *Id.* at 589-93.  No cases have held that the exclusionary language in section 1334(c)(1) precludes consideration of *forum non conveniens*.  The Court concludes that section 1334(c)(1) does not stand as an obstacle to application of *forum non conveniens,* which is analyzed in the next section of this Opinion.  The policies animating chapter 15 support having the U.K. court, where the main insolvency proceeding is pending, resolve the U.K. law issues in this case.

12(h) of the Federal Rules of Civil Procedure on personal jurisdiction and venue motions."

(citations omitted)).  However, in evaluating whether a plaintiff's choice of forum was

convenient, the court may consider the defendant's delay in bringing a motion to dismiss on the

basis of *forum non conveniens*.  *See Genpharm Inc. v. Pliva-Lachema a.s.*, 361 F. Supp. 2d 49,

59 (E.D.N.Y. 2005) (citation omitted).

In the Second Circuit, courts apply a three-step process to determine whether to dismiss

an action for *forum non conveniens*.  *Wilson v. Eckhaus*, 349 F. App'x 649, 650 (2d Cir. 2009)

(noting that the Second Circuit adopted a "three-step inquiry" to analyze *forum non conveniens*

dismissal); *see Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73–74 (2d Cir. 2001) (en banc)

(adopting a three-step process for determining whether *forum non conveniens* dismissal is

appropriate).

- <u>First</u>, the court must "determine[] the degree of deference properly accorded the plaintiff's choice of forum."  *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citing *Iragorri*, 274 F.3d at 73).

- <u>Second</u>, "after determining whether the plaintiff's choice is entitled to more or less deference," the court must determine "whether an adequate alternative forum exists."  *Iragorri*, 274 F.3d at 73; *see Wiwa*, 226 F.3d at 100 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981); *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506–07 (1947)).

- <u>Third</u>, the court must "then balance a series of factors involving the private interests of the parties in maintaining the litigation in the competing fora and any public interests at stake."  *Wiwa*, 226 F.3d at 100 (citing *Gilbert*, 330 U.S. at 508–09).

"The defendant has the burden to establish that an adequate alternative forum exists and

then to show that the pertinent factors 'tilt[] strongly in favor of trial in the foreign forum.'"

*Wiwa*, 226 F.3d at 100 (quoting *R. Maganlal & Co.*, 942 F.2d at 167); *see Iragorri*, 274 F.3d at

74–75 (stating that "[a] defendant does not carry the day simply by showing the existence of an

adequate alternative forum. The action should be dismissed only if the chosen forum is shown to

be genuinely inconvenient and the selected forum significantly preferable.").

### 1.    Degree of Deference to the Plaintiffs' Choice of Forum

A plaintiff's choice of forum is generally entitled to great deference. *Allstate Life Ins.*

*Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (citations omitted); *Gilbert*, 330 U.S.

at 508 ("[U]nless the balance [of the factors] is strongly in favor of the defendant, the plaintiff's

choice of forum should rarely be disturbed."). Where a plaintiff has brought an action in its

home forum, courts give the plaintiff's choice of forum substantial deference "because it is

presumed to be convenient." *Iragorri*, 274 F.3d at 71 (citing *Piper*, 454 U.S. at 255–56). A

foreign plaintiff's choice of the United States as a forum is entitled to <u>less</u> deference because "it

'is much less reasonable' to presume that the choice was made for convenience." *Id.* (quoting

*Piper*, 454 U.S. at 256). "In such circumstances, a plausible likelihood exists that the selection

was made for forum-shopping reasons . . . ." *Id.* Even if forum-shopping reasons did not inform

the foreign plaintiff's decision to file an action in a U.S. court, "there is nonetheless little reason

to assume that it is convenient for a foreign plaintiff." *Id.*

In determining the degree of deference to be afforded to a foreign plaintiff's choice of a

U.S. forum, courts consider various factors to ascertain whether the plaintiff's forum choice was

motivated by convenience or instead by the desire to forum shop. *See Norex*, 416 F.3d at 155

(citing *Iragorri*, 274 F.3d at 72). The following factors are generally considered relevant in

determining whether the plaintiff's choice of forum was motivated by genuine convenience: "[1]

the convenience of the plaintiff's residence in relation to the chosen forum, [2] the availability of

witnesses or evidence to the forum district, [3] the defendant's amenability to suit in the forum

district, [4] the availability of appropriate legal assistance, and [5] other reasons relating to

convenience or expense." *Id.* (quoting *Iragorri*, 274 F.3d at 72). "Circumstances indicative of

forum shopping . . . include '[1] attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, [2] the habitual generosity of juries in the United States or in the forum district, [3] the plaintiff's popularity or the defendant's unpopularity in the region, or [4] the inconvenience and expense to the defendant resulting from litigation in that forum.'" *Id.* (quoting *Iragorri*, 274 F.3d at 72).

In this case, there is little reason to find that the United States is a convenient forum for the foreign Plaintiffs.  <u>First</u>, turning to the Plaintiffs' motives in their choice of forum, it is difficult to argue that Plaintiffs' decision was motivated by genuine convenience, as the United States is not a convenient forum for the Plaintiffs, who reside in the U.K.  In fact, the U.K. is the most convenient forum for the Plaintiffs.  <u>Second</u>, it is arguable that the circumstances in this case may be "indicative of forum shopping." *Id.*  Despite the fact that the Plaintiffs have recognized that "England has the greatest interest in seeing its law applied to the claims alleged in the First Amended Complaint," the Plaintiffs remain steadfast in their pursuit of an action in the United States.[18]  Hosking III at 574.  It is conceivable that the Plaintiffs are fighting to keep this case in the United States because they seek a "tactical advantage resulting from local laws" or they are hopeful of an advantage given the degree of unpredictably associated with an American court's interpretation of U.K. law.  *Norex*, 416 F.3d at 155 (citing *Iragorri*, 274 F.3d at 72.)  Indeed, when this case was initially filed, the Complaint asserted New York law claims exclusively.  Only after the New York law avoidance claims were dismissed did Plaintiffs seek to amend the Complaint to add the U.K. law claims.  If the New York law avoidance claims had survived, the analysis of the *forum non conveniens* motion would be quite different.  In light of

---

[18]     "While this Court *is not necessarily convenient in relation to England*, the Plaintiffs' residence, the Plaintiffs' counsel is located in New York."  *See* Hosking III at 592 (emphasis added).

these factors, and the fact that the Defendants have consented to jurisdiction in the U.K., the

Court gives little deference to the Plaintiffs' chosen forum.  It is evident that the U.K. is the *most*

convenient forum and, as such, the United States is a less convenient forum than the U.K.[19]

### 2.      Existence of an Adequate Alternative Forum

"An alternative forum is ordinarily adequate if the defendants are amenable to service of

process there and the forum permits litigation of the subject matter of the dispute."  *In re*

*Arbitration Between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d

488, 499 (2d Cir. 2002) (citing *Piper*, 454 U.S. at 254 n.22).  A court cannot dismiss an action on

*forum non conveniens* grounds unless it "satisf[ies] itself that the litigation may be conducted

elsewhere against all defendants."  *PT United Can Co. Ltd. v. Crown Cork & Seal Co. Inc.*, 138

F.3d 65, 73 (2d Cir. 1998) (citing *Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 981

(2d Cir. 1993)).  "If there is no adequate alternative forum, the inquiry ends, and the motion to

dismiss is denied."  *Id.* (citing *Piper*, 454 U.S. at 254 n.22).  A defendant's agreement to submit

to the jurisdiction of the foreign forum will generally satisfy the requirement that the defendant

be amenable to process there.  *See DiRienzo v. Phillip Servs. Corp.*, 232 F.3d 49, 57 (2d Cir.

2000), *vacated in part on other grounds*, 294 F.3d 21 (2d Cir. 2002).

### a.      Jurisdiction Over the Named U.S. Defendants

The Defendants have agreed to submit to the jurisdiction of the U.K. court.  Therefore,

the Defendants have established an adequate alternative forum.  *Cf. Rio Tinto PLC v. Vale S.A.*,

Case No. 14 Civ. 3042 (RMB), 2014 WL 7191250, at *13 (S.D.N.Y. Dec. 17, 2014) ("The Court

finds that England is not, in this instance, an adequate alternative forum to New York because, as

---

[19]      As discussed above, the purpose of chapter 15 is advanced by having the U.K. court resolve the U.K. law
issues in this case.  This weighs against giving deference to the Plaintiffs' (Foreign representatives appointed by the
U.K. court) choice of a New York forum for the U.K. law claims.

noted, Defendants . . . , who reside in the United States, may not be amenable to service of process by English courts.").

          b.    <u>The Defendant Class</u>

While Plaintiffs included defendant class allegations in the original complaint and in the First Amended Complaint, they waited until the Defendants filed their Forum Non Conveniens Motion to move for class certification. At this time, the "defendant class" is purely speculative. Moreover, it is unlikely that certification of a defendant class is proper under the facts and circumstances of this case, even if the adversary proceeding were going to be litigated in this Court. Rule 23 requires a class certification motion "at an early practicable time"; this class certification motion was filed two years after the adversary proceeding was filed and it seems intended to throw a roadblock in the way of the Forum Non Conveniens Motion, but it is, at most, a minor speed bump, easily disposed of. Accordingly, the Court concludes that the Class Certification Motion will not affect the result of the Forum Non Conveniens Motion.

Defendant class actions are authorized by the language of Federal Rule of Civil Procedure 23(a), stating "one or more members of a class may sue or be sued." While most class actions involve a class of plaintiffs, Rule 23 does not differentiate on its face between plaintiff and defendant classes. 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COPPER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1770 (3d ed. 2016). For any class to be certified, the four Rule 23(a) requirements—numerosity, commonality, typicality, and adequate representation—must be met, and at least one subsection of Rule 23(b) must be satisfied. While Rule 23(a) expressly authorizes defendant classes, it does not necessarily follow that they are permitted under all three subsections of Rule 23(b). And even if they are permitted, defendant classes are rarely certified. *See* JAMES WAGSTAFFE, PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL (nat'l ed. 2016) Ch. 10-C. While a defendant class could be certified

under Rule 23(b)(3), defendant classes are rarely certified under this subsection because any member of the class can exercise the right to opt out to avoid being bound to an unfavorable judgment under this subsection.  WAGSTAFFE, 10:914.

Because the Forum Non Conveniens Motion is being granted, no "class representatives" remain in this case, making class certification unavailable.  In any event, the stay of this action pending resolution of the U.K. action makes it unnecessary to decide the class certification motion.

### 3.    *The Balancing of Public and Private Factors*

In determining whether the doctrine of *forum non conveniens* should be applied, a court should also consider "factors of public interest" and the "private interest[s] of the litigant."  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).  A balancing of the "private and public interest factors [must] tilt[] heavily in favor of the alternative forum."  *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009); *see also Alfadda v. Fenn*, 159 F.3d 41, 45–46 (2d Cir. 1998).  "The public interest factors include: (1) settling local disputes in a local forum; (2) avoiding the difficulties of applying foreign law; and (3) avoiding the burden on jurors by having them decide cases that have no impact on their community."  *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 454 (S.D.N.Y. 2008) (citations omitted).  "The private interest factors include: (1) the relative ease of access to evidence; (2) the cost to transport witnesses to trial; (3) the availability of compulsory process for unwilling witnesses; and (4) other factors that make the trial more expeditious or less expensive."  *Id.* at 453–54 (citations omitted).

As detailed below, the balancing of the public and private factors weighs in favor of the alternative forum.

37

a.   The Public Factors

i.        Settling Local Disputes in a Local Forum

This case involves events and transactions that implicate various countries across the

world, including the U.K. and the United States.  The December 2006 CPEC Redemption

involved an alleged international transaction through which executives—of British, Italian,

German, and American entities—caused Hellas II, a Luxembourg entity, to raise funds from

investors across the world, and then to distribute those proceeds through wire transfers in the

U.K., Belgium, Luxembourg, and the United States.

While it is evident that, at a minimum, the U.S. has a connection to and an interest in this

dispute, several factors support the conclusion that a local dispute exists in the U.K.  For

example, the First Amended Complaint alleges that (i) the signatories to the Redemption

Agreement were located in England and Italy when it was executed; (ii) the initial transfer was

made between English bank accounts and was principally funded from the proceeds of the Sub

Notes, a substantially greater proportion of which was held by U.K. custodians than by

Luxembourg custodians; and (iii) a substantial number of the actions relating to the December

2006 Transaction were taken by entities and individuals located in countries outside

Luxembourg, including the U.K.  Hosking III at 576.  Moreover, this Court previously held

that—as between New York, Luxembourg and the U.K.—the U.K. had the "greater interest in

having its substantive law govern the Plaintiffs' claims."  *Id.* at 575.  Perhaps most importantly,

the Hellas II compulsory liquidation proceeding is being conducted in the U.K. court.

In summary, given the international nature of the alleged transaction, there is no "local

dispute" to a single jurisdiction in this case.  Rather, this case involves an alleged international

transaction that implicated numerous countries.  As between the U.K. and United States, the

interest in having local disputes settled locally weighs in favor of the U.K and especially given

38

the U.K.'s greater interest in having its substantive law govern the Plaintiffs' claims.

Accordingly, an English court would have an inherent and stronger local interest in the matter

than an American court.

### ii.        Difficulties Applying Foreign Law

One of the factors that courts consider in evaluating dismissal based on *forum non*

*conveniens* is the applicability of foreign law.  In weighing this factor, courts take the numerous

problems associated with the applicability of foreign law into consideration.  *Ocean Shelf*

*Trading Inc. v. Flota Mercante Grancolombiana S.A.*, 638 F. Supp. 249, 253 (S.D.N.Y. 1986).

*Forum non conveniens* dismissal is appropriate in cases where U.K. law is the primary applied,

where English courts have a stronger local interest in the matter than do American courts, and

where key witnesses may only be available in the alternate forum.  *See Pollux Holding Ltd. v.*

*The Chase Manhattan Bank*, 329 F.3d 64, 75–76 (2d Cir. 2003).  However, it is well-established

that "the need to apply foreign law is not alone sufficient to dismiss under the doctrine of *forum*

*non conveniens*."  *R. Maganlal & Co.*, 942 F.2d at 169 (holding that the district court improperly

granted dismissal based on the need to apply Indian law when the primary issue of the case

involved U.S. contract law).

The weight that a court should give to the applicability of foreign law depends on the

facts of the case and the ease of applying foreign law.  *See Rahl v. Bande*, 328 B.R. 387, 405–06

(S.D.N.Y. 2005).  American courts are generally equipped to interpret foreign law without

creating a heavy burden on the judicial process.  *See Nat'l Union Fire Ins. Co. of Pittsburgh v.*

*BP Amoco P.L.C.*, 03 Civ. 0200 (GEL), 2003 WL 21180421, at *10 (S.D.N.Y. May 20, 2003).

"Because federal courts must often apply foreign law, and the means of pleading and proving

foreign law are provided in the Federal Rules of Civil Procedure, interpreting the contracts

according to [foreign] law, and instructing a jury on that law if this case should go to trial, are

not burdens heavy enough to weight the balance of convenience strongly in favor of dismissing

the action." *Id.* The ability of U.S. courts to apply foreign law is especially relevant to U.K. law,

which is generally amenable to interpretation by a U.S. court. *See Gross v. BBC*, 386 F.3d 224,

233–34 (2d Cir. 2004) ("[T]here are few if any countries in the world whose body of law is more

amenable to application in the [U.S.] than Great Britain's. . . . and we do not believe application

of such law creates a burden on the court.").

However, when foreign law remains unsettled and could cause significant difficulty in

interpreting the law, this should be a "powerful factor weighing in favor of dismissal." *LaSala* v.

*UBS, AG*, 510 F. Supp. 2d 213, 233–34 (S.D.N.Y. 2007) (dismissing the case when legal experts

disagreed about critical points in the application of Swiss law in addition to other factors that

weighed in favor of dismissal). Difficult conflicts of law in the application of foreign law is a

significant factor that weighs in favor of dismissal. *See Stewart v. Adidas A.G.*, No. 96 CIV.

6670 (DLC), 1997 WL 218431, at *7 (S.D.N.Y. Apr. 30, 1997). This factor is only strengthened

by a U.S. court's weak interest in adjudicating the claim. *Id.* In *Stewart*, apart from the

difficulty of applying unsettled foreign law, the New York court had "very little interest in

adjudicating [the] claims," and the actions forming the complaint took place largely outside of

the U.S. and involved foreign law. *Id.* When strong problems with interpreting unsettled foreign

law arise and there is a weak connection to the chosen forum, dismissal for *forum non

conveniens* may be appropriate.

In this case—while the application of U.K. law alone is not dispositive of the issue and

while this Court is able to interpret U.K. law—there are strong factors that weigh in favor of

dismissal for *forum non conveniens*. It is preferable to allow the U.K. court to decide a matter of

its own law, especially when the issue would be a matter of first impression. Apart from the

40

difficulty of applying unsettled U.K. law, similar to *Stewart*, this Court has "very little interest in adjudicating [the U.K.] claim," and the actions forming the First Amended Complaint largely took place outside of the United States. *Stewart*, WL 218431, at *7.

### iii. Avoiding the Burden on Jurors by Having Them Decide Cases That Have No Impact on Their Community

When a court has very little interest in adjudicating the claims primarily due to the removed location of events and the applicability of foreign law, this could create an unnecessary burden on jurors. *Id.* In *Stewart*, the court held that it "would be simply unfair to impose the burden of service on a New York jury because of the attenuated contact of New York to the controversy." *Id.* The parties did not address this prong of the analysis. If the Plaintiffs' claims come to trial in the U.K., the trial will be to the court without a jury, despite the expressed desire of Plaintiffs and Defendants for a jury trial if the trial is in the United States.

### b. The Private Factors

### i. Extensive U.S. Discovery

In analyzing a *forum non conveniens* motion, the weight given to the extent of discovery already conducted in the proceedings has not been considered "by the Supreme Court in its jurisprudence because it does not appear to have been present in [the] cases before it." *Lony v. E.I. Du Pont de Nemours & Co.,* 935 F.2d 604, 614 (3d Cir.1991). However, Courts have held that the extent of discovery is a relevant factor that should be considered when assessing a *forum non conveniens* motion. *Alfadda v. Fenn*, 159 F.3d 41, 48 (2d Cir. 1998) (stating that "[a]lthough an issue of first impression in this Court, the Third, Fifth, and Tenth Circuits have concluded that the extent of completed discovery in the American forum is a relevant—but not necessarily dispositive—consideration in assessing convenience."); *see also* 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, ET AL., FED. PRAC. & PROC. JURIS. § 3828,

n.33 (4th ed. 2016) ("When extensive discovery already has occurred in current forum, *forum non conveniens* dismissal is less appropriate.").  Importantly, it is arguable that a party may be "deemed to have waived its right to raise a *forum non conveniens* defense if it has availed itself of rights conferred by the New York courts by, for example, engaging in discovery."  3 Robert L. Haig, N.Y. Prac., Com. Litig. in New York State Courts § 20:4 (4th ed. 2015).

The weight that courts will give to this factor varies based on the facts and circumstances of each case.  In *Bank of Crete v. Koskotas*, the plaintiff, a Greek bank, sued the defendant, a Greek citizen, in New York and the court denied the defendant's motion to dismiss for *forum non conveniens*.  No. 88 Civ. 8412 (KMW), 1991 WL 280714, at *5 (S.D.N.Y. Dec. 20, 1991).  In addition to holding that the defendant failed to establish that Greece was a more convenient forum, the court highlighted the lateness of the motion and extensive discovery that had already occurred.  *Id.*  The court stated that lateness of the motion and extensive discovery "weigh heavily against granting the [*forum non conveniens*] motion."  *Id.* at *6.  Specifically, the court stated that:

> In light of the extensive discovery that had occurred in [the] case . . . the presumption against dismissal [] is very high.  This is particularly true where . . . other issues in the case have been hotly litigated by the parties in oral arguments and hearings, resulting in the court becoming familiar with the parties and the substantive issues in the case . . . . [T]he defendant would have to meet a heavy burden to prevail in [the] forum non conveniens motion.

*Id.* at *5.

In *Alfadda*, the plaintiffs, Saudi investors, sued the defendant, a French bank, in New York and also in France.  *Alfadda*, 159 F.3d at 43–45.  In 1992, the defendants moved for dismissal for *forum non conveniens* in the district court.  *Id.* at 45.  The court denied the motion and the parties conducted significant discovery for three years.  *Id.*  In 1994, the Tribunal Correctionnel in Paris acquitted the defendants, and the Court of Appeals for Paris later affirmed

the acquittal. *Id.* at 44.  Then, in 1996, the defendants again moved to dismiss the case in the

district court on *forum non conveniens*, and this time, court granted the motion. *Id.* at 45.  On

appeal, the Second Circuit affirmed the lower court's ruling, asserting that the public and private

interest factors "weigh heavily in favor of France," and that the extent of discovery and

investment of financial resources, "does not sufficiently tip the scales . . . especially since

plaintiffs are free to use the existing discovery material to whatever extent the French tribunal

will permit." *Id.* at 48.

The extent of discovery was again considered in *Alnwick v. European Micro Holdings*,

29 Fed. Appx. 781, 782 (2d Cir. 2002).  There, the plaintiffs, New York residents, chose to sue

European defendants in New York and the district court granted dismissal for *forum non*

*conveniens. Id.*  On appeal, Second Circuit reversed and remanded, concluding that, "'whenever

discovery in a case has proceeded substantially so that the parties already have invested much of

the time and resources they will expend before trial, the presumption against dismissal on the

grounds of *forum non conveniens* greatly increases.'  Accordingly, the [d]istrict [c]ourt should

inquire as to the current, advanced state of discovery and make appropriate findings with respect

thereto." *Id.* at 783 (quoting *Lony v. E.I. DuPont de Nemours & Co.,* 935 F.2d 604, 614 (3d

Cir.1991)) (motion denied on remand); *accord Bank of Crete, S.A. v. Koskotas,* No. 88 Civ. 8412

(KMW), 1991 WL 280714, at \*5 (S.D.N.Y. Dec. 20, 1991).

Here, the extent of discovery factor should carry little weight.  The Defendants did not

wait for extensive discovery to be conducted before raising the *forum non conveniens* argument.

Rather, the Defendants previously argued that leave to amend the Complaint to assert U.K. law

claims should be denied based on *forum non conveniens*; the Court rejected that argument, and

the parties continued taking discovery that had started when only New York law claims were

asserted in the Complaint.  The Plaintiffs then filed the U.K. Action, and the Defendants moved

to dismiss based on *forum non conveniens*.  To date, this Court has only heard and ruled on

preliminary motions and has yet to hear the issues on their merits.  Similar to *Alfadda*, the

Plaintiffs are also free to use the existing discovery material to whatever extent the U.K. court

will permit.

ii.        **The Delay in Bringing the Forum Non Conveniens
Motion**

While delay in bringing a *forum non conveniens* motion is a factor to be considered in the

Court's evaluation of whether the forum was convenient, there is "no time limit on when a

motion to dismiss on the ground of forum non conveniens can be made."  *See Genpharm Inc. v.

Pliva-Lachema a.s.*, 361 F. Supp. 2d 49, 59 (E.D.N.Y. 2005) (citations omitted); *Breindel &

Ferstendig v. Willis Faber & Dumas Ltd.*, No. 95 CIV. 7905 (SHS), 1996 WL 413727, at *3

(S.D.N.Y. July 24, 1996) (stating that the time constraints established by Fed. R. Civ. P 12(h) are

not applicable to *forum non conveniens* and do not constitute a waiver of the right to move to

dismiss, but would be considered as a factor in evaluating convenience).  Dismissal based on

*forum non conveniens* may be inappropriate, despite a favorable outcome of weighing the private

and public factors, when defendant raises the issue at a late stage in the action and the parties

have engaged in voluminous discovery prior to such move to dismiss on *forum non conveniens*.

*Bank of Crete, S.A.*, 1991 WL 280714, at *4–5.  As such, "[a] doctrine designed for convenience

and the fair treatment of parties should not be available—by dint of strategic timing—to create

an overwhelmingly burdensome shift of venue for a plaintiff in good faith pursuing costly

litigation in a proper forum."  *Id.*

The Plaintiffs argue that the Defendants have implicitly conceded the issue of *forum non

conveniens* by delaying the Forum Non Conveniens Motion "for over 20 months while pursuing

44

discovery . . . in this Court." (Opp'n at 11.) However, this is not a case where the Defendants

unreasonably delayed bringing a *forum non conveniens* motion in order to take advantage of

voluminous discovery. The Plaintiffs initiated the U.K. Action in December 2015 and it was

only at that time that the U.K. became a viable alternative option. The Defendants filed the

Forum Non Conveniens Motion in January 2016. As such, the Defendants moved to dismiss on

*forum non conveniens* promptly after the U.K. became a viable alternative option for this action.

The Defendants also tried to previously argue that the First Amended Complaint would

ultimately be dismissed under the doctrine of *forum non conveniens*. Importantly, although the

Court disagreed with the result at that time, the Court left open the possibility that *dismissal on

forum non conveniens* grounds could be granted later if "Plaintiffs commenced a similar action in

the [U.K.] . . . ." Hosking III at 593 n.38. Accordingly, this factor weighs in favor of dismissal

on *forum non conveniens*.

### iii.        Location of Documents and Witnesses

The location of documents and witnesses is an important factor that courts consider in

determining whether to dismiss an action for *forum non conveniens*. For example, courts take

into consideration the inability to compel critical third-party witnesses to testify in a forum or to

compel the production of documents from third parties. *See Reers v. Deutsche Bahn AG*, 320 F.

Supp. 2d 140, 162 (S.D.N.Y. 2004). In *Fitzgerald v. Texaco*, the court held that the U.K.

presence of key witnesses weighed in favor of dismissal. 521 F.2d 448, 451–52 (2d Cir. 1975).

The court in that case evaluated the fact that it, as an American court, had "no power to subpoena

any of [the U.K.] witnesses." *Id.* at 451. Moreover, the court considered that it was "unlikely

that many [of the foreign witnesses] would be willing to travel to New York to testify" because

"the cost, in any event, would be prohibitively great [and] [t]hose witnesses who reside in

England are subject to the compulsory process of her courts; and the others, if willing to testify,

could do so there at reasonable expense." *Id.* at 451–52. "[T]here is no fixed tipping point at which . . . costs become so great as to warrant dismissal. Instead, the Court should apply a comparative approach that evaluates, on the one hand, the costs that defendant would incur in the present forum, versus the costs plaintiffs would incur in the foreign forum." *Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 767 (S.D.N.Y. 2006) (citing *Iragorri*, 274 F.3d at 74).

The Defendants argue that (i) the majority of the documents that have been produced were collected in the U.K.; (ii) fourteen of the eighteen depositions were conducted in the U.K.; (iii) the majority of the witnesses expected to be called at trial are individuals that reside in the U.K; and (iv) nearly all of the key witnesses reside and/or work in the U.K. (Forum Non Conveniens Mot. at 14–16.) In support of their position, the Defendants consent to the use of fact discovery conducted to date in the U.K. Action. (*Id.*) In response, the Plaintiffs argue that the Defendants have failed to establish that the location of documents and witnesses poses a significant obstacle because (1) the Defendants are sophisticated financial institutions for whom producing documents or witness poses no special inconvenience and (2) it is unclear whether any of the witnesses would be unavailable to testify at trial in the United States. (Opp'n at 12–13.) Given the sophistication of the global institutions involved in the case, this factor is neutral. Moreover, as detailed below, the Defendants have consented to use all reasonable efforts to produce for trial in the U.K. Action those U.S.-resident witnesses who are their current or former employees.

### iv.        Judicial Economy

Numerous courts have found that the "public interest factors often favor dismissal where there is a parallel litigation arising out of the same or similar facts already pending in the foreign jurisdiction." *Argus Media Ltd. v. Tradition Fin. Servs. Inc.*, No. 09 CIV. 7966 (HB), 2009 WL

5125113, at *6 (S.D.N.Y. Dec. 29, 2009).  In this case, it is evident that it would be inefficient

and wasteful for two trials—involving the same claims, involving the same Plaintiffs, regarding

the same transaction and evidence—to go forward.

## IV.       CONCLUSION

Applying the Second Circuit's three-part test, the Court concludes that (1) the Plaintiffs'

choice of forum should be given little, if any, deference because this case involves foreign

Plaintiffs and the United States is clearly an inconvenient forum; (2) the U.K. is an adequate

alternative forum as it pertains to the named U.S.-Defendants and the named defendant class is

not relevant; and (3) the balancing of the private and public factors weighs in favor of dismissal.

A local dispute does not appear to exist in this case.  This Court should avoid interpreting and

applying U.K. law when a U.K. court can do so in the U.K. Action, which challenges the same

transaction and has the same defendants.  The Defendants have agreed that U.S.-discovery may

be used in the U.K. Action.  But the decision whether or how the U.S.-discovery may be used in

the U.K. Action is, of course, subject the control of the U.K. court, just as it would be subject to

evidence rules and court procedures if the action proceeded in this Court.  There is a strong

interest in avoiding parallel trials and possibly conflicting decisions if the two pending cases,

involving the same facts and legal issues, proceed to judgment in the two different courts.

At the Hearing, the Court requested that the Defendants agree that granting the Forum

Non Conveniens Motion would be subject to certain conditions.  On July 18, 2016, Plaintiffs'

counsel filed a letter with the Court (ECF Doc. # 314) enumerating certain conditions that they

believed should be required of the Defendants.  On July 19, 2016, the Defendants filed a

response to the Plaintiffs' conditions (the "Defendants' Letter," ECF Doc. # 316).  The following

conditions represent the "Conditions" that are mandated by this Court, as a prerequisite to the

stay of this action. By the Defendants' Letter and verbal responses of Defendants' counsel at the

Hearing, the Defendants have agreed to all of the Conditions set forth herein:

1.  All Defendants must agree to consent to the jurisdiction of the U.K. court;

2.  All Defendants must agree to accept service of process through their counsel and
    waive any objections to the manner or validity of service of process;

3.  Only with respect to the specific claims that are currently asserted against each
    Defendant in this adversary proceeding, each Defendant must agree to waive and
    not assert any statute of limitations defense(s) not already ripe as of the date each
    defendant was named as a defendant in this adversary proceeding;

4.  All Defendants and their affiliates in the U.K. Action must agree that, subject to
    the practice and procedures of the U.K. court, they will not object to the use in the
    U.K. Action of all discovery produced in the adversary proceeding, *i.e.*, (a) all
    factual discovery, notwithstanding the Confidential Agreement or otherwise, and
    (b) all expert reports and discovery;

5.  All Defendants and their affiliates in the U.K. Action must agree to waive and not
    assert any challenges and/or defenses relating to the absence from the U.K. Action
    of the putative Transferee Class members; and

6.  All Defendant and their affiliates in the U.K. Action must agree to use all
    reasonable efforts to produce for any trial in the U.K. Action those U.S.-resident
    witnesses who are their current or former employees.

For the foregoing reasons, the Forum Non Conveniens Motion is **GRANTED**. The

adversary proceeding is **STAYED** on the conditions set forth above.

Plaintiffs' counsel shall file a written status report with the Court within 14 days after the

Defendants have become respondents in the U.K. Action (or, in separate proceedings, if the U.K.

court requires). (*See* Judgment, dated 19th July 2016 (ECF Doc. # 323-2, at ¶ 49) ("That raises

the prospect of a significant number of additional respondents to these proceedings or . . . of

separate proceedings, but ones which would ideally in terms of orderly case management be

directed to be heard at the same time as the present proceedings.").) The status report should

address Defendants compliance with the Conditions set forth above.

**IT IS SO ORDERED.**

Dated:    August 22, 2016
          New York, New York

_Martin Glenn_

MARTIN GLENN
United States Bankruptcy Judge